Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION


------------------------------------
                                   :
ISABEL ENNIS REYNOSO, SALLY PAYAN   :
and ENRIQUE ROBERTO PAYAN,          :
                                   :
        Plaintiffs,                 :
                                   :
    vs.                             :CIVIL ACTION NO.
                                   :  B-03-120
FORD MOTOR COMPANY and AUTOMOTRIZ   :
DEL NORESTE, S.A. DE C.V.,          :
                                   :
        Defendants.                 :
                                   :
------------------------------------



        Deposition of:  RONALD L. HUSTON, Ph.D., P.E.

        Taken:          By the Defendants
                        Pursuant to Notice

        Date:           March 15, 2005

        Time:           Commencing at 9:10 a.m.

        Place:          Marriott Cincinnati Airport
                        2395 Progress Drive
                        Hebron, Kentucky  41048


        Before:         Kimberly L. Wilson, CSR
                        Notary Public - State of Ohio

Page 6

1    with us today?

2         A.    No.  No, the only thing that would be like

3    that is, you know, I sent a bill and some

4    correspondence so I suppose there would be records of

5    that on a computer, but there's no technical computer

6    work.

7         Q.    No simulations or --

8         A.    Exactly.  There's nothing like that.

9         Q.    And you've also brought your testimony

10   list; is that right?

11        A.    Yes.

12             (Defendants' Exhibit 2 was marked for

13             identification.)

14        Q.    Let me just take care of some housekeeping

15   things.  We'll mark what's here in your file so that

16   we can refer to it if we need to as we move along

17   here.  I've marked as Exhibit No. 2 what was produced

18   to me as your report related to this case; is that

19   correct?

20        A.    Yes, it is.

21        Q.    Okay.  Is that report correct, to the best

22   of your knowledge?  Are there any errors or anything

23   about it you'd like to change now before we get

24   started with this deposition?

25        A.    Yes.  I never cease to be amazed at how

Page 7

1    errors creep into documents, even after you review

2    them.  On page 5 -- do you -- oh, you have a copy?

3         Q.   I have a copy.

4         A.   Okay.  On page 5, item No. 3.

5         Q.   Yes.

6         A.   It says that she was 167 centimeters

7    stature and in English she was 5'7 3/4".  That's an

8    error.  That actually is 5'5 3/4".  So if you make

9    that conversion --

10         Q.   Hence my question --

11         A.   Right.  As far as I know that's all that

12   needs to be changed.

13         Q.   So that was -- you calculated 167

14   centimeters to be 5'5 3/4", not 5'7 3/4"?

15         A.   Yes.  That's what I'm saying.

16         Q.   Okay.  And before I even get there, there

17   was a surrogate study done, correct?

18         A.   Yes.

19         Q.   What was the size of your surrogate that

20   you used in your surrogate study?

21         A.   I'm speaking only from memory.  It's

22   written on a page.  I believe it's about 5'4".

23         Q.   I guess let me ask the question a

24   different way.  Did you discover this error in Mrs.

25   Payan's height before or after you did your surrogate

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1    study?

2        A.    Oh, I didn't discover this typo until last

3    evening when Mr. Martinez asked me about it.  In my

4    analysis I had used 5'5 3/4", which you will see.

5    And somehow this is a typo.  The surrogate study was

6    done after I prepared this report.

7        Q.    Okay.

8        A.    There is a discrepancy in the medical

9    records apparently about her height and weight.  I

10   believe -- well, I believe probably the 5'6" is

11   probably closer than 5'4" for her stature.

12       Q.    Based on what?

13       A.    Well, the medical records seem to -- they

14   both say -- one says 5'4" and the other one says 167.

15   The one that says 5'4" is an emergency medical record

16   and it's probably unlikely that they would have

17   measured her when she's incapacitated like that and

18   so they probably used a driver's license or

19   somebody -- something else, whereas the 167 looks

20   like something they may have measured.  It appears to

21   me to be more accurate, but I'm obviously not the one

22   that took the measurements.

23       Q.    To your knowledge, was Mrs. Payan

24   conscious when she was brought to the emergency room?

25       A.    Oh, I don't know.  I don't know the answer

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 9

1    to that.

2         Q.    So it's possible they may have asked her

3    how tall she was?

4         A.    Sure, that's right.  That's exactly right.

5    That could have happened.

6         Q.    And her driver's license does say she's

7    5'4", doesn't it?

8         A.    Yes, that could be.  And that's -- that's

9    why -- sometimes those things are accurate and

10   sometimes they're not.

11        Q.    Just so I'm clear, there were several

12   discrepancies in Mrs. Payan's records concerning what

13   her actual height and weight was at the time of the

14   accident?

15        A.    That's right.

16        Q.    Did you inquire of Mr. Martinez what Mrs.

17   Payan's height and weight were either through her

18   family or any other means?

19        A.    Yes.

20        Q.    And what did he tell you?

21        A.    5'6".

22        Q.    Which is the 5'5 3/4"?

23        A.    Right.

24        Q.    And what about the weight?

25        A.    I don't have that.  I don't remember that.

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1      Q.   And do you know where Mr. Martinez

2  acquired that information that Mrs. Payan was closer

3  to 5'6"?

4      A.   Well, I understand he -- like you said, he

5  contacted the family on my behalf.

6      Q.   Okay.  Anything else, other than the

7  typographical error in item No. 3, that's incorrect

8  in your report?

9      A.   Well, that's all that I'm aware of.

10      Q.   Thank you.

11      MS. SAMBERG:  I'm sorry?

12      MR. MARTINEZ:  For the record, I, of

13  course, knew Mrs. Payan personally so I -- I

14  vaguely remember it had to be somewhere between

15  5'4" and 5'6".  I couldn't tell you.

16      MS. SAMBERG:  Okay.  Thank you.  Well, I'm

17  glad we all noticed the same thing anyway.

18      MR. MARTINEZ:  Right, a little too tall.

19      (Defendants' Exhibit 3 was marked for

20      identification.)

21  BY MS. SAMBERG:

22      Q.   Let me go through the rest of this

23  material.  I've marked as Exhibit No. 3 what you

24  produced to us as your vehicle inspection

25  photographs.  Can you confirm for me that that's what

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 15

1   are not two separate billings, but the 9,000 includes

2   the 7,000.

3        Q.   Okay.  Less the $2,500 retainer, so the

4   total is roughly 11-, $12,000 that you billed?

5        A.   Well, I believe that was incorporated into

6   the first one.  Right.  So the $2,500 -- what is

7   owed -- what is owed to me now is the 9,850 --

8   9,850 -- aside from what has yet to be billed.

9        Q.   What arrangements have you made with Mr.

10  Martinez to be paid for that?

11       A.   Oh, we haven't even talked about it.

12            (Defendants' Exhibit 9 was marked for

13            identification.)

14       Q.   And then I've marked as Exhibit No. 9 a

15  compilation of what appear to be your file notes; is

16  that correct?

17       A.   Yes.  This is -- right.  This is what

18  might be called my work product in this case.  It's

19  even got a coffee stain on it.

20            MR. MARTINEZ:  What exhibit number is

21            that?

22            MS. SAMBERG:  Nine.

23  BY MS. SAMBERG:

24       Q.   So you've got some notes reviewing the

25  police report, medical records, vehicle inspection,

Page 16

1    review of the defendants' expert reports and then it
2    appears to be a handwritten version of your report in
3    this case?
4          A.    Yes, that's right.
5          Q.    For what purpose did you hand write the
6    report?
7          A.    Well, I wrote the report and then I gave
8    it to a typist to type.
9          Q.    I see.
10          A.    And I don't know.  I just brought it in
11    there.  I've often been asked in depositions is this
12    the only copy?  Where is the original at?  How do I
13    know -- so there's been no revisions.
14          Q.    Did you speak to any of the other experts
15    retained by the plaintiffs in this case before you
16    prepared your report?
17          A.    No, I don't believe that I had.
18          Q.    When was the surrogate study conducted by
19    Mr. Rosenbluth?
20          A.    May I look at Exhibit 9?
21          Q.    You bet.
22          A.    I think I can probably be a little more
23    responsive.  That was done on November 29th of last
24    year, 2004.
25          Q.    And your report was authored on June 30th,

Ace Reporting Services    (513) 241-3200
30 Garfield Place, Suite 620    Cincinnati, Ohio  45202

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1    2004?

2         A.   Right.

3         Q.   So the results of Mr. Rosenbluth's

4    surrogate testing could not have formed the basis of

5    your opinions as expressed in your report because it

6    had not yet been completed?

7         A.   Right.   That's right.

8         Q.   Did you speak to Mr. Irwin, who's been

9    retained by the plaintiffs as an accident

10   reconstructionist in this case?

11        A.   No, I have not.

12        Q.   And I don't even see a copy of Mr. Irwin

13   or Mr. Rosenbluth's reports in your file.  Have you

14   reviewed either one of those things?

