Page 1

1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE SOUTHERN DISTRICT OF TEXAS
3                  BROWNSVILLE DIVISION
4
5   ISABEL ENNIS REYNOSO, SALLY PAYAN, )
    and ENRIQUE ROBERTO PAYAN,         )
6                                      )
                   Plaintiffs,         )
7                                      )
         -vs-                          )  Civil Action
8                                      )  No. B-03-120
    FORD MOTOR COMPANY,                )
9                                      )
                   Defendant.          )
10  _____)
11
12
13              Tempe, Arizona
                May 9, 2005
14              10:00 a.m.
15
            DEPOSITION OF GERALD ROSENBLUTH
16
17
18
19
20  REPORTED BY:
    CATHY E. HOFF, RPR, CSR, CCR
21  Certified Court Reporter          (COPY)
    CCR No. 50101
22                         HOLIDAY & ASSOCIATES
                      Registered Professional Reporters
23                 2025 North Third Street, Suite B-173
                         Phoenix, Arizona 85004
24                  (602) 712-9700  Fax (602) 712-9701
    PREPARED FOR:
25  ASCII/CONDENSED

Page 30

1  that we've previously identified the tags for in a
2  different exhibit, Exhibit No. 8?
3       A.   Correct.
4       Q.   Those are items that you may use at trial to
5  show your opinions and demonstrate things that you're
6  testifying about; is that fair?
7       A.   More likely than not we would use those at
8  trial.
9       Q.   Exhibit No. 11, it looks like October 26,
10 2004, subject vehicle and seat belt examination.
11      A.   Correct.
12      Q.   Those are your photographs?
13      A.   Yes.
14      Q.   Exhibit 12, April 24th of 2004 subject
15 vehicle examination?
16      A.   Correct.
17      Q.   With Exhibits 11 and 12, do we have all of
18 the vehicle inspection photographs that you took of the
19 subject vehicle and the seat belt?  Do we have those
20 two CDs?
21      A.   Yes.
22      Q.   And then can you identify what is underneath
23 exhibit tab 13 for me?
24      A.   You think it's in the wrong place?
25           Yes.  That would be the SAFE report.  And

1  that report is the -- supposedly the compendium of the
2  testing that was done on the two exemplar Explorers,
3  one which was modified, one which was not. And that
4  would be -- the result would be the photographs. So
5  this is post test.
6       Q.   And the page that you're showing me is page
7  No. 62, a photograph of the two vehicles side by side?
8       A.   Yes.
9       Q.   The testing that was done at SAFE was not
10 done to analyze seat belt issues; is that right?
11      A.   Well, no, not specifically.
12      Q.   Are you relying upon the testing that was
13 done at SAFE for your opinions in this case?
14      A.   Only with the opinion such that if you have a
15 1- or 2-inch roof crush, you're not going to adversely
16 affect the occupant survival zone and the occupant
17 would be relatively free of an injury mechanism.
18           If you have a 9-inch, plus or minus, static
19 roof crush, you're definitely going to affect the
20 injury mechanism and cause injury to the occupant, in
21 this instance a C6-7 subluxation.
22           So other than that issue, there are two
23 issues here. And Dr. Jacobson will address the roof
24 collapse issue. I will address keeping the occupant in
25 the seat as much as possible.

Page 32

1    Q.   And I want to try and draw this distinction
2　because you're not offering testimony as a roof expert
3　in this case, right?
4    A.   Correct.
5    Q.   And you're not offering testimony as a
6　biomechanic on injury causation or injury mechanisms,
7　fair?
8    A.   Correct, although I'm aware of it, but that
9　testimony will be offered by Dr. Huston.
10   Q.   And you defer to Dr. Huston on those issues
11　in this case, right?
12   A.   Yes.
13   Q.   So to try and make sure that I understand
14　what you're going to be testifying or using the SAFE
15　for is simply to look at that testing and say, Well,
16　can I find a way to keep someone at least 2 inches back
17　from the roof, because approximately 2 inches is how
18　much roof crush you might see in a roof deformation,
19　you may see in a stronger vehicle.  And can I find a
20　way to do that, and yes, I think I've done that?
21   A.   Well, you threw in the 2 inches.  Let's say
22　can you minimize any roof collapse or crush to a point
23　where you could keep the occupant survival zone intact,
24　and then I would agree, yes.  That's the purpose.
25   Q.   And that's what I'm trying to get to.  It

