Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

---

ISABEL ENNIS REYNOSO, SALLY PAYAN
and ENRIQUE ROBERTO PAYAN,

    Plaintiffs,

vs.                        CIVIL ACTION NO.
                               B-03-120

FORD MOTOR COMPANY and AUTOMOTRIZ
DEL NORESTE, S.A. DE C.V.,

    Defendants.

---

Deposition of:   RONALD L. HUSTON, Ph.D., P.E.

Taken:   By the Defendants
          Pursuant to Notice

Date:   March 15, 2005

Time:   Commencing at 9:10 a.m.

Place:   Marriott Cincinnati Airport
          2395 Progress Drive
          Hebron, Kentucky  41048

Before:   Kimberly L. Wilson, CSR
           Notary Public - State of Ohio

1 testimony about that?
2     A.    As far as I know I'm not, that's correct.
3     Q.    Warnings or marketing?
4     A.    Right, I'm not doing that.
5     Q.    How about human factors?
6     A.    No, I don't believe so.
7     Q.    Statistics?
8     A.    No.
9     Q.    Summarize, if you would, for me your
10 opinions as they relate to the biomechanics and
11 kinematics of Betty Payan in this accident.
12     A.    Well, my opinions are really very simple
13 and perhaps of all the experts my opinions will be
14 the simplest. It's my opinion that during this
15 rollover incident that she was the driver of the
16 vehicle, that it -- the vehicle rolled over passenger
17 side leading, that the -- that at the time of the
18 accident she was wearing her seat belt, that during
19 the accident sequence the roof on her side was
20 collapsed, that the roof came into contact with her
21 head and caused a compression subluxation injury
22 that's reported in the medical records.
23     And that's -- well, that's -- yes, that's
24 all, but let me amend that just a little bit more.
25 It's my opinion based upon also the surrogate study

1   that I did after the preparation of the report that
2   if in this instance the roof had not come down that
3   she would not have experienced the injuries that she
4   did and that depending upon the nature of the
5   restraint system, she would have been kept out of
6   harm to varying degrees.
7       Q.   Are you going to be offering any opinions
8   on reasonable alternative designs for the seat belt
9   system in the Explorer?
10      A.   No, I'm not going to do that.
11      Q.   All right.  We know a surrogate study was
12  performed at Mr. Rosenbluth's facility; is that
13  correct?
14      A.   Yes.
15      Q.   And I'm sorry, tell me the date again of
16  the surrogate study.
17      A.   Well, I've forgot it.  I think it was
18  November the 29th.  Let me look to be sure.  Yes, it
19  was November the 29th of last year.
20      Q.   Did you do a spit test?
21      A.   No.  No, this was not a spit test.  Well,
22  it was a -- it was a spit, but it was not a dynamic
23  test.  That is to say we put a surrogate in the
24  vehicle, took some measurements and then rolled it
25  over so that it was at 180 degrees and to that extent

1  the surrogate's perspective, the surrogate's sitting
2  in the seat, but relatively tight seat belt.
3      Q.   Why did you decide on two to three inches
4  of slack?
5      A.   Well, that's a compromise that Mr.
6  Rosenbluth has arrived at.
7      Q.   Not a decision that you made.  I should
8  ask Jerry?
9      A.   Right.  Yes, that's correct.
10     Q.   Okay.  What happened when you used the
11 integrated seat belt and simulated pretensioner?
12     A.   Well, then, whenever we rolled the -- the
13 person over the, headroom was 3 1/2 inches, so that
14 then the loss of headroom would have been
15 approximately two inches.
16     Q.   So still within that two to four range
17 that you're commonly seeing, correct?
18     A.   Yes, it is.
19     Q.   And, again, did the surrogate's buttocks
20 come off the seat when she was fully inverted using
21 the integrated seat belt with the simulated
22 pretensioner?
23     A.   I don't remember if that's the case or
24 not.
25     Q.   What was the fourth test that you did?

