UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ISABEL ENNIS REYNOSO, SALLY PAYAN, AND ENRIQUE ROBERTO PAYAN | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIVIL ACTION NO. B-03-120 |
| FORD MOTOR COMPANY, AND AUTOMOTRIZ DEL NORESTE, S.A. DE C.V. | § § § § | |
| Defendants. | § | |

**DEFENDANT FORD MOTOR COMPANY'S OPPOSED MOTION TO EXCLUDE TESTIMONY OF GERALD ROSENBLUTH UNDER RULES 402, 403, AND 702 OF THE FEDERAL RULES OF EVIDENCE AND *DAUBERT V. MERRELL DOW PHARMACEUTICALS***

## TABLE OF CONTENTS

[STATEMENT OF ISSUES TO BE RULED UPON] ............................................ 1

BACKGROUND ............................................................................................ 1

LEGAL ANALYSIS [SUMMARY OF THE ARGUMENT] ................................. 3

I.    ADMISSIBILITY OF EXPERT OPINIONS ....................................... 3

II.   MR. ROSENBLUTH'S TESTIMONY MUST BE EXCLUDED BECAUSE IT IS NOT RELEVANT TO ANY ISSUE IN DISPUTE. .......... 5

III.  MR. ROSENBLUTH IS NOT QUALIFIED TO TESTIFY AS AN EXPERT ON DESIGN ISSUES. .......................................................... 8

IV.   MR. ROSENBLUTH'S TESTIMONY IS NOT RELIABLE BECAUSE IT'S BASED ON INVALID SURROGATE TESTING THAT MANUFACTURES RESULTS FAVORABLE TO PLAINTIFFS. .......... 9

      A. MR. ROSENBLUTH REDUCED THE AMOUNT OF SEATBELT WEBBING WITHOUT A VALID BASIS FOR DOING SO. .......... 11

B. MR. ROSENBLUTH IMPROPERLY USED A SURROGATE DRIVER THAT WEIGHED 30 POUNDS LESS THAN BETTY PAYAN.     12

C. MR. ROSENBLUTH IMPROPERLY USED A DISIMILAR SEAT THAT HE IMPROPERLY MODIFIED IN THE SURROGATE TESTING AND ARBITRATLY PLACED THIS SEAT IN THE BUCK.     13

(1) MR. ROSENBLUTH USED A DISSIMILAR SEAT IN TESTING.     13

(2) MR. ROSENBLUTH IMPROPERLY MODIFIED THE ELECTRONIC POWER SEAT TO CRAFT A ONE-OF-A-KIND "INTEGRATED SEATBELT SYSTEM"     13

(3) MR. ROSENBLUTH ARBITRARILY PLACES HIS "INTEGRATED SEATBELT SYSTEM" IN THE BUCK.     14

V.     MR. ROSENBLUTH USES HIS SURROGATE TESTING TO FORM CONCLUSIONS THAT ARE NOT SUPPORTED BY HIS DATA.     15

VI.     ANY CONCEIVABLE PROBATIVE VALUE OF MR. ROSENBLUTH'S TESTIMONY IS OUTWEIGHED BY RULE 403 RISKS.     16

VII.     CONCLUSION     17

Doc ID MENNB-114205
08423-071

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ISABEL ENNIS REYNOSO, SALLY PAYAN, AND ENRIQUE ROBERTO PAYAN | § § § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-03-120 |
| | § | |
| FORD MOTOR COMPANY, AND AUTOMOTRIZ DEL NORESTE, S.A. DE C.V. | § § § | |
| Defendants. | § § | |

**DEFENDANT FORD MOTOR COMPANY'S OPPOSED MOTION TO EXCLUDE TESTIMONY OF GERALD ROSENBLUTH UNDER RULES 402, 403, AND 702 OF THE FEDERAL RULES OF EVIDENCE AND *DAUBERT V. MERRELL DOW PHARMACEUTICALS***

**TABLE OF CITATIONS**

- Rule 401, Federal Rules of Evidence.

- Rule 402, Federal Rules of Evidence.

- Rule 403, Federal Rules of Evidence.

- Rule 702, Federal Rules of Evidence.

- *Barnes v. General Motors,* 547 F.2d 275, 277 (5th Cir. 1977).

- *Castellow v. Chevron USA,* 97 F.Supp.2d 780, 792 (S.D. Tex. 2000).

- *Christophersen v. Allied-Signal Corporation*, 939 F.2d 1106 (5th Cir. 1991).

- *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

- *DePaepe v. General Motors*, 141 F.2d 715 (7th Cir. 1998).

iii

- *Gammill v. Jack Williams Chevrolet*, 983 S.W.2d 1 (Tex. App. -- Ft. Worth 1996).

- *General Electric v. Joiner*, 522 U.S. 136 (1997).

- *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000).

- *Hall v. General Motors Corp.*, 647 F.2d 175, 180 (D.C. Cir. 1980).

- *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994).

- *Jackson v. Fletcher*, 647 F.2d 1020 (10th Cir. 1981).

