Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                    BROWNSVILLE DIVISION

4

5    ISABEL ENNIS REYNOSO, SALLY PAYAN,)
     and ENRIQUE ROBERTO PAYAN,        )
6                                      )
                         Plaintiffs,   )
7                                      )
          -vs-                         )    Civil Action
8                                      )    No. B-03-120
     FORD MOTOR COMPANY,               )
9                                      )
                         Defendant.    )
10   _____)

11

12

13                    Tempe, Arizona
                      May 9, 2005
14                    10:00 a.m.

15

16         DEPOSITION OF GERALD ROSENBLUTH

17

18

19

20   REPORTED BY:
     CATHY E. HOFF, RPR, CSR, CCR
21   Certified Court Reporter          (COPY)
     CCR No. 50101
22                         HOLIDAY & ASSOCIATES
                      Registered Professional Reporters
23                   2025 North Third Street, Suite B-173
                        Phoenix, Arizona 85004
24                   (602) 712-9700  Fax (602) 712-9701
     PREPARED FOR:
25   ASCII/CONDENSED

Gerald Rosenbluth Vol. 1

Page 32

1        Q.    And I want to try and draw this distinction
2    because you're not offering testimony as a roof expert
3    in this case, right?
4        A.    Correct.
5        Q.    And you're not offering testimony as a
6    biomechanic on injury causation or injury mechanisms,
7    fair?
8        A.    Correct, although I'm aware of it, but that
9    testimony will be offered by Dr. Huston.
10        Q.    And you defer to Dr. Huston on those issues
11    in this case, right?
12        A.    Yes.
13        Q.    So to try and make sure that I understand
14    what you're going to be testifying or using the SAFE
15    for is simply to look at that testing and say, Well,
16    can I find a way to keep someone at least 2 inches back
17    from the roof, because approximately 2 inches is how
18    much roof crush you might see in a roof deformation,
19    you may see in a stronger vehicle.  And can I find a
20    way to do that, and yes, I think I've done that?
21        A.    Well, you threw in the 2 inches.  Let's say
22    can you minimize any roof collapse or crush to a point
23    where you could keep the occupant survival zone intact,
24    and then I would agree, yes.  That's the purpose.
25        Q.    And that's what I'm trying to get to.  It

1    supplement as far as your report to bring it up to date

2    for today that we haven't already discussed?

3        A.    I don't believe so.

4        Q.    Because we talked about the partial ejection.

5    Let me strike that for a second.

6            Mr. Rosenbluth, on the numbered opinion

7    No. 9, you say, "Partial ejection resulting in the

8    severe catastrophic injuries of Ms. Reynoso Payan."

9            Did I read that correctly?

10       A.    Well, we're talking about summarily the

11   compromise and effectiveness of the left front seat

12   position No. 1 seat belt, coupled with the roof

13   structure failure, were primary factors of partial

14   eviction resulting in the severe catastrophic injuries,

15   correct.  Meaning that there were really two injury

16   mechanisms.

17       Q.    And what you're saying today, though, is that

18   the severe catastrophic injuries that she suffered

19   weren't actually from the partial ejection, they were

20   resulting from roof deformation while she was inside

21   the vehicle.  That's what you're saying today, right?

22       A.    Correct.

23       Q.    Now, your opinions with regard to

24   crashworthiness in this case, they regard the driver

25   Betty Payan, correct?

Gerald Rosenbluth Vol. 1

Page 46

1      A.    Yes.

2      Q.    Have you also analyzed this case and looked

3  at it as to the passenger, Sally Payan?

4      A.    No.

5      Q.    Why is that?

6      A.    I was asked to evaluate the seating position

7  No. 1, the driver.  I was never requested by

8  Mr. Martinez to evaluate the passenger's injuries.

9      Q.    And based on your knowledge of this case,

10  whose injuries were relatively minor, were they not?

11      A.    Yes.

12      Q.    You agree that the injuries that Sally Payan

13  suffered were of the type and extent that you would

14  reasonably expect in a rollover accident of this

15  severity even in the safest of passenger vehicles?

16      A.    I couldn't agree or disagree, because I'm not

17  familiar with the injuries of the right front

18  passenger.

19      Q.    Have you analyzed the seat belt in that

20  position at all?

21      A.    No.

22      Q.    What was the purpose of your second

23  inspection of the vehicle?

24      A.    Primarily the removal of the seat belt so we

25  could lay out the seat belt and map it.

Page 47

1      Q.    Do you have notes of your mapping that you

2   sometimes do with it elongated out and the marks for

3   witness marks and things like that?  Did you do that in

4   this case?

