1           UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF TEXAS
3               BROWNSVILLE DIVISION
4
5     ------------------------------------
                                        :
6   ISABEL ENNIS REYNOSO, SALLY PAYAN   :
    and ENRIQUE ROBERTO PAYAN,          :
7                                       :
          Plaintiffs,                   :
8                                       :
       vs.                              :CIVIL ACTION NO.
9                                       :   B-03-120
    FORD MOTOR COMPANY and AUTOMOTRIZ   :
10  DEL NORESTE, S.A. DE C.V.,          :
                                        :
11        Defendants.                   :
                                        :
12    ------------------------------------
13
14
15
16     Deposition of:   RONALD L. HUSTON, Ph.D., P.E.
17     Taken:           By the Defendants
                        Pursuant to Notice
18
       Date:            March 15, 2005
19
       Time:            Commencing at 9:10 a.m.
20
       Place:           Marriott Cincinnati Airport
21                      2395 Progress Drive
                        Hebron, Kentucky  41048
22
       Before:          Kimberly L. Wilson, CSR
23                      Notary Public - State of Ohio
24
25                              ORIGINAL

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

1  testimony about that?

2      A.   As far as I know I'm not, that's correct.

3      Q.   Warnings or marketing?

4      A.   Right, I'm not doing that.

5      Q.   How about human factors?

6      A.   No, I don't believe so.

7      Q.   Statistics?

8      A.   No.

9      Q.   Summarize, if you would, for me your

10 opinions as they relate to the biomechanics and

11 kinematics of Betty Payan in this accident.

12     A.   Well, my opinions are really very simple

13 and perhaps of all the experts my opinions will be

14 the simplest.  It's my opinion that during this

15 rollover incident that she was the driver of the

16 vehicle, that it -- the vehicle rolled over passenger

17 side leading, that the -- that at the time of the

18 accident she was wearing her seat belt, that during

19 the accident sequence the roof on her side was

20 collapsed, that the roof came into contact with her

21 head and caused a compression subluxation injury

22 that's reported in the medical records.

23          And that's -- well, that's -- yes, that's

24 all, but let me amend that just a little bit more.

25 It's my opinion based upon also the surrogate study

39

1  that I did after the preparation of the report that
2  if in this instance the roof had not come down that
3  she would not have experienced the injuries that she
4  did and that depending upon the nature of the
5  restraint system, she would have been kept out of
6  harm to varying degrees.
7      Q.   Are you going to be offering any opinions
8  on reasonable alternative designs for the seat belt
9  system in the Explorer?
10     A.   No, I'm not going to do that.
11     Q.   All right.  We know a surrogate study was
12 performed at Mr. Rosenbluth's facility; is that
13 correct?
14     A.   Yes.
15     Q.   And I'm sorry, tell me the date again of
16 the surrogate study.
17     A.   Well, I've forgot it.  I think it was
18 November the 29th.  Let me look to be sure.  Yes, it
19 was November the 29th of last year.
20     Q.   Did you do a spit test?
21     A.   No.  No, this was not a spit test.  Well,
22 it was a -- it was a spit, but it was not a dynamic
23 test.  That is to say we put a surrogate in the
24 vehicle, took some measurements and then rolled it
25 over so that it was at 180 degrees and to that extent

```
 1    it was a spit test, but it wasn't a dynamic test.
 2         Q.   The size and weight of your surrogate?
 3         A.   The surrogate was 5'4" -- 5'4" and weighed
 4    132 pounds.
 5         Q.   Did you take measurements with her seated
 6    height?
 7         A.   Yes.  Her seated height was -- I measured
 8    to be 33 1/2 inches.
 9         Q.   And how about the distance between her
10    buttocks and her knees and knees to the base of the
11    floor, did you take those measurements as well?
12         A.   Yes, but I don't have them recorded.
13    They'll be in the Rosenbluth report.
14         Q.   Okay.  Do you understand that Mr.
15    Rosenbluth did a report related to his surrogate
16    study -- or to the surrogate study that was
17    conducted?
18         A.   Well, let me -- maybe I spoke too soon.
19    What I understand is that a variety -- an extensive
20    variety of measurements were taken at the Rosenbluth
21    facility and Mr. Rosenbluth's practice is to put them
22    into a report folder with various photographs, in
23    which case there will be numerous measurements.  I
24    didn't record all of the measurements that were
25    taken.  I simply recorded those which seemed to be
```

41

1    pertinent from my perspective.

2              MS. SAMBERG:  Off the record for a second.

3              (Off the record.)

4              MS. SAMBERG:  Back on the record.

5    BY MS. SAMBERG:

6        Q.    Did you take a measurement of the position

7    of the seat?

