United States District Court
Southern District of Texas
FILED

JUN 2 4 2005

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| ISABEL INNIS REYNOSO, SALLY PAYAN, and ENRIQUE ROBERTO PAYAN<br>　　　Plaintiffs<br>VS.<br><br>FORD MOTOR COMPANY and<br>AUTOMOTRIZ DEL NORESTE, S.A. de C.V.<br>　　　Defendants | § § § § § § § § § § | CIVIL ACTION NO. B-03-120 |

## PLAINTIFFS' OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. RONALD HUSTON

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs Isabel Ennis Reynoso, Sally Payan, and Enrique Roberto Payan ("Plaintiffs") file this Opposition To Defendant Ford Motor Company's Motion To Exclude Testimony of Gerald Rosenbluth. In support of their opposition, Plaintiffs would show the Court as follows:

I.  **Factual Background**

Betty Reynoso Payan and her daughter Sally Payan woke up early on the morning of January 11, 2003, to go to Monterrey, Mexico, to a dermatologist and do some shopping. (Ex. 1; *Deposition of Sally Payan*, at 39:1 – 43:13). They drove the 2000 Ford Explorer. (*Id.*). At the end of the day, around 5:00, they left Monterrey to return to Matamoros. (*Id.*). Approximately forty-five minutes outside of Monterrey on the superhighway, Sally Payan, who had been sleeping in the passenger's seat, suddenly awoke to see the car swerving off the road. (*Id.* at 49:11 – 52:1). The Explorer went over

the grass median and crossed the oncoming lanes of traffic. (*Id.*). Sally Payan next remembers the car facing the wrong direction resting on its roof. (*Id.* at 51:17 – 52:1). Although it was raining, it was not raining hard; and Sally Payan did not notice any puddles on the road. (*Id.* at 46:15 – 47:6 and 82:4 - 6).

After the accident an ambulance arrived and took Betty Reynoso Payan to a clinic in China, Nuevo Leon, and from there she was transported to a hospital in McAllen. (*Id.* at 74:16 – 78:22). In McAllen, the doctors told Sally Payan that her mother had broken bones in her neck and that she would never walk again. (*Id.* at 82:18 – 83:2). Betty Reynoso Payan was later transferred to Harlingen for surgery on her neck. (*Id.* at 86:11-14). She was then transferred by air ambulance to Houston for physical therapy. After four hours at the physical therapy clinic she was transferred to Hermann Memorial Hospital because she had water in her lungs and internal bleeding. (*Id.* at 88:2 – 89:11). After four major surgeries, including an amputation, Betty Reynoso Payan passed away at the Hermann Memorial Hospital 37 days after the accident occurred. (*Id.* at 90:4 - 94:10).

Susana Reynoso, Betty's sister, purchased the 2000 Explorer new from Automotriz del Noreste in June 2000. (Ex. 2; *Deposition of Susana Reynoso*, at 8:4-12). The whole family, including Susana Reynoso's sisters, nieces, nephews and in-laws, participated in the purchase of the 2000 Explorer. (*Id.* at 7:24 – 8:6). Susana purchased the 2000 Explorer for her mother to do her many charitable activities. (*Id.* at 17:25 – 18:10). However, she also purchased the car for her family to use when traveling in Mexico beyond the 22 kilometer range. (*Id.* at 27:3 – 16). When she purchased the 2000 Explorer, Susana Reynoso was particularly concerned about the handling and stability of

the vehicle. (*Deposition of Susana Reynoso*, at 13:1 – 14:5). She question Luis Elizondo, the manager at the Ford dealer, about the stability of the vehicle, and he allayed her concerns by telling her that there were no safety concerns and that was why his own daughter drove an Explorer. (*Id.* at 13:19-21; 14:15-18).

## II.  Analysis

Defendant claims that Plaintiff's Expert, Dr. Ron Huston, who is designated as a Bio-Mechanic Expert, should be excluded because 1) he is not qualified to opine on the cause of Betty Payan's death and 2) his testimony is not based on a reliable foundation. Defendant's claims are ungrounded and incorrect, as they misinterpret the true work and research which Dr. Huston performed. Dr. Huston testified regarding the injury producing *forces*, not the specific medical causes of injury. Furthermore, Dr. Huston's vast experience in similar cases allowed him to use the information he had to make reliable predictions and analyses of the accident.

Federal Rule Of Evidence 702 guides the admissibility of expert opinion testimony.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

There are extensive Advisory Committee Notes to the 2000 Amendments of Rule 702.

