Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF TEXAS
 3                  BROWNSVILLE DIVISION
 4
 5    -----------------------------------
                                        :
 6    ISABEL ENNIS REYNOSO, SALLY PAYAN  :
      and ENRIQUE ROBERTO PAYAN,         :
 7                                       :
 8           Plaintiffs,                 :
                                         :
 9        vs.                            :CIVIL ACTION NO.
                                         :  B-03-120
      FORD MOTOR COMPANY and AUTOMOTRIZ  :
10    DEL NORESTE, S.A. DE C.V.,         :
                                         :
11           Defendants.                 :
                                         :
12    -----------------------------------
13
14
15
16        Deposition of:  RONALD L. HUSTON, Ph.D., P.E.
17        Taken:          By the Defendants
                          Pursuant to Notice
18
          Date:           March 15, 2005
19
          Time:           Commencing at 9:10 a.m.
20
          Place:          Marriott Cincinnati Airport
21                        2395 Progress Drive
                          Hebron, Kentucky  41048
22
          Before:         Kimberly L. Wilson, CSR
23                        Notary Public - State of Ohio
24
25                                          COPY
```

Page 2

1   APPEARANCES:
2
3       On behalf of the plaintiffs:
4           Tony Martinez, Esq.
                of
5           Martinez, Barrera Y Martinez, L.L.P.
            1201 East Van Buren Street
6           Brownsville, Texas 78520
7
        On behalf of the defendants:
8
        Amy M. Samberg, Esq.
9           of
        Snell & Wilmer, L.L.P.
10      One South Church Avenue, Suite 1500
        Tucson, Arizona 85701
11
12
13          - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                   I N D E X
2   RONALD L. HUSTON, Ph.D., P.E.              PAGE
3       Cross-Examination by Ms. Samberg          4
4
5
6
7
8   EXHIBITS                    MARKED   REFERENCED
9   Defendants' Exhibit 1          4        4
    Defendants' Exhibit 2          6        6
10  Defendants' Exhibit 3         10       10
    Defendants' Exhibit 4         11       11
11  Defendants' Exhibit 5         11       11
    Defendants' Exhibit 6         11       11
12  Defendants' Exhibit 7         12       12
    Defendants' Exhibit 8         14       14
13  Defendants' Exhibit 9         15       15
    Defendants' Exhibit 10        18       18
14  Defendants' Exhibit 11        28       21
    Defendants' Exhibit 12        29       29
15
16
17
18          - - -
19
20
21
22
23
24
25

Page 4

1           RONALD L. HUSTON, Ph.D., P.E.
2   of lawful age, a witness herein, being first duly
3   sworn as hereinafter certified, was examined and
4   deposed as follows:
5           CROSS-EXAMINATION
6   BY MS. SAMBERG:
7       Q. Tell us your name, please, sir.
8       A. Ronald L. Huston.
9       Q. And you are a Ph.D., I understand?
10      A. Yes. I have a doctorate degree.
11      Q. Can I call you Dr. Huston?
12      A. You can call me anything. Dr. Huston will
13  be fine. Call me Ron. I'm not a very formal person
14      Q. Okay. Thank you. You've brought with you
15  today a copy of your file materials related to the
16  case we're here about, have you not?
17      A. Yes.
18          (Defendants' Exhibit 1 was marked for
19          identification.)
20      Q. And you brought your file pursuant to the
21  subpoena that was served along with your notice of
22  deposition, which we've marked as Exhibit No. 1?
23      A. Yes, I did that.
24      Q. Okay. And have you brought all of the
25  materials that were identified in the subpoena?

Page 5

1       A. Well, to the best of my knowledge I have.
2   I did the best I could. I'm not saying it's 100
3   percent, but I don't know of anything that isn't
4   here.
5       Q. Okay. You've brought me your resume,
6   which we'll look at in a minute, correct?
7       A. Yes.
8       Q. You've brought copies of any and all
9   scientific and technical publications authored by you
10  which relate or pertain to the topics about which
11  you're testifying?
12      A. Yes, I believe that's correct.
13      Q. We have some time records here, which I
14  saw, including the handwritten notes on the inside of
15  this folder, which we'll get to.
16      A. Okay. And there's a billing in there,
17  too.
18      Q. Okay. You brought your complete file?
19      A. I did.
20      Q. Have you brought all of the photographs
21  that have been provided to you related to this
22  accident?
23      A. Yes.
24      Q. Are there any computer files in your
25  office or maintained in your office that are not here

2 (Pages 2 to 5)

1   with us today?
2       A.   No. No, the only thing that would be like
3   that is, you know, I sent a bill and some
4   correspondence so I suppose there would be records of
5   that on a computer, but there's no technical computer
6   work.
7       Q.   No simulations or --
8       A.   Exactly. There's nothing like that.
9       Q.   And you've also brought your testimony
10  list; is that right?
11      A.   Yes.
12          (Defendants' Exhibit 2 was marked for
13          identification.)
14      Q.   Let me just take care of some housekeeping
15  things. We'll mark what's here in your file so that
16  we can refer to it if we need to as we move along
17  here. I've marked as Exhibit No. 2 what was produced
18  to me as your report related to this case; is that
19  correct?
20      A.   Yes, it is.
21      Q.   Okay. Is that report correct, to the best
22  of your knowledge? Are there any errors or anything
23  about it you'd like to change now before we get
24  started with this deposition?
25      A.   Yes. I never cease to be amazed at how

1   errors creep into documents, even after you review
2   them. On page 5 -- do you -- oh, you have a copy?
3       Q.   I have a copy.
4       A.   Okay. On page 5, item No. 3.
5       Q.   Yes.
6       A.   It says that she was 167 centimeters
7   stature and in English she was 5'7 3/4". That's an
8   error. That actually is 5'5 3/4". So if you make
9   that conversion --
10      Q.   Hence my question --
11      A.   Right. As far as I know that's all that
12  needs to be changed.
13      Q.   So that was -- you calculated 167
14  centimeters to be 5'5 3/4", not 5'7 3/4"?
15      A.   Yes. That's what I'm saying.
16      Q.   Okay. And before I even get there, there
17  was a surrogate study done, correct?
18      A.   Yes.
19      Q.   What was the size of your surrogate that
20  you used in your surrogate study?
21      A.   I'm speaking only from memory. It's
22  written on a page. I believe it's about 5'4".
23      Q.   I guess let me ask the question a
24  different way. Did you discover this error in Mrs.
25  Payan's height before or after you did your surrogate

1   study?
2       A.   Oh, I didn't discover this typo until last
3   evening when Mr. Martinez asked me about it. In my
4   analysis I had used 5'5 3/4", which you will see.
5   And somehow this is a typo. The surrogate study was
6   done after I prepared this report.
7       Q.   Okay.
8       A.   There is a discrepancy in the medical
9   records apparently about her height and weight. I
10  believe -- well, I believe probably the 5'6" is
11  probably closer than 5'4" for her stature.
12      Q.   Based on what?
13      A.   Well, the medical records seem to -- they
14  both say -- one says 5'4" and the other one says 167.
15  The one that says 5'4" is an emergency medical record
16  and it's probably unlikely that they would have
17  measured her when she's incapacitated like that and
18  so they probably used a driver's license or
19  somebody -- something else, whereas the 167 looks
20  like something they may have measured. It appears to
21  me to be more accurate, but I'm obviously not the one
22  that took the measurements.
23      Q.   To your knowledge, was Mrs. Payan
24  conscious when she was brought to the emergency room?
25      A.   Oh, I don't know. I don't know the answer

1   to that.
2       Q.   So it's possible they may have asked her
3   how tall she was?
4       A.   Sure, that's right. That's exactly right.
5   That could have happened.
6       Q.   And her driver's license does say she's
7   5'4", doesn't it?
8       A.   Yes, that could be. And that's -- that's
9   why -- sometimes those things are accurate and
10  sometimes they're not.
11      Q.   Just so I'm clear, there were several
12  discrepancies in Mrs. Payan's records concerning what
13  her actual height and weight was at the time of the
14  accident?
15      A.   That's right.
16      Q.   Did you inquire of Mr. Martinez what Mrs.
17  Payan's height and weight were either through her
18  family or any other means?
19      A.   Yes.
20      Q.   And what did he tell you?
21      A.   5'6".
22      Q.   Which is the 5'5 3/4"?
23      A.   Right.
24      Q.   And what about the weight?
25      A.   I don't have that. I don't remember that.

3 (Pages 6 to 9)

Page 10

1    Q.  And do you know where Mr. Martinez
2  acquired that information that Mrs. Payan was closer
3  to 5'6"?
4    A.  Well, I understand he -- like you said, he
5  contacted the family on my behalf.
6    Q.  Okay.  Anything else, other than the
7  typographical error in item No. 3, that's incorrect
8  in your report?
9    A.  Well, that's all that I'm aware of.
10    Q.  Thank you.
11    MS. SAMBERG:  I'm sorry?
12    MR. MARTINEZ:  For the record, I, of
13  course, knew Mrs. Payan personally so I -- I
14  vaguely remember it had to be somewhere between
15  5'4" and 5'6".  I couldn't tell you.
16    MS. SAMBERG:  Okay.  Thank you.  Well, I'm
17  glad we all noticed the same thing anyway.
18    MR. MARTINEZ:  Right, a little too tall.
19    (Defendants' Exhibit 3 was marked for
20    identification.)
21  BY MS. SAMBERG:
22    Q.  Let me go through the rest of this
23  material.  I've marked as Exhibit No. 3 what you
24  produced to us as your vehicle inspection
25  photographs.  Can you confirm for me that that's what

Page 11

1  that package is?
2    A.  Yes, that's what it is.
3    (Defendants' Exhibit 4 was marked for
4    identification.)
5    Q.  I've marked as Exhibit No. 4 a copy of
6  your resume, which you brought with you today.  Is
7  that current?
8    A.  Let me look and see.  I believe it is.
9  Yes, it is.  It's the most -- it was prepared just
10  last month.
11    (Defendants' Exhibits 5 and 6 were marked
12    for identification.)
13    Q.  Great.  And I've marked as Exhibit No. 5
14  your trial testimony list and No. 6 your deposition
15  testimony list.  Are these documents current as well?
16    A.  Yeah, I think they are.  Let me check to
17  be sure.  Yes, they're both current.
18    Q.  Okay.  Good.  Thank you.  As for the rest
19  of your file, we have a folder that contained a
20  myriad of things, including your handwritten notes,
21  communications with Mr. Martinez's office, some
22  invoices, travel receipts, maps, a copy of the police
23  report.  Is that --
24    A.  Yes, it's -- it's what I use as my working
25  file and it's just a collection of items and I should

Page 12

1  have placed it in order.  I would have probably taken
2  the maps out.  They're not case specific, but they're
3  all there.
4    Q.  And you've allowed me, in an effort to try
5  and facilitate marking your file, to sort of
6  reorganize things here a little bit?
7    A.  Yes, that's fine.
8    Q.  All right.  Inside the front cover of this
9  folder, there's some handwritten notes.  Can you
10  identify that for me?
11    A.  Yes.  What is there is just roughly a log
12  of activities which include mostly time that I spent
13  on the case and a few expenses.
14    Q.  And how much time do you think you've
15  spent on this case so far?
16    A.  Oh, I don't know.  I can add it up for
17  you, if you want me to.
18    (Defendants' Exhibit 7 was marked for
19    identification.)
20    Q.  I'm going to mark this folder and its
21  contents as 7.  And in this folder I've marked as
22  Exhibit 7 is a copy of the police report with a
23  translation attached?
24    A.  Yes.
25    Q.  Who did the translation?

Page 13

1    A.  I don't know.
2    Q.  There's miscellaneous correspondence from
3  Mr. Martinez's office transmitting documents and the
4  like, correct?
5    A.  Yes, there are a number of cover letters.
6    Q.  There is a couple of pages taken from what
7  appears to be the April 2000 edition of Consumer
8  Reports.  Can you tell me what that is?
9    A.  These are just pages from the April issue,
10  which is their automotive -- automobile issue which
11  would relate to vehicles and particularly the subject
12  vehicle.  Just provides some data on what kind of
13  engine it is, the weight -- the weight distribution,
14  the dimensions.
15    Q.  Was any of this information particularly
16  pertinent to the opinions you'll be offering today in
17  this case?
18    A.  No, not particularly.
19    Q.  I've also got a copy of the Tandy
20  Engineering scene inspection notes?
21    A.  Yes.
22    Q.  Did you rely on the Tandy Engineering
23  scene inspection in support of your opinions in this
24  case?
25    A.  Well, it was background information.  It

4 (Pages 10 to 13)

1  didn't -- I didn't need that for my opinions.
2  Obviously the more information one has, the better I
3  suppose.
4      Q.  I've taken from Exhibit No. 7, the folder,
5  a couple of pieces of correspondence which appear to
6  be two-sided which appear to be billing records; is
7  that right?
8      A.  Yes, that is correct.
9      Q.  And then this document I'm handing you is
10  your fee agreement?
11      A.  It is, yes.
12          (Defendants' Exhibit 8 was marked for
13      identification.)
14      Q.  I'm just going to go ahead and mark the
15  three of those, your billing records and the fee
16  agreement, as No. 8. Is that all right?
17      A.  Oh, sure. Of course.
18      Q.  Has there been any other billings related
19  to this matter other than the two pages I have here?
20      A.  No, not yet.
21      Q.  So there's one billing for $9,709 and
22  there's another billing for $7,209; is that right?
23      A.  No. Actually, the $7,000 billing went
24  first and it wasn't paid and so it was simply
25  incorporated into the second billing so that those

1  are not two separate billings, but the 9,000 includes
2  the 7,000.
3      Q.  Okay. Less the $2,500 retainer, so the
4  total is roughly 11-, $12,000 that you billed?
5      A.  Well, I believe that was incorporated into
6  the first one. Right. So the $2,500 -- what is
7  owed -- what is owed to me now is the 9,850 --
8  9,850 -- aside from what has yet to be billed.
9      Q.  What arrangements have you made with Mr.
10  Martinez to be paid for that?
11      A.  Oh, we haven't even talked about it.
12          (Defendants' Exhibit 9 was marked for
13      identification.)
14      Q.  And then I've marked as Exhibit No. 9 a
15  compilation of what appear to be your file notes; is
16  that correct?
17      A.  Yes. This is -- right. This is what
18  might be called my work product in this case. It's
19  even got a coffee stain on it.
20          MR. MARTINEZ:  What exhibit number is
21      that?
22          MS. SAMBERG:  Nine.
23  BY MS. SAMBERG:
24      Q.  So you've got some notes reviewing the
25  police report, medical records, vehicle inspection,

1  review of the defendants' expert reports and then it
2  appears to be a handwritten version of your report in
3  this case? Yes, that's right.
4      A.  Yes, that's right.
5      Q.  For what purpose did you hand write the
6  report?
7      A.  Well, I wrote the report and then I gave
8  it to a typist to type.
9      Q.  I see.
10      A.  And I don't know. I just brought it in
11  there. I've often been asked in depositions is this
12  the only copy? Where is the original at? How do I
13  know -- so there's been no revisions.
14      Q.  Did you speak to any of the other experts
15  retained by the plaintiffs in this case before you
16  prepared your report?
17      A.  No, I don't believe that I had.
18      Q.  When was the surrogate study conducted by
19  Mr. Rosenbluth?
20      A.  May I look at Exhibit 9?
21      Q.  You bet.
22      A.  I think I can probably be a little more
23  responsive. That was done on November 29th of last
24  year, 2004.
25      Q.  And your report was authored on June 30th,

1  2004?
2      A.  Right.
3      Q.  So the results of Mr. Rosenbluth's
4  surrogate testing could not have formed the basis of
5  your opinions as expressed in your report because it
6  had not yet been completed?
7      A.  Right. That's right.
8      Q.  Did you speak to Mr. Irwin, who's been
9  retained by the plaintiffs as an accident
10  reconstructionist in this case?
11      A.  No, I have not.
12      Q.  And I don't even see a copy of Mr. Irwin
13  or Mr. Rosenbluth's reports in your file. Have you
14  reviewed either one of those things?
15      A.  No, I have not seen them.
16      Q.  Next -- and I'm not going to mark these,
17  but there is a copy in your file of Kevan Granat's
18  report, Don Tandy's report, Ed Paddock's report,
19  Michelle Vogler's report and Bob Piziali's report.
20      A.  Yes.
21      Q.  And you've reviewed all of those?
22      A.  Yes.
23      Q.  Then we have about a six-inch stack of
24  medical records -- four-inch stack of medical
25  records?

5 (Pages 14 to 17)

Page 18

1    A. No. It looks like about two.
2    Q. Okay. Apparently I don't have very
3 good -- it's three of my fingers -- how's that --
4 stack of medical records. Are these all of the
5 medical records you've been provided and reviewed
6 related to this matter?
7    A. Right. I have no others.
8    Q. And you've got flags in various locations.
9 What's the significance of the flags?
10    A. Oh, in some case there isn't any
11 significance. When I'm reviewing the records, if
12 there's something that looks like it might be
13 important, I'll underline it and maybe put a flag on
14 it so that I can find it quickly such as a stature
15 measurement or something like that or some
16 description of injuries.
17        (Defendants' Exhibit 10 was marked for
18        identification.)
19    Q. I'm just going to mark this whole set as
20 10, how's that? And then I have again a three-finger
21 stack of what appears to be literature --
22    A. That's what it is.
23    Q. -- for lack of a better characterization?
24    A. Well, not quite.
25    Q. I apologize. Let me start over.

Page 19

1    A. I'm sorry. I had forgotten that was
2 there.
3    Q. I have a one-inch stack of literature.
4 And for what purpose is this literature in your file,
5 sir?
6    A. The only purpose is because the subpoena
7 wanted me to bring all articles and so on that might
8 be related to the work that I did and so I brought
9 them.