15        A.   No, I have not seen them.

16        Q.   Next -- and I'm not going to mark these,

17   but there is a copy in your file of Kevan Granat's

18   report, Don Tandy's report, Ed Paddock's report,

19   Michelle Vogler's report and Bob Piziali's report.

20        A.   Yes.

21        Q.   And you've reviewed all of those?

22        A.   Yes.

23        Q.   Then we have about a six-inch stack of

24   medical records -- four-inch stack of medical

25   records?

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1      A.    No.  It looks like about two.

2      Q.    Okay.  Apparently I don't have very

3  good -- it's three of my fingers -- how's that --

4  stack of medical records.  Are these all of the

5  medical records you've been provided and reviewed

6  related to this matter?

7      A.    Right.  I have no others.

8      Q.    And you've got flags in various locations.

9  What's the significance of the flags?

10     A.    Oh, in some case there isn't any

11  significance.  When I'm reviewing the records, if

12  there's something that looks like it might be

13  important, I'll underline it and maybe put a flag on

14  it so that I can find it quickly such as a stature

15  measurement or something like that or some

16  description of injuries.

17            (Defendants' Exhibit 10 was marked for

18             identification.)

19     Q.    I'm just going to mark this whole set as

20  10, how's that?  And then I have again a three-finger

21  stack of what appears to be literature --

22     A.    That's what it is.

23     Q.    -- for lack of a better characterization?

24     A.    Well, not quite.

25     Q.    I apologize.  Let me start over.

1      A.    I'm sorry.  I had forgotten that was

2  there.

3      Q.    I have a one-inch stack of literature.

4  And for what purpose is this literature in your file,

5  sir?

6      A.    The only purpose is because the subpoena

7  wanted me to bring all articles and so on that might

8  be related to the work that I did and so I brought

9  them.

10      Q.    Okay.  And these are the papers that you

11  are relying on in support of your opinions in this

12  case?

13      A.    Yes.

14      Q.    One of the things the subpoena also asked

15  you to bring were any articles that you may have

16  authored that have particular bearing on the issues

17  in this case.  Are those included in this stack?

18      A.    No.  I don't think there are any of my

19  articles in there.

20      Q.    Have you written any articles that have

21  any particular bearing on the issues in this case?

22      A.    Well, I haven't written any articles that

23  are case specific.  I've written a number of books

24  and papers over the years which relate to accident

25  reconstruction, biomechanics and general principles,

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 20

1    but -- but they aren't case specific.

2        Q.   I understand.  I wouldn't have expected

3    you to use this accident necessarily as a case study

4    for a paper, but have you written any papers or

5    authored any articles which relate to the mechanism

6    of injury sustained by Mrs. Reynoso --

7            MR. MARTINEZ:  Payan.

8    BY MS. SAMBERG:

9        Q.   -- Payan in this case and/or related to

10   the kinematics of the occupant such as her in this

11   case?

12       A.   No, I don't believe they're that specific.

13       Q.   Have you written any articles related to

14   the concept of torso augmentation?  You're familiar

15   with that, aren't you, sir?

16       A.   No.  Tell me the name --

17       Q.   Torso augmentation.  Diving injuries.

18       A.   Oh, no.  I had not heard that expression

19   before.  I understand what you're saying.

20       Q.   Have you written --

21       A.   No.

22       Q.   -- any papers either --

23       A.   No, I have not.

24       Q.   -- in favor of it or supporting it or not

25   supporting it?

Page 21

1      A.    Right.   No, I have not.

2      Q.    There's a paper here by Robert Eichler,

3   E-i-c-h-l-e-r, called The Causes of Injury in

4   Rollover Accidents.  Can you tell me for what purpose

5   you rely on this paper, please?

6      A.    Well, this simply talks about injury

7   mechanism.  It's just sort of a general summary

8   article.  I didn't particularly rely on it, but I

9   thought I might bring it along since it seems to

10  relate to the issues that are involved.

11     Q.    Okay.  There's an SAE paper 900127 Field

12  Testing and Computer Simulation Analysis and Ground

13  Vehicle Dynamic Stability.  For what purpose have you

14  relied on that publication, sir?

15     A.    Oh, this -- this publication simply talks

16  about stability of vehicles like this one.  I'm not

17  planning to do or have not done the accident

18  reconstruction in this matter.  However, when I was

19  meeting with Mr. Martinez, he said -- he'd asked me

20  some questions about stability and I said, well, as

21  I've read the defense experts' reports, it seemed to

22  be clear to me that there would be a stability issue

23  for the vehicle in that it has a very low static

24  stability factor and so this is just a paper that

25  talks about that.

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1    Q.   We have SAE paper 950655, Determination of

2    the Significance of Roof Crush on Head and Neck

3    Injury to Passenger Vehicle Occupants in Rollover

4    Crashes by Rains, R-a-i-n-s, and a name I cannot

5    pronounce.  For what name -- for what purpose is that

6    paper in your file?

7    A.   That's the same thing as the Syson paper.

8    It -- it relates the head and neck injury to -- to

9    the extent of roof crush.

10   Q.   And it takes the position that the head

11   and neck injury is caused by the intruding roof as

12   opposed to diving?

13   A.   Yes.

14   Q.   And you also have Mr. Friedman's,

15   F-r-i-e-d-m-a-n, SAE paper 980210.  Same thing with

16   this paper?

17   A.   It is, yes.  That's the same thing.

18   Q.   And it essentially stands for the same

19   proposition?

20   A.   Yes.

21   Q.   There's an SAE paper 890859 by Bratten,

22   B-r-a-t-t-e-n, Development of a Tumble Number for use

23   in Accident Reconstruction?

24   A.   Yes.

25   Q.   For what purpose is that paper in your

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 26

1    file?

2        A.    Oh, well, the only purpose for that paper

3    is to indicate that there's some statistical evidence

4    that during a rollover accident the drag factor's

5    about .4 to .5.

6        Q.    But since you're not doing the accident

7    reconstruction in this case, that's essentially

8    irrelevant to your opinions?

9        A.    Yes.   I haven't seen the reconstruction

10   that's going to be made.   All I know is from what

11   I've read in the Tandy report and so I used that to

12   make a few simple calculations in case the issue of

13   the centrifugal force would come up of Ms. Payan

14   being thrown out the window and being injured by

15   striking her head on the pavement as opposed to the

16   roof.

17       Q.    So --

18       A.    That's all -- that wasn't a very clear

19   answer.   I apologize for that.

20       Q.    But essentially you got a drag factor --

21       A.    That's all that is.   That's -- the only

22   purpose of that paper is to have a drag factor for a

23   simple -- very simple calculation that I made.

24       Q.    And I thought I heard you say you had not

25   seen the accident reconstruction -- any accident

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1  reconstruction as of the time that you authored your

2  report; is that correct?

3          A.    Oh, yes, that's true.  I had not.

4          Q.    We have an article by Dr. Moffatt,

5  M-o-f-f-a-t-t, The Relationship Between Vehicle Roof

6  Strength and Occupant Injury in Rollover Crash Data.

7  For what purpose is that article in your file?

8          A.    Well, that's the same thing that supports

9  the idea that the roof crush is related to the head

10  and neck injuries.

11          Q.    Does Dr. Moffatt support the same position

12  as M. Syson and Mr. Friedman?

13          A.    Well, yeah.  He says he doesn't and yet

14  the data that he quotes does, in fact, support it and

15  then in his conclusions, of course, he admits that

16  that's the case.  In his abstract, if you read the

17  abstract, you wouldn't have that impression, but if

18  you read the paper, it is, in fact, a confirmation of

19  the others.

20          Q.    So while you know that Dr. Moffatt

21  believes that neck loading occurs prior to any roof

22  crush because that's his stated position --

23          A.    I don't know what he believes, but this is

24  what -- what is in the paper I think is pretty clear.

25          Q.    Okay.  So your interpretation of Dr.

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 33

1   causation mechanism for Ms. Reynoso.

2        Q.   When did you do a vehicle inspection?

3        A.   On June the 17th of 2004.

4        Q.   Was anybody with you at your vehicle

5   inspection?

6        A.   No, although there were some people in and

7   out.  Mr. Martinez's assistant Monica Polanco was in

8   the room.  She didn't help me with the inspection.

9   And then Mr. Martinez came by and we talked for a

10   little while, but for the most part I was alone.

11        Q.   Have you inspected any other Ford

12   Explorers exemplar vehicles for your work in this

13   case?

14        A.   No.  We did look at a buck in the

15   surrogate test, but no other vehicles.

16        Q.   Prior to the preparation of your report,

17   did you read any depositions of any individuals that

18   may have been taken in this case?

19        A.   No.

20        Q.   Have you to date read any depositions of

21   any individuals that may have been taken in this

22   case?

23        A.   No.  I have no depositions in this matter.

24        Q.   Did you review any documents that were

25   produced by Ford Motor Company?

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1    A.    No, I don't believe that I have.

2    Q.    Now, you told me you didn't have Mr.

3    Irwin's report or even speak to Mr. Irwin prior to

4    the preparation of your report on June 30th, 2004; is

5    that correct?