Page 33

1  sounds -- that opinion sounds an awful lot like a roof
2  or an injury causation opinion as opposed to what I
3  thought I heard you say earlier about the seat belt.
4         Do you understand my confusion?
5     A.  Yes.  And, you know, there's a gray area,
6  there's an intertwining, and I think I said earlier you
7  have to do really two things to reduce, minimize or
8  eliminate a potential injury mechanism in a rollover
9  event.
10        And the two things are, keep the occupant as
11 far down in the seat as possible and keep the roof from
12 intruding into the occupant survival zone.  Those two
13 things.  And, obviously, keep the occupant from
14 experiencing a partial ejection.
15    Q.  Another question for you on that subject, in
16 your report, Exhibit 2, you discuss Ms. Payan being
17 partially ejected out of the driver's side door.
18        Do you recall that in your report?
19    A.  Yes.
20    Q.  Dr. Huston testified that it's his opinion
21 that Ms. Payan did not experience her injury outside
22 the vehicle, but rather inside the vehicle with her
23 head against the roof.
24        Do you understand that?
25    A.  Well, and I think I probably at that point

1  as you sit here today?

2     A.  Well, there could be some confusion.

3     Q.  How so?

4     A.  I say in my report that it's a passenger side
5  leading rollover event.

6     Q.  Yes.

7     A.  And then I continue to say that it's a
8  clockwise rotation.  In fact, it would be a clockwise
9  rotation if you're looking at it from the front of the
10 vehicle, if you're sitting in the driver's seat -- I'm
11 sorry, if you're in front of the vehicle, it would be a
12 counterclockwise rotation.  If you're sitting in the
13 seat, it's a clockwise rotation.

14    Q.  Normally when you're writing a report, you
15 would orient yourself either looking at the back of the
16 vehicle or sitting in the driver's seat, would you not?

17    A.  Normally you would orient it as sitting in
18 the driver's seat, that's correct.

19    Q.  So to the extent that it says
20 counterclockwise rollover, and you look at it from that
21 perspective sitting in the driver's seat, that would be
22 incorrect, it's the passenger side leading roll, not a
23 driver's side?

24    A.  That's correct.

25    Q.  Anything else that you would amend or

Page 45

1  supplement as far as your report to bring it up to date
2  for today that we haven't already discussed?
3      A.   I don't believe so.
4      Q.   Because we talked about the partial ejection.
5  Let me strike that for a second.
6           Mr. Rosenbluth, on the numbered opinion
7  No. 9, you say, "Partial ejection resulting in the
8  severe catastrophic injuries of Ms. Reynoso Payan."
9           Did I read that correctly?
10     A.   Well, we're talking about summarily the
11 compromise and effectiveness of the left front seat
12 position No. 1 seat belt, coupled with the roof
13 structure failure, were primary factors of partial
14 eviction resulting in the severe catastrophic injuries,
15 correct.  Meaning that there were really two injury
16 mechanisms.
17     Q.   And what you're saying today, though, is that
18 the severe catastrophic injuries that she suffered
19 weren't actually from the partial ejection, they were
20 resulting from roof deformation while she was inside
21 the vehicle.  That's what you're saying today, right?
22     A.   Correct.
23     Q.   Now, your opinions with regard to
24 crashworthiness in this case, they regard the driver
25 Betty Payan, correct?

Page 46

1   A.   Yes.
2   Q.   Have you also analyzed this case and looked
3   at it as to the passenger, Sally Payan?
4   A.   No.
5   Q.   Why is that?
6   A.   I was asked to evaluate the seating position
7   No. 1, the driver. I was never requested by
8   Mr. Martinez to evaluate the passenger's injuries.
9   Q.   And based on your knowledge of this case,
10  whose injuries were relatively minor, were they not?
11  A.   Yes.
12  Q.   You agree that the injuries that Sally Payan
13  suffered were of the type and extent that you would
14  reasonably expect in a rollover accident of this
15  severity even in the safest of passenger vehicles?
16  A.   I couldn't agree or disagree, because I'm not
17  familiar with the injuries of the right front
18  passenger.
19  Q.   Have you analyzed the seat belt in that
20  position at all?
21  A.   No.
22  Q.   What was the purpose of your second
23  inspection of the vehicle?
24  A.   Primarily the removal of the seat belt so we
25  could lay out the seat belt and map it.