1    A.    The fourth test was one where we
2 introduced slack into the seat belt before it locked
3 up.
4    Q.    So let me go back. You used the original
5 equipment seat belt, correct?
6    A.    Yes.
7    Q.    And then you introduced some slack before
8 allowing the retractor to lock?
9    A.    Yes.
10   Q.    How much slack?
11   A.    Three inches.
12   Q.    And whose decision was it to use three
13 inches?
14   A.    Mr. Rosenbluth.
15   Q.    Okay. Was there some simulation attempt
16 being made to do this three inch of slack? What was
17 the purpose of running that test?
18   A.    Well, there the purpose was to see what
19 the headroom would be with the slack during the
20 rollover and that was discovered to be three quarters
21 of an inch.
22   Q.    Do you have any reason to believe that
23 there was any slack in Mrs. Payan's belt at the time
24 of the accident?
25   A.    I have no opinion about that. I don't

1  know the answer to that. There again, Mr. Rosenbluth
2  will have inspected the belts and looked at the
3  lockup marks and would be able to answer that.
4      Q.   And what were the results of that test
5  again? I'm sorry.
6      A.   Oh, I'm sorry. Yeah, there the headroom
7  was reduced to three quarters of an inch.
8      Q.   So if it was reduced to three quarters of
9  an inch and it started at 5 1/2, you had about what,
10 four --
11     A.   Four and three-quarter inch of headroom
12 was consumed.
13     Q.   Okay. Just slightly above the two to four
14 range we've been talking about --
15     A.   Right.
16     Q.   -- that's commonly found in all vehicles?
17     A.   Yes, that's right.
18     Q.   What conclusions do you draw from the
19 surrogate testing that was conducted?
20     A.   Well, the conclusions that I made were
21 that with a restraint system that keeps the occupant
22 away from the roof, and without the roof of course
23 coming toward the occupant, that then the significant
24 loading which was experienced in this accident would
25 have been avoided.

1  Q. Can you say to a reasonable degree of
2  scientific certainty that had this vehicle been
3  equipped with the integrated seat belt, all other
4  things remaining the same, that Mrs. Payan would not
5  have received a paralyzing neck injury in this
6  accident?
7  A. No, I don't believe so.
8  Q. No, you can't say that?
9  A. That's correct. I believe that -- that in
10 this accident she still would have received these
11 injuries.
12 Q. Okay. Let me ask a different question.
13 Can you say to a reasonable degree of scientific
14 certainty that had this vehicle been equipped with
15 pretensioners that Mrs. Payan would not have suffered
16 a paralyzing neck injury in this accident?
17 A. No, I can't say that. I don't know if it
18 would have been as bad as it was, and there's some
19 qualitative words there like paralyzing. But, no, it
20 appears to me from the measurements that I have in
21 this surrogate testing that even with the better seat
22 belt system, there was still a significant amount of
23 roof damage which would have come into her occupant
24 space.
25       MS. SAMBERG: Let's take a quick break.

1       (A recess was taken from 10:16 to 10:30.)
2       MS. SAMBERG:  We're back on the record.
3  BY MS. SAMBERG:
4       Q.  Is it fair to say that in order to address
5  the issue of mechanism of injury, you have to have an
6  understanding of the reconstruction of the accident?
7       A.  Yes.
8       Q.  And I think we've established you've not
9  attempted to independently reconstruct the accident;
10 is that correct?
11      A.  That's right.
12      Q.  When and how did you get information on
13 the accident reconstruction for use in your report?
14      A.  What I did was when I inspected the
15 vehicle, I could -- I had -- I was able to observe on
16 the vehicle that it had rolled over approximately
17 three times or two and a half times.  And I also then
18 had information from the police report so that
19 whereas I did not know what the specific speeds were,
20 I did have a general understanding of the accident
21 sequence and the -- and the -- what kind of accident
22 it was, the number of rolls that it did.
23      Q.  And you included in your report all of the
24 information you found to be pertinent to your
25 biomechanical analysis, is that correct, in terms of