- *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

- *Michigan Miller Mutual Ins. Corp. v. Benfield,* 140 F.3d 915 (11th Cir. 1998).

- *Mukhtar v. California State University, Hayward*, 299 F.3d 1053 (9th Cir. 2002).

- *Thomas v. Kline*, 878 F.2d 791 (4th Cir. 1989).

- *Turpin v. Merrell Dow Pharmaceuticals,* 959 F.2d 1349 (6th Cir. 1992).

Doc ID MENNB-114205
08423-071

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ISABEL ENNIS REYNOSO, SALLY PAYAN, AND ENRIQUE ROBERTO PAYAN | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIVIL ACTION NO. B-03-120 |
| FORD MOTOR COMPANY, AND AUTOMOTRIZ DEL NORESTE, S.A. DE C.V. | § § § § | |
| Defendants. | § | |

**DEFENDANT FORD MOTOR COMPANY'S OPPOSED MOTION TO EXCLUDE TESTIMONY OF GERALD ROSENBLUTH UNDER RULES 402, 403 AND 702 OF THE FEDERAL RULES OF EVIDENCE AND DAUBERT V. MERRELL DOW PHARMACEUTICALS**

TO THE HONORABLE JUDGE OF THE COURT:

Defendant Ford Motor Company hereby moves to exclude the testimony of Plaintiffs' expert, Gerald Rosenbluth, pursuant to Rules 402, 403, and 702, Fed.R.Evid., and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* because Mr. Rosenbluth's testimony is irrelevant, he is not qualified to testify on matters upon which he opines, his proposed testimony is based on unreliable and unscientific testing, and because there is simply too great an analytical gap between Mr. Rosenbluth's data and the opinion he offers.

Defendants further request an evidentiary hearing pursuant to Rule 104, Fed.R.Evid., to evaluate the proposed testimony of Mr. Rosenbluth.

**BACKGROUND**

This case arises from a January 11, 2003 rollover accident on a toll highway in Monterrey, Mexico, involving a 2000 Ford Explorer in which Betty Payan was killed.

Betty Payan's daughter, Sally Payan, was a passenger in the vehicle at the time of the accident and she suffered minor injuries.

Based on their alleged facts regarding the accident, Plaintiffs seek recovery from Ford under theories of strict products liability, negligence, gross negligence, breach of warranty, misrepresentation, and violations of the Texas Deceptive Trade Practices Act. *See* Plaintiffs' Original Petition. To succeed, Plaintiffs must prove that the 2000 Ford Explorer was defective and unreasonably dangerous and that any alleged defects in the Explorer caused Betty Payan's death. For this purpose, they have designated four professional expert witnesses: Dr. Dean Jacobson, Dr. Ronald Huston, Stephan Irwin, and Gerald Rosenbluth. *See* Plaintiffs' Designation of Experts, copy attached hereto as Exhibit A.

Plaintiffs primarily allege that the roof of the subject vehicle deformed during the rollover accident and struck Betty Payan in the head, compressing her neck and causing her fatal injury. Since their claim is that the roof of the subject vehicle was defective, it is critical that they prove the vehicle's "intruding roof" caused Betty Payan's injuries, rather than Betty Payan's head striking the roof before the deformation. In support of their defect theory, Plaintiffs argue that Betty Payan's head could not have struck the roof before the deformation because her seatbelt held her down just enough to keep her head from striking the roof. However, Plaintiffs further allege that the seatbelt system was defective because it did not hold Betty Payan down enough to avoid contact with the inward deforming roof.

Plaintiffs' expert designation states that Mr. Rosenbluth will be Plaintiffs' "Seatbelt Analyst Expert," and Mr. Rosenbluth's report states he will testify that the seatbelt system in the 2000 Ford Explorer was defective and failed to hold Betty Payan down enough because it did not have a proper seatbelt pretensioner and because it did not have an integrated seatbelt system.

2

*See* Report of Gerald Rosenbluth ("Rosenbluth Report"), at pages 4 and 5, copy attached hereto as Exhibit B; *see also* Transcript of May 9, 2005 Deposition of Gerald Rosenbluth ("Rosenbluth Depo.") at page 103, line 5 to page 104, line 8 ("And I think, at minimum, to make it reasonably safe, give me the integrated seatbelt or give me the pretensionser"), copy of relevant excerpts attached hereto as Exhibit C.

## LEGAL ANALYSIS

### I.    ADMISSIBILITY OF EXPERT OPINIONS

The introduction of expert testimony is governed by Federal Rule of Evidence 702, which provides, in relevant part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

The Supreme Court has held that once an objection to an expert's testimony is raised, the trial court must perform certain "gatekeeper" duties under Rule 702 and determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 592 (1993); *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) ("where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'") (quoting *Daubert*, 509 U.S. at 592).  In fact, although a trial court has

3

discretion in the manner in which the gatekeeper duty is conducted, it has no discretion regarding the fulfillment of its gatekeeper duty, which must be performed before the jury is permitted to hear the evidence.  *See Mukhtar v. California State University, Hayward,* 299 F.3d 1053, 1063 (9th Cir. 2002), amended *en banc* at 319 F.3d 1073 (9th Cir. 2003); *Goebel v. Denver & Rio Grande W. R.R. Co.,* 215 F.3d 1083, 1087 (10th Cir. 2000).  Further, the trial court is required to make specific findings on the record that it performed its gatekeeper obligations and any basis for finding the testimony admissible under *Daubert*.  *Goebel*, 215 F.3d at 1088-89.