5      A.    No.  I simply did that photographically.

6      Q.    Okay.  Why don't we take that out and talk a

7   little bit about your inspection of the subject

8   vehicle's driver's side seat belt system.  Okay?

9      A.    Sure.

10     Q.    Do you feel like you found all the pieces of

11  webbing that were available and put them all together

12  for that driver's side position?

13     A.    Actually, Mr. Paddock and I did that

14  together, because it was just easier to do.  And with

15  reference to your question, the answer appears to be

16  yes.

17     Q.    The seat belt was cut, was it not?

18     A.    Correct.

19     Q.    In how many places?

20     A.    It was cut roughly at 7 foot 2 inches as

21  measured from the outboard anchor loop.

22     Q.    And you found --

23     A.    So there's one cut, to answer your question

24  directly.

25     Q.    You presume that was cut as a part of the

Gerald Rosenbluth Vol. 1

Page 50

1      Q.    Being 2 inches taller and 35 pounds heavier,

2   you would get greater --

3      A.    Excursion.

4      Q.    -- excursion?  Thank you for the word.  Fair?

5      A.    Yeah.  Your seated height would probably be

6   three-quarters of an inch to an inch higher, and then

7   if you have the extra weight, you would get somewhat of

8   a greater excursion because you would have greater soft

9   tissue compression.

10      Q.    Do you have an opinion as to what the

11   difference would have been in your surrogate analysis

12   in terms of, say, vertical excursion at 180 degrees

13   with an original equipment manufacturer condition and

14   seat lock-up, assuming a 5-foot 6 inch surrogate and

15   165 pounds?

16      A.    You may have had head contact, but not

17   impact.

18      Q.    And that's in a dynamic surrogate test?

19      A.    Yeah.  We're looking at test A-1, which is a

20   roll-induced lock-up.  And so at zero degrees,

21   obviously sitting upright, with the vehicle upright, we

22   have 5-1/2 inches of vertical clearance between the

23   head and the roof structure.  At 180 degrees, we had 2

24   inches of clearance.

25            So if we take the three-quarters to one

Gerald Rosenbluth Vol. 1

Page 51

1    inch -- let's just call it one inch for conversation's

2    sake -- we now have -- because she's an inch higher in

3    the seat, we only have one inch of clearance.  And if

4    we address, let's say, one inch for the additional soft

5    tissue compression, then we would have contact with the

6    roof with a non-collapsed roof and an OEM seat belt.

7              If we then take that further towards test

8    A-2, A-3, et cetera, that becomes different.

9       Q.   Okay.  Would you agree that body compression

10   is generally greater for older occupants than younger

11   occupants?

12      A.   Soft tissue?

13      Q.   Yes.

14      A.   It depends on how much tissue you have.

15              Are you saying that I compress more than you

16   do?

17              MR. MARTINEZ:  Touchè.

18              MR. PETERSEN:  Yes.

19              Let the record reflect everybody in the room

20   is laughing.

21      Q.   BY MR. PETERSEN:  Seriously, if two people,

22   same height, same weight, one's 60, the other is 20,

23   you're generally going to get more compression in the

24   60-year-old than the 20-year-old, all other things

25   being equal?

Gerald Rosenbluth Vol. 1

Page 52

1     A.    That really depends on the amount of soft

2 tissue on the individual.  And if we're talking about

3 compression, it's not really that different, because

4 your -- the lap belt is around the hip structure, and

5 so that would be underneath the greater portion of my

6 weight, if we were to compare you and I.

7     Q.    Have you had an opportunity to review the SAE

8 article that was published by Dr. Carly Ward on spit

9 tests and using female surrogates?

10     A.    No.

11     Q.    Would it surprise you to find that or know

12 that Dr. Ward found some difference, great difference

13 in body compression between men and women of the same

14 size, and finding more soft tissue compression in

15 women?

16     A.    You're saying she found differences -- I have

17 not reviewed it, but you're saying that she found

18 differences in a 25-year-old woman versus a 50-year-old

19 woman who had the same height, the same seated height

20 and the same weight?

21     Q.    That is not at all what I just asked.  My

22 question was, as between men and women, would it

23 surprise you that she found greater soft tissue

24 compression in women than men, speaking in very general

25 terms?

1      A.    Generally I would expect there could be some

2    difference.  I mean, you can't say that all men are

3    muscular and all women are not muscular either.  What

4    you're talking about is do we have soft tissue versus

5    muscle and what is the degree, and that varies as to

6    individual.

7      Q.    Okay.  Because there's so much variance in

8    between individuals and their tissue compressions, is

9    that why it's important to use a surrogate that as

10   closely models the person you're trying to evaluate as

11   you possibly can find and reasonably expect?