8        A.    That would be in the Rosenbluth data as

9    well.

10       Q.    Did you measure the position of the seat

11   at the time of your vehicle inspection?

12       A.    I don't believe that I did, but let me --

13   let me see if I have that.  Well, I do have some

14   information about that so the answer to the question

15   is, yes, I do have some data.

16       Q.    And what data do you have?

17       A.    Well, what I have is that the distance

18   from the -- what I call the bite -- and what I mean

19   by that is the intersection between the back rest and

20   the seat bottom -- that distance to the pedal of the

21   vehicle -- like the brake pedal -- is 37 3/4 inches.

22   The distance from the -- or the closest distance from

23   the seat bottom to the dash -- the under dash is

24   eight inches.  The distance from the vertical

25   through the bite to the center of the steering wheel

1  is 17 1/2 inches.

2      Q.    Do you have any information about whether

3  the position of the seat was moved at any time after

4  the accident?

5      A.    No, I don't know the answer to that.

6      Q.    Did you take any measurements during the

7  surrogate study of headroom with the non-deformed

8  roof?

9      A.    Yes, that was what I did and I found that

10  measurement or that distance to be 5 1/2 inches.

11      Q.    Did you measure the vertical roof

12  deformation in the accident vehicle?

13      A.    Yes.  Well, let me tell you what I did.  I

14  measured the distance -- the vertical distance from

15  the bite to the roof in the accident vehicle.  I

16  found that to be 28 1/2 inches.  In contrast, the

17  similar measurement in the buck, or the exemplar, was

18  38 inches so that then the deformation would have

19  been approximately 9 1/2 inches in the static

20  condition.

21      Q.    Did you also attempt to determine any

22  lateral intrusion or deformation?

23      A.    No, I did not.

24      Q.    Explain to me what you did with your

25  surrogate.  You put her in the vehicle?

43

1      A.    Yes, put the surrogate in -- well, before

2   putting her in the vehicle, we took some -- the

3   height and weight measurements and then took some

4   measurements of the vehicle.  Put the surrogate in

5   the vehicle, measured the headroom and then told the

6   surrogate to buckle up in the usual way, which she

7   did.  And then we rotated the buck with the surrogate

8   in the vehicle and took some measurements while the

9   surrogate was upside down.

10      Q.    Was the geometry of the restraint that was

11   used in your surrogate test the same as the geometry

12   of the strength that was used in the accident

13   vehicle?

14      A.    Yes and no.  The objective in the first

15   test was to make it the same and then we did three

16   other tests where we made it different.

17      Q.    Okay.  Explain to me what you did.  Let's

18   talk about the first test.

19      A.    Okay.

20      Q.    What were the findings in your first test?

21      A.    In the first test, whenever the vehicle

22   was rolled over, the headroom decreased from 5 1/2

23   inches to two inches and also the buttocks of the

24   surrogate came off the seat approximately two inches.

25      Q.    Was the retractor locked at that point?

1    A.    Yes.

2    Q.    How much excursion was there before the

3 retractor locked?  How much belt spooled out, if any?

4    A.    I don't know the answer to that.  This was

5 a very slow moving test so that the retractor would

6 have locked whenever the vehicle was turned at about

7 30 degrees and -- or 35 degrees so that there would

8 probably have been very little, if any, spool out.

9    Q.    So did I hear you say the headroom was

10 decreased by a half inch to two inches?

11    A.    Oh, no.  I miss -- no, I didn't say that.

12 The headroom originally is 5 1/2 inches and then

13 after the roll it was only two inches between the

14 head and the roof --

15    Q.    So the --

16    A.    -- so that the decrease was 3 1/2 inches.

17    Q.    Okay.  You've done several of these static

18 spit tests before, haven't you?

19    A.    Yes.

20    Q.    Isn't it typical to see about two to four

21 inches movement towards the roof when inverted?

22    A.    Yeah, that's exactly what we got.

23    Q.    Okay.  So this was right in that range

24 that you've seen many, many times before?

25    A.    Yes.  No surprise.  Nothing particularly

1    unusual or remarkable.

2         Q.   And that's typical for all vehicles with

3    three-point restraint systems consistent with the

4    results you've seen?

5         A.   Yeah.  As far as -- yeah, and I've done a

6    number of these.  They're all -- they're all pretty

7    similar.

8         Q.   At what point did the surrogate's buttocks

9    come off the seat?  How many degrees?

10        A.   I don't know the answer to that.  I didn't

11   observe that.

12        Q.   But her buttocks was off the seat when she

13   was fully inverted to 180 degrees, right?