"The committee note was revised to emphasize that the amendment is not intended to limit the right to jury trial, nor to permit a challenge to the testimony of every expert, nor to preclude the testimony of experience-based experts, nor to prohibit testimony

based upon competing methodologies within a field of expertise." GAP REPORT ON PROPOSED AMENDMENT TO RULE 702 N.3. The commentary to Rule 702 provides special guidance in assimilating the various principles to be taken from *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993), *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119* S.Ct. *1167 (1999)* and their progeny.

According to the Supreme Court, "The trial judge has considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire, 119* S.Ct. at 1176. The analysis of expert testimony admissibility is reviewed for an abuse of discretion. *Id.* While *Daubert* lists five areas to help assess the reliability of scientific expert testimony, neither Rule *702* nor the Supreme Court suggests these elements are "codified" or exclusive. *See Daubert, 113* S.Ct. at *2796* (factors are not "a definitive checklist or test"); ADVISORY COMMITTEE NOTE TO RULE *702*. The trial judge has discretion "both to avoid unnecessary `reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Id.*

Applying Rule *702* and case precedent, this Court's analysis may rely on a fair look at the extensive and specialized experience of Dr. Huston and the detailed factual record and data serving as the basis for his opinions. "No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire, 119* S.Ct. at *1178.*

> The text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominate, if not sole, basis for a great deal of reliable expert testimony (citations omitted) ... If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is the sufficient basis for the opinion, and how that experience is reliably applied to the facts.

ADVISORY COMMITTEE NOTE TO RULE 702. Within this analytical framework, there is a history of relevant experience applied to a detailed factual record which lead to Dr. Huston's reliable conclusion that the "compressed, or shortened, sitting height of Ms. Payan is consistent with the reported cervical spine compression injury resulting in the C6/C7 subluxation with jumped facets of C6 and C7." (Ex. 3; Report of Ronald Huston).

Rule 702 sets out a disjunctive list of means by which an expert may be "qualified" to offer technical testimony. An expert may be qualified based on his or her "knowledge, skill, experience, training or education..." Fed. R. Evid. 702. Dr. Huston's qualifications are based on every element.

Dr. Huston has over 40 years experience in the field of engineering mechanics, mechanical engineering, and biomechanics. (*See* Ex. 4; Resume of Ronald Huston, Ph.D., P.E.). His resume of experience shows over 40 years of study, research, teaching, and work. Not only is he a Distinguished Research Professor at the University of Cincinnati, he is the Interim Head of both the Chemical and Materials Engineering and the Material Science and Engineering Departments. He has taught in both the engineering and medical departments. For over a dozen years he was an Adjunct Professor of Orthopaedic Surgery Research at the University of Cincinnati. He has taught biomechanics and injury mechanics, among the numerous other courses. Among the more than twenty Professional and Society Affiliations listed in his resume, Dr. Huston is a member of both the American Society of Biomechanics and the International Society of

Biomechanics. He earned a bachelor degree in Mechanical Engineering 1959 from University of Pennsylvania. He also received a Masters of Science and a Ph.D. in Engineering Mechanics, also from the University of Pennsylvania.

The Fifth Circuit, district courts within it, as well as various appellate courts in Texas, have repeatedly found that practical education and experience can qualify an expert. *See, e.g. Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 507 (5th Cir. 1999) ("As long as some reasonable indication of qualifications is adduced, the Court may admit the evidence without abdicating its gate-keeping function. After that, qualifications become an issue for the trier of fact, rather than for the Court in its gatekeeping capacity."); *Vienne v. American Honda Motor Co.,* 2001 WL 43598 *3 (E.D.La. January 16,200 1); *Phillips v. General Motors Corp.,* 2000 WL 1285380 *4 (E.D.La. September 12, 2000); *Gammill v. Jack Williams Chevrolet, Inc., 972* S. W.2d 713, 722 (Tex. 1998) ("An experienced car mechanic's diagnosis of problems with a car's performance may well be relevant and reliable without resort to engineering principles."); *Ford Motor Co. Aguiniga, 9* S.W.3d 252, 264-65 (Tex. App. - - San Antonio 1999, no pet.); *Nissan Motor Co. v. Armstrong, 32* S.W.3d 701, 708 (Tex. App. - - Houston [14"' Dist.] 2000, no pet.) ("The alleged defect about which he rendered an opinion relates to a relatively simple automotive component ... [It] did not require an explanation from a "rocket scientist" for the jury to understand. Indeed, almost any qualified mechanical expert could show the jury how the cable worked and how a loose dust boot might stick on the throttle cable....").