10    Q. Okay. And these are the papers that you
11 are relying on in support of your opinions in this
12 case?
13    A. Yes.
14    Q. One of the things the subpoena also asked
15 you to bring were any articles that you may have
16 authored that have particular bearing on the issues
17 in this case. Are those included in this stack?
18    A. No. I don't think there are any of my
19 articles in there.
20    Q. Have you written any articles that have
21 any particular bearing on the issues in this case?
22    A. Well, I haven't written any articles that
23 are case specific. I've written a number of books
24 and papers over the years which relate to accident
25 reconstruction, biomechanics and general principles,

Page 20

1 but -- but they aren't case specific.
2    Q. I understand. I wouldn't have expected
3 you to use this accident necessarily as a case study
4 for a paper, but have you written any papers or
5 authored any articles which relate to the mechanism
6 of injury sustained by Mrs. Reynoso --
7        MR. MARTINEZ: Payan.
8 BY MS. SAMBERG:
9    Q. -- Payan in this case and/or related to
10 the kinematics of the occupant such as her in this
11 case?
12    A. No, I don't believe they're that specific.
13    Q. Have you written any articles related to
14 the concept of torso augmentation? You're familiar
15 with that, aren't you, sir?
16    A. No. Tell me the name --
17    Q. Torso augmentation. Diving injuries.
18    A. Oh, no. I had not heard that expression
19 before. I understand what you're saying.
20    Q. Have you written --
21    A. No.
22    Q. -- any papers either --
23    A. No, I have not.
24    Q. -- in favor of it or supporting it or not
25 supporting it?

Page 21

1    A. Right. No, I have not.
2    Q. There's a paper here by Robert Eichler,
3 E-i-c-h-l-e-r, called The Causes of Injury in
4 Rollover Accidents. Can you tell me for what purpose
5 you rely on this paper, please?
6    A. Well, this simply talks about injury
7 mechanism. It's just sort of a general summary
8 article. I didn't particularly rely on it, but I
9 thought I might bring it along since it seems to
10 relate to the issues that are involved.
11    Q. Okay. There's an SAE paper 900127 Field
12 Testing and Computer Simulation Analysis and Ground
13 Vehicle Dynamic Stability. For what purpose have you
14 relied on that publication, sir?
15    A. Oh, this -- this publication simply talks
16 about stability of vehicles like this one. I'm not
17 planning to do or have not done the accident
18 reconstruction in this matter. However, when I was
19 meeting with Mr. Martinez, he said -- he'd asked me
20 some questions about stability and I said, well, as
21 I've read the defense experts' reports, it seemed to
22 be clear to me that there would be a stability issue
23 for the vehicle in that it has a very low static
24 stability factor and so this is just a paper that
25 talks about that.

6 (Pages 18 to 21)

Page 22

1   Q. Before we wander too far off afield, let
2   me just ask you: Will you be offering any expert
3   opinions in the area of vehicle dynamics, stability
4   handling or resistance to rollover?
5   A. I don't believe so. I mean, obviously
6   I'll answer any questions that somebody would ask me
7   to the best that I can, but my understanding of what
8   I've been asked to do is primarily the biomechanics
9   and injury causation.
10   Q. And you have not -- strike that. Have you
11   ever been qualified to testify as an expert witness
12   at the time of trial on issues related to rollover,
13   stability, resistance to rollover, vehicle handling,
14   vehicle dynamics?
15   A. Well, I've testified about that on a
16   number of occasions. I'm trying to think what I've
17   done at trial. I probably have done that at trial as
18   well.
19   Q. Okay. And those cases would be on your
20   trial testimony list?
21   A. Yes.
22   Q. But it is not -- just so we're clear
23   here -- your intention to testify at the time of
24   trial that there is a stability defect in the Ford
25   Explorer involved in this accident, is it?

Page 23

1   A. No, I don't expect I'll do that. That is
2   my opinion, but I don't expect that I'll make that --
3   I just brought these papers to complete the file --
4   Q. Okay. So while --
5   A. -- because Mr. Martinez asked me about it.
6   Q. Okay. So while you have an opinion as it
7   relates to the stability of the Explorer, you will
8   not be expressing that opinion at the time of trial;
9   is that correct?
10   A. Well, that's my understanding, yes.
11   Q. We have an article by Leon Robertson, More
12   Evidence on Vehicle Static Stability and Rollovers.
13   Again, same --
14   A. Same -- same thing. That's where he
15   establishes what he believes is a reasonable static
16   stability factor.
17   Q. And it's in your file for the same reason
18   as we just discussed with this SAE paper 900127?
19   A. Yes, it is.
20   Q. And then we have an article by Harwin &
21   Brewer, Analysis of the Relationship Between Vehicle
22   Rollover Stability and Rollover Risk Using the NHTSA
23   CARDfile Database. Same --
24   A. Same thing.
25   Q. We have an SAE paper 900104, Engineering

Page 24

1   Parameters Relating to Rollover Frequency by Ian
2   Jones and Maria Penny. For what purpose is this
3   article in your file?
4   A. Oh, let me look at that and see if I can
5   help. This is the same thing. This is the same
6   thing. It talks about the static stability factor
7   and how that's the principle determining factor of
8   rollover propensity.
9   Q. We have SAE paper 950654, Mr. Syson's
10   paper, Occupant to Roof Contact: Rollovers and Drop
11   Tests?
12   A. Right.
13   Q. Is there anything specific in this paper
14   that you relied on in support of your opinions in
15   this case?
16   A. No. I didn't know -- I brought that along
17   in case you might ask me if there was an issue of
18   diving into the roof or the roof came down and this
19   paper addresses that.
20   Q. And what is your understanding of how Mr.
21   Syson addresses that issue in his paper?
22   A. Well, I believe his conclusion is that the
23   roof crush is a significant factor in the injury as
24   opposed to the impact with the roof before the --
25   before the deformation.

Page 25

1   Q. We have SAE paper 950655, Determination of
2   the Significance of Roof Crush on Head and Neck
3   Injury to Passenger Vehicle Occupants in Rollover
4   Crashes by Rains, R-a-i-n-s, and a name I cannot
5   pronounce. For what name -- for what purpose is that
6   paper in your file?
7   A. That's the same thing as the Syson paper.
8   It -- it relates the head and neck injury to -- to
9   the extent of roof crush.
10   Q. And it takes the position that the head
11   and neck injury is caused by the intruding roof as
12   opposed to diving?
13   A. Yes.
14   Q. And you also have Mr. Friedman's,
15   F-r-i-e-d-m-a-n, SAE paper 980210. Same thing with
16   this paper?
17   A. It is, yes. That's the same thing.
18   Q. And it essentially stands for the same
19   proposition?
20   A. Yes.
21   Q. There's an SAE paper 890859 by Bratten,
22   B-r-a-t-t-e-n, Development of a Tumble Number for use
23   in Accident Reconstruction?
24   A. Yes.
25   Q. For what purpose is that paper in your

7 (Pages 22 to 25)

Page 26

1  file?
2      A.  Oh, well, the only purpose for that paper
3  is to indicate that there's some statistical evidence
4  that during a rollover accident the drag factor's
5  about .4 to .5.
6      Q.  But since you're not doing the accident
7  reconstruction in this case, that's essentially
8  irrelevant to your opinions?
9      A.  Yes.  I haven't seen the reconstruction
10  that's going to be made.  All I know is from what
11  I've read in the Tandy report and so I used that to
12  make a few simple calculations in case the issue of
13  the centrifugal force would come up of Ms. Payan
14  being thrown out the window and being injured by
15  striking her head on the pavement as opposed to the
16  roof.
17      Q.  So --
18      A.  That's all -- that wasn't a very clear
19  answer.  I apologize for that.
20      Q.  But essentially you got a drag factor --
21      A.  That's all that is.  That's -- the only
22  purpose of that paper is to have a drag factor for a
23  simple -- very simple calculation that I made.
24      Q.  And I thought I heard you say you had not
25  seen the accident reconstruction -- any accident

Page 27

1  reconstruction as of the time that you authored your
2  report; is that correct?
3      A.  Oh, yes, that's true.  I had not.
4      Q.  We have an article by Dr. Moffatt,
5  M-o-f-f-a-t-t, The Relationship Between Vehicle Roof
6  Strength and Occupant Injury in Rollover Crash Data
7  For what purpose is that article in your file?
8      A.  Well, that's the same thing that supports
9  the idea that the roof crush is related to the head
10  and neck injuries.
11      Q.  Does Dr. Moffatt support the same position
12  as M. Syson and Mr. Friedman?
13      A.  Well, yeah.  He says he doesn't and yet
14  the data that he quotes does, in fact, support it and
15  then in his conclusions, of course, he admits that
16  that's the case.  In his abstract, if you read the
17  abstract, you wouldn't have that impression, but if
18  you read the paper, it is, in fact, a confirmation of
19  the others.
20      Q.  So while you know that Dr. Moffatt
21  believes that neck loading occurs prior to any roof
22  crush because that's his stated position --
23      A.  I don't know what he believes, but this is
24  what -- what is in the paper I think is pretty clear.
25      Q.  Okay.  So your interpretation of Dr.

Page 28

1  Moffatt's paper and the data included in it is in
2  support of your position that head and neck injuries
3  occur from the intruding roof?
4      A.  Well, yes, that's a fair statement.
5      Q.  You've also got some FMVS standards in
6  your file?
7      A.  Right.
8      Q.  And the Anthropometric Source Book.  For
9  what purpose is this in your file, sir?
10      A.  Well, I -- whereas there was some
11  discrepancy about the stature of Ms. Payan, there was
12  no information that I had on her sitting height and
13  so I had to simply use standard anthropometric data
14  to estimate that and that was the basis for those
15  estimations.
16      MS. SAMBERG:  What exhibit number am I on?
17      MR. MARTINEZ:  Your literature was Exhibit
18  No. 11, if I recall.
19      MS. SAMBERG:  I don't think I stuck a
20  sticker on it after all that.
21      (Defendants' Exhibit 11 was marked for
22      identification.)
23  BY MS. SAMBERG:
24      Q.  So we're marking all the literature as 11.
25  And then there's a set of black and white prints.

Page 29

1  Now that I'm flipping through here, let me rephrase.
2  There appears to be a set of prints of someone's
3  vehicle inspection.  Can you identify these for me?
4      A.  Yeah.  These were apparently copies of
5  photographs that were taken of a vehicle inspection.
6  They were provided to me by Mr. Martinez's firm.  I
7  don't know who took them or those.
8      Q.  And you didn't rely on them?
9      A.  Oh, I simply looked at them, but I
10  didn't -- I had an opportunity to look at the vehicle
11  myself and so I didn't need them.
12      Q.  Okay.  I'm not going to mark these because
13  we've got all the photographs.
14      And, finally, we've got thumbnail prints
15  of two sets of photographs.  The first set I'm
16  handing you, I believe, are your vehicle inspection
17  photographs?
18      A.  Yes, that's right.  And I believe we
19  already looked at these or marked --
20      Q.  Right.  We've marked those as Exhibit 3.
21      A.  Okay.
22      (Defendants' Exhibit 12 was marked for
23      identification.)
24      Q.  And then we have what I'm going to mark as
25  Exhibit No. 12, which are thumbnails of what I

8 (Pages 26 to 29)

Page 30

1  understand to be Mr. Rosenbluth's surrogate study?
2      A.  Well, we did it together.  It was at
3  his -- at Mr. Rosenbluth's facility and these were
4  photographs that I took.  Rosenbluth -- that is Mr.
5  Rosenbluth and his assistant took a numerous
6  collection of photographs.  I don't have that
7  collection, but -- so this is just photographs that I
8  took for my own purposes.
9          MS. SAMBERG:  And we've not seen these
10     either so same issue with respect to -- I
11     thought these were Jerry's photographs, Exhibit
12     12, but these are actually Dr. Huston's copies
13     of his own photographs related to this.
14         MR. MARTINEZ:  Were they part of your
15     report?
16         THE WITNESS:  No.
17         MS. SAMBERG:  No.
18         THE WITNESS:  They were not.
19         MS. SAMBERG:  Off the record for a second.
20         (Off the record.)
21         MS. SAMBERG:  Let's go back on the record
22     for a second.
23  BY MS. SAMBERG:
24     Q.  I now found in an envelope here what
25  appears to be prints of Exhibit 12; is that correct?

Page 31

1      A.  Yes, that's right.
2      Q.  I'm going to mark the outside of the
3  envelope in case we need to refer to these at some
4  point during our discussion today.  We can at least
5  use the actual prints rather than the thumbnails.
6      A.  Uh-huh.
7          MR. MARTINEZ:  You just tell me what you
8      want.  You want the thumbnails or do you want
9      the --
10         MS. SAMBERG:  If we can just get them on a
11     CD, that would be great.
12  BY MS. SAMBERG:
13     Q.  I assume they were digital photographs,
14  weren't they, Dr. Huston?
15     A.  Yeah.  The CD is here.
16         MS. SAMBERG:  If we could get the CD
17     photos, that would be terrific.
18  BY MS. SAMBERG:
19     Q.  I've got a CD with Kevan Granat's vehicle
20  inspection photographs.  I've got a CD with more
21  Kevan Granat photographs, scene inspection.  More
22  Kevan Granat.  More Kevan Granat.  And this one's
23  just marked Reynoso vehicle photos, accident site and
24  vehicle.  Do you have any idea what's on there?
25     A.  Just what it says.

Page 32

1      Q.  Are these your photographs?
2      A.  No.  No, those are all provided to me.  I
3  have -- it's my understanding that those are defense
4  experts' photographs.
5      Q.  That's what they appear to be.  And
6  finally I have a CD that says Betty Payan and a
7  date --
8      A.  Yes.
9      Q.  -- 11/29/04.
10     A.  Okay.  Now, this would be the CD that we
11  talked about earlier which would pertain to my
12  photographs of the surrogate inspection.
13     Q.  All right.
14         MR. MARTINEZ:  That's what you need a copy
15     of.
16  BY MS. SAMBERG:
17     Q.  Thank you for indulging me while we did
18  that housekeeping.
19         When were you retained in this case, sir?
20     A.  Give me that.  Yes.  Okay.  I was
21  initially retained on -- or initially contacted on
22  April the 22nd of last year -- that's 2004.
23     Q.  And what were you asked to do?
24     A.  My understanding at that time was that I
25  was asked to look at the biomechanics and the injury

Page 33

1  causation mechanism for Ms. Reynoso.
2      Q.  When did you do a vehicle inspection?
3      A.  On June the 17th of 2004.
4      Q.  Was anybody with you at your vehicle
5  inspection?
6      A.  No, although there were some people in and
7  out.  Mr. Martinez's assistant Monica Polanco was in
8  the room.  She didn't help me with the inspection.
9  And then Mr. Martinez came by and we talked for a
10  little while, but for the most part I was alone.
11     Q.  Have you inspected any other Ford
12  Explorers exemplar vehicles for your work in this
13  case?
14     A.  No.  We did look at a buck in the
15  surrogate test, but no other vehicles.
16     Q.  Prior to the preparation of your report,
17  did you read any depositions of any individuals that
18  may have been taken in this case?
19     A.  No.
20     Q.  Have you to date read any depositions of
21  any individuals that may have been taken in this
22  case?
23     A.  No.  I have no depositions in this matter.
24     Q.  Did you review any documents that were
25  produced by Ford Motor Company?

9 (Pages 30 to 33)

Page 34

1    A. No, I don't believe that I have.
2    Q. Now, you told me you didn't have Mr.
3 Irwin's report or even speak to Mr. Irwin prior to
4 the preparation of your report on June 30th, 2004; is
5 that correct?
6    A. Yes, that's right.
7    Q. Have you spoken to Mr. Irwin to date?
8    A. Not about this matter.
9    Q. Okay. And I understand you went to Mr.
10 Rosenbluth's facility in Arizona to conduct the
11 surrogate study; is that correct?
12    A. Yes.
13    Q. Did you speak to Mr. Rosenbluth prior to
14 the preparation of your June 30th, 2004 report
15 related to this case?
16    A. Yeah, I understand. No, I don't believe
17 that I did.
18    Q. And you understand that Mr. Jacobson has
19 also been hired as an expert in this case?
20    A. Yes.
21    Q. Did you speak to Dr. Jacobson prior to the
22 preparation of your report in this case?
23    A. No.
24    Q. Have you spoken to Dr. Jacobson at any
25 time related to this case?

Page 35

1    A. No.
2    Q. Before I forget, have you done any work
3 related to the biomechanics or kinematics of the
4 passenger Sally Payan?
5    A. No.
6    Q. Are you prepared to give me all your
7 opinions today, Dr. Huston?
8    A. I believe so. I feel a little
9 disadvantaged in that I learned last evening that I
10 am the first of the experts to be deposed and I'm
11 therefore not sure what others may say. And so not
12 knowing what they may say that may stimulate that
13 I'll want to enhance or change my opinions, but aside
14 from that I have no plans to do any further work. I
15 have no plans to do anything and I don't expect or
16 anticipate that my opinions will change and to that
17 extent they'll be final.
18    Q. So as you sit here today, you're prepared
19 to give me all the opinions that you've formulated up
20 until this point, correct?
21    A. Yes. Yes, I can do that.
22    Q. And you may have some additional comment
23 related to the opinions expressed by others as the
24 depositions progress?
25    A. Yes, of course.

Page 36

1    Q. And you've been asked to address
2 biomechanics and injury -- I'm sorry. Strike that --
3 biomechanics and occupant kinematics as it relates to
4 the driver -- is it Betty --
5        MR. MARTINEZ: Betty.
6 BY MS. SAMBERG:
7    Q. -- Payan; is that correct?
8    A. Betty Payan, yes. The occupant kinematics
9 and the movement and the injury forces.
10    Q. And I think we've already covered this.
11 You're not doing accident reconstruction in this
12 case, right?