6    A.    Yes, that's right.

7    Q.    Have you spoken to Mr. Irwin to date?

8    A.    Not about this matter.

9    Q.    Okay.  And I understand you went to Mr.

10   Rosenbluth's facility in Arizona to conduct the

11   surrogate study; is that correct?

12   A.    Yes.

13   Q.    Did you speak to Mr. Rosenbluth prior to

14   the preparation of your June 30th, 2004 report

15   related to this case?

16   A.    Yeah, I understand.  No, I don't believe

17   that I did.

18   Q.    And you understand that Mr. Jacobson has

19   also been hired as an expert in this case?

20   A.    Yes.

21   Q.    Did you speak to Dr. Jacobson prior to the

22   preparation of your report in this case?

23   A.    No.

24   Q.    Have you spoken to Dr. Jacobson at any

25   time related to this case?

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 35

1    A.    No.

2    Q.    Before I forget, have you done any work

3  related to the biomechanics or kinematics of the

4  passenger Sally Payan?

5    A.    No.

6    Q.    Are you prepared to give me all your

7  opinions today, Dr. Huston?

8    A.    I believe so.  I feel a little

9  disadvantaged in that I learned last evening that I

10  am the first of the experts to be deposed and I'm

11  therefore not sure what others may say.  And so not

12  knowing what they may say that may stimulate that

13  I'll want to enhance or change my opinions, but aside

14  from that I have no plans to do any further work.  I

15  have no plans to do anything and I don't expect or

16  anticipate that my opinions will change and to that

17  extent they'll be final.

18    Q.    So as you sit here today, you're prepared

19  to give me all the opinions that you've formulated up

20  until this point, correct?

21    A.    Yes.  Yes, I can do that.

22    Q.    And you may have some additional comment

23  related to the opinions expressed by others as the

24  depositions progress?

25    A.    Yes, of course.

Page 36

1    Q.    And you've been asked to address
2  biomechanics and injury -- I'm sorry.  Strike that --
3  biomechanics and occupant kinematics as it relates to
4  the driver -- is it Betty --
5           MR. MARTINEZ:  Betty.
6  BY MS. SAMBERG:
7    Q.    -- Payan; is that correct?
8    A.    Betty Payan, yes.  The occupant kinematics
9  and the movement and the injury forces.
10   Q.    And I think we've already covered this.
11 You're not doing accident reconstruction in this
12 case, right?
13   A.    Yes, I am not.
14   Q.    Okay.  You have done accident
15 reconstruction in the past, right?
16   A.    Oh, yes.  I still do that.
17   Q.    But you've not been retained to do so in
18 this case?
19   A.    That's correct.
20   Q.    Are you going to be offering any opinions
21 at the time of trial that the Explorer that was
22 involved in this accident or any of its components
23 was defective?
24   A.    I don't believe so.  I do have some
25 opinions about that obviously, but that isn't

Page 38

1    testimony about that?

2        A.    As far as I know I'm not, that's correct.

3        Q.    Warnings or marketing?

4        A.    Right, I'm not doing that.

5        Q.    How about human factors?

6        A.    No, I don't believe so.

7        Q.    Statistics?

8        A.    No.

9        Q.    Summarize, if you would, for me your

10   opinions as they relate to the biomechanics and

11   kinematics of Betty Payan in this accident.

12       A.    Well, my opinions are really very simple

13   and perhaps of all the experts my opinions will be

14   the simplest.  It's my opinion that during this

15   rollover incident that she was the driver of the

16   vehicle, that it -- the vehicle rolled over passenger

17   side leading, that the -- that at the time of the

18   accident she was wearing her seat belt, that during

19   the accident sequence the roof on her side was

20   collapsed, that the roof came into contact with her

21   head and caused a compression subluxation injury

22   that's reported in the medical records.

23          And that's -- well, that's -- yes, that's

24   all, but let me amend that just a little bit more.

25   It's my opinion based upon also the surrogate study

1    that I did after the preparation of the report that

2    if in this instance the roof had not come down that

3    she would not have experienced the injuries that she

4    did and that depending upon the nature of the

5    restraint system, she would have been kept out of

6    harm to varying degrees.

7        Q.   Are you going to be offering any opinions

8    on reasonable alternative designs for the seat belt

9    system in the Explorer?

10       A.   No, I'm not going to do that.

11       Q.   All right.  We know a surrogate study was

12   performed at Mr. Rosenbluth's facility; is that

13   correct?

14       A.   Yes.

15       Q.   And I'm sorry, tell me the date again of

16   the surrogate study.

17       A.   Well, I've forgot it.  I think it was

18   November the 29th.  Let me look to be sure.  Yes, it

19   was November the 29th of last year.

20       Q.   Did you do a spit test?

21       A.   No.  No, this was not a spit test.  Well,

22   it was a -- it was a spit, but it was not a dynamic

23   test.  That is to say we put a surrogate in the

24   vehicle, took some measurements and then rolled it

25   over so that it was at 180 degrees and to that extent

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 40

1    it was a spit test, but it wasn't a dynamic test.

2         Q.    The size and weight of your surrogate?

3         A.    The surrogate was 5'4" -- 5'4" and weighed

4    132 pounds.

5         Q.    Did you take measurements with her seated

6    height?

7         A.    Yes.  Her seated height was -- I measured

8    to be 33 1/2 inches.

9         Q.    And how about the distance between her

10   buttocks and her knees and knees to the base of the

11   floor, did you take those measurements as well?

12        A.    Yes, but I don't have them recorded.

13   They'll be in the Rosenbluth report.

14        Q.    Okay.  Do you understand that Mr.

15   Rosenbluth did a report related to his surrogate

16   study -- or to the surrogate study that was

17   conducted?

18        A.    Well, let me -- maybe I spoke too soon.

19   What I understand is that a variety -- an extensive

20   variety of measurements were taken at the Rosenbluth

21   facility and Mr. Rosenbluth's practice is to put them

22   into a report folder with various photographs, in

23   which case there will be numerous measurements.  I

24   didn't record all of the measurements that were

25   taken.  I simply recorded those which seemed to be

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 41

1    pertinent from my perspective.

2              MS. SAMBERG:  Off the record for a second.

3              (Off the record.)

4              MS. SAMBERG:  Back on the record.

5    BY MS. SAMBERG:

6         Q.    Did you take a measurement of the position

7    of the seat?

8         A.    That would be in the Rosenbluth data as

9    well.

10        Q.    Did you measure the position of the seat

11   at the time of your vehicle inspection?

12        A.    I don't believe that I did, but let me --

13   let me see if I have that.  Well, I do have some

14   information about that so the answer to the question

15   is, yes, I do have some data.

16        Q.    And what data do you have?

17        A.    Well, what I have is that the distance

18   from the -- what I call the bite -- and what I mean

19   by that is the intersection between the back rest and

20   the seat bottom -- that distance to the pedal of the

21   vehicle -- like the brake pedal -- is 37 3/4 inches.

22   The distance from the -- or the closest distance from

23   the seat bottom to the dash -- the under dash is

24   eight inches.  The distance from the vertical

25   through the bite to the center of the steering wheel

Page 42

1    is 17 1/2 inches.

2        Q.    Do you have any information about whether

3    the position of the seat was moved at any time after

4    the accident?

5        A.    No, I don't know the answer to that.

6        Q.    Did you take any measurements during the

7    surrogate study of headroom with the non-deformed

8    roof?

9        A.    Yes, that was what I did and I found that

10   measurement or that distance to be 5 1/2 inches.

11       Q.    Did you measure the vertical roof

12   deformation in the accident vehicle?

13       A.    Yes.  Well, let me tell you what I did.  I

14   measured the distance -- the vertical distance from

15   the bite to the roof in the accident vehicle.  I

16   found that to be 28 1/2 inches.  In contrast, the

17   similar measurement in the buck, or the exemplar, was

18   38 inches so that then the deformation would have

19   been approximately 9 1/2 inches in the static

20   condition.

21       Q.    Did you also attempt to determine any

22   lateral intrusion or deformation?

23       A.    No, I did not.

24       Q.    Explain to me what you did with your

25   surrogate.  You put her in the vehicle?

1    A.   Yes, put the surrogate in -- well, before

2   putting her in the vehicle, we took some -- the

3   height and weight measurements and then took some

4   measurements of the vehicle.  Put the surrogate in

5   the vehicle, measured the headroom and then told the

6   surrogate to buckle up in the usual way, which she

7   did.  And then we rotated the buck with the surrogate

8   in the vehicle and took some measurements while the

9   surrogate was upside down.

10    Q.   Was the geometry of the restraint that was

11   used in your surrogate test the same as the geometry

12   of the strength that was used in the accident

13   vehicle?

14    A.   Yes and no.  The objective in the first

15   test was to make it the same and then we did three

16   other tests where we made it different.

17    Q.   Okay.  Explain to me what you did.  Let's

18   talk about the first test.