1      A.    Yes.  I think the web grabber is a good

2   concept.

3      Q.    We've talked a little bit about several of

4   the components of your alternative design, the seat

5   integration on the restraints and the pretensioner.

6      A.    Correct.

7      Q.    If Ford had used a seat-integrated restraint,

8   not used a pretensioner, would that system alone have

9   made it reasonably safe and non-defective, in your

10  mind?

11     A.    It would have improved the performance of the

12  occupant restraint and protection system.  I believe in

13  the year 2000, that it should have been integrated and

14  pretensioned to provide maximum performance and

15  effectiveness relative to occupant protection.

16     Q.    I think we've now defined sort of a

17  continuum, so to speak, from the original equipment

18  manufactured condition, on the one hand, and the --

19  what I would call the whole kit and caboodle of Jerry

20  Rosenbluth over here, with the seat-integrated

21  restraint, rollover-activated pretensioner.

22            And so we've got that continuum between what

23  you believe is defective and what you think provides

24  the maximum amount of protection.  What I'm trying to

25  understand now, is there a line somewhere in between

Page 103

1  there that you say, I think this is reasonably safe and
2  not defective, but doesn't have the whole kit and
3  caboodle?  Do you understand my question?
4       A.   Agreed.  Object to your term "kit and
5  caboodle," because "kit and caboodle" is defined as
6  what multiple manufacturers are already doing.  So this
7  is not a Jerry Rosenbluth concept.  This is a concept
8  that is -- those concepts are currently employed by
9  Ford Motor Company.  But anyway, let's get past that
10 and say, is there something in between, because that's
11 your question.
12      Q.   Yes.
13      A.   And I think, at minimum, to make it
14 reasonably safe, give me the integrated seat belt or
15 give me the pretensioner.  Give me one of the two, and
16 we probably wouldn't be here today.
17      Q.   Okay.  Have you seen the spit testing that
18 Thomas Engineering did on a Chevy case several years
19 ago, where they used a -- it was a Ford case, that they
20 used a Chevy full-sized truck with a seat-integrated
21 restraint and a stock Explorer with the same surrogate,
22 and showed that 135 and 180 degrees, you got the same
23 level of the occupant excursion?  Have you seen that
24 testing?
25      A.   I think it's a red truck.  Chevy's red.

1   Q.   Yes.
2   A.   I equated that as red danger, but I must have
3   been mistaken.
4        I did see that.  And you didn't see in that
5   test that he's already leaning out before it locks up?
6   That's one of those failure analysis tests.
7   Q.   So you think the methodology used in that
8   test was improper?
9   A.   Absolutely.
10  Q.   Had they used a different methodology, you
11  think that they would have arrived at the same
12  conclusion you did?
13  A.   Well, they're doing that.  And I'll tell you
14  there's another case, Hemanis, and where that's very
15  much the same issue.  And I didn't see General Motors
16  using that test Piziali used.  It was either Piziali
17  or -- I can't remember now, but it was a red Chevy
18  pickup.
19       And the issues in the case were the exact
20  same issues that they are in this case:  Roof crush,
21  seat belt design.
22  Q.   The conclusion that the folks --
23  A.   I believe the case is down in Beaumont,
24  Texas.
25  Q.   The experts have relied on that test in the

Page 105

1  past to say that the seat-integrated restraint does not
2  minimize occupant excursion. You just flat-out think
3  that's wrong?
4      A.   Totally wrong.
5      Q.   So in the model year 2000, if Ford had used a
6  seat-integrated restraint without a pretensioner, you
7  think that would have been a reasonably safe design
8  from a seat and seat belt system perspective?
9      A.   It would have been a safer design. And your
10 question is -- you're trying to get this fine line of
11 saying what is defective, what is not defective, but
12 not the maximum protection. And those two things would
13 be the pretensioner and the integrated seat belt. And
14 I probably would go with the integrated seat belt, then
15 the pretensioner, then the pretension integrated.
16     Q.   And those three, the pretension integrated,
17 the pretension and the integrated, those three you
18 think are all reasonably safe and non-defective designs
19 from the seat and seat belt system perspective?
20     A.   Correct. But they go up in effectiveness.
21     Q.   All right. And I guess that's a valid point
22 that you bring out. I want to make sure that we're
23 both on the same page here.
24          It's not Jerry Rosenbluth's position that you
25 have to use the absolute maximum in safety on every