1   the accident reconstruction?
2       A.  I think that's probably right.  Let me see
3   what I did say on that.  Yes, I think -- I believe
4   that I did.  I believe that I did.
5       Q.  Tell me your understanding of how the
6   accident occurred.
7       A.  All right.  This was on -- it occurred in
8   Mexico in the evening.  It was about 8:00, wet
9   roadway.  It was on January 11th, 2003, single
10  vehicle rollover accident.  It was a 2000 Ford
11  Explorer.  The operator was Betty Payan.  Right front
12  passenger was Sally Payan.  And that the -- for some
13  unknown cause the vehicle went out of control so that
14  the -- presumably from water on the roadway, but when
15  the vehicle went out of control, it began to roll
16  along the roadway and across the roadway with the
17  passenger side leading.  It rolled over two and a
18  half times, which means it came to rest upside down
19  on its roof.
20      Q.  Could it have been as many as three and a
21  half times?
22      A.  Well, I didn't see evidence of three and a
23  half times, but I suppose that's possible.  I believe
24  one of the defendants -- Mr. --
25      Q.  Granat?

1    Q.    Do any of the papers identified in your
2    resume deal with that issue?
3        A.    With compression?
4        Q.    Compression neck injuries from intruding
5    roof.
6        A.    No, I don't think so.  I mean, I talk
7    about head and neck dynamics in my papers, but not in
8    terms of specific movements of one vertebrae on
9    another.  It's my belief that in this case that
10   there's no real question -- or there should not be
11   any question as to what the injury is.
12       Q.    Okay.  Have you ever heard of a nutcracker
13   injury?
14       A.    Uh-huh.
15       Q.    Is that what --
16       A.    It's like a nutcracker.
17       Q.    -- happened here?
18       A.    It's like a nutcracker, yes.
19       Q.    And so if I understand the nutcracker
20   theory, forces are generated through the seat to the
21   buttocks while the head's being compressed by the
22   roof?
23       A.    Yes.
24       Q.    Is that essentially how it goes?
25       A.    That's right.  The spine is shortened

1  simply by the vehicle structure -- the roof and the
2  seat combination coming together.  Like any
3  nutcracker, it's just a squeezing together.  It's
4  compression.
5      Q.   Are you aware of any literature that
6  you've read or are relying on that addresses or
7  supports the nutcracker theory --
8      A.   Well --
9      Q.   -- of mechanism of injury?
10     A.   Well, there again the Levine book and the
11 paper by McElhaney in there will address that.
12     Q.   And do you believe that Mrs. Payan's
13 injury occurred from a single impact with the roof or
14 was it multiple impacts?
15     A.   Yeah, I don't know that for sure.  It
16 would be my belief that the injury would have been a
17 single impact.  I don't believe that it would have
18 been one which occurred and then was later
19 aggravated.
20     Q.   In your report you state that Mrs. Payan's
21 seated height was compressed by approximately five
22 inches.  Do you remember saying that?
23     A.   Yeah.  Well, I'm looking at it now.
24     Q.   Can you tell me what you meant by that?
25     A.   There's nothing very profound in that.

| | |
|---|---|
| 1 | What I have is that her seated height is |
| 2 | approximately 34 1/2 inches and the vehicle -- or |
| 3 | that distance where she would have been seated to the |
| 4 | roof is compressed to about 29 inches, so it's just a |
| 5 | subtraction of those two numbers. |
| 6 | Q.   Are you saying that Mrs. Payan's body was |
| 7 | compressed by five inches or just that the seat was |
| 8 | compressed by five inches? |
| 9 | A.   Yeah, her seat -- her sitting height |
| 10 | would -- that is the distance would have been |
| 11 | compressed by about five inches. |
| 12 | Q.   Not her body? |
| 13 | A.   Not necessarily, that's right. |
| 14 | Q.   Okay. |
| 15 | A.   That's right.  Sure.  Sure, of course, |
| 16 | that would follow. |
| 17 | Q.   Do you have an opinion about whether Mrs. |
| 18 | Payan's head or any part of her body for that matter |
| 19 | gets outside the plane of the window at any point |
| 20 | during this rollover accident? |
| 21 | A.   Yes. |
| 22 | Q.   What's your opinion? |
| 23 | A.   I don't believe that it did. |
| 24 | Q.   The basis for that? |
| 25 | A.   Well, the basis for that is -- there's |