A trial court fulfills its gatekeeper obligation by undertaking two separate inquires.  First, the court must determine whether the witness is qualified to offer the opinions he or she is espousing. Fed.R.Evid. 702.  Second, the proponent of the witness bears the burden of proving that its witness's opinions are both relevant and reliable.  *See Daubert*, 509 U.S. at 589-90, 592; *Kuhmo*, 526 U.S. at 141, 149, 152 (the trial judge must determine whether the witness is qualified testimony and it must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline).

The Supreme Court in *Daubert* set out four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable. They are:

(1) whether the theory or technique has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and

(4) whether the theory or method has been generally accepted by the scientific community.

*Daubert*, 509 U.S. at 593-94.

4

The Court in *Kumho* stressed that, in assessing the reliability of expert testimony, whether scientific or otherwise, the trial judge may consider one or more of the *Daubert* factors when doing so will help determine that expert's reliability. *Kumho*, 526 U.S. at 150. The test of reliability is a "flexible" one, however, and the four Daubert factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case. *Id.*, quoting *Daubert*, 509 U.S. at 593.

The particular factors will depend upon the unique circumstances of the expert testimony involved. *See Kumho*, 526 U.S. at 151-52. "Whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." First, the court must determine whether the witness is qualified to offer the opinions he or she is espousing. Fed.R.Evid. 702. Second, the proponent of the witness bears the burden of proving that its witness's opinions are both relevant and reliable. *See Daubert*, 509 U.S. at 589-90, 592; *Kuhmo*, 526 U.S. at 141, 149, 152 (the trial judge must determine whether the witness is qualified testimony and it must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline).

## II.  MR. ROSENBLUTH'S TESTIMONY MUST BE EXCLUDED BECAUSE IT IS NOT RELEVANT TO ANY ISSUE IN DISPUTE.

Pursuant to Rule 401, Fed.R.Evid, only relevant evidence is admissible. *See also Daubert*, 509 U.S. at 591 (Expert testimony that does not relate to any issue in the case is not relevant and, ergo, non-helpful). Plaintiffs bear the burden of proving that Mr. Rosenbluth's testimony is both relevant and reliable. *See Id.* at 589-90, 592; *Kuhmo*, 526 U.S. at 141, 149, 152. To be relevant, Mr. Rosenbluth's proposed testimony must make the existence of a fact of

5

consequence to the determination of this action more or less probable than it would be without his testimony. Rule 401, Fed.R.Evid.

In the present case, Mr. Rosenbluth's testimony that Betty Payan was wearing her seatbelt and that the seatbelt system of the 2000 Ford Explorer is defective is irrelevant because Ford does not dispute the fact that Betty Payan was wearing her seatbelt and Plaintiffs' expert on injury causation, Dr. Ronald Huston, testified that Betty Payan's injuries were caused by an "intruding roof," not the seatbelt defect described by Mr. Rosenbluth.

Mr. Rosenbluth opines on the allegedly defective condition of the seatbelt system only as it relates to the injuries of the driver, Betty Payan. *See* Rosenbluth Depo. at page 45, lines 23 to page 46, line 21. He expresses no opinion as to the seatbelt system used by the only other occupant of the subject vehicle, Sally Payan, (*Id.*) and he defers to Dr. Huston to opine on whether the alleged seatbelt defect caused Betty Payan's injury. *Id.* at page 32, lines 5 to 12; page 72, line 15 to page 73, line 13.

Plaintiffs' expert designation states that Dr. Huston is Plaintiffs' "Bio Mechanic Expert," and his report states that he will testify as to the cause of Betty Payan's fatal injury. *See* Report of Dr. Ronald Huston ("Dr. Huston Report") at page 6, copy attached hereto as Exhibit D. Dr. Huston opines that, at some point during the rollover sequence, the subject vehicle's roof deformed inward and made a single impact with Betty Payan's head, causing her fatal head injury. *See* Transcript of March 15, 2005 Deposition of Dr. R. Huston ("Dr. Huston Depo."), relevant excerpts attached hereto as Exhibit E, at page 95, lines 12 to 19. Dr. Huston identified this "intruding roof" as the cause of Betty Payan's injuries and testified that he did not believe the seatbelt system was causally related to Betty Payan's injuries. *Id.* at page 51, lines 1 to 24.

Doc ID MENNB-114205
08423-071

As more fully set forth in Ford's Motion for Summary Judgment on Plaintiffs' Defective Seatbelt Claim, contemporaneously filed herewith, Dr. Huston testified that:

Q.    Can you say to a reasonable degree of scientific certainty that had this vehicle been equipped with the integrated seatbelt, all other things remaining the same, that Mrs. Payan would not have received a paralyzing neck injury in this accident?