12     A.    Yes, as closely models structurally.

13     Q.    What did you do with regard to your surrogate

14   spit test to try to find and determine whether this

15   surrogate most closely models Ms. Payan in her

16   structure?

17     A.    I went by overall height, overall weight, and

18   in this instance, the in-seam measurement.

19     Q.    You had Ms. Payan's in-seam measurement?

20     A.    I had called or someone had called and

21   verified that, that it was a 30-inch in-seam, so that I

22   could then establish or try to establish as close as

23   possible the structure of Ms. Payan to the surrogate.

24     Q.    How old was the surrogate that you used?

25     A.    The surrogate was substantially younger,

Page 61

1    belt to see if, in fact, do we have a late lock-up

2    issue.

3        Q.    Do you think you have a late lock-up issue in

4    this case?

5        A.    I think it's somewhat late, but depending on

6    the exact position, it could really fall within a

7    range.  So I'm not saying it's defective because

8    there's a late lock-up because the retractor failed to

9    perform its design and intended function and was

10    defective in performance.  That's not what I'm saying.

11        Q.    Okay.  Let me short-circuit this another way,

12    perhaps.  Could another explanation of it simply be

13    that Ms. Payan was actually 165 pounds, as Dr. Huston

14    found, whatever his source was, and that ate up another

15    3 inches, and that could also explain that it maybe was

16    not a late lock-up at all, but simply a function of her

17    being a little heavier than what you found in your

18    analysis?

19        A.    Possibly.  I don't know if I would go quite

20    that far, but it's possible.  I don't know what

21    difference 35 pounds would be.  And then we'd have to

22    know where the 35 pounds would be applied.

23        Q.    You have that problem now when you're picking

24    out a surrogate that's 20, and instead of a

25    51-year-old, and who is 2 inches shorter, perhaps, and

Gerald Rosenbluth Vol. 1

Page 62

1    perhaps 35 pounds difference in weight?  I mean, you

2    don't know the exact distribution, you're making

3    assumptions already, right?

4         A.   Sure.  I mean, you come as close as you can

5    to a seated height and overall height and in-seam

6    measurement and a weight.  And from the information I

7    had, I chose the surrogate, so I will take

8    responsibility for that.

9         Q.   Okay.  You've not tried to model a five-six

10   165-pound woman in the buck and see where that would

11   fall as far as seat belt measurements to the latch

12   plate and D-ring, have you?

13        A.   I have not, but if that becomes an issue, I'm

14   sure that would be done.

15        Q.   At this point, is late lock-up an issue for

16   you?

17        A.   No.

18        Q.   You feel as though the retractor in this case

19   performed as it was designed to?

20        A.   Yes.

21        Q.   Did you find a web grabber mark on this seat

22   belt?

23        A.   Not that I could positively discern.  Not to

24   say it isn't there, but web grabber marks are very --

25   sometimes they're very subtle, especially in rollovers.

Gerald Rosenbluth Vol. 1

Page 70

1      A.    Pretty much now the state of the art would be

2    the Pre-Safe system, where the standard of the industry

3    would be pretensioner system in 2005.  So the standard

4    of the industry is pretty much what most of the

5    manufacturers are doing.  State of the art would be

6    reasonably advanced technology that is still doable.

7      Q.    You've not been to the accident scene, have

8    you?

9      A.    Correct.

10      Q.    You've not personally spoken with any of the

11    plaintiffs or any witnesses to the accident?

12      A.    Correct.

13      Q.    The seat position, as you measured it in the

14    subject vehicle, is as you've identified it in

15    Exhibit 14, page 2, in your exemplar vehicle test

16    setup; is that right?

17      A.    It's under the caption Exemplar Vehicle Test

18    Setup under the column Subject Vehicle.

19      Q.    Those are the measurements that you took

20    while you were out there inspecting the vehicle?

21      A.    Yes.

22      Q.    Do you know if the seat had been adjusted at

23    all prior to you inspecting the vehicle?

24      A.    Not that I'm aware of.

25      Q.    Was it an electronic seat, such that you

Gerald Rosenbluth Vol. 1

Page 71

1    would need to have power going to the seat?

2         A.    No.    There's a bar in the front.    Probably

3    have some more detailed photos.

4         Q.    Based on your exemplar inspection, did it

5    seem like that seat position was a pretty reliable

6    position for Betty Payan to have had it in at the time

7    of the accident?

8         A.    Yes.    Represented in photographs taken

9    November 23rd, 2000 -- November 29th, 2004, 1049

10   through 1052.

11        Q.    Fair to say, then, based on your surrogate

12   analysis, in fact you don't have any other evidence to

13   the contrary, you feel as that the seat position

14   measurements you took are representative of where they

15   would have been for Betty Payan at the time of the

16   accident?