14        A.   Yes, that's right.

15        Q.   And you said she came off the seat

16   approximately two inches?

17        A.   Correct.

18        Q.   You said you didn't add any dynamic

19   component to this test, right?

20        A.   Right.

21        Q.   Would you agree that by adding a dynamic

22   component, you'd expect that the occupant's going to

23   move closer to the roof?

24        A.   Sure.

25        Q.   How much closer, based on your experience?

46

1      A.    Well, it would depend upon the -- how much

2  the dynamic component is.  That would be accident

3  specific.

4      Q.    But that would be true with any restraint

5  system if you added a dynamic component, you would

6  expect the occupant would move closer to the roof?

7      A.    Oh, sure.  Of course.

8      Q.    All right.  Tell me about the -- so that's

9  the first test that you ran, right?

10      A.    Yes, it is.

11      Q.    Tell me about the next one.

12      A.    Well, we did three others and many more

13  details will be provided in the Rosenbluth data, but

14  what I have is that we then used an integrated seat

15  belt system and the headroom then was reduced only to

16  two and three-quarter inches upon rolling.

17      Q.    So it went from -- let me make sure I've

18  got this right -- from 5 1/2 to two and

19  three-quarters?

20      A.    Yes.

21      Q.    So help me with my subtraction here.

22      A.    Well, that would be two and a quarter.

23      Q.    So --

24      A.    No, excuse me.  Two and three-quarters.

25      Q.    So still within that two to four range we

1    were talking about?

2         A.    Yes, that's right.

3         Q.    And then you fully -- when she was fully

4    inverted with the integrated seat belt, did the

5    surrogate's buttocks come off the seat?

6         A.    Yes, but I don't have that measurement.  I

7    don't know what that was.

8         Q.    And do you know at what point as she was

9    being rotated her buttocks came off the seat?

10        A.    No.

11        Q.    Do you recall whether that was a

12   measurement that Dr. -- I'm sorry -- that Mr.

13   Rosenbluth was taking?

14        A.    Yes, it was.

15        Q.    So --

16        A.    He always takes all of those measurements.

17        Q.    Okay.  How much -- well, strike that.  All

18   right.  Your third test was what?

19        A.    The third test was one where we had an

20   integrated seat belt and a pretensioner -- or a

21   simulated pretensioner.

22        Q.    Tell me how you simulated the pretension.

23        A.    Well, the way that was done was to take

24   two to three inches of slack out of the webbing and

25   lock the retractor before rolling so that the -- from

1   the surrogate's perspective, the surrogate's sitting
2   in the seat, but relatively tight seat belt.
3        Q.    Why did you decide on two to three inches
4   of slack?
5        A.    Well, that's a compromise that Mr.
6   Rosenbluth has arrived at.
7        Q.    Not a decision that you made.  I should
8   ask Jerry?
9        A.    Right.  Yes, that's correct.
10       Q.    Okay.  What happened when you used the
11  integrated seat belt and simulated pretensioner?
12       A.    Well, then, whenever we rolled the -- the
13  person over the, headroom was 3 1/2 inches, so that
14  then the loss of headroom would have been
15  approximately two inches.
16       Q.    So still within that two to four range
17  that you're commonly seeing, correct?
18       A.    Yes, it is.
19       Q.    And, again, did the surrogate's buttocks
20  come off the seat when she was fully inverted using
21  the integrated seat belt with the simulated
22  pretensioner?
23       A.    I don't remember if that's the case or
24  not.
25       Q.    What was the fourth test that you did?

1      A.    The fourth test was one where we
2  introduced slack into the seat belt before it locked
3  up.
4      Q.    So let me go back.  You used the original
5  equipment seat belt, correct?
6      A.    Yes.
7      Q.    And then you introduced some slack before
8  allowing the retractor to lock?
9      A.    Yes.
10     Q.    How much slack?
11     A.    Three inches.
12     Q.    And whose decision was it to use three
13 inches?
14     A.    Mr. Rosenbluth.
15     Q.    Okay.  Was there some simulation attempt
16 being made to do this three inch of slack?  What was
17 the purpose of running that test?
18     A.    Well, there the purpose was to see what
19 the headroom would be with the slack during the
20 rollover and that was discovered to be three quarters
21 of an inch.
22     Q.    Do you have any reason to believe that
23 there was any slack in Mrs. Payan's belt at the time
24 of the accident?
25     A.    I have no opinion about that.  I don't

1    know the answer to that.  There again, Mr. Rosenbluth

2    will have inspected the belts and looked at the

3    lockup marks and would be able to answer that.