Defendant argues that Dr. Huston is not qualified to opine on the cause of Betty Payan's injuries because he does not have a medical background. However, Defendant mischaracterizes the nature of Dr. Huston's testimony by describing the testimony as an

attempt to explain the medical reasons and medical causes of the injury. But this is not what Dr. Huston was explaining. Rather, as he states in his report, "it is the opinion of this investigator that the injury producing *forces* on Ms. Payan were due to compressive *forces* on her body due to the intruding vehicle roof." (Report of Dr. Ronald Huston at p.6 (emphasis added)). Dr. Huston was never retained to testify as to the medical causes of Betty Payan's injury. In fact, he testified that his only purpose was to testify about the biomechanics of the accident—the physical forces which were exerted on the body during the rollover. As a distinguished engineer and professor of engineering, Dr. Huston is qualified to testify as an expert regarding physical *forces*, as well as explain the progression of the accident and how the injury-producing forces came about.

Defendant further argues that Dr. Huston's testimony should be excluded because the Texas Supreme Court and the United States Court of Appeals for the Sixth Circuit did not allow Dr. Huston to testify as to the causation of the injury. Defendant relies on the Court of Appeals' statement in *Gammill v. Jack Williams Chevrolet*, 983 S.W.2d 1, 12 (Tex. App.—Ft. Worth 1996), which states that the Court did not find any reason showing that Huston "was qualified to express opinions regarding the condition of Jaime's body or the cause of her death." However, in the present case, Dr. Huston had already seen the medical records and knew what injuries Betty Payan received prior to her death; he was not diagnosing her injuries. (Ex. 4 at p.6). He was not testifying as to the condition of her body or the cause of her death. Rather, he was explaining the probable injury-producing forces which occurred, given the facts of the accident— something well within his field of expertise.

The Defendants do point out that in *Gammill,* the Supreme Court overruled the Court of Appeals' decision to exclude the seatbelt testimony but affirmed the decision to exclude Dr. Huston's testimony regarding the victim's cause of death. However, the Supreme Court's ruling in that case does not require this Court to exclude Dr. Huston's testimony in the present case. He is not testifying about cause of death, which is different than injury causation, even though Defendants have equated the two terms.

In fact, the Texas Supreme Court in *Gammill* held that:

> Huston has been shown to be qualified to testify about defects in the rear seat belt of the Gammills' vehicle. He is a licensed engineer with a long academic career. He has researched vehicular restraint systems, some of them like the system in the Gammills' vehicle, and has published articles on the subject. He has also testified in numerous cases involving allegations of seat belt defects.

972 S.W.2d at 719. For these reasons the Supreme Court held that Dr. Huston was indeed qualified to testify about the seat belts. And in this case, Dr. Huston performed four distinct seat belt tests during the surrogate testing, and these results are extremely relevant in showing that the seat belt restraints would have prevented Betty Payan's head from contacting the roof of the Explorer had there been very little or no roof-crush deformation. (Ex. 5; *Deposition of Dr. Huston* at pp. 43-51).

In *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 301 (6th Cir. 1997), the Court of Appeals held that since Huston's methodology was not reliable and his expertise in biomechanics did not enable him to testify as to specific medical injuries, his testimony should have been excluded. However, the factors which lead the Court to this conclusion are not present in our case. As to Dr. Huston's methodology in our case, he performed a surrogate study along with Mr.

Rosenbluth in which they tested several different types of seat belt restraints and documented their results. During these tests, Dr. Huston and Mr. Rosenbluth both took extensive measurements of the surrogate driver in various positions in the car. Furthermore, both Dr. Huston and Mr. Rosenbluth were present, which would have allowed them to confirm measurements and testing conditions with each other.

Despite the *Smelser* court's rejection of Dr. Huston's causation opinion, the Court noted that "he was qualified to render an opinion that made use of his discipline's general principles, described the forces generated in the...collision, and spoke in general about the types of injuries those forces would generate...[but] his expertise in biomechanics did not qualify him to testify about the cause of Smelser's specific injuries." *Id.* at 305. Because in the present case Dr. Huston has only testified as to the injury producing forces of the collision and not the causation of the specific injuries, his testimony should not be excluded.