13    A. Yes, I am not.
14    Q. Okay. You have done accident
15 reconstruction in the past, right?
16    A. Oh, yes. I still do that.
17    Q. But you've not been retained to do so in
18 this case?
19    A. That's correct.
20    Q. Are you going to be offering any opinions
21 at the time of trial that the Explorer that was
22 involved in this accident or any of its components
23 was defective?
24    A. I don't believe so. I do have some
25 opinions about that obviously, but that isn't

Page 37

1 something that I expect to be asked about in trial.
2    Q. Okay. For instance, will you be offering
3 an opinion at the time of trial that the restraints
4 were defective either in design or their performance
5 in this accident?
6    A. No, I don't believe so. I believe that
7 it's my understanding that someone else, specifically
8 Mr. Rosenbluth, will do that.
9    Q. And same question with respect to the roof
10 or the pillars. Will you be offering any opinions at
11 the time of trial that the roof or the pillars were
12 defective in their design or performance in this
13 accident?
14    A. Right, it's the same answer. I believe
15 that Dean Jacobson is going to do that.
16    Q. Offering any opinions on the seats -- the
17 design or performance of the seats in the vehicle?
18    A. No.
19    Q. Okay. Glazing?
20    A. No.
21    Q. I think we covered this: handling,
22 stability or resistance to rollover?
23    A. I believe that that's an accident
24 reconstruction matter.
25    Q. Okay. But you're not offering any

10 (Pages 34 to 37)

Page 38

1 testimony about that?
2    A. As far as I know I'm not, that's correct.
3    Q. Warnings or marketing?
4    A. Right, I'm not doing that.
5    Q. How about human factors?
6    A. No, I don't believe so.
7    Q. Statistics?
8    A. No.
9    Q. Summarize, if you would, for me your
10 opinions as they relate to the biomechanics and
11 kinematics of Betty Payan in this accident.
12    A. Well, my opinions are really very simple
13 and perhaps of all the experts my opinions are
14 the simplest. It's my opinion that during this
15 rollover incident that she was the driver of the
16 vehicle, that it -- the vehicle rolled over passenger
17 side leading, that the -- that at the time of the
18 accident she was wearing her seat belt, that during
19 the accident sequence the roof on her side was
20 collapsed, that the roof came into contact with her
21 head and caused a compression subluxation injury
22 that's reported in the medical records.
23    And that's -- well, that's -- yes, that's
24 all, but let me amend that just a little bit more.
25 It's my opinion based upon also the surrogate study

Page 39

1 that I did after the preparation of the report that
2 if in this instance the roof had not come down that
3 she would not have experienced the injuries that she
4 did and that depending upon the nature of the
5 restraint system, she would have been kept out of
6 harm to varying degrees.
7    Q. Are you going to be offering any opinions
8 on reasonable alternative designs for the seat belt
9 system in the Explorer?
10    A. No, I'm not going to do that.
11    Q. All right. We know a surrogate study was
12 performed at Mr. Rosenbluth's facility; is that
13 correct?
14    A. Yes.
15    Q. And I'm sorry, tell me the date again of
16 the surrogate study.
17    A. Well, I've forgot it. I think it was
18 November the 29th. Let me look to be sure. Yes, it
19 was November the 29th of last year.
20    Q. Did you do a spit test?
21    A. No. No, this was not a spit test. Well,
22 it was a -- it was a spit, but it was not a dynamic
23 test. That is to say we put a surrogate in the
24 vehicle, took some measurements and then rolled it
25 over so that it was at 180 degrees and to that extent

Page 40

1 it was a spit test, but it wasn't a dynamic test.
2    Q. The size and weight of your surrogate?
3    A. The surrogate was 5'4" -- 5'4" and weighed
4 132 pounds.
5    Q. Did you take measurements with her seated
6 height?
7    A. Yes. Her seated height was -- I measured
8 to be 33 1/2 inches.
9    Q. And how about the distance between her
10 buttocks and her knees and knees to the base of the
11 floor, did you take those measurements as well?
12    A. Yes, but I don't have them recorded.
13 They'll be in the Rosenbluth report.
14    Q. Okay. Do you understand that Mr.
15 Rosenbluth did a report related to his surrogate
16 study -- or to the surrogate study that was
17 conducted?
18    A. Well, let me -- maybe I spoke too soon.
19 What I understand is that a variety -- an extensive
20 variety of measurements were taken at the Rosenbluth
21 facility and Mr. Rosenbluth's practice is to put them
22 into a report folder with various photographs, in
23 which case there will be numerous measurements. I
24 didn't record all of the measurements that were
25 taken. I simply recorded those which seemed to be

Page 41

1 pertinent from my perspective.
2    MS. SAMBERG: Off the record for a second.
3    (Off the record.)
4    MS. SAMBERG: Back on the record.
5 BY MS. SAMBERG:
6    Q. Did you take a measurement of the position
7 of the seat?
8    A. That would be in the Rosenbluth data as
9 well.
10    Q. Did you measure the position of the seat
11 at the time of your vehicle inspection?
12    A. I don't believe that I did, but let me --
13 let me see if I have that. Well, I do have some
14 information about that so the answer to the question
15 is, yes, I do have some data.
16    Q. And what data do you have?
17    A. Well, what I have is that the distance
18 from the -- what I call the bite -- and what I mean
19 by that is the intersection between the back rest and
20 the seat bottom -- that distance to the pedal of the
21 vehicle -- like the brake pedal -- is 37 3/4 inches.
22 The distance from the -- or the closest distance from
23 the seat bottom to the dash -- the under dash is
24 eight inches. The distance from the vertical
25 through the bite to the center of the steering wheel

11 (Pages 38 to 41)

Page 42

1 is 17 1/2 inches.
2    Q. Do you have any information about whether
3 the position of the seat was moved at any time after
4 the accident?
5    A. No, I don't know the answer to that.
6    Q. Did you take any measurements during the
7 surrogate study of headroom with the non-deformed
8 roof?
9    A. Yes, that was what I did and I found that
10 measurement or that distance to be 5 1/2 inches.
11    Q. Did you measure the vertical roof
12 deformation in the accident vehicle?
13    A. Yes. Well, let me tell you what I did. I
14 measured the distance -- the vertical distance from
15 the bite to the roof in the accident vehicle. I
16 found that to be 28 1/2 inches. In contrast, the
17 similar measurement in the buck, or the exemplar, was
18 38 inches so that then the deformation would have
19 been approximately 9 1/2 inches in the static
20 condition.
21    Q. Did you also attempt to determine any
22 lateral intrusion or deformation?
23    A. No, I did not.
24    Q. Explain to me what you did with your
25 surrogate. You put her in the vehicle?

Page 43

1    A. Yes, put the surrogate in -- well, before
2 putting her in the vehicle, we took some -- the
3 height and weight measurements and then took some
4 measurements of the vehicle. Put the surrogate in
5 the vehicle, measured the headroom and then told the
6 surrogate to buckle up in the usual way, which she
7 did. And then we rotated the buck with the surrogate
8 in the vehicle and took some measurements while the
9 surrogate was upside down.
10    Q. Was the geometry of the restraint that was
11 used in your surrogate test the same as the geometry
12 of the strength that was used in the accident
13 vehicle?
14    A. Yes and no. The objective in the first
15 test was to make it the same and then we did three
16 other tests where we made it different.
17    Q. Okay. Explain to me what you did. Let's
18 talk about the first test.
19    A. Okay.
20    Q. What were the findings in your first test?
21    A. In the first test, whenever the vehicle
22 was rolled over, the headroom decreased from 5 1/2
23 inches to two inches and also the buttocks of the
24 surrogate came off the seat approximately two inches.
25    Q. Was the retractor locked at that point?

Page 44

1    A. Yes.
2    Q. How much excursion was there before the
3 retractor locked? How much belt spooled out, if any?
4    A. I don't know the answer to that. This was
5 a very slow moving test so that the retractor would
6 have locked whenever the vehicle was turned at about
7 30 degrees and -- or 35 degrees so that there would
8 probably have been very little, if any, spool out.
9    Q. So did I hear you say the headroom was
10 decreased by a half inch to two inches?
11    A. Oh, no. I miss -- no, I didn't say that.
12 The headroom originally is 5 1/2 inches and then
13 after the roll it was only two inches between the
14 head and the roof --
15    Q. So the --
16    A. -- so that the decrease was 3 1/2 inches.
17    Q. Okay. You've done several of these static
18 spit tests before, haven't you?
19    A. Yes.
20    Q. Isn't it typical to see about two to four
21 inches movement towards the roof when inverted?
22    A. Yeah, that's exactly what we got.
23    Q. Okay. So this was right in that range
24 that you've seen many, many times before?
25    A. Yes. No surprise. Nothing particularly

Page 45

1 unusual or remarkable.
2    Q. And that's typical for all vehicles with
3 three-point restraint systems consistent with the
4 results you've seen?
5    A. Yeah. As far as -- yeah, and I've done a
6 number of these. They're all -- they're all pretty
7 similar.
8    Q. At what point did the surrogate's buttocks
9 come off the seat? How many degrees?
10    A. I don't know the answer to that. I didn't
11 observe that.
12    Q. But her buttocks was off the seat when she
13 was fully inverted to 180 degrees, right?
14    A. Yes, that's right.
15    Q. And you said she came off the seat
16 approximately two inches?
17    A. Correct.
18    Q. You said you didn't add any dynamic
19 component to this test, right?
20    A. Right.
21    Q. Would you agree that by adding a dynamic
22 component, you'd expect that the occupant's going to
23 move closer to the roof?
24    A. Sure.
25    Q. How much closer, based on your experience?

12 (Pages 42 to 45)

Page 46

1    A.   Well, it would depend upon the -- how much
2  the dynamic component is.  That would be accident
3  specific.
4    Q.   But that would be true with any restraint
5  system if you added a dynamic component, you would
6  expect the occupant would move closer to the roof?
7    A.   Oh, sure.  Of course.
8    Q.   All right.  Tell me about the -- so that's
9  the first test that you ran, right?
10    A.   Yes, it is.
11    Q.   Tell me about the next one.
12    A.   Well, we did three others and many more
13  details will be provided in the Rosenbluth data, but
14  what I have is that we then used an integrated seat
15  belt system and the headroom then was reduced only to
16  two and three-quarter inches upon rolling.
17    Q.   So it went from -- let me make sure I've
18  got this right -- from 5 1/2 to two and
19  three-quarters?
20    A.   Yes.
21    Q.   So help me with my subtraction here.
22    A.   Well, that would be two and a quarter.
23    Q.   So --
24    A.   No, excuse me.  Two and three-quarters.
25    Q.   So still within that two to four range we

Page 47

1  were talking about?
2    A.   Yes, that's right.
3    Q.   And then you fully -- when she was fully
4  inverted with the integrated seat belt, did the
5  surrogate's buttocks come off the seat?
6    A.   Yes, but I don't have that measurement.  I
7  don't know what that was.
8    Q.   And do you know at what point as she was
9  being rotated her buttocks came off the seat?
10    A.   No.
11    Q.   Do you recall whether that was a
12  measurement that Dr. -- I'm sorry -- that Mr.
13  Rosenbluth was taking?
14    A.   Yes, it was.
15    Q.   So --
16    A.   He always takes all of those measurements.
17    Q.   Okay.  How much -- well, strike that.  All
18  right.  Your third test was what?
19    A.   The third test was one where we had an
20  integrated seat belt and a pretensioner -- or a
21  simulated pretensioner.
22    Q.   Tell me how you simulated the pretension.
23    A.   Well, the way that was done was to take
24  two to three inches of slack out of the webbing and
25  lock the retractor before rolling so that the -- from

Page 48

1  the surrogate's perspective, the surrogate's sitting
2  in the seat, but relatively tight seat belt.
3    Q.   Why did you decide on two to three inches
4  of slack?
5    A.   Well, that's a compromise that Mr.
6  Rosenbluth has arrived at.
7    Q.   Not a decision that you made.  I should
8  ask Jerry?
9    A.   Right.  Yes, that's correct.
10    Q.   Okay.  What happened when you used the
11  integrated seat belt and simulated pretensioner?
12    A.   Well, then, whenever we rolled the -- the
13  person over the head, the headroom was 3 1/2 inches, so that
14  then the loss of headroom would have been
15  approximately two inches.
16    Q.   So still within that two to four range
17  that you're commonly seeing, correct?
18    A.   Yes, it is.
19    Q.   And, again, did the surrogate's buttocks
20  come off the seat when she was fully inverted using
21  the integrated seat belt with the simulated
22  pretensioner?
23    A.   I don't remember if that's the case or
24  not.
25    Q.   What was the fourth test that you did?

Page 49

1    A.   The fourth test was one where we
2  introduced slack into the seat belt before it locked
3  up.
4    Q.   So let me go back.  You used the original
5  equipment seat belt, correct?
6    A.   Yes.
7    Q.   And then you introduced some slack before
8  allowing the retractor to lock?
9    A.   Yes.
10    Q.   How much slack?
11    A.   Three inches.
12    Q.   And whose decision was it to use three
13  inches?
14    A.   Mr. Rosenbluth.
15    Q.   Okay.  Was there some simulation attempt
16  being made to do this three inch of slack?  What was
17  the purpose of running that test?
18    A.   Well, there the purpose was to see what
19  the headroom would be with the slack during the
20  rollover and that was discovered to be three quarters
21  of an inch.
22    Q.   Do you have any reason to believe that
23  there was any slack in Mrs. Payan's belt at the time
24  of the accident?
25    A.   I have no opinion about that.  I don't

13 (Pages 46 to 49)

Page 50

1  know the answer to that. There again, Mr. Rosenbluth
2  will have inspected the belts and looked at the
3  lockup marks and would be able to answer that.
4      Q.  And what were the results of that test
5  again? I'm sorry.
6      A.  Oh, I'm sorry.  Yeah, there the headroom
7  was reduced to three quarters of an inch.
8      Q.  So if it was reduced to three quarters of
9  an inch and it started at 5 1/2, you had about what,
10  four --
11      A.  Four and three-quarter inch of headroom
12  was consumed.
13      Q.  Okay.  Just slightly above the two to four
14  range we've been talking about --
15      A.  Right.
16      Q.  -- that's commonly found in all vehicles?
17      A.  Yes, that's right.
18      Q.  What conclusions do you draw from the
19  surrogate testing that was conducted?
20      A.  Well, the conclusions that I made were
21  that with a restraint system that keeps the occupant
22  away from the roof, and without the roof of course
23  coming toward the occupant, that then the significant
24  loading which was experienced in this accident would
25  have been avoided.

Page 51

1      Q.  Can you say to a reasonable degree of
2  scientific certainty that had this vehicle been
3  equipped with the integrated seat belt, all other
4  things remaining the same, that Mrs. Payan would not
5  have received a paralyzing neck injury in this
6  accident?
7      A.  No, I don't believe so.
8      Q.  No, you can't say that?
9      A.  That's correct.  I believe that -- that in
10  this accident she still would have received these
11  injuries.
12      Q.  Okay.  Let me ask a different question.
13  Can you say to a reasonable degree of scientific
14  certainty that had this vehicle been equipped with
15  pretensioners that Mrs. Payan would not have suffered
16  a paralyzing neck injury in this accident?
17      A.  No, I can't say that.  I don't know if it
18  would have been as bad as it was, and there's some
19  qualitative words there like paralyzing.  But, no, it
20  appears to me from the measurements that I have in
21  this surrogate testing that even with the better seat
22  belt system, there was still a significant amount of
23  roof damage which would have come into her occupant
24  space.
25      MS. SAMBERG:  Let's take a quick break.

Page 52

1      (A recess was taken from 10:16 to 10:30.)
2      MS. SAMBERG:  We're back on the record.
3  BY MS. SAMBERG:
4      Q.  Is it fair to say that in order to address
5  the issue of mechanism of injury, you have to have an
6  understanding of the reconstruction of the accident?
7      A.  Yes.
8      Q.  And I think we've established you've not
9  attempted to independently reconstruct the accident;
10  is that correct?
11      A.  That's right.
12      Q.  When and how did you get information on
13  the accident reconstruction for use in your report?
14      A.  What I did was when I inspected the
15  vehicle, I could -- I had -- I was able to observe on
16  the vehicle that it had rolled over approximately
17  three times or two and a half times.  And I also then
18  had information from the police report so that
19  whereas I did not know what the specific speeds were,
20  I did have a general understanding of the accident
21  sequence and the -- and the -- what kind of accident
22  it was, the number of rolls that it did.
23      Q.  And you included in your report all of the
24  information you found to be pertinent to your
25  biomechanical analysis, is that correct, in terms of

Page 53

1  the accident reconstruction?
2      A.  I think that's probably right.  Let me see
3  what I did say on that.  Yes, I think -- I believe
4  that I did.  I believe that I did.
5      Q.  Tell me your understanding of how the
6  accident occurred.
7      A.  All right.  This was on -- it occurred in
8  Mexico in the evening.  It was about 8:00, wet
9  roadway.  It was on January 11th, 2003, single
10  vehicle rollover accident.  It was a 2000 Ford
11  Explorer.  The operator was Betty Payan.  Right front
12  passenger was Sally Payan.  And that the -- for some
13  unknown cause the vehicle went out of control so that
14  the -- presumably from water on the roadway, but when
15  the vehicle went out of control, it began to roll
16  along the roadway and across the roadway with the
17  passenger side leading.  It rolled over two and a
18  half times, which means it came to rest upside down
19  on its roof.
20      Q.  Could it have been as many as three and a
21  half times?
22      A.  Well, I didn't see evidence of three and a
23  half times, but I suppose that's possible.  I believe
24  one of the defendants -- Mr. --
25      Q.  Granat?

14 (Pages 50 to 53)

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

Page 54

1  A. Yes -- suggested that it might have been
2  more than two and a half. He said at least two and a
3  half. So it could have been more. I don't know the
4  speed of the vehicle at the time of the rollover, but
5  assuming that it was going at highway speed or speed
6  limit, which was 110 kilometers per hour, it would
7  have then been going a little over 65 miles per
8  hour -- about 68 miles per hour at the time of the
9  roll and then it would have rolled or moved nearly a
10  little over 300 feet.