19    A.   Okay.

20    Q.   What were the findings in your first test?

21    A.   In the first test, whenever the vehicle

22   was rolled over, the headroom decreased from 5 1/2

23   inches to two inches and also the buttocks of the

24   surrogate came off the seat approximately two inches.

25    Q.   Was the retractor locked at that point?

1    A.    Yes.

2    Q.    How much excursion was there before the

3    retractor locked?  How much belt spooled out, if any?

4    A.    I don't know the answer to that.  This was

5    a very slow moving test so that the retractor would

6    have locked whenever the vehicle was turned at about

7    30 degrees and -- or 35 degrees so that there would

8    probably have been very little, if any, spool out.

9    Q.    So did I hear you say the headroom was

10   decreased by a half inch to two inches?

11   A.    Oh, no.  I miss -- no, I didn't say that.

12   The headroom originally is 5 1/2 inches and then

13   after the roll it was only two inches between the

14   head and the roof --

15   Q.    So the --

16   A.    -- so that the decrease was 3 1/2 inches.

17   Q.    Okay.  You've done several of these static

18   spit tests before, haven't you?

19   A.    Yes.

20   Q.    Isn't it typical to see about two to four

21   inches movement towards the roof when inverted?

22   A.    Yeah, that's exactly what we got.

23   Q.    Okay.  So this was right in that range

24   that you've seen many, many times before?

25   A.    Yes.  No surprise.  Nothing particularly

Page 45

1    unusual or remarkable.

2        Q.    And that's typical for all vehicles with

3    three-point restraint systems consistent with the

4    results you've seen?

5        A.    Yeah.  As far as -- yeah, and I've done a

6    number of these.  They're all -- they're all pretty

7    similar.

8        Q.    At what point did the surrogate's buttocks

9    come off the seat?  How many degrees?

10       A.    I don't know the answer to that.  I didn't

11   observe that.

12       Q.    But her buttocks was off the seat when she

13   was fully inverted to 180 degrees, right?

14       A.    Yes, that's right.

15       Q.    And you said she came off the seat

16   approximately two inches?

17       A.    Correct.

18       Q.    You said you didn't add any dynamic

19   component to this test, right?

20       A.    Right.

21       Q.    Would you agree that by adding a dynamic

22   component, you'd expect that the occupant's going to

23   move closer to the roof?

24       A.    Sure.

25       Q.    How much closer, based on your experience?

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 46

1   A.   Well, it would depend upon the -- how much

2   the dynamic component is.  That would be accident

3   specific.

4   Q.   But that would be true with any restraint

5   system if you added a dynamic component, you would

6   expect the occupant would move closer to the roof?

7   A.   Oh, sure.  Of course.

8   Q.   All right.  Tell me about the -- so that's

9   the first test that you ran, right?

10   A.   Yes, it is.

11   Q.   Tell me about the next one.

12   A.   Well, we did three others and many more

13   details will be provided in the Rosenbluth data, but

14   what I have is that we then used an integrated seat

15   belt system and the headroom then was reduced only to

16   two and three-quarter inches upon rolling.

17   Q.   So it went from -- let me make sure I've

18   got this right -- from 5 1/2 to two and

19   three-quarters?

20   A.   Yes.

21   Q.   So help me with my subtraction here.

22   A.   Well, that would be two and a quarter.

23   Q.   So --

24   A.   No, excuse me.  Two and three-quarters.

25   Q.   So still within that two to four range we

Page 47

1   were talking about?

2        A.    Yes, that's right.

3        Q.    And then you fully -- when she was fully

4   inverted with the integrated seat belt, did the

5   surrogate's buttocks come off the seat?

6        A.    Yes, but I don't have that measurement.  I

7   don't know what that was.

8        Q.    And do you know at what point as she was

9   being rotated her buttocks came off the seat?

10       A.    No.

11       Q.    Do you recall whether that was a

12  measurement that Dr. -- I'm sorry -- that Mr.

13  Rosenbluth was taking?

14       A.    Yes, it was.

15       Q.    So --

16       A.    He always takes all of those measurements.

17       Q.    Okay.  How much -- well, strike that.  All

18  right.  Your third test was what?

19       A.    The third test was one where we had an

20  integrated seat belt and a pretensioner -- or a

21  simulated pretensioner.

22       Q.    Tell me how you simulated the pretension.

23       A.    Well, the way that was done was to take

24  two to three inches of slack out of the webbing and

25  lock the retractor before rolling so that the -- from

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1   the surrogate's perspective, the surrogate's sitting

2   in the seat, but relatively tight seat belt.

3        Q.    Why did you decide on two to three inches

4   of slack?

5        A.    Well, that's a compromise that Mr.

6   Rosenbluth has arrived at.

7        Q.    Not a decision that you made.  I should

8   ask Jerry?

9        A.    Right.  Yes, that's correct.

10       Q.    Okay.  What happened when you used the

11  integrated seat belt and simulated pretensioner?

12       A.    Well, then, whenever we rolled the -- the

13  person over the, headroom was 3 1/2 inches, so that

14  then the loss of headroom would have been

15  approximately two inches.

16       Q.    So still within that two to four range

17  that you're commonly seeing, correct?

18       A.    Yes, it is.

19       Q.    And, again, did the surrogate's buttocks

20  come off the seat when she was fully inverted using

21  the integrated seat belt with the simulated

22  pretensioner?

23       A.    I don't remember if that's the case or

24  not.

25       Q.    What was the fourth test that you did?

1    A.    The fourth test was one where we
2  introduced slack into the seat belt before it locked
3  up.
4    Q.    So let me go back.  You used the original
5  equipment seat belt, correct?
6    A.    Yes.
7    Q.    And then you introduced some slack before
8  allowing the retractor to lock?
9    A.    Yes.
10    Q.    How much slack?
11    A.    Three inches.
12    Q.    And whose decision was it to use three
13  inches?
14    A.    Mr. Rosenbluth.
15    Q.    Okay.  Was there some simulation attempt
16  being made to do this three inch of slack?  What was
17  the purpose of running that test?
18    A.    Well, there the purpose was to see what
19  the headroom would be with the slack during the
20  rollover and that was discovered to be three quarters
21  of an inch.
22    Q.    Do you have any reason to believe that
23  there was any slack in Mrs. Payan's belt at the time
24  of the accident?
25    A.    I have no opinion about that.  I don't

Page 50

1    know the answer to that.  There again, Mr. Rosenbluth

2    will have inspected the belts and looked at the

3    lockup marks and would be able to answer that.

4         Q.   And what were the results of that test

5    again?  I'm sorry.

6         A.   Oh, I'm sorry.  Yeah, there the headroom

7    was reduced to three quarters of an inch.

8         Q.   So if it was reduced to three quarters of

9    an inch and it started at 5 1/2, you had about what,

10   four --

11        A.   Four and three-quarter inch of headroom

12   was consumed.

13        Q.   Okay.  Just slightly above the two to four

14   range we've been talking about --

15        A.   Right.

16        Q.   -- that's commonly found in all vehicles?

17        A.   Yes, that's right.

18        Q.   What conclusions do you draw from the

19   surrogate testing that was conducted?

20        A.   Well, the conclusions that I made were

21   that with a restraint system that keeps the occupant

22   away from the roof, and without the roof of course

23   coming toward the occupant, that then the significant

24   loading which was experienced in this accident would

25   have been avoided.

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1      Q.   Can you say to a reasonable degree of

2  scientific certainty that had this vehicle been

3  equipped with the integrated seat belt, all other

4  things remaining the same, that Mrs. Payan would not

5  have received a paralyzing neck injury in this

6  accident?

7      A.   No, I don't believe so.

8      Q.   No, you can't say that?

9      A.   That's correct.  I believe that -- that in

10 this accident she still would have received these

11 injuries.

12     Q.   Okay.  Let me ask a different question.

13 Can you say to a reasonable degree of scientific

14 certainty that had this vehicle been equipped with

15 pretensioners that Mrs. Payan would not have suffered

16 a paralyzing neck injury in this accident?

17     A.   No, I can't say that.  I don't know if it

18 would have been as bad as it was, and there's some

19 qualitative words there like paralyzing.  But, no, it

20 appears to me from the measurements that I have in

21 this surrogate testing that even with the better seat

22 belt system, there was still a significant amount of

23 roof damage which would have come into her occupant

24 space.

25          MS. SAMBERG:  Let's take a quick break.

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 52

1          (A recess was taken from 10:16 to 10:30.)

2          MS. SAMBERG:  We're back on the record.

3    BY MS. SAMBERG:

4          Q.   Is it fair to say that in order to address

5    the issue of mechanism of injury, you have to have an

6    understanding of the reconstruction of the accident?

7          A.   Yes.

8          Q.   And I think we've established you've not

9    attempted to independently reconstruct the accident;

10   is that correct?

11         A.   That's right.

12         Q.   When and how did you get information on

13   the accident reconstruction for use in your report?

14         A.   What I did was when I inspected the

15   vehicle, I could -- I had -- I was able to observe on

16   the vehicle that it had rolled over approximately

17   three times or two and a half times.  And I also then

18   had information from the police report so that

19   whereas I did not know what the specific speeds were,

20   I did have a general understanding of the accident

21   sequence and the -- and the -- what kind of accident

22   it was, the number of rolls that it did.