A.    No, I don't believe so.

Q.    No, you can't say that?

A.    That's correct.  I believe that -- that in this accident she still would have received these injuries.

Q.    Okay.  Let me ask a different question.  Can you say to a reasonable degree of scientific certainty that had this vehicle been equipped with pretensioners that Mrs. Payan would not have suffered a paralyzing neck injury in this accident?

A.    No, I can't say that.  I don't know if it would have been as bad as it was, and there's some qualitative words there like paralyzing.  But, no, it appears to me from the measurements that I have in this surrogate testing that even with the better seatbelt system, there was still a significant amount of roof damage which would have come into her occupant space.

Dr. Huston Depo. at page 51, lines 1 to 24, Exhibit E.

Dr. Huston's testimony fails to establish any causal connection between Plaintiffs' alleged seatbelt defect and Betty Payan's fatal injury.  Further, aside from speculation on what may have happened to Betty Payan if there was no roof deformation, Dr. Huston's testimony does not establish a causal connection between any non-fatal injury to Betty Payan and the allegedly defective seatbelt system.  Mr. Rosenbluth's seatbelt defect testimony, therefore, does not make any fact of consequence to this action more or less probable.  Accordingly, since his opinions that Betty Payan was wearing her seatbelt and that the seatbelt was defective are irrelevant, Mr. Rosenbluth's testimony must be dismissed.

7

### III.    MR. ROSENBLUTH IS NOT QUALIFIED TO TESTIFY AS AN EXPERT ON DESIGN ISSUES.

Mr. Rosenbluth is not qualified either by knowledge, skill, training, education, or experience to testify as an expert on issues related to the design of the seatbelt system in the 2000 Ford Explorer. He does not hold a degree in any area of engineering. *See* Transcript from Deposition of Gerald Rosenbluth in *Ford v. State of California* ("Rosenbluth CA Depo."), page 225, lines 9 to 11, relevant excerpts attached hereto as Exhibit F. The extent of his formal education includes a B.A. and M.A. in industrial education received in 1967 from the School of Education of Arizona State University. *See* Automotive Consulting Services Curriculum Vitae of Gerald Rosenbluth ("Rosenbluth CV"), copy attached hereto as Exhibit G. Although he once took a course in "Industrial Design" that he believes relates to engineering principles, Mr. Rosenbluth has never taken an engineering course. *See* Rosenbluth Depo. at page 114, lines 1 to 9, Exhibit C; Rosenbluth CA Depo. at page 223, line 18 to page 225, line 19, Exhibit F.

Mr. Rosenbluth's lack of education in the field of engineering design is not compensated by practical experience in engineering or automotive design. He is not a mechanical engineer. *See* Rosenbluth Depo. at page 113, lines 23 to 25, Exhibit C. He has never worked for an automobile manufacturer or designed automotive components. *Id.* at page 114, lines 12 to 19; Rosenbluth CA Depo. at page 225, lines 20 to 24, Exhibit F. Rather, he is a former auto mechanic by trade. *See* Rosenbluth CV, Exhibit G.

Mr. Rosenbluth taught at East Phoenix High School for approximately 15 years and taught an auto shop course at Maricopa Technical College from 1974 to 1978. *See* Rosenbluth CV, Exhibit G. Since leaving his shop courses at Maricopa Technical College in 1978, Mr. Rosenbluth has devoted much of his time to litigation consulting. This of course does not qualify him as an expert because "it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying." *Thomas J. Kline, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989).

Doc ID MENNB-114205
08423-071

In fact, Mr. Rosenbluth has never participated in the design of a mass-produced automotive component, nor has he ever designed any other product available to the consuming public. *See* Rosenbluth Depo. at page 115, lines 16 to 23, Exhibit C. Specifically, he has never designed any seatbelt system for production vehicles sold to the public. *See Id.* at page 115, line 24 to page 166, line 2; Rosenbluth CA Depo. at page 227, lines 15 to 19, Exhibit F. He has also never authored any scientific papers and submitted them for publication on any aspect of automobile design or performance. *See* Rosenbluth CV, Exhibit G.

Mr. Rosenbluth's only experience with seatbelt design and performance comes from being hired by plaintiff attorneys in litigation and rendering opinions that seatbelts are defective. *See* Rosenbluth CV, Exhibit G. This kind of testimony from an unqualified witness designated to testify on key design issues cannot possibly help a jury determine what was or was not state-of-the-art in safety restraint design for a mass produced automobile. Rather, Mr. Rosenbluth knows just enough about automotive design to confuse the jury. Therefore, his testimony should be precluded as expert testimony in the area of safety restraints pursuant to Rules 402 and 702, Fed.R.Evid.