17        A.    Yes.

18        Q.    You didn't try to reconstruct the accident

19   yourself, right?

20        A.    Correct.

21        Q.    So if I were to ask you questions on a

22   quarter roll by quarter roll basis, asking you where

23   the vehicle was in relation to the physical evidence,

24   would you be able to do that sitting here today?

25        A.    That's a function of accident reconstruction,

Gerald Rosenbluth Vol. 1

Page 72

1    so I would defer to Mr. Irwin.

2         Q.   That's not something that you've done up to

3    this point?

4         A.   Correct.

5         Q.   All right.  I'm trying to think of a way to

6    short-circuit this, but I'll just ask it the big way

7    and narrow it down.

8         A.   I think we got the opinions out early on.

9         Q.   In general, yes.  It's your opinion that the

10   2000 Ford Explorer is defective in its design for the

11   driver's side seat belt and seat assembly, right?

12        A.   Essentially.  The seat belt as designed is

13   ineffective in an accident foreseeable on the part of a

14   manufacturer.

15        Q.    In this case, in this accident, everything

16   else remaining equal, if we simply used your

17   alternative design, a seat-integrated restraint coupled

18   with a rollover sensor and a pretensioner, would that

19   change, everything else being equal, have saved

20   Ms. Payan from getting a serious neck injury?

21        A.    Would it have made a difference relative to

22   her C6-7 subluxation injury mechanism?

23        Q.   Sure.

24        A.    And that's primarily a question that should

25   be addressed to Dr. Huston.  I would defer to

Page 73

1  Dr. Huston's answer to that question, was that he
2  thought it would make a significant difference, but he
3  couldn't quantify it.
4      Q.   You don't have an opinion yourself as to
5  whether simply replacing the seat belt and seat system
6  in this Explorer with your reasonably safe alternative
7  design would have prevented the paralysis injury in
8  this case?  You don't have an opinion on that today,
9  fair?
10     A.   To a point I have an opinion, just short of a
11 biomechanical analysis, and that it would have at least
12 reduced or minimized the propensity for the
13 incapacitating C6-C7 injury mechanism.
14     Q.   What's the basis for that opinion?
15     A.   We have a roof collapse of approximately
16 9 inches, somewhat less, toward the B-pillar.  And I
17 can do that and probably give you the exact numbers,
18 but let's just say approximately -- we have 5 inches at
19 the -- directly above the H point, and what we did do
20 was measure -- what we did was measure at that H point.
21          And you're getting somewhat less than
22 9 inches, but let's just go -- as we keep the occupant
23 just a little further back, as you get to the B-pillar,
24 you're probably at 5 inches, 6 inches, something like
25 that, in that order.

Page 74

1          We know that if we pretension, as we have

2    done so, statically, integrated EOR with an ETR

3    lock-up, and we're roughly with an ETR, at 180 we have

4    4-1/2 inches.  Therefore, we have an inch or two of

5    displacement, which probably could be absorbed by the

6    human body, but, again, now we're teetering on the

7    biomechanical.  I can only give you the measurements

8    and the data.  I can't interpret that data

9    biomechanically, or at least I shouldn't.  And I should

10   rely on Dr. Huston.

11         But when Dr. Huston stated that if we reduce

12   the roof crush, and we don't have to reduce that roof

13   collapse 100 percent, the further back we keep the

14   occupant toward the B-pillar, the less roof crush we

15   have to deal with.

16         In this instance, test A-2 with the ETR, we

17   had 4-1/2 inches of clearance.  So if you get an inch,

18   2 inches, even, you may have a headache, but you're

19   surely not going to have a C6-C7 subluxation.  So the

20   answer to your question is probably yes, with that

21   explanation.

22      Q.    Okay.

23      A.    The truth is I forgot the question.

24      Q.    Let's talk a little bit more about your

25   surrogate testing, because that forms a large part of

Gerald Rosenbluth Vol. 1

Page 75

1    the bases for your opinions in this case, right?

2         A.    True.

3         Q.    The surrogate testing you did, you did five

4    different tests, right?

5         A.    Correct.

6         Q.    And all of those were done in a -- and

7    they're quasi-static tests?

8         A.    Correct.

9         Q.    The movement, for instance, if we use the

10   first test -- which was in original equipment

11   manufactured condition, right?

12        A.    Correct.

13        Q.    And you allowed that to simply lock up

14   through rolling the vehicle through its plane, right?

15        A.    A roll-induced ELR lock-up.

16        Q.    So at 180 degrees, you end up with your

17   surrogate with a head that's about 2 inches from the

18   headliner, is that right, the roof liner?

19        A.    Correct.

20        Q.    Now, you would expect that to be different in

21   a dynamic accident, right?