4         Q.    And what were the results of that test

5    again?  I'm sorry.

6         A.    Oh, I'm sorry.  Yeah, there the headroom

7    was reduced to three quarters of an inch.

8         Q.    So if it was reduced to three quarters of

9    an inch and it started at 5 1/2, you had about what,

10   four --

11        A.    Four and three-quarter inch of headroom

12   was consumed.

13        Q.    Okay.  Just slightly above the two to four

14   range we've been talking about --

15        A.    Right.

16        Q.    -- that's commonly found in all vehicles?

17        A.    Yes, that's right.

18        Q.    What conclusions do you draw from the

19   surrogate testing that was conducted?

20        A.    Well, the conclusions that I made were

21   that with a restraint system that keeps the occupant

22   away from the roof, and without the roof of course

23   coming toward the occupant, that then the significant

24   loading which was experienced in this accident would

25   have been avoided.

1      Q.   Can you say to a reasonable degree of

2  scientific certainty that had this vehicle been

3  equipped with the integrated seat belt, all other

4  things remaining the same, that Mrs. Payan would not

5  have received a paralyzing neck injury in this

6  accident?

7      A.   No, I don't believe so.

8      Q.   No, you can't say that?

9      A.   That's correct.  I believe that -- that in

10  this accident she still would have received these

11  injuries.

12      Q.   Okay.  Let me ask a different question.

13  Can you say to a reasonable degree of scientific

14  certainty that had this vehicle been equipped with

15  pretensioners that Mrs. Payan would not have suffered

16  a paralyzing neck injury in this accident?

17      A.   No, I can't say that.  I don't know if it

18  would have been as bad as it was, and there's some

19  qualitative words there like paralyzing.  But, no, it

20  appears to me from the measurements that I have in

21  this surrogate testing that even with the better seat

22  belt system, there was still a significant amount of

23  roof damage which would have come into her occupant

24  space.

25      MS. SAMBERG:  Let's take a quick break.

1          (A recess was taken from 10:16 to 10:30.)

2          MS. SAMBERG:  We're back on the record.

3    BY MS. SAMBERG:

4          Q.   Is it fair to say that in order to address

5    the issue of mechanism of injury, you have to have an

6    understanding of the reconstruction of the accident?

7          A.   Yes.

8          Q.   And I think we've established you've not

9    attempted to independently reconstruct the accident;

10   is that correct?

11         A.   That's right.

12         Q.   When and how did you get information on

13   the accident reconstruction for use in your report?

14         A.    What I did was when I inspected the

15   vehicle, I could -- I had -- I was able to observe on

16   the vehicle that it had rolled over approximately

17   three times or two and a half times.  And I also then

18   had information from the police report so that

19   whereas I did not know what the specific speeds were,

20   I did have a general understanding of the accident

21   sequence and the -- and the -- what kind of accident

22   it was, the number of rolls that it did.

23         Q.    And you included in your report all of the

24   information you found to be pertinent to your

25   biomechanical analysis, is that correct, in terms of

Page 53

1  the accident reconstruction?

2      A.   I think that's probably right.  Let me see

3  what I did say on that.  Yes, I think -- I believe

4  that I did.  I believe that I did.

5      Q.   Tell me your understanding of how the

6  accident occurred.

7      A.   All right.  This was on -- it occurred in

8  Mexico in the evening.  It was about 8:00, wet

9  roadway.  It was on January 11th, 2003, single

10 vehicle rollover accident.  It was a 2000 Ford

11 Explorer.  The operator was Betty Payan.  Right front

12 passenger was Sally Payan.  And that the -- for some

13 unknown cause the vehicle went out of control so that

14 the -- presumably from water on the roadway, but when

15 the vehicle went out of control, it began to roll

16 along the roadway and across the roadway with the

17 passenger side leading.  It rolled over two and a

18 half times, which means it came to rest upside down

19 on its roof.

20     Q.   Could it have been as many as three and a

21 half times?

22     A.   Well, I didn't see evidence of three and a

23 half times, but I suppose that's possible.  I believe

24 one of the defendants -- Mr. --

25     Q.   Granat?

Page 80

1    A.   Yes.

2    Q.   Would it be better, based on our earlier

3 discussion, to say that she was someplace between 5'4

4 and 5'6, or are you comfortable with 5'6?

5    A.   Well, the medical records seem to lean

6 toward the 5'6.  There may be driver's license

7 information which would be smaller than that.  I'm

8 not sure.  I'm not familiar with the procedure in

9 Texas as to how that information gets onto a driver's

10 license.  For example, in Ohio, as an applicant, I

11 simply fill -- state that and so what's measured may

12 be better than what somebody may have stated, if it's

13 the same.