Finally, despite the fact that Defendant's argument largely rests upon these two cases, it is important to note that he has testified about kinematics, biomechanics, and injury causation in over 500 depositions and over 200 trials. Furthermore, in other cases biomechanics experts have been given some leeway when testifying as to possible injuries. In *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 571 (5th Cir. 2001), the plaintiffs' biomechanics expert testified that if a football helmet had been fitted with a certain new type of foam, then the helmet would have reduced substantially the risk of a subdural hematoma. In *Krummel v. Bombardier Corp.*, 206 F.3d 548, 500 (5th Cir. 2000), a case involving a broken

leg as a result of a water sport accident, the Court allowed Dr. Jacobsen, a biomechanics expert, to testify as to the forces necessary to break bones. These cases are much like our present case in that they allow biomechanics to testify as to injury causation and general medical injuries without testifying as to the detailed medical causes which are taught and learned in medical school.

Contrary to Defendant's arguments, Dr. Huston's testimony is based on reliable data. One of their contentions is that Dr. Huston's data was not based on a reconstruction of the accident. However, though Dr. Huston was not retained to do an actual reconstruction of the accident, he has vast experience in accident reconstructions (*Deposition of Dr. Huston*, p. 36), and he also had an extensive understanding of the accident and how it occurred (*Deposition of Dr. Huston,*, pp. 52-54). Therefore, even though he did not do a formal reconstruction of the accident, Dr. Huston has enough experience and knowledge to understand the accident and opine about the forces which occurred during the accident. Defendant's claims that that Dr. Huston knows nothing about the yaw rates, side slip angles, and pre-trip steering are irrelevant because Dr. Huston is only concerned with what happens after the tires leave the road. (*Deposition of Dr. Huston*, p. 58). Though it was true that he could not testify to any specific dynamics of the rollover sequence, Dr. Huston made it clear that he was only testifying as to what commonly happens to a similar car in a similar collision-type situation. (*Deposition of Dr. Huston*, p. 59).

Furthermore, Dr. Huston's testimony as to the roof deformation causing injury is not speculation, as Defendant claims. What Dr. Huston has done is to

take measurements from a surrogate test, and then he has used the factors of the accident to determine that had there been 3 inches or less of roof deformation, the seat belt would have been sufficient to restrain Betty Payan from any contact with the roof. (*Deposition of Dr. Huston*, p. 126.)

Defendant further claims that Dr. Huston's mention of the rubbing mark is not fully explained and therefore cannot support his opinion. However, since Dr. Huston had no choice but to inspect the car after it had already been attended to by emergency personnel and then towed off the road, there are certain things which he cannot account for. It is impossible for him to say definitively where the rubbing mark came from, but it is evidence which supports his expert opinion that the roof deformation was a compressive force which caused injury to Betty Payan.

Additionally, the discrepancy in Betty Payan's height was not as significant as Defendants would suggest. Though there is still some confusion about Betty Payan's height, Dr. Huston's initial calculations used a height of 5'7 ¾", but he later found out that she was probably 5'5 ¾". Though there was initially a mistake of two inches in Betty Payan's height, the two inches does not directly convert to a miscalculation of two inches in seated height, as Defendants claim. Rather, the seated height would only change by about one inch. (*Deposition of Dr. Huston*, pp. 81-82.) Furthermore, the surrogate that was used for the surrogate testing had a height of 5'4". Because the surrogate was about 2" shorter than Betty Payan, Mr. Rosenbluth and Dr. Huston were conservative in their testing, because the shorter surrogate driver would then have more headroom

for the roof to deform into before her head would be put at danger. Therefore, Defendant's claim that the height analysis is unreliable because it is based on erroneous data is inconsequential and incorrect.

### III. Conclusion

WHEREFORE PREMISES CONSIDERED, Plaintiffs oppose Defendant Ford Motor Company's Motion To Exclude Testimony of Dr. Ronald Huston. Plaintiffs' request a hearing be set on this motion and that the Court enter an order denying Ford's motion.

Respectfully submitted,
**MARTINEZ, BARRERA Y MARTINEZ L.L.P.**
1201 E. Van Buren Street
Brownsville, Texas 78520
Ph. (956) 546-7159
Fax (956) 544-0602

_____
Tony Martinez
State Bar No. 1313900
Federal ID: 1943

**RANDOLPH KIMBLE WHITTINGTON**
Law Office of Randolph Kimble Whittington
2014 East Harrison Street
Harlingen, Texas 78550
Ph. (956) 423-7200
Fax (956) 423-7999

_____
R. K. Whittington
State Bar No. 21404500
Federal ID: 1091

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been forwarded to counsel of record on this the ___24___ day of June, 2005.

_____
R. K. Whittington