11  Q. And essentially the information that
12  you've provided me came from the translated version
13  of the accident report?
14  A. Yes, that's right.
15  Q. Are you aware or did you read in that
16  accident report that the investigating officer
17  believed that Mrs. Payan may have been exceeding the
18  speed limit or at least for the conditions as they
19  existed at that time?
20  A. Yeah, I did -- that's right. I read that.
21  I believed that he said that she was going too fast
22  for conditions. I didn't know or understand that he
23  thought she was breaking the speed limit.
24  Q. Okay. Are there any assumptions that
25  you're relying on concerning the reconstruction of

Page 55

1  this accident if proved untrue would change any
2  aspect of your biomechanical or kinematic analysis?
3  A. Okay. Well, I guess, of course, depends
4  upon what they are. If one would say that it really
5  wasn't a rollover or that something else happened --
6  I mean, nothing that I can think of that would be
7  reasonable. Well, let me continue --
8  Q. Sure.
9  A. -- as I think about that a little bit
10  more.
11  Q. It's a good question, isn't it?
12  A. It's an interesting question. It is an
13  interesting question because it's really open ended,
14  but the kinds of things that can change are these --
15  my experience in these matters that experts will
16  disagree upon the speed of the accident. The defense
17  experts often think it's faster than the plaintiffs'
18  experts so that the speed could vary somewhat. I
19  don't believe that within reasonable limits that will
20  affect my opinions whatever the speed is. In
21  terms -- that's the only thing I think that there
22  might be some issue about.
23  Q. Okay. And you don't know what Mr. Irwin
24  believed the speed to be because you haven't even
25  seen his accident reconstruction; is that fair?

Page 56

1  A. That's exactly right, I don't know.
2  Q. And you reviewed Mr. Granat's
3  reconstruction, right?
4  A. Well, he didn't say either. He simply
5  said what the speed limit was. He didn't say what
6  the speed before the accident was.
7  Q. Well, essentially he concluded, as you
8  did, that she was probably traveling at highway
9  speeds, correct?
10  A. That's what he said, yes.
11  Q. So in this particular case you can't say
12  that there was any disagreement between the experts
13  as to the speed of the vehicle since you don't know
14  what Mr. Irwin's speed is and Mr. Granat didn't
15  really come to any specific conclusion, right?
16  A. Exactly. I was simply saying that in the
17  past there's often some disagreement. See, what
18  stimulated all this is suppose something changes and
19  I'm just speculating on how it might change.
20  Q. So you don't know what the pre-trip speed
21  was, correct?
22  A. I do not, that's correct.
23  Q. Do you know whether this was an on-road
24  trip or an off-road trip?
25  A. Well, from my reading of the police

Page 57

1  report, it's my belief it was an on-road.
2  Q. Based on what's in the police report?
3  A. Well, simply that it was on the highway
4  and that the highway was wet.
5  Q. Okay. Do you believe that the vehicle
6  left its wheels while traveling on the paved portion
7  of the highway or the vehicle actually left its
8  wheels after leaving the paved portion of the
9  highway? That's my question.
10  A. Yes, I understand the question. It was my
11  belief from reading the -- or impression from reading
12  the accident report that this occurred on the
13  highway. I could be mistaken about that. I didn't
14  explore that in any great detail.
15  Q. Do you have any information about pre-trip
16  steering or breaking input?
17  A. No.
18  Q. And I take it you don't have any
19  information about yaw rates, yaw angles, side slip
20  angles, any of those types of things?
21  A. Right, I don't know any of that. I mean,
22  I have no information about that and I have no
23  opinion about it and I haven't attempted to find any
24  of that out.
25  Q. And given highway speeds of let's just say

15 (Pages 54 to 57)

Page 58

1 roughly 65 miles an hour, it would be reasonable,
2 based on your reconstruction experience, for a
3 vehicle to have rolled as many as three and a half
4 times, right?
5    A. Yes.
6    Q. We know it's a half because the vehicle
7 ends up on its roof, correct?
8    A. Yes.
9    Q. So you think it's at least two and a half
10 and it could be as many as three and a half?
11    A. Well, that's what Mr. — help me.
12    Q. Granat.
13    A. — Granat said, yes. And I can't disagree
14 with that. I haven't explored it. What I do know
15 from my — from what I saw is that there were
16 scratches at least in three directions on the roof
17 which would give at least two and a half.
18    Q. Right. With respect to your work, is it
19 true that the portion of the accident that's really
20 important to you is the time when the vehicle leaves
21 its tires until the time it comes to rest?
22    A. Yes.
23    Q. So the steering maneuvers and the braking
24 maneuvers that occurred prior to the time the vehicle
25 leaves its wheels is not really important to your

Page 59

1 opinions today, right?
2    A. Yes, that's correct.
3    Q. What is your understanding, if any, of
4 what portion of the vehicle first impacted the ground
5 during this rollover sequence?
6    A. Well, there again, I didn't reconstruct
7 the accident, but what I would believe would have
8 happened was that the first impact with the ground
9 after the wheels — or after it begins to roll over
10 would be on the driver's side roof corner.
11    Q. Okay. And what is the basis for that
12 belief?
13    A. Well, that's simply my experience. If it
14 begins to roll passenger side leading, it generally
15 skips over the passenger side and comes down hard on
16 the — on the driver's side. That is, you take a
17 diagonal from the tripped wheels to the opposite
18 corner.
19    Q. So having not reconstructed the accident
20 in this case, you can say that based on your
21 experience you believe that that's what may have
22 happened, but you can't say that is what happened in
23 this instance?
24    A. Yes, that's right.
25    Q. And if I was to ask the same question with

Page 60

1 respect to the second roll and if there was a third
2 roll, would your answer be the same?
3    A. Well, as the vehicle begins to roll, it
4 loses energy obviously from the impacts and so more
5 and more of the vehicle comes into contact with the
6 road surface as it rolls.
7       In the very first roll, it is spinning in
8 such a way that it tends to skip over part of the
9 roadway so that the — the heavy impacts come on the
10 driver's side, but less and less so as the vehicle
11 slows down simply because it has less energy and
12 therefore less impact force.
13    Q. Is it fair to say that you cannot tell me
14 the specifics of the dynamics of the rollover
15 sequence in this accident?
16    A. Oh, sure. I didn't make that
17 reconstruction.
18    Q. And so you can't tell me, for instance,
19 what the roll angle was at any point during the roll
20 sequence, can you?
21    A. Right.
22    Q. Okay. You can't tell me what precise area
23 of the vehicle came in contact with the ground at any
24 point during the rollover, can you, and when that
25 happened?

Page 61

1    A. Oh, yeah, when. There certainly is
2 physical evidence that the vehicle came into
3 contact —
4    Q. Sure.
5    A. — with the ground and to say that I don't
6 know wouldn't be —
7    Q. But you can't —
8    A. — truthful.
9    Q. But you can't tell me when the damage that
10 occurred that's visible on the vehicle happened
11 during this roll sequence; is that correct?
12    A. Sure. It would vary, but I should say
13 that the most significant impact probably would not
14 have been on the first roll, but probably on the
15 second roll. There again, the reconstructionist will
16 be able to provide more details on that.
17    Q. How much — strike that. Do you believe
18 that there were three separate impacts on the
19 driver's side roof rail in this accident?
20    A. Yes, I believe that would be the case.
21    Q. There was at least three?
22    A. Yes.
23    Q. Okay. And if we assume three — could be
24 more, but let's assume three impacts on the driver's
25 side roof rail —

16 (Pages 58 to 61)

Page 62

1    A.  Okay.
2    Q.  -- which of those three were the most
3  significant?
4    A.  I would predict that the second of the
5  three would be the most significant and that that's
6  what the reconstruction will show.
7    Q.  How much roof deformation was there on the
8  driver's side roof pillars after the first impact?
9    A.  I don't know.
10    Q.  How much deformation was there to the
11  driver's side roof pillars after the second impact?
12    A.  I don't know that either.  Although there,
13  if I am correct that that would be the most
14  significant impact, then the deformation would be in
15  the order of ten inches.
16    Q.  Okay.  But you're making an assumption
17  there?
18    A.  Right, I am.  I'm assuming that that's the
19  most significant impact.
20    Q.  And you're assuming -- well, you found
21  there to be approximately nine inches in vertical
22  roof deformation, correct?
23    A.  That's right.
24    Q.  And you believe that all of that roof
25  deformation occurred during the section impact?

Page 63

1    A.  No.  No, it would have -- some of it would
2  have occurred in the first and some in the third, but
3  the heavy impact would have contributed the most.
4    Q.  Okay.  But you can't tell me how much roof
5  deformation there was in the first roll, the second
6  roll or the third roll; is that correct?
7    A.  That's exactly right.
8        MR. MARTINEZ:  That's assuming there were
9    three rolls?
10        MS. SAMBERG:  Correct.
11  BY MS. SAMBERG:
12    Q.  I think we assume even at two and a half
13  rolls, there would have been three impacts on the
14  driver's side roof rail?
15    A.  Yes, there are at least three impacts to
16  the roof.
17        MS. SAMBERG:  Let me make sure I ask that
18    so it's clear.
19        MR. MARTINEZ:  Okay.
20  BY MS. SAMBERG:
21    Q.  You cannot tell me, can you, sir, how much
22  roof deformation occurred during any of the impacts
23  that may have occurred on the driver's side roof rail
24  or pillars; is that correct?
25    A.  Yes, that's correct.

Page 64

1    Q.  Do you know when the driver's side window
2  broke in this accident sequence?
3    A.  No.
4    Q.  When, during this accident sequence, do
5  you believe Mrs. Payan's head came in contact with
6  the roof?
7    A.  Well, during the significant -- during the
8  significant roof deformation.  Based upon what I had
9  told you earlier, it would be my belief that that
10  would have been during the second impact is most
11  likely the time that that would have occurred.
12    Q.  Okay.  And you can't tell me how much
13  deformation there was to the roof on the second roll,
14  but you believe that's when her head came in contact
15  with the roof, however much it was?
16    A.  Yes.  And that would be where the majority
17  of the ten inches or more would have occurred.
18    Q.  Based on your experience, but not based on
19  any testing or any information that has been gleaned
20  specifically from this case; is that correct?
21    A.  Well, no, that's not entirely correct
22  because it is based upon the number of rolls that I
23  believe that occurred and the measurements that I
24  took, but it isn't based upon actual knowledge of the
25  deformation of the specific rolls, and that latter is

Page 65

1  simply based upon my experience that the higher
2  energy impact would have occurred probably on the
3  second roll in this kind of a sequence.
4    Q.  Can you say -- strike that.  We know,
5  based on your measurement, that you believe the roof
6  deformed vertically about 9 1/2 inches, is that
7  correct, on the driver's side?
8    A.  Yeah.  I believe it's probably more than
9  that.  That's what I measured.  There would be
10  probably a little bit of spring back so that
11  dynamically it would have been a little bit more.
12  How much more?  I don't know.
13    Q.  You're reading my mind.
14    A.  Okay.
15    Q.  That was my next question is how much did
16  the roof deform dynamically?
17    A.  Just a rule of thumb would be 10 to 15
18  percent more.  Some people believe it's higher than
19  that.  I don't think it would be.
20    Q.  But you do agree that the roof
21  deformation that did occur was cumulative over the
22  course of several rolls, however many there were?
23    A.  Yes, I do.
24    Q.  To your knowledge, was there any
25  post-accident roof deformation?

17 (Pages 62 to 65)

Page 66

1  A. Oh, well, now, that's a good question. I
2  don't know the answer to that. Often in handling of
3  the vehicle deformation occurs and certainly whenever
4  they're trying to right the vehicle and move it
5  around, it would be difficult to do that without
6  doing some damage to the vehicle.
7  Q. Are you aware that the tow truck driver
8  dragged this vehicle off the road by attaching a
9  chain and dragging it on its roof?
10  A. No, I wasn't aware of that.
11  Q. Did you do any formal scratch pattern
12  analysis? You said you sort of glanced at the
13  scratches and determined there were at least two
14  sets. Did you do any formal scratch pattern
15  analysis?
16  A. No, I didn't do anything. I didn't
17  attempt to draw any conclusions from the scratch
18  patterns.
19  Q. Except to confirm that there was at least
20  two and a half rolls?
21  A. Yes, that's right.
22  Q. Let's talk about your vehicle inspection
23  for a few minutes.
24  A. Okay.
25  Q. Let me give you a copy of your

Page 67

1  photographs. And hopefully I have a Sharpie pen in
2  my briefcase.
3      MS. SAMBERG: Can we go off for one
4  second?
5      (Off the record.)
6  BY MS. SAMBERG:
7  Q. Did you find any witness marks on the
8  interior of the vehicle during your inspection?
9  A. Well, I'm — yes, I did and I
10  was expecting you were going to ask me about that.
11  What I found that I thought was significant was a
12  witness mark in the roof on the inside pretty much
13  above the driver's seat. In my vehicle inspection
14  notes, I — I tried to document its position pretty
15  clearly as to where it is.
16  Q. Tell me what you wrote.
17  A. Okay. What I have is there's a mark on
18  the roof which is sort of like a — if I can describe
19  it to you: the fabric is deformed or rubbed,
20  scrubbed down. It's about five inches in diameter.
21  The center of that circle is approximately 11 inches
22  inboard of the driver's side roof and four inches in
23  front of the front of the driver's side B pillar.
24  Q. Okay.
25  A. So that would — can you picture that?

Page 68

1  Q. Right. And the mark is on the headliner,
2  correct?
3  A. Right. Right.
4  Q. Did you inspect the top — the roof — the
5  exterior roof of the vehicle to see whether or not
6  there was any similar indentation?
7  A. I don't believe that I did. I'm trying to
8  think. Let me see if I have anything in my notes on
9  that. No, I don't believe that I did.
10  Q. In your experience — strike that. This
11  isn't the first time you've seen, for lack of a
12  better word, a scrub mark —
13  A. Right.
14  Q. — on the headliner —
15  A. Uh-huh.
16  Q. — inside a vehicle, isn't it?
17  A. No, it isn't.
18  Q. In the past have you found a dent, for
19  lack of a better word, in the metal portion of the
20  roof corresponding with the scrub mark?
21  A. Yeah, usually there is some kind of an
22  indentation — a dent.
23  Q. In this case you didn't look for it?
24  A. That's right, I didn't. I focused more on
25  the interior. I don't know that it isn't there. I

Page 69

1  can't say one way or the other.
2  Q. Can you mark with the Sharpie pen those
3  photographs that depict the scrub mark on the roof
4  we've been talking about? Just circle it in the
5  photograph because sometimes it's very hard to see on
6  prints.
7  A. Yeah. And I must tell you before I do
8  that, for the record, that I'm not a professional
9  photographer so my photographs may not be as good as
10  others might be, but what I do have in Defendants'
11  Exhibit 3, down in the right-hand corner of the
12  photographs, there is a numbering and so what I can
13  do is refer to the numbers for the record.
14  A. That would be great.
15  A. And I'm not sure which of these is going
16  to be the best one to use. Probably the blue one.
17  In No. 3 — can I mark on this?
18  A. Yes.
19  Q. That's why I brought them on paper like
20  that.
21  A. There we go. And I'll do it again in 4.
22  Q. So you're circling for us in blue the area
23  where the scruff or scrub mark it?
24  A. Yes. And the circle I'm making is bigger
25  than the scuff mark. I can actually sort of put —

18 (Pages 66 to 69)

Page 70

1  let me do it in 3 —
2     Q.  Sure.
3     A.  — sort of like an annular region and what
4  I'm attempting to do is show the scuff mark where
5  it's prominent.
6     Q.  Okay.
7     A.  The entire diameter is about five inches.
8  5 doesn't show too much.  6 — if you look at 6 in
9  different angles, you can see it sort of in an area
10  like that.
11     Q.  Okay.
12     A.  I believe that's probably the best that
13  we've got.  There's some more in 11 and 12.  13, I
14  attempt to take a closer view and I don't know if you
15  want me to put any mark on 13.
16     Q.  What is 13?
17     A.  It's sort of a close up view of some of
18  the scuffed marks you can see.
19     Q.  On the ceiling?
20     A.  Yes.
21     Q.  I mean on the headliner?
22     A.  Yes.
23     Q.  Yeah, go ahead and circle that for me.
24     A.  It's the whole thing.
25     Q.  The whole picture.  I see.

Page 71

1     A.  I'll put a check mark.
2     Q.  And you think that's all the photographs
3  that you took of that area of the vehicle?
4     A.  Well, I believe so, but let me look
5  through here to be sure.
6     Q.  Did you find another one, sir?
7     A.  I may have.  Let me see if I'm correct on
8  that.  Yeah, I — knowing that the photographs we
9  looked at before might not be too good, I attempted
10  to take a picture of my finger pointing to the mark
11  and this is in photograph No. 58.
12     Q.  Right.
13     A.  If you want, I can circle —
14     Q.  Yes, please circle.
15     A.  Okay.  And then similar in 59.  Sorry,
16  that's a wavy circle.
17     Q.  That's all right.  Thank you.  All right.
18  Other than the scuff mark we found — or you found in
19  the headliner, what other witness marks did you find
20  on the interior of the vehicle that were of
21  significance to your opinions in this case?
22     A.  Yeah, okay.  Let me look at my notes.
23     Q.  I'm sorry.  While you're looking at that,
24  did you find any blood or hair around the headliner
25  mark?