23         Q.   And you included in your report all of the

24   information you found to be pertinent to your

25   biomechanical analysis, is that correct, in terms of

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 53

1    the accident reconstruction?

2        A.   I think that's probably right.  Let me see

3    what I did say on that.  Yes, I think -- I believe

4    that I did.  I believe that I did.

5        Q.   Tell me your understanding of how the

6    accident occurred.

7        A.   All right.  This was on -- it occurred in

8    Mexico in the evening.  It was about 8:00, wet

9    roadway.  It was on January 11th, 2003, single

10   vehicle rollover accident.  It was a 2000 Ford

11   Explorer.  The operator was Betty Payan.  Right front

12   passenger was Sally Payan.  And that the -- for some

13   unknown cause the vehicle went out of control so that

14   the -- presumably from water on the roadway, but when

15   the vehicle went out of control, it began to roll

16   along the roadway and across the roadway with the

17   passenger side leading.  It rolled over two and a

18   half times, which means it came to rest upside down

19   on its roof.

20       Q.   Could it have been as many as three and a

21   half times?

22       A.   Well, I didn't see evidence of three and a

23   half times, but I suppose that's possible.  I believe

24   one of the defendants -- Mr. --

25       Q.   Granat?

Page 54

1    A.   Yes -- suggested that it might have been
2   more than two and a half.  He said at least two and a
3   half.  So it could have been more.  I don't know the
4   speed of the vehicle at the time of the rollover, but
5   assuming that it was going at highway speed or speed
6   limit, which was 110 kilometers per hour, it would
7   have then been going a little over 65 miles per
8   hour -- about 68 miles per hour at the time of the
9   roll and then it would have rolled or moved nearly a
10  little over 300 feet.
11   Q.   And essentially the information that
12  you've provided me came from the translated version
13  of the accident report?
14   A.   Yes, that's right.
15   Q.   Are you aware or did you read in that
16  accident report that the investigating officer
17  believed that Mrs. Payan may have been exceeding the
18  speed limit or at least for the conditions as they
19  existed at that time?
20   A.   Yeah, I did -- that's right.  I read that.
21  I believed that he said that she was going too fast
22  for conditions.  I didn't know or understand that he
23  thought she was breaking the speed limit.
24   Q.   Okay.  Are there any assumptions that
25  you're relying on concerning the reconstruction of

1   this accident if proved untrue would change any

2   aspect of your biomechanical or kinematic analysis?

3        A.   Okay.  Well, I guess, of course, depends

4   upon what they are.  If one would say that it really

5   wasn't a rollover or that something else happened --

6   I mean, nothing that I can think of that would be

7   reasonable.  Well, let me continue --

8        Q.   Sure.

9        A.   -- as I think about that a little bit

10  more.

11       Q.   It's a good question, isn't it?

12       A.   It's an interesting question.  It is an

13  interesting question because it's really open ended,

14  but the kinds of things that can change are these --

15  my experience in these matters is that experts will

16  disagree upon the speed of the accident.  The defense

17  experts often think it's faster than the plaintiffs'

18  experts so that the speed could vary somewhat.  I

19  don't believe that within reasonable limits that will

20  affect my opinions whatever the speed is.  In

21  terms -- that's the only thing I think that there

22  might be some issue about.

23       Q.   Okay.  And you don't know what Mr. Irwin

24  believed the speed to be because you haven't even

25  seen his accident reconstruction; is that fair?

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1     A.   That's exactly right, I don't know.

2     Q.   And you reviewed Mr. Granat's

3 reconstruction, right?

4     A.   Well, he didn't say either.  He simply

5 said what the speed limit was.  He didn't say what

6 the speed before the accident was.

7     Q.   Well, essentially he concluded, as you

8 did, that she was probably traveling at highway

9 speeds, correct?

10    A.   That's what he said, yes.

11    Q.   So in this particular case you can't say

12 that there was any disagreement between the experts

13 as to the speed of the vehicle since you don't know

14 what Mr. Irwin's speed is and Mr. Granat didn't

15 really come to any specific conclusion, right?

16    A.   Exactly.  I was simply saying that in the

17 past there's often some disagreement.  See, what

18 stimulated all this is suppose something changes and

19 I'm just speculating on how it might change.

20    Q.   So you don't know what the pre-trip speed

21 was, correct?

22    A.   I do not, that's correct.

23    Q.   Do you know whether this was an on-road

24 trip or an off-road trip?

25    A.   Well, from my reading of the police

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1    report, it's my belief it was an on-road.

2        Q.    Based on what's in the police report?

3        A.    Well, simply that it was on the highway

4    and that the highway was wet.

5        Q.    Okay.  Do you believe that the vehicle

6    left its wheels while traveling on the paved portion

7    of the highway or the vehicle actually left its

8    wheels after leaving the paved portion of the

9    highway?  That's my question.

10       A.    Yes, I understand the question.  It was my

11   belief from reading the -- or impression from reading

12   the accident report that this occurred on the

13   highway.  I could be mistaken about that.  I didn't

14   explore that in any great detail.

15       Q.    Do you have any information about pre-trip

16   steering or breaking input?

17       A.    No.

18       Q.    And I take it you don't have any

19   information about yaw rates, yaw angles, side slip

20   angles, any of those types of things?

21       A.    Right, I don't know any of that.  I mean,

22   I have no information about that and I have no

23   opinion about it and I haven't attempted to find any

24   of that out.

25       Q.    And given highway speeds of let's just say

Page 58

1    roughly 65 miles an hour, it would be reasonable,

2    based on your reconstruction experience, for a

3    vehicle to have rolled as many as three and a half

4    times, right?

5         A.   Yes.

6         Q.   We know it's a half because the vehicle

7    ends up on its roof, correct?

8         A.   Yes.

9         Q.   So you think it's at least two and a half

10   and it could be as many as three and a half?

11        A.   Well, that's what Mr. -- help me.

12        Q.   Granat.

13        A.   -- Granat said, yes.  And I can't disagree

14   with that.  I haven't explored it.  What I do know

15   from my -- from what I saw is that there were

16   scratches at least in three directions on the roof

17   which would give at least two and a half.

18        Q.   Right.  With respect to your work, is it

19   true that the portion of the accident that's really

20   important to you is the time when the vehicle leaves

21   its tires until the time it comes to rest?

22        A.   Yes.

23        Q.   So the steering maneuvers and the braking

24   maneuvers that occurred prior to the time the vehicle

25   leaves its wheels is not really important to your

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1  opinions today, right?

2      A.    Yes, that's correct.

3      Q.    What is your understanding, if any, of

4  what portion of the vehicle first impacted the ground

5  during this rollover sequence?

6      A.    Well, there again, I didn't reconstruct

7  the accident, but what I would believe would have

8  happened was that the first impact with the ground

9  after the wheels -- or after it begins to roll over

10 would be on the driver's side roof corner.

11     Q.    Okay.  And what is the basis for that

12 belief?

13     A.    Well, that's simply my experience.  If it

14 begins to roll passenger side leading, it generally

15 skips over the passenger side and comes down hard on

16 the -- on the driver's side.  That is, you take a

17 diagonal from the tripped wheels to the opposite

18 corner.

19     Q.    So having not reconstructed the accident

20 in this case, you can say that based on your

21 experience you believe that that's what may have

22 happened, but you can't say that is what happened in

23 this instance?

24     A.    Yes, that's right.

25     Q.    And if I was to ask the same question with

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1  respect to the second roll and if there was a third

2  roll, would your answer be the same?

3       A.   Well, as the vehicle begins to roll, it

4  loses energy obviously from the impacts and so more

5  and more of the vehicle comes into contact with the

6  road surface as it rolls.

7            In the very first roll, it is spinning in

8  such a way that it tends to skip over part of the

9  roadway so that the -- the heavy impacts come on the

10 driver's side, but less and less so as the vehicle

11 slows down simply because it has less energy and

12 therefore less impact force.

13      Q.   Is it fair to say that you cannot tell me

14 the specifics of the dynamics of the rollover

15 sequence in this accident?

16      A.   Oh, sure.  I didn't make that

17 reconstruction.

18      Q.   And so you can't tell me, for instance,

19 what the roll angle was at any point during the roll

20 sequence, can you?

21      A.   Right.

22      Q.   Okay.  You can't tell me what precise area

23 of the vehicle came in contact with the ground at any

24 point during the rollover, can you, and when that

25 happened?

1    A.   Oh, yeah, when.  There certainly is

2  physical evidence that the vehicle came into

3  contact --

4    Q.   Sure.

5    A.   -- with the ground and to say that I don't

6  know wouldn't be --

7    Q.   But you can't --

8    A.   -- truthful.

9    Q.   But you can't tell me when the damage that

10  occurred that's visible on the vehicle happened

11  during this roll sequence; is that correct?