## IV. **MR. ROSENBLUTH'S TESTIMONY IS NOT RELIABLE BECAUSE IT IS BASED ON INVALID SURROGATE TESTING THAT MANUFACTURES RESULTS FAVORABLE TO PLAINTIFFS.**

Any expert testimony under Rule 702 must rest on a reliable foundation. *Kuhmo*, 526 U.S. at 141. In addition, it is well established that out-of-court experiments are not admissible unless they are carried out under conditions substantially similar to those that existed at the time of a subject crash. *Jackson v. Fletcher*, 647 F.2d 1020, 1027 (10th Cir. 1981); *Hall v. General Motors Corp.*, 647 F.2d 175, 180 (D.C. Cir. 1980); *Barnes v. General Motors*, 547 F.2d 275, 277 (5th Cir. 1977).

9

As noted above, Plaintiffs allege that the roof of the subject vehicle struck Betty Payan while it deformed rather than Betty Payan's head striking the roof before the deformation. As evidence of this, Plaintiffs argue that Betty Payan's head could not have struck the roof before the deformation because the subject vehicle's seatbelt held her down just enough to keep her head from striking the roof before it deformed, but did not sufficiently restrain her to avoid contact with the inward deforming roof. Mr. Rosenbluth opines that use of seatbelt pretensioner and an integrated seat would have prevented the positioning of Betty Payan that led to her injury. As primary support for this opinion, he relies on static spit testing in which he placed a surrogate driver into a cutout of a vehicle driver's compartment, or "buck," intended to represent the driver's compartment of a 2000 Ford Explorer. *See* Rosenbluth Depo, page 74, line 25 to page 75, line 2, Exhibit C.

Mr. Rosenbluth slowly spun the buck on its longitudinal axis to make approximations of occupant kinematics based on the surrogate's movements under the force of gravity. Mr. Rosenbluth did not perform the test properly and it did not replicate the conditions of the subject accident. Specifically, the spit test cannot be admitted as evidence under Rules 402, 403, and 702, Fed.R.Evid., because Mr. Rosenbluth manufactured results in support of Plaintiffs' seatbelt defect theory by reducing the amount of seatbelt webbing without a valid basis for doing so and by using a surrogate driver that weighed 30 pounds less than Betty Payan.

Mr. Rosenbluth's spit test conditions were also substantially dissimilar to the conditions of the subject vehicle and rollover accident in several ways. First, the surrogate's physical characteristics were substantially different from Betty Payan's. Second, Mr. Rosenbluth used a seat that was different from that present in the subject vehicle. Third, he provides no valid basis

10

for placement of the seat; and fourth, his use of an artificial "H-Point" in placing the seat served

no valid purpose except to manufacture results consistent with Plaintiffs' theory of defect.

### A.    MR. ROSENBLUTH REDUCED THE AMOUNT OF SEATBELT WEBBING WITHOUT A VALID BASIS FOR DOING SO.

Mr. Rosenbluth attempted to test the subject vehicle's seatbelt system and his proposed

alternative seatbelt system through five separate tests in which he rolled the buck under two

testing scenarios, a "Roll Induced ELR Lock-Up" Scenario and "Mechanically Induced ELR

Lock-Up" Scenario.   *See* Automotive Consulting Services, Inc, Surrogate Testing Notes

("Surrogate Testing Notes") at page 3, copy attached hereto as Exhibit H.  For the Roll-Induced

ELR Lock-Up Scenario tests, Mr. Rosenbluth allowed the seatbelt retractor to lock the seatbelt

automatically without his interference and then measured the distance along the webbing from

the outboard floor anchor through the latch plate and to the D-ring.  *Id.*  He also measured the

height of the surrogate driver's head from the roof for the buck position pre-roll at 0 degrees, and

post roll at 180 degrees, while the surrogate was upside down.  *Id.*

In the Mechanical Induced ELR Lock-Up Scenario tests, Mr. Rosenbluth manipulated the

original equipment seatbelt by simply locking the seatbelt so that there was three inches less

webbing.  *See* Surrogate Testing Notes at page 3, copy attached hereto as Exhibit H.  He then

repeated the spin process to 0 degrees and 180 degrees of roll and measured the webbing

distance and distance between the driver's head and the roof.  *Id.*  During this testing, the three

inches of slack removed by Mr. Rosenbluth artificially tightened the seatbelt, creating additional

headroom.  This, in turn, manufactured support for Plaintiffs' theory that Betty Payan's head did

not strike the roof during the roll sequence before the roof deformed.  Mr. Rosenbluth provides

11

no valid basis for why he chose to remove three inches of webbing. *See* Rosenbluth Depo. at page 83, line 17 to page 84, line 13 (citing to an unidentified authority), Exhibit C.