22        A.    Sure.  There's some differences, and don't

23   forget when you have the roof crush and you have that

24   9 inches of crush that we talked about, probably the

25   restitution is 10 to 15 percent.  So there's another

Gerald Rosenbluth Vol. 1

Page 76

1    inch, more or less, that you need to deal with

2    dynamically.

3        Q.    So let's break this down.  As far as the

4    difference between your static test and what you would

5    expect dynamically in an accident, you have the roof

6    deformation because you're assuming a perfectly stiff

7    roof in your static test, right?

8        A.    Correct.

9        Q.    So you've got the raw roof intrusion,

10   wherever that is at the end of the accident, the static

11   deformation, fair?

12       A.    You said the raw roof intrusion?

13       Q.    Static.  Using the -- synonymous with static.

14       A.    Okay.

15       Q.    And then you've got what you would do for a

16   dynamic intrusion, which you would include another 10

17   to 15 percent deformation.

18            Do you think that's fair?

19       A.    That's plastic deformation versus elastic

20   deformation.  So static and dynamic intrusion, same

21   thing.  We're agreeing.

22       Q.    All right.  I'll go back to my question then.

23   Static deformation, then you've got dynamic, which is

24   about the static plus 10 to 15 percent.  That's what

25   you're saying, right?

Gerald Rosenbluth Vol. 1

Page 77

1    A.    Fair enough.  But that's generally termed --

2    that's what I'm saying.  Static is going to be plastic

3    deformation, and dynamic is going to include the

4    elastic deformation.  That's the only thing I was

5    trying to clarify.

6    Q.    I was simply using your terms from a previous

7    answer.

8    A.    Okay.

9    Q.    Let's move past that now.  So we've got the

10   deformation.

11   A.    I think we ought to use static and dynamic.

12   Q.    That's what I was using, for heaven's sakes.

13   A.    I know that.

14   Q.    So we've got the deformation.  Other things

15   that are going to change between your static and

16   dynamic tests, there's going to be some belt

17   elongation, right?

18   A.    Right.

19   Q.    Additional body compliance?

20   A.    Right.

21   Q.    What else?

22   A.    Potentially some plastic deformation of the

23   anchorage points for the -- most especially for the

24   buckle and the load bar, the traveler bar.

25   Q.    The plastic deformation of the traveler bar,

Gerald Rosenbluth Vol. 1

Page 78

1   how much is that really going to make a difference as

2   far as occupant excursion?

3       A.   I've seen it --

4       Q.   In this case.

5       A.   Not significant in this case.

6       Q.   Okay.  Anything else?

7       A.   I think we've covered the points.

8       Q.   Okay.  With just 2 inches in your static

9   test, what would your estimation be for additional

10  excursion through body compliance of a person the size

11  of Betty Payan?

12      A.   Well, I didn't break it down into the

13  individual components because I don't know of any test

14  that's ever been done that has broken it down to those

15  individual components.

16           If your question is, with 2 inches of head

17  clearance, would I expect between the static and

18  dynamic, that in a dynamic test, you would have head

19  contact with the roof, I think the answer is yes.

20      Q.   Okay.

21      A.   If you were to ask me that question.

22      Q.   Assume that I asked you that question,

23  Mr. Rosenbluth.  I mean, what you're saying is that if

24  you put this surrogate in a perfectly stiff roof with

25  the original equipment manufactured belt and did a

Page 79

1   static three to five G roll event, her head is going to

2   be in touch with that roof liner without any roof

3   deformation at all, right?

4        A.   It's going to make contact, but not impact,

5   and I think there's a difference there.

6        Q.   Tell me what you think the difference is

7   between contact and impact.

8        A.   Contact is a headache.  Impact is a broken

9   neck.

10       Q.   Okay.

11       A.   I mean, I suppose we could describe that in

12  HIC values and other ways, but that's probably the --

13  cutting through that chase.

14       Q.   I'm fine with that.  Tell me how much

15  deformation, then, to the roof do you need?  What's the

16  minimum level there that you need to go from having a

17  headache to a broken neck once your head is already in

18  contact with the roof liner?

19       A.   I think if you have 4 inches static clearance

20  in the 180-degree range, that you're probably 3 to 4

21  inches, that you're going to be pretty safe, by the

22  time you consider the body soft tissue compression, the

23  belt fabric elongation, all of the other factors.