14    Q.   And what was your assumption concerning

15 Mrs. Payan's weight.  If her height was 5'6, what was

16 her weight?

17    A.   Her weight would have been 75 -- the

18 weight of 75 kilograms and I believe I -- I believe

19 that is okay in my report of 100 and --

20    Q.   65 pounds?

21    A.   Yeah.

22    Q.   165 pounds?

23    A.   165, right.  That's what it would be.

24    Q.   Did you find any other conflicting

25 information about Mrs. Payan's weight in the records

Page 81

1    you reviewed?

2          A.    No.

3          Q.    Did you make any assumption concerning

4    Mrs. Payan's hip width for purposes of your analysis?

5          A.    No, I did not.

6          Q.    Did you make any assumption concerning

7    Mrs. Payan's shoulder width for your analysis?

8          A.    No.

9          Q.    What assumption did you make concerning

10   her seated height and based on what?

11         A.    Okay.  Let me take a moment here.  Okay.

12   I just wanted to get this exhibit out of my way so I

13   can look at that.  I have her height -- her seated

14   height to be approximately 34 and three-quarter

15   inches.  I obtained that simply by using NASA

16   anthropometric data, of which I brought a copy and

17   made some calculations, which are simply linear

18   interpolation calculations.

19         Q.    Was that consistent -- strike that.  Was

20   the seated height that you extrapolated consistent

21   with the seated height of the surrogate in the buck

22   when you did your testing?

23         A.    Well, the seated height that I calculated

24   would be a little bit higher -- or excuse me --

25   greater than the seated height of the surrogate by

94

1          Q.     Do any of the papers identified in your

2     resume deal with that issue?

3          A.     With compression?

4          Q.     Compression neck injuries from intruding

5     roof.

6          A.     No, I don't think so.  I mean, I talk

7     about head and neck dynamics in my papers, but not in

8     terms of specific movements of one vertebrae on

9     another.  It's my belief that in this case that

10    there's no real question -- or there should not be

11    any question as to what the injury is.

12         Q.     Okay.  Have you ever heard of a nutcracker

13    injury?

14         A.     Uh-huh.

15         Q.     Is that what --

16         A.     It's like a nutcracker.

17         Q.     -- happened here?

18         A.     It's like a nutcracker, yes.

19         Q.     And so if I understand the nutcracker

20    theory, forces are generated through the seat to the

21    buttocks while the head's being compressed by the

22    roof?

23         A.     Yes.

24         Q.     Is that essentially how it goes?

25         A.     That's right.  The spine is shortened

1    simply by the vehicle structure -- the roof and the

2    seat combination coming together.  Like any

3    nutcracker, it's just a squeezing together.  It's

4    compression.

5         Q.    Are you aware of any literature that

6    you've read or are relying on that addresses or

7    supports the nutcracker theory --

8         A.    Well --

9         Q.    -- of mechanism of injury?

10        A.    Well, there again the Levine book and the

11   paper by McElhaney in there will address that.

12        Q.    And do you believe that Mrs. Payan's

13   injury occurred from a single impact with the roof or

14   was it multiple impacts?

15        A.    Yeah, I don't know that for sure.  It

16   would be my belief that the injury would have been a

17   single impact.  I don't believe that it would have

18   been one which occurred and then was later

19   aggravated.

20        Q.    In your report you state that Mrs. Payan's

21   seated height was compressed by approximately five

22   inches.  Do you remember saying that?

23        A.    Yeah.  Well, I'm looking at it now.

24        Q.    Can you tell me what you meant by that?

25        A.    There's nothing very profound in that.

1    What I have is that her seated height is

2    approximately 34 1/2 inches and the vehicle -- or

3    that distance where she would have been seated to the

4    roof is compressed to about 29 inches, so it's just a

5    subtraction of those two numbers.

6        Q.    Are you saying that Mrs. Payan's body was

7    compressed by five inches or just that the seat was

8    compressed by five inches?

9        A.    Yeah, her seat -- her sitting height

10    would -- that is the distance would have been

11    compressed by about five inches.

12        Q.    Not her body?

13        A.    Not necessarily, that's right.

14        Q.    Okay.

15        A.    That's right.  Sure.  Sure, of course,

16    that would follow.

17        Q.    Do you have an opinion about whether Mrs.

18    Payan's head or any part of her body for that matter

19    gets outside the plane of the window at any point

20    during this rollover accident?

21        A.    Yes.

22        Q.    What's your opinion?

23        A.    I don't believe that it did.

24        Q.    The basis for that?

25        A.    Well, the basis for that is -- there's