Page 72

1     A.  No, I did not.
2     Q.  Does that surprise you?
3     A.  No.  No, it did not.  The other notes I
4  have are interestingly a lack of witness marks, that
5  is to say the steering wheel — there wasn't anything
6  there.  The only other witness marks that were of any
7  significance were a series of marks that I recorded
8  on the seat belt and its webbing, but in terms of
9  other impact marks, I don't have any.
10     Q.  Let's talk about the seat belt next then.
11  What marks did you find on the seat belt -- any
12  aspect of the seat belt that you found to be
13  pertinent to your opinions?
14     A.  Okay.  Well, one thing that was
15  immediately apparent was that the webbing itself had
16  been cut.  That, of course, would not have occurred
17  during the accident, but presumably after the
18  accident.  I found what appeared to me to be stretch
19  marks on the webbing.
20        If you visualize this is a three-point
21  flow through seat belt with a retractor in the D
22  pillar, then the belt would come through the latch
23  plate and go over and be attached to the floor to the
24  left of the driver.
25        Now, from that point, the floor anchor, I

Page 73

1  found the stretch marks in the webbing to be between
2  41 to 47 inches from the -- along the webbing and
3  then also 64 inches.  I found what appeared —
4     Q.  Do you have a photograph of that mark,
5  sir?  As we go through these, if you can just find me
6  a photograph that depicts that and circle it with a
7  pen, that would be helpful.
8     A.  Okay.  All right.  Here again, the
9  photographs are not that good, but on photograph No.
10  51 I'll circle the area, and then a little more
11  prominent focus is on 52 and I'll circle that.  The
12  same shows up in 54 and I'll draw a circle there.
13  And unfortunately I do not have a photograph of the
14  mark at 64 inches.
15     Q.  Any particular reason?
16     A.  No, I don't know why that is.  I was
17  looking for it and I don't see it.
18     Q.  What was the next mark that you found on
19  the webbing or restraints?
20     A.  Well, I found that there was scarring on
21  the D ring and on the latch plate loop.  Let me see
22  if I have photographs of that.  Undoubtedly Mr.
23  Rosenbluth will have a lot of these photographs, but
24  the answer is, no, I don't believe that I have any
25  photograph of the D ring scarring.  I do have

19 (Pages 70 to 73)

Page 74

1  photographs of scarring on the latch plate loop and
2  that's in photograph 63 —
3      Q.  Okay.
4      A.  — and 62.
5      Q.  All right.  You expressed an opinion
6  earlier that you believe that Mrs. Payan was wearing
7  her seat belt at the time of the accident?
8      A.  Uh-huh.
9      Q.  My intent by this exercise was to try to
10  ascertain the evidence upon which you base that
11  conclusion.  Is that an independent conclusion on
12  your part or are you relying on Mr. Rosenbluth's
13  opinion that she was belted?
14      A.  Oh, no, this is my opinion.  I haven't
15  spoken to him about it.
16      Q.  Okay.
17      A.  Although I believe obviously from the
18  surrogate test that it's his belief that she was
19  belted, he didn't share with me any of his findings.
20      Q.  Have you now marked for us all of the
21  evidence you believe supports your opinion that Mrs.
22  Payan was belted at the time of the accident in the
23  course of us talking about witness marks and marks on
24  the restraints?
25      A.  Well, I've marked on the photographs those

Page 75

1  items which I think supports — which tries to
2  document some of the field notes that I have.
3      Q.  Okay.  Did you find any marks on the D
4  ring or the latch plate?
5      A.  Well, I do have a note that there was D
6  ring scarring.  And the latch plate itself, I
7  don't — I don't have anything to offer.
8      Q.  Did you look at the latch plate and you
9  just don't have any notes about it or you don't
10  remember seeing anything that was indicative one way
11  or the other on the latch plate?
12      A.  Right, I don't remember at this time.  I
13  probably looked at the latch plate.  If there was
14  anything significant on there, I would have made a
15  notation.
16      Q.  Did you measure the seat back angle during
17  your inspection?
18      A.  Yes.
19      Q.  Do you know how many degrees reclined from
20  vertical the seat was?
21      A.  Well, I could calculate it.  It would be
22  six over 24, so it would be the angle whose tangent
23  is a quarter.
24      Q.  What was your measurement for the seat
25  back angle?

Page 76

1      A.  If you go vertical, then — when you go
2  vertical 24, you would have to go horizontal six to
3  get back to the back rest.
4      Q.  Okay.  Do you know one way or the other
5  whether the seat back angle was changed after the
6  accident?
7      A.  No, I don't.
8      Q.  Did you find the owner's manual in the
9  vehicle?
10      A.  No.  I can't say that I looked for it,
11  either.
12      Q.  Did you find any hair, tissue or blood
13  anywhere on the vehicle that you related to Mrs.
14  Payan?
15      A.  Yeah.  You had asked me that earlier.  I
16  didn't find any.
17      Q.  I just —
18      A.  I'm not saying that it wasn't there, but I
19  don't have any record of that.
20      Q.  Here's my — here's the reason I'm asking
21  and this is — I'm just going to show you this
22  because I have it on my computer and I don't have it
23  in hard copy.
24      A.  Okay.
25      Q.  But this is a photograph that was, I

Page 77

1  believe, taken by either Mr. Martinez or his
2  investigator or some member of the family, but these
3  were provided to us by the plaintiffs which shows the
4  headliner area with blood on the headliner.  This is
5  photograph 17.
6      A.  Uh-huh.
7      Q.  Was that blood on the headliner when you
8  were there taking photographs?
9      A.  Well, apparently it would have been, but I
10  don't think I have any photographs that show that
11      Q.  And you don't remember seeing it?
12      A.  Right, I don't.
13      Q.  And that's something you would have
14  documented in your notes had it been there?
15      A.  Probably, yes.  Well, had I seen it.  Had
16  I seen it.  That's a better way of saying it.
17          MR. MARTINEZ:  Off the record.
18          MS. SAMBERG:  Let's go off for a second.
19          (Off the record.)
20          MS. SAMBERG:  Let's go back on the record.
21  BY MS. SAMBERG:
22      Q.  We were having a brief discussion about
23  which set of photographs I was looking at it.
24          MR. MARTINEZ:  I'll take a look at them.
25      A.  Oh, yeah.  Are we on the record?

20 (Pages 74 to 77)

Page 78

1  Q.  Yeah, we're on the record now.
2  A.  Okay.  While we were off the record, we
3  were looking at some photographs which had to do with
4  blood on the — on the — apparent blood stains on
5  the roof.  And I don't — I'm looking through the
6  photographs now and I don't see any record in my
7  photographs that recorded it and I don't have record
8  in my notes about that.
9        There is — I do have a record of apparent
10 glass scattered throughout and some of the
11 photographs on the seat — of the seat show some
12 stains, but one of the things I wanted to correct for
13 the record that I discovered as I went through these
14 photographs is that the — earlier I had said that
15 there was webbing stretch marks or I believe load
16 marks on the seat belt at 41 to 47 and also at 64.  I
17 did, in fact, take pictures of those at 64 inches and
18 if it's okay, I'll circle that.
19 Q.  Which photo numbers are those?
20 A.  These are — photographs No. 49 and 50
21 show pretty clearly the stretch mark in the webbing
22 at 64 inches from the floor anchor.
23 Q.  Okay.  All right.  I think I may have
24 asked you this before and if I did forgive me.  Did
25 you measure the position of the seat on the track

Page 79

1  when you inspected the vehicle?
2  A.  Not on the track, but what I did was I
3  measured — and I have a photograph of that.  I have
4  a measurement from the — from the floor — from the
5  brake pedal to the back of the seat bottom and that
6  measurement is 37 1/2 inches and I have a photograph
7  of that.
8  Q.  Okay.
9  A.  And that's in photograph Nos. 19 and 20.
10 Q.  And, again, you have no information about
11 whether the position of the seat may have changed
12 from the time of the accident to the time of your
13 inspection, right?
14 A.  Yes, that's correct.
15 Q.  Did the seat have a height adjustment, to
16 your knowledge?
17 A.  I don't remember —
18 Q.  Did you take any --
19 A.  — and so I don't know and then obviously
20 I didn't measure that, but I do have — well, yeah, I
21 believe I've answered the question.
22 Q.  Okay.  And I think we established that you
23 used your assumption in terms of Mrs. Payan's height.
24 You believed her to be approximately 5'6; is that
25 right?

Page 80

1  A.  Yes.
2  Q.  Would it be better, based on our earlier
3  discussion, to say that she was someplace between 5'4
4  and 5'6, or are you comfortable with 5'6?
5  A.  Well, the medical records seem to lean
6  toward the 5'6.  There may be driver's license
7  information which would be smaller than that.  I'm
8  not sure.  I'm not familiar with the procedure in
9  Texas as to how that information gets onto a driver's
10 license.  For example, in Ohio, as an applicant, I
11 simply fill — state that and so what's measured may
12 be better than what somebody may have stated, if it's
13 the same.
14 Q.  And what was your assumption concerning
15 Mrs. Payan's weight.  If her height was 5'6, what was
16 her weight?
17 A.  Her weight would have been 75 — the
18 weight of 75 kilograms and I believe I — I believe
19 that is okay in my report of 100 and —
20 Q.  65 pounds?
21 A.  Yeah.
22 Q.  165 pounds?
23 A.  165, right.  That's what it would be.
24 Q.  Did you find any other conflicting
25 information about Mrs. Payan's weight in the records

Page 81

1  you reviewed?
2  A.  No.
3  Q.  Did you make any assumption concerning
4  Mrs. Payan's hip width for purposes of your analysis?
5  A.  No, I did not.
6  Q.  Did you make any assumption concerning
7  Mrs. Payan's shoulder width for your analysis?
8  A.  No.
9  Q.  What assumption did you make concerning
10 her seated height and based on what?
11 A.  Okay.  Let me take a moment here.  Okay.
12 I just wanted to get this exhibit out of my way so I
13 can look at that.  I have her height — her seated
14 height to be approximately 34 and three-quarter
15 inches.  I obtained that simply by using NASA
16 anthropometric data, of which I brought a copy and
17 made some calculations, which are simply linear
18 interpolation calculations.
19 Q.  Was that consistent -- strike that.  Was
20 the seated height that you extrapolated consistent
21 with the seated height of the surrogate in the buck
22 when you did your testing?
23 A.  Well, the seated height that I calculated
24 would be a little bit higher — or excuse me —
25 greater than the seated height of the surrogate by

21 (Pages 78 to 81)

1 approximately an inch.
2     Q. Because she was an inch shorter?
3     A. Yes. Well, the surrogate was actually a
4 couple of inches shorter, but then in the seated
5 height, it was an inch shorter. That is, the stature
6 was two inches and the seated height would have been
7 about one inch.
8     Q. Let me go back to something we were
9 talking about a minute ago because I forgot to ask
10 you this: Did you look at the traveler bar onto the
11 front seat when you were doing your inspection?
12     A. I'm not sure what --
13     Q. The seat track, the traveler bar.
14     A. No, I did not inspect that.
15     Q. Do you have any evidence one way or the
16 other about how Mrs. Payan was wearing her seat belt
17 at the time of the accident?
18     A. No.
19     Q. Can you say how far along -- or how far
20 from the anchor the latch plate was along the webbing
21 at the beginning of the accident?
22     A. No.
23     Q. Can you say how far from the anchor the D
24 ring was along the webbing at the beginning of the
25 accident?

1     A. No.
2     Q. Can you say whether there was any slack in
3 the belt before the accident occurred?
4     A. No.
5     Q. Can you say whether there was any slack
6 introduced into the restraint system during the
7 accident sequence?
8     A. No.
9     Q. Was there any evidence of spool out or
10 improper performance of the restraint system as it
11 relates to the retractor?
12     A. Not that I know of. There may be evidence
13 to that, but I don't know -- I don't know the answer
14 to that.
15     Q. Let's talk about Mrs. Payan's kinematics,
16 okay?
17     A. Uh-huh.
18     Q. What injuries did Mrs. Payan suffer in
19 this accident? And --
20     A. Let me switch here to different notes.
21 Are you ready?
22     Q. Yes.
23     A. Okay. It's my belief that the most
24 significant injury that she had was a paralysis from
25 a spinal cord injury. That in turn was due to a

1 subluxation of C6 on C7 with C6 going forward of C7
2 or anterior to C7. That is what is significant.
3 That led then to a paralysis or quadriplegia.
4     She had, however, other injuries which
5 were less -- lesser importance. She had contusions
6 on her head and chest. She had a rather significant
7 contusion on her right shoulder, her right knee and
8 her right forehead. There was a bruising of her
9 upper chest and her left arm, right leg and her left
10 hand.
11     Q. Let's --
12     A. Let me just look at one other thing
13 before -- she had a hematoma of her duodenum.
14     Q. Where's that?
15     A. Well, as the stomach empties, the first
16 part of the small intestine is the duodenum, so that
17 would be more on the right side near the base of the
18 thorax.
19     Q. Your report says subdural hematoma. Where
20 is that?
21     A. Well, a subdural hematoma is a brain
22 injury. The dura matter covers the brain so that
23 would be underneath the dura matter so it would be
24 within the brain itself.
25     Q. Do you know where --

1     A. No, I don't know.
2     Q. -- where the location of that was on her
3 head?
4     A. No, I don't know.
5     Q. Okay.
6     A. No, I don't know. I don't have that. I
7 think that's all that I have that's significant.
8     Q. All right. Let's talk about her cervical
9 injury. She had a C6-7 cervical subluxation; is that
10 right?
11     A. Yes.
12     Q. In your report you mentioned bilateral
13 jumped, j-u-m-p-e-d, facets of C6-7. What does that
14 mean?
15     A. Well, the -- let me tell you what I think
16 that means. I got that out of the medical records,
17 but what I understand that to mean is that the
18 vertebrae, of course, sit one on top of another and
19 in the cervical spine they're numbered from top down
20 and there are seven of them, so that this would be
21 the bottom cervical vertebrae and the one on top of
22 it. The sixth one then would have been moved forward
23 onto the seventh one so much that the facets which
24 come out of the back would have -- the facets of six
25 would have come forward on the facets of seven and

22 (Pages 82 to 85)

Page 86

1  locked themselves onto those facets so that after
2  it's over, they don't go back.  In other words, it's
3  not only deformed forward, but it's deformed and
4  stuck in that region.
5      Q.  Okay.  Describe Mrs. Payan's kinematics
6  during this rollover accident.
7      A.  Well, I don't have a precise description
8  of the accident itself having not seen the accident
9  reconstruction report, but -- and so then therefore I
10 can't give you a precise description of her
11 kinematics, but I can tell you what I believe has
12 happened and what I believe will prove to be the case
13 after the review of the reconstruction report.
14      In the initial movement, as it's a
15 passenger side leading rollover -- and I believe that
16 there won't be any issue about that.  That will
17 probably be agreed upon by the reconstructionists.
18 That being the case, then the driver's side of the
19 vehicle will have been lifted upwards.  So if we're
20 behind the vehicle and we're looking -- like if we're
21 in the back seat and we're looking forward, it will
22 be rotating clockwise.  Ms. Payan then, by laws of
23 inertia, would have initially felt -- or come down in
24 the seat, that is the seat would have gone up so that
25 she would have gone down toward the seat bottom.

Page 87

1      As the vehicle is spinning and rotating as
2  it moves, let's say through its first roll, and it
3  becomes upside down and it begins to strike on the
4  roof rail of the driver's side, she would have then
5  began -- would have come off of the seat and moved
6  toward the point of impact, which from her
7  perspective -- again, if we were an observer in the
8  back, she would have been moving upward and to the
9  left.  Although, in actuality, during the accident
10 she's moving down towards the -- towards the ground.
11      And then as the vehicle continues to spin,
12 the rotation rate would tend to thrust her upward and
13 outboard, probably staying in that position, but
14 restrained simply by the seat belt.
15      And then I believe that during the second
16 impact is whenever her head would have come into
17 contact with the roof, not because she goes upward so
18 far, but rather instead because the roof comes down
19 and strikes her -- strikes her head.
20      Q.  And, again --
21      A.  I tended to talk too long on that.  I'm
22 sorry.
23      Q.  That's okay.  And, again, this is your
24 belief based on your experience, but not based on any
25 analysis of this specific crash; is that correct?

Page 88

1      A.  Yes, that's right.  I'm making an
2  assumption as to what the reconstruction will show.
3  I'm assuming that it will show that this was a
4  barrel-type roll encompassing two and a half rolls or
5  perhaps three and a half rolls and that it was a
6  passenger side leading.  That was my assumption from
7  the beginning and then after reading one of the
8  reports, that seems to be consistent with what others
9  will say.
10      Q.  Again, it's your belief that her head
11 comes in contact with the roof during the time that
12 the second -- during the time of the second roll or
13 the second contact of the driver's side roof rail
14 with the ground?
15      A.  Yes.
16      Q.  Can you say whether her head is in contact
17 with any other part of the interior before the roof
18 rail hits the ground?
19      A.  No.
20      Q.  During the first roll when the roof rail
21 is in contact with the ground, can you tell me where
22 her head is relative to the roof in that first roll
23 when the vehicle's inverted?
24      A.  Well, during that first roll when I
25 believe the roof deformation would have been

Page 89

1  relatively small compared to that of the second roll,
2  during that impact she would have been moving toward
3  the roof.  She would have been in what might be
4  called the diving mode toward the roof.
5      Q.  But you can't say what her head -- what
6  the position of her head would have been relative to
7  the roof because you don't know how much roof crush
8  there was during that first --
9      A.  That's true.
10      Q.  -- contact with the ground, right?
11      A.  Yes, that's right.
12      Q.  Do you know when during this roll sequence
13 the retractor on the seat belt locked?
14      A.  No, but if it worked properly -- and I
15 have no reason to believe that it wasn't working
16 properly.  Mr. Rosenbluth may have some opinions upon
17 that -- but assuming that there was no late lockup --
18 I don't know that, but assuming that there was no
19 late lockup, it should have locked at 35 degrees or
20 less of roll angle.