12    A.   Sure.  It would vary, but I should say

13  that the most significant impact probably would not

14  have been on the first roll, but probably on the

15  second roll.  There again, the reconstructionist will

16  be able to provide more details on that.

17    Q.   How much -- strike that.  Do you believe

18  that there were three separate impacts on the

19  driver's side roof rail in this accident?

20    A.   Yes, I believe that would be the case.

21    Q.   There was at least three?

22    A.   Yes.

23    Q.   Okay.  And if we assume three -- could be

24  more, but let's assume three impacts on the driver's

25  side roof rail --

Page 62

1    A.    Okay.

2    Q.    -- which of those three were the most

3    significant?

4    A.    I would predict that the second of the

5    three would be the most significant and that that's

6    what the reconstruction will show.

7    Q.    How much roof deformation was there on the

8    driver's side roof pillars after the first impact?

9    A.    I don't know.

10    Q.    How much deformation was there to the

11    driver's side roof pillars after the second impact?

12    A.    I don't know that either.  Although there,

13    if I am correct that that would be the most

14    significant impact, then the deformation would be in

15    the order of ten inches.

16    Q.    Okay.  But you're making an assumption

17    there?

18    A.    Right, I am.  I'm assuming that that's the

19    most significant impact.

20    Q.    And you're assuming -- well, you found

21    there to be approximately nine inches in vertical

22    roof deformation, correct?

23    A.    That's right.

24    Q.    And you believe that all of that roof

25    deformation occurred during the section impact?

Page 63

1    A.   No.  No, it would have -- some of it would
2  have occurred in the first and some in the third, but
3  the heavy impact would have contributed the most.
4    Q.   Okay.  But you can't tell me how much roof
5  deformation there was in the first roll, the second
6  roll or the third roll; is that correct?
7    A.   That's exactly right.
8    MR. MARTINEZ:  That's assuming there were
9    three rolls?
10    MS. SAMBERG:  Correct.
11  BY MS. SAMBERG:
12    Q.   I think we assume even at two and a half
13  rolls, there would have been three impacts on the
14  driver's side roof rail?
15    A.   Yes, there are at least three impacts to
16  the roof.
17    MS. SAMBERG:  Let me make sure I ask that
18    so it's clear.
19    MR. MARTINEZ:  Okay.
20  BY MS. SAMBERG:
21    Q.   You cannot tell me, can you, sir, how much
22  roof deformation occurred during any of the impacts
23  that may have occurred on the driver's side roof rail
24  or pillars; is that correct?
25    A.   Yes, that's correct.

Page 64

1    Q.    Do you know when the driver's side window
2    broke in this accident sequence?
3    A.    No.
4    Q.    When, during this accident sequence, do
5    you believe Mrs. Payan's head came in contact with
6    the roof?
7    A.    Well, during the significant -- during the
8    significant roof deformation.  Based upon what I had
9    told you earlier, it would be my belief that that
10   would have been during the second impact is most
11   likely the time that that would have occurred.
12   Q.    Okay.  And you can't tell me how much
13   deformation there was to the roof on the second roll,
14   but you believe that's when her head came in contact
15   with the roof, however much it was?
16   A.    Yes.  And that would be where the majority
17   of the ten inches or more would have occurred.
18   Q.    Based on your experience, but not based on
19   any testing or any information that has been gleaned
20   specifically from this case; is that correct?
21   A.    Well, no, that's not entirely correct
22   because it is based upon the number of rolls that I
23   believe that occurred and the measurements that I
24   took, but it isn't based upon actual knowledge of the
25   deformation of the specific rolls, and that latter is

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 65

1    simply based upon my experience that the higher

2    energy impact would have occurred probably on the

3    second roll in this kind of a sequence.

4        Q.   Can you say -- strike that.  We know,

5    based on your measurement, that you believe the roof

6    deformed vertically about 9 1/2 inches, is that

7    correct, on the driver's side?

8        A.   Yeah.  I believe it's probably more than

9    that.  That's what I measured.  There would be

10   probably a little bit of spring back so that

11   dynamically it would have been a little bit more.

12   How much more?  I don't know.

13       Q.   You're reading my mind.

14       A.   Okay.

15       Q.   That was my next question is how much did

16   the roof deform dynamically?

17       A.   Just a rule of thumb would be 10 to 15

18   percent more.  Some people believe it's higher than

19   that.  I don't think it would be.

20       Q.    But you do agree that the roof

21   deformation that did occur was cumulative over the

22   course of several rolls, however many there were?

23       A.   Yes, I do.

24       Q.   To your knowledge, was there any

25   post-accident roof deformation?

1    A.   Oh, well, now, that's a good question.  I

2  don't know the answer to that.  Often in handling of

3  the vehicle deformation occurs and certainly whenever

4  they're trying to right the vehicle and move it

5  around, it would be difficult to do that without

6  doing some damage to the vehicle.

7    Q.   Are you aware that the tow truck driver

8  dragged this vehicle off the road by attaching a

9  chain and dragging it on its roof?

10    A.   No, I wasn't aware of that.

11    Q.   Did you do any formal scratch pattern

12  analysis?  You said you sort of glanced at the

13  scratches and determined there were at least two

14  sets.  Did you do any formal scratch pattern

15  analysis?

16    A.   No, I didn't do anything.  I didn't

17  attempt to draw any conclusions from the scratch

18  patterns.

19    Q.   Except to confirm that there was at least

20  two and a half rolls?

21    A.   Yes, that's right.

22    Q.   Let's talk about your vehicle inspection

23  for a few minutes.

24    A.   Okay.

25    Q.   Let me give you a copy of your

1   photographs.  And hopefully I have a Sharpie pen in

2   my briefcase.

3              MS. SAMBERG:  Can we go off for one

4        second?

5              (Off the record.)

6   BY MS. SAMBERG:

7        Q.   Did you find any witness marks on the

8   interior of the vehicle during your inspection?

9        A.   Well, I'm -- yes, I did and I

10  was expecting you were going to ask me about that.

11  What I found that I thought was significant was a

12  witness mark in the roof on the inside pretty much

13  above the driver's seat.  In my vehicle inspection

14  notes, I -- I tried to document its position pretty

15  clearly as to where it is.

16       Q.   Tell me what you wrote.

17       A.   Okay.  What I have is there's a mark on

18  the roof which is sort of like a -- if I can describe

19  it to you:  the fabric is deformed or rubbed,

20  scrubbed down.  It's about five inches in diameter.

21  The center of that circle is approximately 11 inches

22  inboard of the driver's side roof and four inches in

23  front of the front of the driver's side B pillar.

24       Q.   Okay.

25       A.   So that would -- can you picture that?

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1    you reviewed?

2         A.    No.

3         Q.    Did you make any assumption concerning

4    Mrs. Payan's hip width for purposes of your analysis?

5         A.    No, I did not.

6         Q.    Did you make any assumption concerning

7    Mrs. Payan's shoulder width for your analysis?

8         A.    No.

9         Q.    What assumption did you make concerning

10   her seated height and based on what?

11        A.    Okay.  Let me take a moment here.  Okay.

12   I just wanted to get this exhibit out of my way so I

13   can look at that.  I have her height -- her seated

14   height to be approximately 34 and three-quarter

15   inches.  I obtained that simply by using NASA

16   anthropometric data, of which I brought a copy and

17   made some calculations, which are simply linear

18   interpolation calculations.

19        Q.    Was that consistent -- strike that.  Was

20   the seated height that you extrapolated consistent

21   with the seated height of the surrogate in the buck

22   when you did your testing?

23        A.    Well, the seated height that I calculated

24   would be a little bit higher -- or excuse me --

25   greater than the seated height of the surrogate by

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 82

1    approximately an inch.

2         Q.    Because she was an inch shorter?

3         A.    Yes.  Well, the surrogate was actually a

4    couple of inches shorter, but then in the seated

5    height, it was an inch shorter.  That is, the stature

6    was two inches and the seated height would have been

7    about one inch.

8         Q.    Let me go back to something we were

9    talking about a minute ago because I forgot to ask

10   you this:  Did you look at the traveler bar onto the

11   front seat when you were doing your inspection?

12        A.    I'm not sure what --

13        Q.    The seat track, the traveler bar.

14        A.    No, I did not inspect that.

15        Q.    Do you have any evidence one way or the

16   other about how Mrs. Payan was wearing her seat belt

17   at the time of the accident?

18        A.    No.

19        Q.    Can you say how far along -- or how far

20   from the anchor the latch plate was along the webbing

21   at the beginning of the accident?

22        A.    No.

23        Q.    Can you say how far from the anchor the D

24   ring was along the webbing at the beginning of the

25   accident?

Page 83

1      A.    No.

2      Q.    Can you say whether there was any slack in

3   the belt before the accident occurred?

4      A.    No.

5      Q.    Can you say whether there was any slack

6   introduced into the restraint system during the

7   accident sequence?

8      A.    No.

9      Q.    Was there any evidence of spool out or

10  improper performance of the restraint system as it

11  relates to the retractor?