### B.   MR. ROSENBLUTH IMPROPERLY USED A SURROGATE DRIVER THAT WEIGHED 30 POUNDS LESS THAN BETTY PAYAN.

Mr. Rosenbluth admits that the body composition of a vehicle occupant can affect tension of a seatbelt during a rollover accident. *See* Rosenbluth Depo. at page 49, line 22 to page 53, line 12, Exhibit C. The surrogate driver used in Mr. Rosenbluth's spit testing was 5'4" and weighed 132 pounds. *See* Surrogate Testing Notes at page 1, copy attached hereto as Exhibit H. However, Betty Payan's actual weight was 164 pounds, more than 30 pounds than the surrogate used by Mr. Rosenbluth. *See* Dr, Huston Depo. at page 81, line 14 to page 82, line 2, Exhibit E. Mr. Rosenbluth admitted that this 30-pound weight difference could create additional soft tissue compression and take away as much as an inch of distance between Betty Payan's head and the vehicle roof. *Id.* at page 50, line 10 to page 51, line 8. Adding this distance back into each of the five spit tests, one of which shows a distance of as little as 3/4 inches from the surrogate driver's head to the roof, would negate much of the spit testing results.

### C.   MR. ROSENBLUTH USED A DISSIMILAR SEAT THAT HE IMPROPERLY MODIFIED IN THE SURROGATE TESTING AND ARBITRATLY PLACED THIS SEAT IN THE BUCK.

#### 1.   MR. ROSENBLUTH IMPROPERLY USED A DISSIMILAR SEAT IN TESTING.

Critical to the determination of Betty Payan's movement in the rollover accident was her position in the seat of the subject vehicle, configuration of the seat relative to it placement in the vehicle, and distance of the seat from the roof. Although the subject vehicle was equipped with a manual seat, Mr. Rosenbluth used an electronic power seat in his surrogate testing. *See* Rosenbluth Depo., at page 70, lines 25 to page 71, line 3, Exhibit C; R. Piziali Photograph of

12

Subject Vehicle Seat, attached hereto as Exhibit I; Rosenbluth Photos of Surrogate Vehicle at EV SOA (1052), relevant copies attached hereto as Exhibit J.

An electronic power seat has different controls, movement tracks, and composition than a manual seat. *See* R. Piziali Photograph of Subject Vehicle Seat, attached hereto as Exhibit I; Rosenbluth Photos of Surrogate Vehicle at EV SOA (1052).JPG, Exhibit J. Yet, Mr. Rosenbluth provides no reason why this different seat was used or how differences in the configuration of the power and manual seats affect the validity of his surrogate testing.

### 2.    MR. ROSENBLUTH IMPROPERLY MODIFIED THE ELECTRONIC POWER SEAT TO CRAFT A ONE-OF-A-KIND "INTEGRATED SEATBELT SYSTEM."

Not only was the seat used in Mr. Rosenbluth's spit testing of a dissimilar production design from the subject vehicle's seat, Mr. Rosenbluth manipulated the spit test seat to create a one-of-a-kind "integrated seatbelt system," never before seen in production. This modified seat was crafted by Mr. Rosenbluth by cutting a hole in the top right corner of the seat through which Mr. Rosenbluth fed seatbelt webbing. *See* Rosenbluth Depo. at page 82 line 23 to page 82, line 16, Exhibit C; G. Rosenbluth Photos of Surrogate Vehicle at EV SOA (1118-1120), Exhibit J.

Integrated seatbelt systems were in production by Ford before the date of Mr. Rosenbluth's spit test analysis, but Mr. Rosenbluth provides no explanation for why he did not use a Ford production seat rather than the one-of-a-kind integrated seatbelt system he crafted. Moreover, an integrated seatbelt system is, by definition, a seatbelt system self-contained in a vehicle seat, the webbing of which is fed through a D-ring not attached to any pillar of a vehicle. As evidenced by the spit test photographs produced by Mr. Rosenbluth, although the webbing of the seatbelt is passed through the hole he cut in the seat, it still passes through a D-ring that is

13

mounted to the B Pillar of the buck. Because Mr. Rosenbluth's one-of-a-kind seat does not exemplify an integrated seatbelt system, it must not be represented to the jury as such a system and his testing data related to it must be excluded. Moreover, Mr. Rosenbluth's attempt to make the electronic power seat an integrated seatbelt system further renders it substantially dissimilar to the subject vehicle's seat, making the spit testing even more invalid for comparison purposes.

### 3.    MR. ROSENBLUTH ARBITRARILY PLACES HIS "INTEGRATED SEATBELT SYSTEM" IN THE BUCK.

As is evidenced in the photographs of the buck used in the spit testing and photographs of the subject vehicle's seat, the position of the seat in the buck is different from the location of the seat in the subject vehicle. *See* R. Piziali Photograph of Subject Vehicle Seat, attached hereto as Exhibit I; Rosenbluth Photos of Surrogate Vehicle at EV SOA (1052).JPG, relevant copies attached hereto as Exhibit J. It is more vertical and moved forward. *Id.* This dissimilar condition resulted from Mr. Rosenbluth's arbitrary placement of the electronic power one-of-a-kind "integrated seatbelt system" inside the buck. Although he cites some measurements relative to positioning of the seat itself, these measurements do not document the fore and aft position of the seat. Moreover, the "H-Point" reference of 37.50 inches cited in his Exemplar Vehicle Test Set-Up Worksheet is incorrect. *See* Surrogate Testing Notes at page 2, copy attached hereto as Exhibit H.