24       Q.   Okay.  Now, if you were an auto manufacturer

25  and you're designing your seat belt system, you're not

Gerald Rosenbluth Vol. 1

Page 82

```
 1        A.    I'm not brave.

 2        Q.    So you're willing to put a

 3   20-something-year-old woman through this, but you're

 4   not brave enough to do it yourself?

 5        A.    Well, we have done surrogate analyses here

 6   with various employees, including Mr. Pollack, Sr., Tom

 7   Pollack, Craig Pollack.  So if I fit the bill for the

 8   surrogate, we probably would use me.

 9        Q.    Okay.

10        A.    Absolutely.

11        Q.    So it's nothing about bravery.  You don't

12   have hesitation of going and doing that?

13        A.    No.

14        Q.    You just haven't done it yourself?

15        A.    There hasn't been a need to.

16        Q.    All right.

17        A.    I could prove to you the efficiency of the

18   system if you're willing to get in the buck right now.

19        Q.    Once again, I'm asking the questions,

20   Mr. Rosenbluth.

21              MR. MARTINEZ:  He's just trying to be

22   friendly.

23        Q.    BY MR. PETERSEN:  Mr. Rosenbluth, have you

24   seen or are you aware of any other expert or engineer

25   who has modeled seat-integrated restraints the same way
```

Page 83

1    you have, by cutting a hole in the seat?

2        A.    Yes.

3        Q.    Who?

4        A.    Bill Muzzy.

5        Q.    Anyone else?

6        A.    I don't know one way or the other.  I know

7    Mr. Muzzy did it because it was on a Bronco II and we

8    did the test for him, and he requested that we do that.

9        Q.    Was it his idea to start doing that, where

10   you cut the hole in the back of the seat and loop it

11   through?

12       A.    Who, Mr. Muzzy?

13       Q.    Yes.

14       A.    No.

15       Q.    It was something that you came up with?

16       A.    Yes.

17       Q.    Now, when you did your seat-integrated

18   restraint test, which is A-2, it's in Exhibit 14, you

19   took out 3 inches of belt webbing; is that right?

20       A.    The ETR, yes.

21       Q.    ETR is?

22       A.    Emergency tensioning retractor.

23       Q.    The pretensioner?

24       A.    Yes.

25       Q.    Where did you get the 3 inches from?

Page 84

1          Where did the 3 inches come from,

2   Mr. Rosenbluth?

3       A.   The seat belt webbing.

4       Q.   I understand.  As opposed to one inch, a

5   half-inch, 5 inches, where did the 3 inches come from?

6       A.   Well, the maximum authority would be

7   6 inches, so I chose 50 percent of the maximum

8   authority.

9       Q.   What is the maximum authority?

10      A.   6 inches.

11      Q.   Where does the maximum authority come from?

12      A.   Data that I've seen relative to pretensioner

13  seat belts.

14      Q.   Have you done any dynamic testing of

15  pretensioners yourself?

16      A.   No.

17      Q.   You've reviewed Bob McCoy's pretensioner

18  presentation and testing, have you not?

19      A.   Bob McCorey?

20      Q.   McCoy, M-c-C-o-y.  It was produced in this

21  case and has been in others.  It's a presentation that

22  he gave to the Rollover Committee in 2004.

23      A.   Produced in this case?

24      Q.   Yes.

25      A.   Is that the Chevy?

Page 85

1    Q.   It is not.  Bob McCoy is a rollover advance
2  team person at Ford, Ph.D. level engineer who did a
3  presentation on the effectiveness or ineffectiveness of
4  pretensioners in rollover accidents.
5    A.   Okay.
6    Q.   Do you recall seeing that presentation and
7  those analyses?
8    A.   No.
9         MR. MARTINEZ:  Counselor, could you enlighten
10  me.  Was that given in one of the depos?
11        MR. PETERSEN:  In Paddock's deposition.
12        MR. MARTINEZ:  Okay.
13    Q.   BY MR. PETERSEN:  I take it because you have
14  no memory of it, there's no hope of you having a
15  response to it?
16    A.   It's possible.
17    Q.   I believe it was also produced in the
18  Pollesche case.
19    A.   I think the one you were relying on there was
20  the testing that Barry Hare did and crew.
21    Q.   I'll getting around to the Barry Hare data.
22    A.   Okay.
23    Q.   You still don't recall having seen that Bob
24  McCoy analyses and presentation?
25    A.   It doesn't ring a bell.

Gerald Rosenbluth Vol. 1

Page 86

1    Q.    You have reviewed the Barry Hare paper?

2    A.    Yes.

3    Q.    And that was a 2000 SAE publication, right?

4    A.    Correct.

5    Q.    And in that 2000 SAE publication, they were

6    analyzing the effectiveness of pretensioners in

7    rollover accidents, right?

8    A.    Correct.

9    Q.    And they were doing so even though,

10   admittedly, they didn't have a way of firing a

11   pretensioner in a rollover accident, right?