21      Q.  At what force or acceleration do you
22 believe Mrs. Payan made contact with the roof during
23 the second roll?
24      A.  I don't have -- I don't know the answer to
25 that.

23 (Pages 86 to 89)

Page 90

1    Q.  Okay.  What was the duration of her
2  contact with -- strike that.  What was the duration
3  of the contact of Mrs. Payan's head to the roof?
4    A.  I don't know that either.
5    Q.  Can you tell me the direction of the force
6  that was being applied to Mrs. Payan at the time her
7  head made contact with the roof?
8    A.  Not precisely, but it would have been one
9  which led to compression flexion, which would have
10  been from her perspective, downward and forward.
11    Q.  Can you tell me the amount of that force
12  in any direction?
13    A.  No.
14    Q.  Can you tell me the relative velocity
15  between her head and the vehicle that's required to
16  produce the type of compression injury Mrs. Payan
17  suffered?
18    A.  Oh, let me think about that.  I can't be
19  precise, but I can tell you what I know.
20    Q.  Okay.  Tell me what you know.  Well, I
21  want to know what you think is the case here, so if
22  that's --
23    A.  Right.  Okay.  Well, the reason I can't be
24  precise -- there's several reasons I can't be
25  precise.  First of all, it's individual dependent and

Page 91

1  so then therefore what may be the case for you or for
2  me or someone else may be different from Betty Payan
3  But assuming that she's not unusual in her physical
4  characteristics, then what is needed is roughly a
5  loading of about a thousand pounds axial loading to
6  do this kind of deformation to her cervical spine.
7    Q.  Is a thousand pounds -- strike that.  Are
8  you relying on any studies or testing to confirm that
9  it would take a thousand pounds -- roughly a thousand
10  pounds of force to create the injury Mrs. Payan
11  suffered to her cervical spine?
12    A.  Well, what I'm relying there on is my
13  memory of data that's listed in SAE J8 -- I'm trying
14  to -- 885 -- SAE J885, which is titled something like
15  Human Tolerances to Impact Loading.  And in there
16  they list data of strength of cervical spines and
17  they talk about the compression loading being a
18  thousand pounds.  The flexion loading at the
19  beginning of injury is 140 -- or 140 foot pounds and
20  the extension is about 42 foot pounds.  There was
21  no -- in my opinion this wasn't any extension here
22  that would have been flexion and compression.
23    Q.  Okay.  That was a later question, but you
24  believe there was some component of flexion in this
25  injury?

Page 92

1    A.  Yes.
2    Q.  And to what degree?
3    A.  Oh, I don't have it quantified.  I think
4  the main loading was compression axial with a flexion
5  component.
6    Q.  Tell me what the mechanism is of the
7  injury Mrs. Payan sustained in your opinion?
8    A.  Well, in my opinion, mechanism of injury
9  is the -- from her perspective a force going to her
10  head which is then transmitted to her neck, which is
11  sort of like her neck is then a lever and it's
12  bending or -- bending about the base.  And that
13  bending is what moves the upper portion that is C6,
14  rotates it and moves it forward on C7 and -- but the
15  injury isn't so much that as it would be the
16  impingement of the spinal cord.
17    Q.  Can you cite me to any literature that
18  supports your opinion on the mechanism of injury in
19  this case?
20    A.  Oh, my.  I would have brought some things
21  if I had thought you were going to ask me that.
22    Q.  Well, since that was one of the things
23  that I thought I did ask you to bring was any of the
24  papers that might support the opinions that you're
25  offering and since mechanism of injury is one of the

Page 93

1  things you're here to talk about --
2    A.  Well, it seems to me that that's a fairly
3  obvious kind of thing.  It is document by -- in
4  various books.
5    Q.  Well, is it documented in any of the
6  papers you brought here with you today?
7    A.  It might be.  I don't believe that it is,
8  but it could be.
9    Q.  Okay.  Well, I need to know the basis upon
10  which you opine that Mrs. Payan's neck injury
11  mechanism occurred in the way you just told me.
12    A.  Okay.  Well, let me see how I can proceed.
13    Q.  Can you think of an author that's written
14  on this?
15    A.  Well, yeah, this is in Levine's book on
16  head and neck injury and they document this through a
17  whole series of papers and I'm trying to think if I
18  can remember the SAE number.  What I'm saying is that
19  if in the -- if we have evidence of impact to the
20  roof, the roof coming down and that's compression, it
21  would seem to me to be fairly clear that that
22  would -- and the medical records say compression --
23  that it's clear what compression means and I don't
24  know that going to a dictionary would -- I just
25  didn't bring a dictionary to define all those terms.

24 (Pages 90 to 93)

1    Q.  Do any of the papers identified in your
2  resume deal with that issue?
3    A.  With compression?
4    Q.  Compression neck injuries from intruding
5  roof.
6    A.  No, I don't think so.  I mean, I talk
7  about head and neck dynamics in my papers, but not in
8  terms of specific movements of one vertebrae on
9  another.  It's my belief that in this case that
10  there's no real question -- or there should not be
11  any question as to what the injury is.
12    Q.  Okay.  Have you ever heard of a nutcracker
13  injury?
14    A.  Uh-huh.
15    Q.  Is that what --
16    A.  It's like a nutcracker.
17    Q.  -- happened here?
18    A.  It's like a nutcracker, yes.
19    Q.  And so if I understand the nutcracker
20  theory, forces are generated through the seat to the
21  buttocks while the head's being compressed by the
22  roof?
23    A.  Yes.
24    Q.  Is that essentially how it goes?
25    A.  That's right.  The spine is shortened

1  simply by the vehicle structure -- the roof and the
2  seat combination coming together.  Like any
3  nutcracker, it's just a squeezing together.  It's
4  compression.
5    Q.  Are you aware of any literature that
6  you've read or are relying on that addresses or
7  supports the nutcracker theory --
8    A.  Well --
9    Q.  -- of mechanism of injury?
10    A.  Well, there again the Levine book and the
11  paper by McElhaney in there will address that.
12    Q.  And do you believe that Mrs. Payan's
13  injury occurred from a single impact with the roof or
14  was it multiple impacts?
15    A.  Yeah, I don't know that for sure.  It
16  would be my belief that the injury would have been a
17  single impact.  I don't believe that it would have
18  been one which occurred and then was later
19  aggravated.
20    Q.  In your report you state that Mrs. Payan's
21  seated height was compressed by approximately five
22  inches.  Do you remember saying that?
23    A.  Yeah.  Well, I'm looking at it now.
24    Q.  Can you tell me what you meant by that?
25    A.  There's nothing very profound in that.

1  What I have is that her seated height is
2  approximately 34 1/2 inches and the vehicle -- or
3  that distance where she would have been seated to the
4  roof is compressed to about 29 inches, so it's just a
5  subtraction of those two numbers.
6    Q.  Are you saying that Mrs. Payan's body was
7  compressed by five inches or just that the seat was
8  compressed by five inches?
9    A.  Yeah, her seat -- her sitting height
10  would -- that is the distance would have been
11  compressed by about five inches.
12    Q.  Not her body?
13    A.  Not necessarily, that's right.
14    Q.  Okay.
15    A.  That's right.  Sure.  Sure, of course,
16  that would follow.
17    Q.  Do you have an opinion about whether Mrs.
18  Payan's head or any part of her body for that matter
19  gets outside the plane of the window at any point
20  during this rollover accident?
21    A.  Yes.
22    Q.  What's your opinion?
23    A.  I don't believe that it did.
24    Q.  The basis for that?
25    A.  Well, the basis for that is -- there's

1  several.  One is it seems to me that during the most
2  violent part of the accident from her perspective, as
3  we've talked about this second impact, is whenever
4  she comes into contact with the roof.  I believe that
5  the -- the headliner mark is a clear witness mark
6  that her head was in contact with the roof.
7    Secondly, it's my belief that she was
8  wearing her seat belt, that -- and if the seat belt
9  was working properly, that should have restrained her
10  and kept her inside of the -- of the vehicle.
11    Third, according to the brief analysis
12  that I did on the roll rate, the average roll rate
13  was such that the angular velocity was only about on
14  average two radiants per second so that the G
15  loading -- or the loading going outboard would --
16  would be roughly a half a G, which would not be
17  enough to overcome the restraint provided by the seat
18  belt system.
19    And then although this is only indirect
20  evidence, there's no -- nothing that I found in the
21  medical records which would suggest any head impact
22  with a surface outside of the vehicle such as on the
23  roadway.  Now, admittedly one can have his or her
24  head go outside the vehicle without impacting
25  something, but that's just -- well, that -- that's

25 (Pages 94 to 97)

Page 98

1  the end of my bases.
2      Q. Okay. Let me go back and ask you a couple
3  of questions about that. I thought I asked you
4  whether you had calculated roll rates and I thought
5  you told me no, but apparently you have done that?
6      A. No, I don't think you did ask me that. I
7  did not make any reconstruction, but simply using the
8  data that was provided in the defense expert's
9  report, I made some calculations.
10     Q. Tell me what calculations you made
11 to come to the conclusion that the accelerations
12 going outboard during this roll were at a half a G.
13     A. Okay. Those are just mental calculations.
14 Let me tell you what they are. At 110 kilometers per
15 hour, that's a little more than 65 miles per hour —
16 about 68 miles per hour. So with a drag factor of
17 .4, the travel distance is about 390 feet.
18         And then again with a drag factor of .4,
19 the time over which that would occur is about 7.8
20 seconds. Now, the reconstructions that come forward
21 will be more detailed. At two and a half rolls, that
22 simply takes about .32 — that means there's about
23 .32 rolls per second for — the roll rate on average
24 is about 115 or 116 degrees per second, which is the
25 same as two radiants per second on average.

Page 99

1         Now, the outward loading — inertia
2  loading is proportional to the square of the angular
3  speed. So if the angular speed is two, the square,
4  of course, is four. And if the distance from the
5  roll axis is a few feet and may be as much as four
6  feet, then four fours are 16 and that's a half a G.
7      Q. Let me — strike that. If you were to
8  assume that there was three and a half rolls rather
9  than two and a half rolls, what does that do to the
10 accelerations going up and out during the rollover
11 accident?
12     A. Okay. What that does is you take three
13 and a half over two and a half and you square it.
14 I'm not sure what that number would be, but it would
15 increase it by that factor. So that would increase
16 the outward loading by that factor and it would
17 probably get us up to about three-quarters of a G.
18     Q. You also made a comment that the restraint
19 system should have kept her in the vehicle and not
20 allowed her head to leave the plane of the vehicle?
21     A. Uh-huh.
22     Q. Again, you're not offering any opinions
23 concerning any defect in the restraint system, are
24 you?
25     A. No, I'm not.

Page 100

1      Q. Okay. Are you aware of any studies that
2  have been done related to lateral excursion during a
3  rollover accident? Strike that.
4         Are you aware of any studies that have
5  been done concerning lateral excursion of an occupant
6  wearing their seat belt during a rollover accident?
7      A. No, except for the studies that I did
8  together with Jerry Rosenbluth. We have done this on
9  a number of occasions where we've looked at the
10 extent of head excursion with belted occupants in
11 these spits and what — what the results show — and,
12 again, Mr. Rosenbluth will be able to speak in more
13 detail than I. What the results show with the
14 original belts — the OEM belts in the vehicle — if
15 they're working properly, it's difficult for the
16 surrogate to get his or head out of the plane.
17     Q. Difficult, but not impossible?
18     A. That's right. Difficult, but not
19 impossible, that's right.
20     Q. And would you agree that in a dynamic
21 setting it would be easier for the occupant to get
22 their head outside the vehicle —
23     A. Yes.
24     Q. — than it would in a static setting?
25     A. Yes, of course, I would agree with that.

Page 101

1      Q. You also said there was no marks on her
2  head that would be indicative of hitting her head
3  outside the window or coming in contact with anything
4  outside the window.
5      A. Right.
6      Q. I think we did talk about the fact that
7  she had a subdural hematoma, right?
8      A. Right.
9      Q. And that could come from hitting her head
10 on the ground, right, or some other part of the
11 vehicle?
12     A. Well, yeah. There was no bruising on her
13 head which would be suggestive of an impact like that
14 which would lead to a subdural hematoma. There is
15 evidence, of course, of impact with the roof. There
16 is no — there is a bruise, I believe, on her right
17 forehead and the medical records show some bruising
18 on her — right side of her head which could have
19 come from some impact.
20     Q. Okay.
21     A. I would expect, however, that for a driver
22 that if the bruises — if bruises occur during impact
23 with let's say the ground or something like that, it
24 would be on the left side instead of right side.
25     Q. You don't know where the subdural hematoma

26 (Pages 98 to 101)

Page 102

1  is, do you? It could have been on the left side?
2      A. There, too, the position of the hematoma
3  isn't indicative of the point of impact because of
4  coup/contrecoup phenomena in the brain. The brain
5  just sits in there loose.
6      Q. So if she hit the left side of her head,
7  she could have had a hematoma on the right side of
8  her head?
9      A. Well, subdural hematoma, yes.
10     Q. What did Mrs. Payan die from? I realize
11 you're not a medical doctor.
12     A. Yeah, I'm not a medical doctor and I don't
13 do diagnosis except for myself, but I asked Mr.
14 Martinez that and what -- what I understand was she
15 ultimately died of an infection.
16     Q. Okay. You've reviewed the medical
17 records, though, right?
18     A. Right.
19     Q. And you certainly have more training than
20 I do in reviewing those records and understanding
21 what they mean, right?
22     A. Yes.
23     Q. In your experience, was --
24     A. Well, I don't know if that's true or not.
25     Q. In your experience, was the C6-7 injury

Page 103

1  that Mrs. Payan sustained survivable?
2      A. Yes.
3      Q. Okay. Do you know whether there was any
4  correlation between any of the other injuries that
5  she sustained other than the cervical fracture -- you
6  know, she had a lacerated liver and a tear to her
7  stomach and some other things that -- that were
8  directly linked to the infection that ultimately
9  resulted in her death?
10     MR. MARTINEZ: Could I object to the form?
11     MS. SAMBERG: Sure.
12 BY MS. SAMBERG:
13     Q. And that was sort of a -- sort of a
14 complex question, but if you understand what I'm
15 trying to get at --
16     A. I do.
17     Q. -- I'd appreciate your helping me out.
18     A. Yes, I do, and the answer is I don't know.
19     Q. Okay.
20     MR. MARTINEZ: Amy, do you have a whole
21 lot more? I didn't check out. I just want to
22 go check out.
23     MS. SAMBERG: We can take a break if you
24 want to go check out.
25     (A recess was taken from 11:48 to 11:55.)

Page 104

1      MS. SAMBERG: Let's go back on the record.
2  BY MS. SAMBERG:
3      Q. We talked about this a few minutes ago, so
4  forgive me for going backwards here. Are you aware
5  of any testing or studies regarding the relative
6  strength of the various areas of the vertebral
7  column?
8      A. Yeah. The only ones that I'm aware of are
9  those that are published in the J885 and then that
10 would be listed in a book by Levine.
11     Q. Am I right that certain parts of the
12 cervical spine are stronger and can withstand more
13 force than other areas of the cervical spine?
14     A. Yes. The cervical spine is such that it's
15 bigger at the bottom and smaller at the top. And not
16 only is it smaller at the top, because the spinal
17 cord is bigger at the top at the annular region or
18 the foreman, the central part would be larger so that
19 the upper portions of the spine would be weaker than
20 the lower portions.
21     Q. That thousand pounds of force you
22 mentioned earlier when we were talking about this,
23 does that apply to the upper portions of the cervical
24 spine or to the lower portions of the cervical spine
25 or do you know?

Page 105

1      A. No, that would just be the whole spine
2  itself and I don't know the distinction.
3      Q. So you can't tell me the specific amount
4  of force necessary to cause the type of fracture that
5  Mrs. Payan sustained in this accident, right?
6      A. Yes. As a matter of fact, I don't even
7  know if it was characterized as a fracture as much as
8  it was a displacement or subluxation.
9      Q. So you can't tell me specifically how much
10 force was necessary to cause that injury; is that
11 true?
12     A. Yes.
13     Q. Have you seen the same type of injuries
14 sustained by Mrs. Payan in other accidents involving
15 belted occupants or is this the first time you've
16 seen this specific injury?
17     A. No, I've seen this on other occasions. As
18 I look at my notes here, I may have misspoke earlier.
19 There was a compression fracture at C7, but in --
20 yes, I have seen this on other occasions.
21     Q. Okay. And I know you said you didn't do
22 any testing specifically for this case to support
23 your theory of the mechanism of injury, but did you
24 do any testing in the other cases that -- case or
25 cases that you've seen this same type of injury occur

27 (Pages 102 to 105)

Page 106

1 involving a belted occupant in a rollover accident?
2    A. The testing that I've done in other
3 matters has been similar to the testing that I did in
4 this matter, simply surrogate testing. I didn't do
5 any cadaver testing, for example, with cadavers of
6 the same stature as Betty Payan, nor did I do any
7 analytical studies, finite element analyses or
8 strength analyses.
9    Q. I think I asked you this already, but you
10 didn't do any computer modeling or simulations?
11    A. Right, I did not.
12    Q. And you don't hold yourself out as an
13 expert in the area of restraints, do you?
14    A. Oh, yeah, I can do that and I've written
15 papers about seat belts and seat belt restraints. I
16 simply haven't done that kind of a study in this
17 matter.
18    Q. Okay. And so while I think we've
19 established that you have some criticism of the OEM
20 restraints that were in this vehicle, we are not
21 going to hear you offer those opinions at the time of
22 trial; is that fair?
23    A. That's my understanding, yes, ma'am.
24    Q. What kind of retractor was there on the
25 OEM belt in this vehicle?

Page 107

1    A. I don't know the answer to that.
2    Q. Was it an ELR, ALR?
3    A. It would be an emergency locking retractor
4 for sure, but whether it had a webbing grabber, I'm
5 not sure. I believe it probably would have.