12     A.    Not that I know of.  There may be evidence

13  to that, but I don't know -- I don't know the answer

14  to that.

15     Q.    Let's talk about Mrs. Payan's kinematics,

16  okay?

17     A.    Uh-huh.

18     Q.    What injuries did Mrs. Payan suffer in

19  this accident?  And --

20     A.    Let me switch here to different notes.

21  Are you ready?

22     Q.    Yes.

23     A.    Okay.  It's my belief that the most

24  significant injury that she had was a paralysis from

25  a spinal cord injury.  That in turn was due to a

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 85

1    A.    No, I don't know.

2    Q.    -- where the location of that was on her

3    head?

4    A.    No, I don't know.

5    Q.    Okay.

6    A.    No, I don't know.  I don't have that.  I

7    think that's all that I have that's significant.

8    Q.    All right.  Let's talk about her cervical

9    injury.  She had a C6-7 cervical subluxation; is that

10   right?

11   A.    Yes.

12   Q.    In your report you mentioned bilateral

13   jumped, j-u-m-p-e-d, facets of C6-7.  What does that

14   mean?

15   A.    Well, the -- let me tell you what I think

16   that means.  I got that out of the medical records,

17   but what I understand that to mean is that the

18   vertebrae, of course, sit one on top of another and

19   in the cervical spine they're numbered from top down

20   and there are seven of them, so that this would be

21   the bottom cervical vertebrae and the one on top of

22   it.  The sixth one then would have been moved forward

23   onto the seventh one so much that the facets which

24   come out of the back would have -- the facets of six

25   would have come forward on the facets of seven and

1  locked themselves onto those facets so that after

2  it's over, they don't go back.  In other words, it's

3  not only deformed forward, but it's deformed and

4  stuck in that region.

5      Q.   Okay.  Describe Mrs. Payan's kinematics

6  during this rollover accident.

7      A.   Well, I don't have a precise description

8  of the accident itself having not seen the accident

9  reconstruction report, but -- and so then therefore I

10 can't give you a precise description of her

11 kinematics, but I can tell you what I believe has

12 happened and what I believe will prove to be the case

13 after the review of the reconstruction report.

14      In the initial movement, as it's a

15 passenger side leading rollover -- and I believe that

16 there won't be any issue about that.  That will

17 probably be agreed upon by the reconstructionists.

18 That being the case, then the driver's side of the

19 vehicle will have been lifted upwards.  So if we're

20 behind the vehicle and we're looking -- like if we're

21 in the back seat and we're looking forward, it will

22 be rotating clockwise.  Ms. Payan then, by laws of

23 inertia, would have initially felt -- or come down in

24 the seat, that is the seat would have gone up so that

25 she would have gone down toward the seat bottom.

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1    As the vehicle is spinning and rotating as

2  it moves, let's say through its first roll, and it

3  becomes upside down and it begins to strike on the

4  roof rail of the driver's side, she would have then

5  began -- would have come off of the seat and moved

6  toward the point of impact, which from her

7  perspective -- again, if we were an observer in the

8  back, she would have been moving upward and to the

9  left.  Although, in actuality, during the accident

10 she's moving down towards the -- towards the ground.

11    And then as the vehicle continues to spin,

12 the rotation rate would tend to thrust her upward and

13 outboard, probably staying in that position, but

14 restrained simply by the seat belt.

15    And then I believe that during the second

16 impact is whenever her head would have come into

17 contact with the roof, not because she goes upward so

18 far, but rather instead because the roof comes down

19 and strikes her -- strikes her head.

20    Q.   And, again --

21    A.   I tended to talk too long on that.  I'm

22 sorry.

23    Q.   That's okay.  And, again, this is your

24 belief based on your experience, but not based on any

25 analysis of this specific crash; is that correct?

1        A.    Yes, that's right.  I'm making an

2   assumption as to what the reconstruction will show.

3   I'm assuming that it will show that this was a

4   barrel-type roll encompassing two and a half rolls or

5   perhaps three and a half rolls and that it was a

6   passenger side leading.  That was my assumption from

7   the beginning and then after reading one of the

8   reports, that seems to be consistent with what others

9   will say.

10       Q.    Again, it's your belief that her head

11  comes in contact with the roof during the time that

12  the second -- during the time of the second roll or

13  the second contact of the driver's side roof rail

14  with the ground?

15       A.    Yes.

16       Q.    Can you say whether her head is in contact

17  with any other part of the interior before the roof

18  rail hits the ground?

19       A.    No.

20       Q.    During the first roll when the roof rail

21  is in contact with the ground, can you tell me where

22  her head is relative to the roof in that first roll

23  when the vehicle's inverted?

24       A.    Well, during that first roll when I

25  believe the roof deformation would have been

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1  relatively small compared to that of the second roll,

2  during that impact she would have been moving toward

3  the roof.  She would have been in what might be

4  called the diving mode toward the roof.

5        Q.   But you can't say what her head -- what

6  the position of her head would have been relative to

7  the roof because you don't know how much roof crush

8  there was during that first --

9        A.   That's true.

10       Q.   -- contact with the ground, right?

11       A.   Yes, that's right.

12       Q.   Do you know when during this roll sequence

13  the retractor on the seat belt locked?

14       A.   No, but if it worked properly -- and I

15  have no reason to believe that it wasn't working

16  properly.  Mr. Rosenbluth may have some opinions upon

17  that -- but assuming that there was no late lockup --

18  I don't know that, but assuming that there was no

19  late lockup, it should have locked at 35 degrees or

20  less of roll angle.

21       Q.   At what force or acceleration do you

22  believe Mrs. Payan made contact with the roof during

23  the second roll?

24       A.   I don't have -- I don't know the answer to

25  that.

8d9ef21d-02ea-4bff-900f-8216e058d4c4

Page 90

1    Q.   Okay.  What was the duration of her
2    contact with -- strike that.  What was the duration
3    of the contact of Mrs. Payan's head to the roof?
4    A.   I don't know that either.
5    Q.   Can you tell me the direction of the force
6    that was being applied to Mrs. Payan at the time her
7    head made contact with the roof?
8    A.   Not precisely, but it would have been one
9    which led to compression flexion, which would have,
10   been from her perspective, downward and forward.
11   Q.   Can you tell me the amount of that force
12   in any direction?
13   A.   No.
14   Q.   Can you tell me the relative velocity
15   between her head and the vehicle that's required to
16   produce the type of compression injury Mrs. Payan
17   suffered?
18   A.   Oh, let me think about that.  I can't be
19   precise, but I can tell you what I know.
20   Q.   Okay.  Tell me what you know.  Well, I
21   want to know what you think is the case here, so if
22   that's --
23   A.   Right.  Okay.  Well, the reason I can't be
24   precise -- there's several reasons I can't be
25   precise.  First of all, it's individual dependent and

1  What I have is that her seated height is

2  approximately 34 1/2 inches and the vehicle -- or

3  that distance where she would have been seated to the

4  roof is compressed to about 29 inches, so it's just a

5  subtraction of those two numbers.

6      Q.   Are you saying that Mrs. Payan's body was

7  compressed by five inches or just that the seat was

8  compressed by five inches?

9      A.   Yeah, her seat -- her sitting height

10  would -- that is the distance would have been

11  compressed by about five inches.

12      Q.   Not her body?

13      A.   Not necessarily, that's right.

14      Q.   Okay.

15      A.   That's right.  Sure.  Sure, of course,

16  that would follow.

17      Q.   Do you have an opinion about whether Mrs.

18  Payan's head or any part of her body for that matter

19  gets outside the plane of the window at any point

20  during this rollover accident?

21      A.   Yes.

22      Q.   What's your opinion?

23      A.   I don't believe that it did.

24      Q.   The basis for that?

25      A.   Well, the basis for that is -- there's

Page 97

1  several.  One is it seems to me that during the most

2  violent part of the accident from her perspective, as

3  we've talked about this second impact, is whenever

4  she comes into contact with the roof.  I believe that

5  the -- the headliner mark is a clear witness mark

6  that her head was in contact with the roof.

7         Secondly, it's my belief that she was

8  wearing her seat belt, that -- and if the seat belt

9  was working properly, that should have restrained her

10 and kept her inside of the -- of the vehicle.

11        Third, according to the brief analysis

12 that I did on the roll rate, the average roll rate

13 was such that the angular velocity was only about on

14 average two radiants per second so that the G

15 loading -- or the loading going outboard would --

16 would be roughly a half a G, which would not be

17 enough to overcome the restraint provided by the seat

18 belt system.

19        And then although this is only indirect

20 evidence, there's no -- nothing that I found in the

21 medical records which would suggest any head impact

22 with a surface outside of the vehicle such as on the

23 roadway.  Now, admittedly one can have his or her

24 head go outside the vehicle without impacting

25 something, but that's just -- well, that -- that's

Page 109

1   seen that.

2       Q.   Okay.  So fair to say the excursion that

3   you've seen in your own testing from the seat is

4   between roughly two and five inches in the vehicles

5   that you've tested; is that fair?