An H-Point is a reference point established by the Society of Automobile Engineers for comparative purposes and is used to assess relative headroom among different vehicle models. *See* Transcript of March 28, 2005 Deposition of E. Paddock (Paddock Depo.), at page 94, line 13 to page 95, page 2, relevant excepts attached hereto as Exhibit K. It represents the distance from

14

the center of a seat to the roof in a motor vehicle and varies among different vehicle makes and models.

The H-Point for the subject 2000 Ford Explorer is 39.9 inches. *See* Paddock Depo. at page 94, line 23 to page 94, line 1, Exhibit K; Dimensional Data for 2000 Ford Explorer, copy attached hereto as Exhibit L. However, the H-Point used in the buck created by Mr. Rosenbluth was 37.50 inches, over two inches less than the actual H-Point. *See* Surrogate Testing Notes at page 2, copy attached hereto as Exhibit H. This error in Mr. Rosenbluth's analysis results in the unjustified removal of two inches of space between the surrogate's head and the roof, skewing the results in favor of Plaintiffs' theory of defect.

## V.    MR. ROSENBLUTH USES HIS SURROGATE TESTING TO FORM CONCLUSIONS THAT ARE NOT SUPPORTED BY HIS DATA.

Although trained experts commonly extrapolate from existing data, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *General Electric v. Joiner*, 522 U.S. 136, 146 (1997). A court may properly conclude that there is simply too great an analytical gap between the data and the opinion proffered. *See Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992).

As described above, Mr. Rosenbluth's spit test consisted of five static tests performed under artificial laboratory conditions. Other than static tests, a dynamic test is another form of vehicle testing that involves real world crashes and rollovers in vehicles containing cadavers or crash dummies. Dynamic testing is more representative of what direction and magnitude of forces are experienced in actual rollover accidents. *See* Transcript of March 25, 2005 Deposition of Dean Jacobsen at page 54, lines 22 to 24, relevant excerpts attached hereto as Exhibit M

15

("I think that in a drop test you have a dynamic test which really simulates what you're really concerned about in a rollover, and that is an impact").

Both Mr. Rosenbluth and Dr. Huston testified that the results of static tests would likely differ from the results of dynamic tests. *See* Rosenbluth Depo. at page 75, line 20 to page 79, line 5, Exhibit C; Dr. Huston Depo. at page 45, line 18 to page 46, line 7, Exhibit E. Mr. Rosenbluth testified that, if his test set-up was subject to a dynamic test, the test seatbelt would elongate and the surrogate's head would hit the roof. *Se*e Rosenbluth Depo. at page 77, line 14 to page 79, line 5, Exhibit C. Nevertheless, Mr. Rosenbluth's opinion infers that the precise results of the spit testing are applicable to performance of the subject vehicle during the subject rollover accident. *Id.* at page 73, line 4 to page 74, line 74, line 21. This analytical gap between the spit test data and Mr. Rosenbluth's testimony is too great. Accordingly, his testimony must be excluded.

## VI.    ANY CONCEIVABLE PROBATIVE VALUE OF MR. ROSENBLUTH'S TESTIMONY IS OUTWEIGHED BY RULE 403 RISKS.

Mr. Rosenbluth's opinions are not relevant to any matter of consequence in this action. Even if they were relevant to issues in dispute, Mr. Rosenbluth's testimony itself is not relevant because he is not qualified to testify on design of a production seatbelt system. The evidence of his surrogate analysis is also irrelevant since it would prove nothing other than that, if relevant conditions are ignored, a person sitting in the driver's seat of the 2000 Ford Explorer may not touch the roof with their heads when the vehicle is turned upside-down in an artificial setting. This is certainly not evidence tending to prove or disprove how Betty Payan's head experienced contact with the roof in the rollover accident. Such evidence, however, would unduly prejudice, confuse, and mislead the jury into believing that, since the surrogate's head did not contact the

16

roof in a static encounter, Betty Payan's head most likely did not contact the roof in a dynamic encounter.

Expert testimony veiled in the shroud of "science," such as that offered by Mr. Rosenbluth, poses substantial risks in the courtroom. It can be both "dangerous and misleading." *See Michigan Miller Mutual Ins. Corp. v. Benfield*, 140 F.3d 915, 920 (11th Cir. 1998) (discussing the dangers posed by expert testimony under the veil of science). Thus, in consideration of the irrelevance of Mr. Rosenbluth's testimony, his lack of qualifications, the unreliable basis of his opinions, and his lack of analytical reasoning, this Court must exclude Mr. Rosenbluth's proffered testimony under Rule 403.

## VII.  **CONCLUSION**

For the foregoing reasons, Mr. Rosenbluth's safety restraint opinions and evidence of spit testing are inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* and Rules 402, 403, and 702 of the Federal Rules of Evidence. They must therefore be excluded.