12   A.    Correct.

13   Q.    And it was their ultimate opinion that

14   pretensioners made little, if any, difference in

15   rollover accidents?

16   A.    Well, that depends on the position.  If you

17   read the paper, as I'm sure you did, and you'll find

18   that, A, they fired a pretensioner late, as I recall,

19   and, B, that the far side pretensioner did have an

20   effect because it pretensioned by 2 inches.  Read the

21   paper.  That's exactly what it says.

22   Q.    2 inches?

23   A.    Yes, it did.

24   Q.    And they were firing it late?

25   A.    Correct.

Gerald Rosenbluth Vol. 1

Page 87

1      Q.    Okay.  And what distance is it that you're

2    referring to as 2 inches?

3      A.    Total amount of pretension.

4      Q.    What effect did the 2 inches of pretension

5    have on occupant excursion?

6      A.    2 inches is very significant.  I don't

7    recall.  They didn't measure the occupant excursion, I

8    don't believe.

9            I'm trying to go back from memory, and I do

10   recall in that paper that the far side had a 2-inch

11   pretension, and it wasn't given in inches.  It was

12   given in like 51 millimeters or something like that.

13     Q.    So they fired off a pretensioner on the

14   far-side occupant, it pretensioned the belt 51

15   millimeters, which is roughly equivalent of 2 inches?

16     A.    And their conclusion was it didn't make a

17   significant impact that were -- significant difference

18   on the near-side occupant, but you had 2 inches on the

19   far-side occupant.

20     Q.    I want to make sure that we're talking about

21   the same thing, because whether you take out zero

22   inches or 2 inches or 5 inches out of the webbing, what

23   you really care about is the level of occupant

24   excursion, right?

25     A.    Correct.  And if you take out 2 inches versus

Page 90

1   rollover, how much would you need to pretension a belt

2   in order to bring -- pull out 3 inches of belt webbing?

3   How much force would you need?

4        A.    Probably 30, 40 pounds.  Not that much.  I

5   mean, we do it here.

6        Q.    In a dynamic accident --

7        A.    And you're agreeing that we have a 130-pound

8   woman?

9        Q.    I'm not.  I gave you an example.

10       A.    Okay.

11       Q.    Hypothetical.

12       A.    Just checking.

13       Q.    If the evidence bears out, Mr. Rosenbluth,

14  that Ms. Payan was actually 165 pounds instead of 130

15  pounds, you've already agreed that that's going to

16  affect your findings in the surrogate analysis, right?

17       A.    If that were to come to pass.

18       Q.    Yes.

19       A.    I think we can still rely on the surrogate

20  analysis done, but just to be on the safe side, I would

21  recommend to Mr. Martinez that we do another surrogate

22  analysis, and let's see what -- how the numbers differ,

23  if they do at all, if significantly.

24       Q.    So if you were using a buckle-based

25  pyrotechnic pretensioner in a high-speed rollover

Page 103

1    there that you say, I think this is reasonably safe and

2    not defective, but doesn't have the whole kit and

3    caboodle?  Do you understand my question?

4        A.    Agreed.  Object to your term "kit and

5    caboodle," because "kit and caboodle" is defined as

6    what multiple manufacturers are already doing.  So this

7    is not a Jerry Rosenbluth concept.  This is a concept

8    that is -- those concepts are currently employed by

9    Ford Motor Company.  But anyway, let's get past that

10   and say, is there something in between, because that's

11   your question.

12       Q.    Yes.

13       A.    And I think, at minimum, to make it

14   reasonably safe, give me the integrated seat belt or

15   give me the pretensioner.  Give me one of the two, and

16   we probably wouldn't be here today.

17       Q.    Okay.  Have you seen the spit testing that

18   Thomas Engineering did on a Chevy case several years

19   ago, where they used a -- it was a Ford case, that they

20   used a Chevy full-sized truck with a seat-integrated

21   restraint and a stock Explorer with the same surrogate,

22   and showed that 135 and 180 degrees, you got the same

23   level of the occupant excursion?  Have you seen that

24   testing?

25       A.    I think it's a red truck.  Chevy's red.

Page 104

1     Q.    Yes.

2     A.    I equated that as red danger, but I must have

3  been mistaken.

4          I did see that.  And you didn't see in that

5  test that he's already leaning out before it locks up?

6  That's one of those failure analysis tests.

7     Q.    So you think the methodology used in that

8  test was improper?

9     A.    Absolutely.

10    Q.    Had they used a different methodology, you

11  think that they would have arrived at the same

12  conclusion you did?

13    A.    Well, they're doing that.  And I'll tell you

14  there's another case, Hemanis, and where that's very

15  much the same issue.  And I didn't see General Motors

16  using that test Piziali used.  It was either Piziali

17  or -- I can't remember now, but it was a red Chevy

18  pickup.