6    Q. That was my next question: Did it have a
7 web grabber? You don't know?
8    A. No. I expect that it did, but I don't
9 know.
10    Q. Have you ever analyzed the geometry of the
11 restraint system?
12    A. No.
13    Q. Did you do any analysis of the effect the
14 geometry of the seat belt system would have on the
15 excursion during a rollover accident or have you ever
16 done that study?
17    A. Right. I did not do that in this case.
18    Q. In your own testing of restraint systems,
19 you said you've done some static spit tests in the
20 past?
21    A. Uh-huh.
22    Q. Have you ever been able to get less than
23 four or five inches of excursion from the occupant?
24    A. Well, I think in this case she came off
25 the buttocks about -- her buttocks came off the seat

Page 108

1 about two inches.
2    Q. So you've got two inches --
3    A. Yeah.
4    Q. -- in this case?
5    A. Right.
6    Q. Have you ever had a number different than
7 two, higher or lower?
8    A. Well, they're never always the same.
9    Q. Okay. Have you ever seen one that exceeds
10 five?
11    A. No, I can't say that I have.
12    Q. Okay. So between two and five --
13    A. Yeah.
14    Q. -- is that fair?
15    A. I assume you're talking about original
16 equipment belt --
17    Q. Right.
18    A. -- and not the pretensioner?
19    Q. Correct, OEM.
20    A. I can't remember anything that high.
21    Q. To your --
22    A. Let me just say one other thing. What I
23 was thinking about is some vans which have -- like
24 conversion vans which have different seat belt
25 arrangements could possibly do that, but I haven'(

Page 109

1 seen that.
2    Q. Okay. So fair to say the excursion that
3 you've seen in your own testing from the seat is
4 between roughly two and five inches in the vehicles
5 that you've tested; is that fair?
6    A. Well, we had talked earlier between two
7 and four. I don't know that I've seen five.
8    Q. Okay.
9    A. Now, these are, of course, static tests.
10 They're not dynamic.
11    Q. Okay. Are you aware of any restraint
12 system in any vehicle manufactured now or back in
13 2000 that eliminates occupant excursion?
14    A. Oh, no, I'm not. Mr. Rosenbluth probably
15 is, but I'm not aware of that.
16    Q. Are you critical of Ford's use of an ELR
17 retractor in this vehicle?
18    A. No.
19    Q. Again, while you have an opinion
20 concerning whether this vehicle should have had a
21 pretensioner, we're not going to hear those opinions
22 at the time of trial, right?
23    A. I suspect -- yes, I don't expect --
24    Q. From you?
25    A. Yes, that's right.

28 (Pages 106 to 109)

**Page 110**

1    Q. If Mrs. Reynoso were inverted in a vehicle
2  statistically, 180 degrees, in the OEM seat belt
3  without any roof deformation, would her head ever be
4  in contact with the undeformed roof?
5    A. I wouldn't expect so.
6    Q. How about dynamically?
7    A. Oh, possibly, sure. Uh-huh, that's
8  possible.
9        MS. SAMBERG: Off the record for a second.
10        (Off the record.)
11        MS. SAMBERG: Back on the record.
12  BY MS. SAMBERG:
13    Q. I think we've already established you are
14  not going to be offering any opinions at the time of
15  trial concerning a roof defect; is that correct?
16    A. Yes, not me.
17    Q. Okay.
18    A. I suspect others will, but I don't expect
19  to say anything about that.
20    Q. However, you will be offering an opinion
21  that roof crush contributed to the injuries Mrs.
22  Payan sustained in this accident, right?
23    A. Yes.
24    Q. I think we've talked about the
25  measurements that you took during your vehicle

**Page 111**

1  inspection and it's your opinion that there was about
2  9 1/2 inches of vertical roof intrusion into the
3  occupant compartment; is that right?
4    A. That's right.
5    Q. And you did not take a measurement of any
6  lateral intrusion, is that -- or deformation; is that
7  right?
8    A. Yes.
9    Q. Did you take measurements at the A pillar
10  and the B pillar or did you just do the one
11  measurement that you told me about from the floor to
12  the sort of lowest portion of the roof?
13    A. Well, the measurement I took was over
14  the -- at the seating position of the occupant.
15    Q. I see.
16    A. And that was where I took my measurements
17  from that position, what I called the bite, the
18  intersection between the back rest and the seat
19  bottom midway laterally.
20    Q. Did you take a measurement from the scuff
21  mark you found in the headliner to the seat bottom?
22    A. No, I didn't, but it would be
23  approximately the same place.
24    Q. How close is it to the area where you took
25  the measurement?

**Page 112**

1    A. I don't know the answer to that, but it
2  would be very close, but I don't know precisely.
3    Q. Where was the greatest amount of roof
4  crush on this vehicle?
5    A. I don't know that answer either.
6    Q. Did you do a diagram or anything that
7  identifies your measurements? Is that in your notes?
8    A. Yeah, in my notes I have a little
9  diagram -- just a little pictorial or what I would
10  call a -- just a little sketch outlining these
11  measurements. That's on page 3. There are four
12  pages of vehicle inspections and that's on the third
13  page at the top.
14    Q. I think we've been through all of this
15  once before so I'm not going to belabor this, but you
16  can't tell me how much roof deformation occurred in
17  any of the contact that the roof rails had with the
18  ground during this rollover accident, right?
19    A. Yes.
20    Q. Okay. All you know is that at the end of
21  the rollover sequence there was, in your opinion,
22  approximately nine inches of roof deformation over
23  the seating position for the driver; is that right?
24    A. Yes.
25    Q. So you can't tell me how much roof

**Page 113**

1  deformation occurred before Mrs. Payan received her
2  spinal injury; is that fair?
3    A. Yes.
4    Q. And you can't tell me how much roof
5  deformation occurred after she received her spinal
6  injury, can you?
7    A. That's right.
8    Q. In the moment before the roof contacts the
9  ground during the second roll when you believe Mrs.
10  Payan sustained her injury, was her head in contact
11  with the roof?
12    A. No, I don't think so.
13    Q. If not -- well, if it wasn't in contact
14  with the roof, how far away was it from the roof from
15  the top of her head?
16    A. Well, I don't know, but the surrogate test
17  would suggest at least a couple of inches.
18    Q. Okay. Can you assume with me that the
19  roof to ground contact in this roll is zero
20  milliseconds, okay? It happens at zero milliseconds.
21  Just assume that.
22    A. Okay. I think I'm with you.
23    Q. How many milliseconds past zero --
24    A. Okay.
25    Q. -- does this injury -- does her injury

29 (Pages 110 to 113)

Page 114

1   occur?
2       A.  Oh -- oh, my.  I haven't made that
3   calculation.  I'd have to -- I'd have to know more
4   about the accident reconstruction to do that, but
5   that is doable, but I don't -- I don't know the
6   answer.  I haven't done that.
7       Q.  Do you agree that at the instant Mrs.
8   Payan's spinal injury occurred her head was in
9   contact with the roof and the roof was in contact
10  with the ground?
11      A.  Well, the former I would agree with.  The
12  second I don't know.  I don't know.  I would expect
13  so, but I'm not sure.
14      Q.  Let me try a different hypothetical.  Do
15  you agree that the ground at the moment of impact has
16  zero velocity?
17      A.  Yeah, the ground is what's probably our
18  best estimate of an inertial reference frame so
19  that --
20      Q.  So the ground is zero velocity?
21      A.  Yes, from an observer on the ground.
22  Obviously from an observer in the car, it wouldn't
23      Q.  Sure.  When the roof is in contact with
24  the ground, that portion of the roof that's in
25  contact with the ground also has zero velocity,

Page 115

1   right?
2       A.  In the direction of the ground.  It can
3   have velocity tangent to the ground.
4       Q.  Okay.  So for the moment that the roof is
5   in contact with the ground, the roof's not moving,
6   right?
7       A.  Well, yeah, it's not moving -- it's not
8   moving normal to its surface, that's right.
9       Q.  And --
10      A.  It can be sliding on the ground.
11      Q.  Okay.  But the roof can't deform unless
12  there's some force acting on it, right?
13      A.  Yes, that's true.
14      Q.  And if the roof isn't against the ground,
15  there can't be any force acting on it, right?
16      A.  Yes, that's -- that's right.  Aside from
17  inertia loading, there would be no contact forces
18  acting on it.  The inertia forces on the roof
19  wouldn't be significant enough to cause any great
20  deformation.
21      Q.  So in this case the roof deformation was
22  the result of the roof stopping against the ground
23  and the rest of the vehicle continuing to move toward
24  the ground and deforming the pillars; is that right?
25      A.  Yes, that's a good way of saying it.

Page 116

1       Q.  Did you detrim the headliner in this
2   vehicle?
3       A.  No, I didn't.
4       Q.  Do you know whether anybody did?
5       A.  No, I don't.
6       Q.  You're familiar with the Malibu tests,
7   aren't you?
8       A.  Yes.
9       Q.  The series one and series two Malibu
10  tests?
11      A.  Sure.
12      Q.  Some of those tests they ran with roll
13  cages and some without, right?
14      A.  Right.
15      Q.  And one of the conclusions that's been
16  drawn from the Malibu test is that the trailing side
17  passenger had heavier loads than the leading side; is
18  that correct?
19      A.  Sure.
20      Q.  And the reports of those Malibu studies
21  were published in the SAE publications, right?  They
22  were an SAE paper at some point?
23      A.  I believe they -- yeah, they've been there
24  and referred to on a number of occasions in other
25  papers.

Page 117

1       Q.  Would you agree that the results of the
2   Malibu series show that the dummy's neck injury is
3   the result of the dummy's head stopping against the
4   roof when the roof contacts the ground?
5       A.  I believe it does show that, yes.
6       Q.  And when -- and the tests further show --
7   the Malibu studies further show that when the dummy's
8   head stops, the dummy's torso continues to move
9   towards the head?
10      A.  Uh-huh.
11      Q.  Do you agree with that?
12      A.  Yes.
13      Q.  And this causes these high axial forces to
14  act on the neck that were recorded in those Malibu
15  tests; is that right?
16      A.  Yes, that's right.
17      Q.  And would you agree that the neck
18  measurements that were taken during the Malibu tests
19  show a peak force pulse occurred approximately ten
20  milliseconds after the adjacent roof panel struck the
21  ground which was before any significant roof crush?
22      A.  No, I don't know the answer to that.
23      Q.  So you're not disagreeing with that
24  statement, you just don't know the answer?
25      A.  I don't know.

30 (Pages 114 to 117)

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

Page 118

1    Q. Would you agree generally that the Malibu
2  tests show that neck load on the dummy peaks before
3  there's any significant roof deformation in those
4  tests?
5    A. I don't know that.
6    Q. So you're not disagreeing, you just don't
7  know?
8    A. No, I don't know that. I don't know that.
9  I think the dummy characteristics aren't necessarily
10 representative of human beings.
11   Q. Why do you say that?
12   A. Well, they have a stiff neck.
13   Q. But they've got these dummies
14 instrumented, right, to record the loads that are
15 acting —
16   A. Yeah. So what they record are the dummy
17 loads and it isn't necessarily a good conclusion that
18 that's what happens with human beings since the dummy
19 necks are not very representative of human being
20 necks. They'll record the dummy loads, but — well,
21 I think I've said enough. What I'm simply saying is
22 the conclusions don't — the obvious — what would
23 seem to be obvious conclusions aren't necessarily
24 accurate.
25   Q. Well, it seems to me that what you're

Page 119

1  saying is you take issue with the conclusions that
2  were drawn from the Malibu studies?
3    A. Sure, I do.
4    Q. Tell me what your disagreement is with the
5  conclusions that were drawn from the Malibu studies.
6    A. Well, the Malibu studies — whenever they
7  use unbelted dummies and they strike the roof, I
8  don't disagree with that. I just don't see that
9  that's relevant to belted dummies.
10   Q. Okay. Any other criticism of the results
11 from the Malibu tests?
12   A. Well, the Malibu tests were set up to
13 demonstrate this whole diving into the roof sequence.
14 In other words, it was like a preconceived idea that
15 if you can make the vehicle roll fast enough, you can
16 project the person into the roof. There's no
17 question you can do that. You can do that with a
18 centrifuge.
19      See, this was a multiple roll — much more
20 than you see in any accidents. Most accident
21 sequence aren't nearly as multiple rolls as they were
22 in the Malibu tests. And the Malibu dummies, of
23 course then, with a stiff neck, place the head a lot
24 closer to the roof than one might expect from a —
25 from a person.

Page 120

1    Q. Any other criticisms of the Malibu tests?
2    A. No. I haven't really looked at them
3  recently very much.
4    Q. Are you familiar with the CRIS testing,
5  C-R-I-S?
6    A. I forgot what that is.
7    Q. Controlled rollover impact system testing.
8    A. Yes.
9    Q. Are you familiar with that testing and the
10 results of those tests?
11   A. No, I'm not, but I have heard of that. I
12 used to know what that was, but I don't remember.
13   Q. Do you agree that while wearing an OEM
14 seat belt like the one that was equipped in the
15 Explorer Mrs. Payan was driving, you can sustain a
16 neck injury if your head is against the roof when the
17 roof hits the ground in a rollover accident before
18 the roof experiences any roof crush?
19   A. You better say that again.
20      MS. SAMBERG: Would you read it back?
21      (The record was read.)
22      MR. MARTINEZ: I will object to the form.
23   A. You could contrive that to happen. That
24 is, you could take a vehicle and you could place it
25 on the ground and then you could compress the person

Page 121

1  and cause the neck injury. That could happen. That
2  could be — you could — you could conduct an
3  experiment where that would occur.
4  BY MS. SAMBERG:
5    Q. In a dynamic rollover accident, could that
6  occur?
7    A. I don't think so, no. I would not expect
8  so.
9      MR. MARTINEZ: I object to the form of
10   that one.
11 BY MS. SAMBERG:
12   Q. Why not?
13   A. Well, it would seem to me that it would be
14 impossible with — for the roof to hit the ground
15 without deforming and that's — that would be the
16 answer to the question.
17   Q. Do you agree that while wearing an OEM
18 seat belt like the one that was in the Payan vehicle,
19 you can sustain a neck injury if your head's against
20 the roof when the roof hits the ground — hits the
21 ground before the roof experiences four inches of
22 roof crush?
23      MR. MARTINEZ: I also object. I would
24   object to the form. And I was — you just say
25   a neck injury. You do not talk about the

31 (Pages 118 to 121)

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

Page 122

1  severity of the neck injury.
2      MS. SAMBERG: That's correct. I'm just
3  talking about a neck injury.
4      A.  The answer is yes.
5  BY MS. SAMBERG:
6      Q.  In your opinion is it reasonable to design
7  a roof that doesn't crush or distort in a rollover
8  accident?
9      A.  Is it reasonable?  Yes.  Well, I should
10  say doesn't distort or deform significantly.  Nothing
11  is entirely rigid.  That's what I meant by my answer
12  to the previous question is you can't really strike
13  the roof on the ground without it deforming.
14     Q.  So some amount of roof crush or distortion
15  is reasonable; is that fair?
16     A.  Well, you can't avoid it -- cannot avoid.
17     Q.  How much is reasonable, in your opinion?
18     A.  I don't have an opinion about that.  I
19  haven't done any studies to substantiate that.
20     Q.  Can you identify any production vehicle
21  that has a roof and a restraint system such that a
22  restrained occupant has zero risk of sustaining a
23  serious neck injury in a rollover accident?
24     A.  No.
25     Q.  And you'll agree that virtually any

Page 123

1  vehicle still presents a risk of a serious neck
2  injury in a rollover accident even with seat belts
3  being used; is that fair?
4      A.  No, that doesn't follow.
5      Q.  Why not?
6      A.  Well, if I understood the question, it
7  would be virtually any vehicle.  I think certainly
8  race cars can roll over.
9      Q.  Okay.  Let me rephrase the question.  Do
10  you agree in a production passenger vehicle --
11     A.  Uh-huh.
12     Q.  -- with an OEM restraint system there is
13  always going to be a risk of a serious neck injury in
14  a rollover accident?
15     A.  Oh, sure.  Of course.
16     MS. SAMBERG: Off the record.
17     (Off the record.)
18     MS. SAMBERG: Back on the record.
19  BY MS. SAMBERG:
20     Q.  What is your understanding, if any, of the
21  maximum vertical height that the roof of the Explorer
22  obtained during the roll before the left roof rail
23  hit the ground?
24     A.  I don't have an opinion about that.  I
25  don't know.

Page 124

1      Q.  In your view how much roof crush would
2  have been acceptable in this accident and not
3  resulted in the vertebral injury that Mrs. Payan
4  suffered?
5      A.  I don't know that either, but a couple
6  of -- a few inches would not be unreasonable, but not
7  the nine or ten.  So I'm looking at two or three
8  would be acceptable.
9      Q.  So in your opinion can you say to a
10  reasonable degree of scientific certainty that if the
11  roof crushed only one or two inches, Mrs. Payan would
12  not have sustained her injury?
13     A.  I believe that -- yes, I would -- I would
14  be of that opinion.
15     Q.  Same question:  What if the roof only
16  crushed four inches?
17     A.  Yeah, I can't -- you know, I don't have a
18  linear interpolation on that.  I don't know.  I don't
19  know --
20     Q.  So you feel --
21     A.  I don't know what those answers would be.
22     Q.  Okay.  So --
23     A.  I can see where you're going, but I don't
24  know how to answer that.
25     Q.  Well, let me back up.  You do believe at

Page 125

1  some point -- strike that.  You do believe that there
2  is some amount of roof crush that's going to happen
3  any time the roof makes contact with the ground,
4  correct?