6       A.   Well, we had talked earlier between two

7   and four.  I don't know that I've seen five.

8       Q.   Okay.

9       A.   Now, these are, of course, static tests.

10  They're not dynamic.

11      Q.   Okay.  Are you aware of any restraint

12  system in any vehicle manufactured now or back in

13  2000 that eliminates occupant excursion?

14      A.   Oh, no, I'm not.  Mr. Rosenbluth probably

15  is, but I'm not aware of that.

16      Q.   Are you critical of Ford's use of an ELR

17  retractor in this vehicle?

18      A.   No.

19      Q.   Again, while you have an opinion

20  concerning whether this vehicle should have had a

21  pretensioner, we're not going to hear those opinions

22  at the time of trial, right?

23      A.   I suspect -- yes, I don't expect --

24      Q.   From you?

25      A.   Yes, that's right.

Page 110

1      Q.    If Mrs. Reynoso were inverted in a vehicle

2   statistically, 180 degrees, in the OEM seat belt

3   without any roof deformation, would her head ever be

4   in contact with the undeformed roof?

5      A.    I wouldn't expect so.

6      Q.    How about dynamically?

7      A.    Oh, possibly, sure.  Uh-huh, that's

8   possible.

9          MS. SAMBERG:  Off the record for a second.

10         (Off the record.)

11         MS. SAMBERG:  Back on the record.

12   BY MS. SAMBERG:

13     Q.    I think we've already established you are

14   not going to be offering any opinions at the time of

15   trial concerning a roof defect; is that correct?

16     A.    Yes, not me.

17     Q.    Okay.

18     A.    I suspect others will, but I don't expect

19   to say anything about that.

20     Q.    However, you will be offering an opinion

21   that roof crush contributed to the injuries Mrs.

22   Payan sustained in this accident, right?

23     A.    Yes.

24     Q.    I think we've talked about the

25   measurements that you took during your vehicle

Page 111

1    inspection and it's your opinion that there was about

2    9 1/2 inches of vertical roof intrusion into the

3    occupant compartment; is that right?

4         A.    That's right.

5         Q.    And you did not take a measurement of any

6    lateral intrusion, is that -- or deformation; is that

7    right?

8         A.    Yes.

9         Q.    Did you take measurements at the A pillar

10   and the B pillar or did you just do the one

11   measurement that you told me about from the floor to

12   the sort of lowest portion of the roof?

13        A.    Well, the measurement I took was over

14   the -- at the seating position of the occupant.

15        Q.    I see.

16        A.    And that was where I took my measurements

17   from that position, what I called the bite, the

18   intersection between the back rest and the seat

19   bottom midway laterally.

20        Q.    Did you take a measurement from the scuff

21   mark you found in the headliner to the seat bottom?

22        A.    No, I didn't, but it would be

23   approximately the same place.

24        Q.    How close is it to the area where you took

25   the measurement?

Page 112

1      A.   I don't know the answer to that, but it
2 would be very close, but I don't know precisely.

3      Q.   Where was the greatest amount of roof
4 crush on this vehicle?

5      A.   I don't know that answer either.

6      Q.   Did you do a diagram or anything that
7 identifies your measurements?  Is that in your notes?

8      A.   Yeah, in my notes I have a little
9 diagram -- just a little pictorial or what I would
10 call a -- just a little sketch outlining these
11 measurements.  That's on page 3.  There are four
12 pages of vehicle inspections and that's on the third
13 page at the top.

14      Q.   I think we've been through all of this
15 once before so I'm not going to belabor this, but you
16 can't tell me how much roof deformation occurred in
17 any of the contact that the roof rails had with the
18 ground during this rollover accident, right?

19      A.   Yes.

20      Q.   Okay.  All you know is that at the end of
21 the rollover sequence there was, in your opinion,
22 approximately nine inches of roof deformation over
23 the seating position for the driver; is that right?

24      A.   Yes.

25      Q.   So you can't tell me how much roof

Page 114

1  occur?

2        A.    Oh -- oh, my.   I haven't made that

3  calculation.   I'd have to -- I'd have to know more

4  about the accident reconstruction to do that, but

5  that is doable, but I don't -- I don't know the

6  answer.   I haven't done that.

7        Q.    Do you agree that at the instant Mrs.

8  Payan's spinal injury occurred her head was in

9  contact with the roof and the roof was in contact

10  with the ground?

11        A.    Well, the former I would agree with.   The

12  second I don't know.   I don't know.   I would expect

13  so, but I'm not sure.

14        Q.    Let me try a different hypothetical.   Do

15  you agree that the ground at the moment of impact has

16  zero velocity?

17        A.    Yeah, the ground is what's probably our

18  best estimate of an inertial reference frame so

19  that --

20        Q.    So the ground is zero velocity?

21        A.    Yes, from an observer on the ground.

22  Obviously from an observer in the car, it wouldn't.

23        Q.    Sure.   When the roof is in contact with

24  the ground, that portion of the roof that's in

25  contact with the ground also has zero velocity,

Page 123

1   vehicle still presents a risk of a serious neck

2   injury in a rollover accident even with seat belts

3   being used; is that fair?

4       A.   No, that doesn't follow.

5       Q.   Why not?

6       A.   Well, if I understood the question, it

7   would be virtually any vehicle.  I think certainly

8   race cars can roll over.

9       Q.   Okay.  Let me rephrase the question.  Do

10  you agree that in a production passenger vehicle --

11      A.   Uh-huh.

12      Q.   -- with an OEM restraint system there is

13  always going to be a risk of a serious neck injury in

14  a rollover accident?

15      A.   Oh, sure.  Of course.

16      MS. SAMBERG:  Off the record.

17      (Off the record.)

18      MS. SAMBERG:  Back on the record.

19  BY MS. SAMBERG:

20      Q.   What is your understanding, if any, of the

21  maximum vertical height that the roof of the Explorer

22  obtained during the roll before the left roof rail

23  hit the ground?

24      A.   I don't have an opinion about that.  I

25  don't know.

Page 124

1    Q.   In your view how much roof crush would
2 have been acceptable in this accident and not
3 resulted in the vertebral injury that Mrs. Payan
4 suffered?

5    A.   I don't know that either, but a couple
6 of -- a few inches would not be unreasonable, but not
7 the nine or ten.  So I'm looking at two or three
8 would be acceptable.

9    Q.   So in your opinion can you say to a
10 reasonable degree of scientific certainty that if the
11 roof crushed only one or two inches, Mrs. Payan would
12 not have sustained her injury?

13    A.   I believe that -- yes, I would -- I would
14 be of that opinion.

15    Q.   Same question:  What if the roof only
16 crushed four inches?

17    A.   Yeah, I can't -- you know, I don't have a
18 linear interpolation on that.  I don't know.  I don't
19 know --

20    Q.   So you feel --

21    A.   I don't know what those answers would be.

22    Q.   Okay.  So --

23    A.   I can see where you're going, but I don't
24 know how to answer that.

25    Q.   Well, let me back up.  You do believe at

8d9ef21d-02ea-4bff-900f-8216e058d4c4

1  some point -- strike that.  You do believe that there

2  is some amount of roof crush that's going to happen

3  any time the roof makes contact with the ground,

4  correct?

5      A.   Yes.

6      Q.   And there is some reasonable amount of

7  roof crush someplace in there, right?

8      A.   Yes, that's right.

9      Q.   And you said you can say to a reasonable

10  degree of certainty that with, say, one or two inches

11  of roof crush you feel comfortable that Mrs. Payan

12  would not have received the neck injuries that she

13  sustained in this accident; is that fair?

14      A.   Yes, that's right.

15      Q.   Okay.  If I now take the number up to four

16  inches --

17      A.   Uh-huh.

18      Q.   -- can you say now to a reasonable degree

19  of certainty, all other things being equal, with only

20  four inches of roof crush that Mrs. Payan would have

21  sustained the neck injury that she had in this

22  accident?

23      A.   Right.  Yes.  Yes.  That's the question I

24  thought you were asking and the answer is I don't

25  know.  I'm assuming that you're thinking now that it

Page 126

1  would have been with the OEM belt and not with a

2  pretensioner?

3      Q.    Sure, with all things being equal.

4      A.    Right.  It would seem to me -- I just

5  don't -- I don't know the answers to those questions.

6  I don't know how much roof crush -- I can simply say

7  that two to three inches would be reasonable.  How

8  much more, I don't know.

9      Q.    Okay.

10     A.    And, of course, the degree or the severity

11  of the injury obviously goes up the more the roof

12  crush is.

13     Q.    So we could say that to a reasonable

14  degree of certainty you'll testify that with two to

15  three inches -- up to three inches of roof crush you

16  feel confident that Mrs. Payan would not have

17  received her neck injury in this rollover accident --

18     A.    Sure.

19     Q.    -- all other things being equal?

20     A.    Sure.

21     Q.    But beyond three inches you can't answer

22  that question?

23     A.    That's right.

24     Q.    Are you going to offer any opinions

25  regarding roof padding as protection of an occupant