Respectfully submitted,

BROWN McCARROLL, L.L.P.
111 Congress Avenue, Suite 1400
Austin, Texas  78701
(512) 472-5456
(512) 479-1101 (Fax)

By: _____  (William L Mennucci G

Chris A. Blackerby, Attorney in Charge   Chris Blackerby
State Bar No. 00787091
So. Dist. of Texas No. 20016   w/ permission

17

THOMPSON, COE, COUSINS & IRONS, L.L.P.
William L. Mennucci
State Bar No. 00788042
So. Dist. of Texas No. 18172
701 Brazos Street, Suite 1500 Austin Centre
Austin, Texas 78701
(512) 708-8200 Telephone
(512) 708-8777 (Fax)

and

Matthew Goldstein
SNELL & WILMER, L.L.P.
One South Church Ave.
Suite 1500
Tuscon, AZ  85701
(520) 882-1200
(520) 884-1294 (Fax)

**ATTORNEYS FOR DEFENDANT
FORD MOTOR COMPANY**

18

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been forwarded as set forth below to the following attorney(s) on this ___13___ day of May, 2005:

Benigno (Trey) Martinez
Tony Martinez
MARTINEZ, BARRERA Y MARTINEZ, L.L.P.
1201 East Van Buren
Brownsville, TX 78520

_____
Chris A. Blackerby

*William L Mennucci*
*G. Chris Blackerby,*
*w/ permission*

19

CIVIL ACTION NO. B-03-120

**DEFENDANT FORD MOTOR COMPANY'S OPPOSED MOTION TO EXCLUDE TESTIMONY OF GERALD ROSENBLUTH UNDER RULES 402, 403, AND 702 OF THE FEDERAL RULES OF EVIDENCE AND *DAUBERT V. MERRELL DOW PHARMACEUTICALS***

## APPENDIX

A.  Plaintiffs' Designation of Experts

B.  Report of Gerald Rosenbluth

C.  Excerpts from Transcript of May 9, 2005 Deposition of Gerald Rosenbluth

D.  Report of Dr. Ronald Huston

E.  Excerpts from Transcript of March 15, 2005 Deposition of Dr. R. Huston

F.  Excerpts from Transcript of October 2, 2001 Deposition of Gerald Rosenbluth in

   *Ford Motor Company v. State of California*

G.  Automotive Consulting Services Inc., Curriculum Vitae of Gerald Rosenbluth

H.  Automotive Consulting Services, Inc, Surrogate Testing Notes

I.  Photograph of Subject Vehicle Seat by Dr. Robert Piziali

J.  Photos of Surrogate Vehicle by Gerald Rosenbluth

K.  Excerpts from Transcript of March 28, 2005 Deposition of Edward Paddock

L.  Dimensional Data for 2000 Ford Explorer

M.  Excerpts from Transcript of March 25, 2005 Deposition of Dean Jacobsen

20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ISABEL ENNIS REYNOSO, SALLY PAYAN,  §
AND ENRIQUE ROBERTO PAYAN,          §
                                    §
              Plaintiffs,           §
                                    §
vs.                                 §
                                    §   **CIVIL ACTION NO. B-03-120**
FORD MOTOR COMPANY, et al.          §
                                    §
              Defendants.           §
                                    §

**CERTIFICATE OF CONFERENCE IN SUPPORT OF:**

**DEFENDANT FORD MOTOR COMPANY'S OPPOSED MOTION TO EXCLUDE
TESTIMONY OF GERALD ROSENBLUTH UNDER RULES 402, 403, AND 702 OF
THE FEDERAL RULES OF EVIDENCE AND *DAUBERT V. MERRELL DOW
PHARMACEUTICALS***

TO THE HONORABLE JUDGE OF THE COURT:

Undersigned counsel, Matthew Goldstein, for Ford Motor Company ("Ford"), certifies

that counsel for Ford has conferred with respondent and, after personal consultation and good

faith efforts to do so, counsel cannot agree on the disposition of Ford's Opposed Motion to

Exclude Testimony of Gerald Rosenbluth Under Rules 402, 403, and 702 of the Federal Rules of

Evidence and *Daubert v. Merrell Dow Pharmaceuticals*.

. . .

. . .

Respectfully submitted,

SNELL & WILMER L.L.P.
One South Church Avenue
Suite 1500
Tucson, Arizona 85701
(520) 882-1218 Telephone
(520) 884-1294 Fax

By: _____
Matthew A. Goldstein
Admitted Pro Hace Vice

- and -

William L. Mennucci
State Bar No. 00788042
Michael W. Eady
State Bar No. 06332400
THOMPSON, COE, COUSINS & IRONS, L.L.P.
701 Brazos Street, Suite 1500 Austin Centre
(512) 708-8200 Telephone
(512) 708-8777 Fax


ATTORNEYS FOR DEFENDANT
FORD MOTOR COMPANY

## CERTIFICATE OF SERVICE

I hereby certify by my signature below that a true and correct copy of the foregoing has been served on all counsel of record via facsimile and regular mail on this 13th day of May, 2005:

Tony Martinez, Esq.
Martinez, Barrera & Martinez, L.L.P.
1201 East Van Buren
Brownsville, Texas  78520

**Attorneys for Plaintiffs**

Matthew Goldstein, Esq.

370265

3