19          And the issues in the case were the exact

20  same issues that they are in this case:  Roof crush,

21  seat belt design.

22    Q.    The conclusion that the folks --

23    A.    I believe the case is down in Beaumont,

24  Texas.

25    Q.    The experts have relied on that test in the

Gerald Rosenbluth Vol. 1

Page 113

1    survive.

2        Q.    That covers those two tests?

3        A.    Yes.

4            MR. MARTINEZ:    I think this may be an

5    appropriate time, Brad, that I do have an agreement

6    with Ford with regard to discovery, and it has been

7    informal discovery to this date, because I have signed

8    an agreement not to disclose any protected documents,

9    but there may be some documents which I will request

10   which I may give to the witnesses prior to trial.

11           MR. PETERSEN:    Okay.    I'm assuming that if

12   Mr. Rosenbluth, or whoever the experts are, that part

13   of that agreement is that you'll update counsel on

14   changes in those opinions or whatever.

15           MR. MARTINEZ:    Of course.

16       Q.    BY MR. PETERSEN:    I'm assuming that you'll

17   read anything that Mr. Martinez sends to you by way of

18   additional documents or papers or anything like that?

19       A.    Yes.

20           MR. PETERSEN:    Go off the record for a

21   second.

22           (Discussion off the record.)

23       Q.    BY MR. PETERSEN:    Mr. Rosenbluth, you're not

24   a mechanical engineer?

25       A.    Correct.

Gerald Rosenbluth Vol. 1

Page 114

1        Q.    You've never taken an engineering course?

2        A.    I've taken courses concurrent between

3    industrial design and technology and engineering.

4        Q.    The courses that you took were with regard to

5    industrial design?

6        A.    Arizona State University School of Education,

7    Division of Industrial Design and Technology, with the

8    specialization in automotive technology, and a minor in

9    physical sciences.

10           And I have a hunch you know the answers to

11    every one of these questions.

12        Q.    You've never worked for an automobile

13    manufacturer as a full-time employee?

14        A.    That's correct.  I have worked for numerous

15    manufacturers in a litigation posture.

16        Q.    Object to the non-responsive portion.

17           You've never worked as a full-time employee

18    for an automotive design component manufacturer?

19        A.    Correct.

20        Q.    Never worked as a full-time employee for

21    NHSTA?

22        A.    Correct.

23        Q.    The degrees you got from the Arizona State

24    University were from the School of Education?

25        A.    Asked and answered.  Yes.

Gerald Rosenbluth Vol. 1

Page 115

1        Q.    You've not personally designed an automobile

2    or an automobile component?

3        A.    False.

4        Q.    What have you designed?

5        A.    That's an interesting question, because

6    that's not the question you meant to ask, but that's a

7    good question.  I have designed vehicles that have been

8    used in off-road racing, both track racing as well as

9    off-road racing.  And I have designed those vehicles

10   and fabricated them from the ground up, and that

11   includes the frame, structures, suspension, seats, seat

12   belt, drive train, power train, the complete vehicle

13   designed and fabricated that have run the Las Vegas

14   500, the Baja 1000, that have been subjected to 10, 12,

15   15 rolls and never had an injury, not once.

16            Now that I've answered your question, the

17   question you meant to ask was, have I ever designed a

18   vehicle, a production vehicle, for a manufacturer.  And

19   the answer is no.

20       Q.    You've not designed a production vehicle that

21   reached the highways and byways of these United States?

22       A.    Well, I've not designed a production vehicle

23   for sale to the general public.

24       Q.    Not designed a seat belt or safety restraint

25   system that has made its way into a production vehicle

Gerald Rosenbluth Vol. 1

Page 116

1    to the consuming public?

2        A.    Correct.

3        Q.    You don't hold any patents?

4        A.    Correct.  That's my brother you're thinking

5    of.

6        Q.    I was not.  But you don't hold any patents

7    yourself?

8        A.    Correct.

9        Q.    You've not taught any design courses in the

10   area of seat belts or safety restraints, fair?

11       A.    They've been part and parcel of a number of

12   courses I've taught on the junior college, technical

13   college and university level.

14            I think your question is that -- or the

15   question you want to ask is have I taught occupant

16   restraint design to engineers.  And that answer is no.

17            I'm just trying to get to the point here.

18       Q.    That sounds an awful lot like the question I

19   asked, so I'm not going to go back and ask it again.

20       A.    There was a slight difference.  The answer to

21   your question is yes.  The answer to my question is no.

22   And the answer to our question is possibly.

23       Q.    You've reviewed the reports, and in some

24   cases the depositions of experts retained by defense

25   counsel?