5      A.  Yes.
6      Q.  And there is some reasonable amount of
7  roof crush someplace in there, right?
8      A.  Yes, that's right.
9      Q.  And you said you can say to a reasonable
10  degree of certainty that with, say, one or two inches
11  of roof crush you feel comfortable that Mrs. Payan
12  would not have received the neck injuries that she
13  sustained in this accident; is that fair?
14     A.  Yes, that's right.
15     Q.  Okay.  If I now take the number up to four
16  inches --
17     A.  Uh-huh.
18     Q.  -- can you say now to a reasonable degree
19  of certainty, all other things being equal, with only
20  four inches of roof crush that Mrs. Payan would have
21  sustained the neck injury that she had in this
22  accident?
23     A.  Right.  Yes.  Yes.  That's the question I
24  thought you were asking and the answer is I don't
25  know.  I'm assuming that you're thinking now that it

32 (Pages 122 to 125)

Page 126

1 would have been with the OEM belt and not with a
2 pretensioner?
3    Q. Sure, with all things being equal.
4    A. Right. It would seem to me -- I just
5 don't -- I don't know the answers to those questions.
6 I don't know how much roof crush -- I can simply say
7 that two to three inches would be reasonable. How
8 much more, I don't know.
9    Q. Okay.
10    A. And, of course, the degree or the severity
11 of the injury obviously goes up the more the roof
12 crush is.
13    Q. So we could say that to a reasonable
14 degree of certainty you'll testify that with two to
15 three inches -- up to three inches of roof crush you
16 feel confident that Mrs. Payan would not have
17 received her neck injury in this rollover accident --
18    A. Sure.
19    Q. -- all other things being equal?
20    A. Sure.
21    Q. But beyond three inches you can't answer
22 that question?
23    A. That's right.
24    Q. Are you going to offer any opinions
25 regarding roof padding as protection of an occupant

Page 127

1 in a rollover accident?
2    A. No.
3    Q. Are you aware or have you done any
4 research or analysis comparing occupant head and neck
5 injuries in Explorer rollover accidents versus other
6 accidents?
7    A. No.
8    Q. Are you going to be offering any opinions
9 about alleged other similar accidents to this one?
10    A. No.
11    Q. Have you had a personal experience being
12 in a Ford vehicle during a spit test?
13    A. No.
14    Q. Okay. I thought I read someplace in some
15 deposition that you personally sat in the spit as a
16 surrogate and run the test.
17    A. No, I haven't.
18    Q. My mistake then.
19    A. I was in a rollover accident one time, but
20 I've not done any spit tests.
21    Q. What kind of vehicle were you in when that
22 rolled over?
23    A. I don't remember.
24    Q. You were wearing your seat belt, weren't
25 you?

Page 128

1    A. No.
2    Q. Really?
3    A. There weren't any seat belts.
4    Q. That long ago. There were no seat belts?
5    A. Well, it was in 1956.
6    Q. No kidding?
7    A. They didn't have seat belts in those days.
8       MR. MARTINEZ: That's almost 50 years ago.
9 BY MS. SAMBERG:
10    Q. Have I covered all of the opinions you
11 intend to express at the time of trial, sir?
12    A. Well, as far -- I think you've covered the
13 opinions for which I believe I'll be asked.
14 Obviously, as I mentioned, if somebody asks me a
15 question at trial, I'll try to answer it. I don't
16 anticipate being asked any questions or any opinion
17 questions different from what we've talked about
18 today.
19    Q. Okay. Do you intend to do any additional
20 work on this case between now and the time of trial
21 other than reading the depositions as they come in of
22 the other experts and perhaps preparing some
23 exhibits?
24    A. Yes, that's all I'll do. I'll just see
25 what the other experts say. I don't expect them to

Page 129

1 say anything that's going to change my opinion. And
2 then obviously before going to trial I'll want to
3 review my notes and my file and prepare for the
4 trial, maybe read some depositions, but I have no
5 other planned investigative work.
6    Q. I saved this for the end because I'm not
7 going to spend a lot of time here, but we marked your
8 CV as Exhibit No. 4.
9    A. Okay.
10    Q. By whom are you presently employed?
11    A. University of Cincinnati.
12    Q. And are you currently teaching at the
13 University of Cincinnati?
14    A. Yes.
15    Q. In what area?
16    A. In the department of mechanical
17 engineering. I teach multi-body dynamics and
18 biomechanics.
19    Q. How long have you been teaching at the
20 University of Cincinnati?
21    A. 43 years.
22    Q. And have all those 43 years been teaching
23 in the same general area?
24    A. No. I used to teach primarily mathematics
25 and strength materials and elementary mechanics, but

33 (Pages 126 to 129)

Page 130

1  I suppose in the last ten years it's been pretty much
2  the same.
3      Q.  So for about ten years you've been
4  teaching biomechanics and --
5      A.  Dynamics and design.
6      Q.  Design of what?
7      A.  Design of mechanical compounds.  Just
8  general machine design is what it's called.
9      Q.  Right.  You're a licensed professional
10  engineer; is that correct?
11      A.  Yes.
12      Q.  In the state of Ohio?
13      A.  Yes.
14      Q.  Do you have licenses in any other states?
15      A.  No.
16      Q.  You're a member of the American Society
17  for Mechanical Engineers; is that right?
18      A.  Yes.
19      Q.  Are you a member of the -- member of SAE?
20      A.  Yes.
21      Q.  Serve on any committees for SAE?
22      A.  No, not currently.  Well, that isn't true.
23      Q.  It looks like you used to.
24      A.  Yeah, I used to.  I was chair of the
25  recreational vehicles committee.  I used to serve on

Page 131

1  the human biomechanics subcommittee.
2      Q.  How long ago was that?
3      A.  Oh, gee.  This goes back now 25 years,
4  probably.
5      Q.  Doing anything recently with any of the
6  professional organizations you belong to?
7      A.  Well, for -- up until last summer, I was
8  working directly for ASME.  I was a technical editor
9  for the applied mechanics reviews and I was being
10  compensated for that.
11      Q.  And you stopped doing that last year?
12      A.  Yes.
13      Q.  Do you have any experience designing any
14  automobile components?
15      A.  Well, I did some work for NHTSA on design
16  of a hood/fender system to ameliorate pedestrian head
17  impact injuries.
18      Q.  How long ago was that?
19      A.  Probably about seven or eight years ago.
20      Q.  Okay.  Have you ever been involved in the
21  design of a vehicle component that was sold to the
22  public?
23      A.  Not that I'm aware of.
24      Q.  Ever been involved in the design of a seat
25  belt system that was ultimately sold to the public?

Page 132

1      A.  No, I have not.
2      Q.  Ever been involved in any testing of seat
3  belt or restraint systems other than in the context
4  of litigation of the nature we've been discussing
5  here?
6      A.  Well, I did some independent work whenever
7  the issue of the window shades was important in
8  litigation.
9      Q.  I'm sorry.  I'm not sure I'm familiar with
10  the window shade issue.
11      A.  Oh, the window shade issue was -- you
12  understand how the window shade works and you pull it
13  down?
14      Q.  Right.
15      A.  So you could -- in seat belts you could
16  put slack in the belt.
17      Q.  I see.
18      A.  Intentionally put slack in the belt.
19      Q.  I see what you're saying.
20      A.  What I was --
21          MR. MARTINEZ:  It's before your time,
22  girl.
23      A.  I did some work on that.
24  BY MS. SAMBERG:
25      Q.  For who?

Page 133

1      A.  Just independent research.
2      Q.  Did you publish anything related to that?
3      A.  Yeah, I did.
4      Q.  Is that listed someplace here in your --
5      A.  It is.
6      Q.  -- publication list?
7      A.  Sure, it is.
8      Q.  Any other independent research or research
9  that was funded by someone other than in the context
10  of litigation?
11      A.  Well, I did a number of computer studies
12  regarding seat belts and seat belt restraints and how
13  they affect body movement and the effectiveness of
14  the shoulder belt, lap belt.  All of that would have
15  been sponsored by either the National Science
16  Foundation or the Office of Naval Research.
17      Q.  Help me out here.  As I look through your
18  publication list, there's designations in the
19  margin --
20      A.  Yes.
21      Q.  -- a letter and several numbers.  What
22  does that represent?
23      A.  What you'll see in there is you'll see a
24  J.  You'll see a P.
25      Q.  Right.

34 (Pages 130 to 133)

Page 134

1    A. You'll see a V and you'll see a B and
2    you'll see an R. The J refers to journal or archival
3    publications. These would be the traditional peer
4    reviewed articles which would be in the literature
5    and you can go and look them up. The P would be
6    conference papers -- papers presented at conferences.
7    The B would be books. The V would stand for book
8    reviews and the R would stand for reports.
9        Q. What's the difference between a report and
10   a paper?
11       A. Well, a report is like if I'm doing some
12   work for a government agency, then they require that
13   you make a report on what you found. It's not
14   usually nearly as good a quality as a paper. It's
15   intended primarily for the sponsor rather than for
16   the general public.
17       Q. So all of the articles that have a J in
18   front of them are published and peer reviewed --
19       A. Yes.
20       Q. -- is that correct?
21       A. That's correct.
22       Q. And you were either the author or one of
23   the authors in each of those; is that correct?
24       A. Yes.
25       Q. Have you ever been involved in the

Page 135

1    drafting of any regulation that related to the
2    automotive industry?
3        A. No, I have not.
4        Q. Have you ever been involved in writing any
5    Federal Motor Vehicle Safety standards or
6    participated in any testing related to that?
7        A. No.
8        Q. Have you ever conducted -- strike that.
9    Have you ever conducted any crash tests of vehicles?
10       A. Yes.
11       Q. Okay. In what context?
12       A. In litigation context.
13       Q. Have you ever conducted a rollover crash
14   test of any kind or any test that was intended to
15   simulate a rollover accident other than the spit
16   tests we've talked about?
17       A. No.
18       Q. When did you start consulting for
19   litigation?
20       A. 1975.
21       Q. What possessed you to do that?
22       A. Well, I -- I was involved in an aircraft
23   crash worthiness meeting here in Cincinnati based
24   upon work that I did and I received a lot of national
25   attention and there were lawyers and I got some local

Page 136

1    publicity and then I began to get some inquiries from
2    local attorneys.
3        Q. Have you ever testified on behalf of an
4    automobile manufacturer?
5        A. Yes.
6        Q. Who?
7        A. For whom? General Motors.
8        Q. How long was that?
9        A. Oh, a long time ago. Probably late '70s
10   or early '80s, maybe.
11       Q. Since that time have you been retained by
12   any automobile manufacturer to testify on their
13   behalf?
14       A. No, I don't think so.
15       Q. Of the work you're -- strike that. How
16   much of your time right now is spent on your
17   obligations at the University of Cincinnati versus
18   your private consulting business?
19       A. I probably spend about 30 percent of my
20   time on litigation matters.
21       Q. And of that amount of time you spend on
22   litigation matters, what percentage of your cases are
23   you retained by the plaintiffs, or the person
24   representing an injured person, as opposed to the
25   defendant in a suit?

Page 137

1        A. Well, the percentage is probably about 90
2    percent plaintiffs. I do a lot of very minor defense
3    work. I do low-speed rearend collision defense work
4    in Kentucky and there are many of those cases so that
5    the numbers are large, but the time isn't -- doesn't
6    take very long.
7        Q. Where you're retained by an insurance
8    carrier, for instance?
9        A. Yes. Yes, that's right.
10       Q. Had you worked with Mr. Martinez before?
11       A. No, I have not.
12       Q. Do you know how he happened to be referred
13   to you?
14       A. I suspect through Mr. Rosenbluth.
15       Q. And you have worked with Mr. Rosenbluth
16   before, right?
17       A. Yes.
18       Q. Have you ever failed to qualify as an
19   expert in the area of biomechanics or occupant
20   kinematics?
21       A. Well, there was an interesting case in
22   Texas where I wasn't permitted to testify, which went
23   then to the Supreme Court and they ruled that the
24   judge had made an error.
25       Q. Okay. Do you remember what the name of

35 (Pages 134 to 137)

Page 138

1  that case was?
2      A.  That was Gamel versus Isuzu.
3      Q.  When did that Supreme Court opinion come
4  out?
5      A.  That's been some time ago.  Probably in
6  the '90s.
7      Q.  Okay.  So in that case you were offered as
8  an expert in the area of biomechanics and kinematics
9  and for whatever reason the judge excluded you from
10  testifying?
11      A.  Well, what happened there was I was going
12  to say in this particular accident that there was an
13  inertial release of the seat belt and the judge felt
14  that there wasn't sufficient evidence that the person
15  was wearing the seat belt and so then therefore
16  didn't allow me to testify.
17      Q.  I see.  Any other cases where you've been
18  excluded or failed to qualify as an expert?
19      A.  No, not that I know of.
20      Q.  You're sure about that?
21      A.  Yeah.  Well, there were -- there were a
22  couple of -- there was one assault case where the
23  judge allowed me to testify on what's called
24  proffered testimony and then -- this was a criminal
25  matter.  And there again, there was a ruling that the

Page 139

1  judge had made the error and then they dropped the
2  case.
3      Q.  Any other cases where you were excluded
4  or --
5      A.  Not that I know of.
6      Q.  -- failed to qualify?
7      A.  Not that I know of.
8      Q.  How many rollover cases have you worked
9  on?
10      A.  Oh, my.  Gee, I don't know.  Probably --
11  oh, probably fewer than 50 --
12      Q.  Okay.
13      A.  -- but more than 20.
14      Q.  If I was to look at your testimony list --
15  and there's one for depositions and there's one for
16  trial marked as Exhibits 5 and 6 -- that doesn't tell
17  us what kind of vehicle was involved in the case,
18  does it?
19      A.  No.  What you can do is look through that
20  listing and you can see by the case caption if it
21  involved an automotive manufacturer.  However, that
22  would only go so far.  It wouldn't tell you
23  specifically if it was a rollover accident.
24      Q.  And just so I'm clear, you consider
25  yourself to be an expert in the area of occupant

Page 140

1  kinematics and injury biomechanics; is that fair?
2      A.  Yes.
3      Q.  You consider yourself to be an expert in
4  the area of restraints --
5      A.  Yes.
6      Q.  -- is that fair?  You consider yourself to
7  be an expert in the area of accident reconstruction?
8      A.  Yes.
9      Q.  Are there any other areas you consider
10  yourself to be an expert?
11      A.  Well, yes.  I've done warnings, human
12  factors, mechanical design.
13      Q.  Mechanical design of just machines in
14  general?
15      A.  Machine design, yeah.
16      Q.  Any other area in which you've offered
17  expert testimony related to an automobile accident?
18      A.  No.  I was going to say I've done premises
19  liability work.  I don't do that anymore.  In terms
20  of automobiles, what I've done in recent years has
21  been primarily biomechanics and accident
22  reconstruction.  I have not in recent years done any
23  testimony on restraint systems, per se, or on crash
24  worthiness.
25      Q.  How about human factors?

Page 141

1      A.  On occasion that will come up as an
2  auxiliary to the work I do in biomechanics.
3      Q.  And you feel you're qualified as an expert
4  in the area of human factors?
5      A.  Yes.
6      MS. SAMBERG:  If you guys give me five
7  minutes to flip through my notes here, we're
8  probably done.
9      (A recess was taken from 12:43 to 12:50.)
10      MS. SAMBERG:  We're back on the record.
11  BY MS. SAMBERG:
12      Q.  Just one final area, Dr. Huston.  You
13  reviewed Bob Piziali's report that was prepared
14  related to this case?
15      A.  Yes, I did.
16      Q.  And other than Dr. Piziali's conclusion
17  that Mrs. Payan's head most likely came -- impacted
18  the ground at approximately the same time as the
19  driver's side roof rail, is there anything else in
20  Dr. Piziali's report that you disagree with?
21      A.  Oh, let me -- I think not, but just to be
22  sure --
23      Q.  We gave that back to you.  That's one of
24  the things we didn't mark and it's in your file.
25      A.  Yes.  I understand that, but in my green

36 (Pages 138 to 141)

Page 142

1  paper I made notes on his report and that's how I can
2  best answer that and I can do that very quickly as
3  soon as I find those notes. Here they are. Well, he
4  said that there were no head marks on the roof. I
5  believe that there is a head mark on the roof. He
6  said that the head probably hit the ground. I don't
7  believe that it did. That's all.
8      MS. SAMBERG: Okay. That's all the
9  questions I have. Thanks.
10
11
12
13
14

       _____
15          RONALD L. HUSTON, PhD, PE
16
17
18          - - -
19      DEPOSITION CONCLUDED AT 12:58 P.M.
20          - - -
21
22
23
24
25

Page 143

1          C E R T I F I C A T E
2  STATE OF OHIO     :
               :  SS
3  COUNTY OF WARREN  :
4      I, Kimberly L. Wilson, CSR, the undersigned, a
5  duly qualified and commissioned notary public within
6  and for the State of Ohio, do hereby certify that
7  before the giving of his aforesaid deposition,
8  RONALD L. HUSTON, PhD, PE was by me first duly sworn
9  to depose the truth, the whole truth and nothing but
10  the truth; that the foregoing is the deposition given
11  at said time and place by RONALD L. HUSTON, PhD, PE;
12  that said deposition was taken in all respects
13  pursuant to stipulations of counsel; that I am
14  neither a relative of nor employee of any of the
15  parties or their counsel, and have no interest
16  whatever in the result of the action; that I am not,
17  nor is the court reporting firm with which I am
18  affiliated, under a contract as defined in Civil Rule
19  28(D).
20      IN WITNESS WHEREOF, I hereunto set my hand and
21  official seal of office at Lebanon, Ohio, this ____
22  day of _____, 2005.
23
24
       _____
   My commission expires:  Kimberly L. Wilson, CSR
25  June 15, 2009.     Notary Public - State of Ohio

37 (Pages 142 to 143)