IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 2 4 2005

Michael N. Milby
Clerk of Court

| | |
|---|---|
| ISABEL INNIS REYNOSO, SALLY PAYAN, and ENRIQUE ROBERTO PAYAN<br>    Plaintiffs<br>VS.<br><br>FORD MOTOR COMPANY and<br>AUTOMOTRIZ DEL NORESTE, S.A. de C.V.<br>    Defendants | §<br>§<br>§<br>§ CIVIL ACTION NO. B-03-120<br>§<br>§<br>§<br>§<br>§ |

**PLAINTIFFS' OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S
MOTION TO EXCLUDE TESTIMONY OF GERALD ROSENBLUTH**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiffs Isabel Ennis Reynoso, Sally Payan, and Enrique Roberto Payan ("Plaintiffs") file this Opposition To Defendant Ford Motor Company's Motion To Exclude Testimony of Gerald Rosenbluth. In support of their opposition, Plaintiffs would show the Court as follows:

**I.     Factual Background**

Betty Reynoso Payan and her daughter Sally Payan woke up early on the morning of January 11, 2003, to go to Monterrey, Mexico, to a dermatologist and do some shopping. (Ex. 1; *Deposition of Sally Payan*, at 39:1 – 43:13). They drove the 2000 Ford Explorer. (*Id.*). At the end of the day, around 5:00, they left Monterrey to return to Matamoros. (*Id.*). Approximately forty-five minutes outside of Monterrey on the superhighway, Sally Payan, who had been sleeping in the passenger's seat, suddenly awoke to see the car swerving off the road. (*Id.* at 49:11 – 52:1). The Explorer went over

the grass median and crossed the oncoming lanes of traffic. (*Id.*). Sally Payan next remembers the car facing the wrong direction resting on its roof. (*Id.* at 51:17 – 52:1). Although it was raining, it was not raining hard; and Sally Payan did not notice any puddles on the road. (*Id.* at 46:15 – 47:6 and 82:4 - 6).

After the accident an ambulance arrived and took Betty Reynoso Payan to a clinic in China, Nuevo Leon, and from there she was transported to a hospital in McAllen. (*Id.* at 74:16 – 78:22). In McAllen, the doctors told Sally Payan that her mother had broken bones in her neck and that she would never walk again. (*Id.* at 82:18 – 83:2). Betty Reynoso Payan was later transferred to Harlingen for surgery on her neck. (*Id.* at 86:11-14). She was then transferred by air ambulance to Houston for physical therapy. After four hours at the physical therapy clinic she was transferred to Hermann Memorial Hospital because she had water in her lungs and internal bleeding. (*Id.* at 88:2 – 89:11). After four major surgeries, including an amputation, Betty Reynosa Payan passed away at the Hermann Memorial Hospital 37 days after the accident occurred. (*Id.* at 90:4 - 94:10).

Susana Reynoso, Betty's sister, purchased the 2000 Explorer new from Automotriz del Noreste in June 2000. (Ex. 2; *Deposition of Susana Reynoso*, at 8:4-12). The whole family, including Susana Reynoso's sisters, nieces, nephews and in-laws, participated in the purchase of the 2000 Explorer. (*Id.* at 7:24 – 8:6). Susana purchased the 2000 Explorer for her mother to do her many charitable activities. (*Id.* at 17:25 – 18:10). However, she also purchased the car for her family to use when traveling in Mexico beyond the 22 kilometer range. (*Id.* at 27:3 – 16).

When she purchased the 2000 Explorer, Susana Reynoso was particularly concerned about the handling and stability of the vehicle. (*Deposition of Susana Reynoso*, at 13:1 – 14:5). She questioned Luis Elizondo, the manager at the Ford dealer, about the stability of the vehicle, and he allayed her concerns by telling her that there were no safety concerns and that his own daughter drove an Explorer. (*Id.* at 13:19-21; 14:15-18).

## II.   Analysis

Federal Rule Of Evidence 702 guides the admissibility of expert opinion testimony.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

There are extensive Advisory Committee Notes to the 2000 Amendments of Rule 702.

"The committee note was revised to emphasize that the amendment is not intended to limit the right to jury trial, nor to permit a challenge to the testimony of every expert, nor to preclude the testimony of experience-based experts, nor to prohibit testimony based upon competing methodologies within a field of expertise." GAP REPORT ON PROPOSED AMENDMENT TO RULE 702 N.3. The commentary to Rule 702 provides special guidance in assimilating the various principles to be taken from *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993), *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167 (1999)* and their progeny.

According to the Supreme Court, "The trial judge has considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire, 119* S.Ct. at 1176. The analysis of expert testimony admissibility is reviewed for an abuse of discretion. *Id.* While *Daubert* lists five areas to help assess the reliability of scientific expert testimony, neither Rule *702* nor the Supreme Court suggests these elements are "codified" or exclusive. *See Daubert, 113* S.Ct. at *2796* (factors are not "a definitive checklist or test"); ADVISORY COMMITTEE NOTE TO RULE *702*. The trial judge has discretion "both to avoid unnecessary `reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Id.*

Applying Rule *702* and case precedent, this Court's analysis may rely on a fair look at the extensive and specialized experience of Mr. Rosenbluth and the detailed factual record and data serving as the basis for his opinions.' "No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire, 119* S.Ct. at *1178*.

> The text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominate, if not sole, basis for a great deal of reliable expert testimony (citations omitted) ... If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is the sufficient basis for the opinion, and how that experience is reliably applied to the facts.

ADVISORY COMMITTEE NOTE TO RULE 702. Within this analytical framework, there is a history of relevant experience applied to a detailed factual

record which lead to Rosenbluth's reliable conclusion that the occupant restraint design for the 2000 Ford Explorer was defective and that a safer alternative design existed at the time.

Rule 702 sets out a disjunctive list of means by which an expert may be "qualified" to offer technical testimony. An expert may be qualified based on his or her "knowledge, skill, experience, training or education..." Fed. R. Evid. 702. Mr. Rosenbluth's qualifications are based on every element.

Mr. Rosenbluth has over 40 years experience in the automobile industry and, specifically, auto mechanics. *(See* Ex. 3; Report of Gerald Rosenbluth (*Curriculum Vitae* attached thereto)). He worked as a mechanic, served as an automotive instructor, taught in a University setting, and then served as an automotive consultant specific to mechanical elements of auto function for private attorneys, automobile manufacturers and dealerships, and federal and state governmental agencies including the National Highway Traffic Safety Administration and the Arizona Department of Public Safety. (Ex. 3). He earned a bachelor degree in 1965 from Arizona State University Division of Industrial Design and Technology, and a master's degree in 1967. (Ex. 3). Mr. Rosenbluth completed further graduate study in industrial design and automotive technology at Arizona State University and Northern Arizona University. (Ex. 3). Mr. Rosenbluth is a member of the Society of Automotive Engineers, The National Association of University Automotive Instructors, The National Center for Auto Safety, The Insurance Institute for Highway Safety, as well as others. (Ex. 3). He is board certified by The American Board of Forensic Examiners. (Ex. 3). Mr. Rosenbluth has completed courses at multiple technical schools, including those offered by Ford Motor Company on automotive mechanic systems. (Ex. 3).

Mr. Rosenbluth does not purport to be an expert in accident reconstruction, biomechanics, or some other field outside his years of experience. His testimony is limited to seatbelt analysis. (*See* Ex. 4; Plaintiffs' Designation of Experts).

Some insight into reviewing Mr. Rosenbluth's qualifications is found in another case where Defendant Daimler Chrysler challenged Mr. Rosenbluth's qualifications to testify as an expert in automotive fuel system design, "claiming his qualifications are more appropriately analogized to those of a 'qualified automotive mechanic.'" *See Tolliver v. Naor*, 2001 WL 1345735 (E.D. La. Nov. 1, 2001). The court held that "although Mr. Rosenbluth is not an engineer, the Court finds that he is qualified by both education and experience to render an expert opinion in this case. The Court recognizes that Mr. Rosenbluth is a 30 year veteran of the automotive industry with the benefit of both practical experience and graduate study in industrial design. Furthermore, the theories proposed by Mr. Rosenbluth are not so complex or specialized to require formal degrees in engineering or another highly specialized discipline. The Court finds that the witness satisfies Rule *702* and the '*Daubert* test'." *Id.* at *4*.

Likewise, the First Circuit Court of Appeals affirmed the admission of Mr. Rosenbluth as an expert:

> [Rosenbluth's] qualifications *include* substantial education in automobile technology and physical sciences; prior ownership of Automobile Technical Services, Inc., a company that was responsible for the maintenance of approximately *250* vehicles; teaching experience at various educational levels of automobile maintenance and servicing; and his employment at the time of the trial as an automotive expert for the State of Arizona. Whether or not Rosenbluth took courses focusing exclusively on tires, his extensive automotive background - - and his inevitable exposure to problems of tire maintenance and failure - - provided an adequate basis for the District Court to exercise its discretion in favor of letting him testify.

*Marshall v. Arzuaga*, 828 F.2d 845, 851 (1st Cir. 1987) (emphasis in original).

The Fifth Circuit, district courts within it, as well as various appellate courts in Texas, have repeatedly found that practical education and experience can qualify an expert. *See, e.g. Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999) ("As long as

some reasonable indication of qualifications is adduced, the Court may admit the evidence without abdicating its gate-keeping function. After that, qualifications become an issue for the trier of fact, rather than for the Court in its gatekeeping capacity."); *Vienne v. American Honda Motor Co.,* 2001 WL 43598 *3 (E.D.La. January 16,2001); *Phillips v. General Motors Corp.,* 2000 WL 1285380 *4 (E.D.La. September 12, 2000); *Gammill v. Jack Williams Chevrolet, Inc., 972* S. W.2d 713, 722 (Tex. 1998) ("An experienced car mechanic's diagnosis of problems with a car's performance may well be relevant and reliable without resort to engineering principles."); *Ford Motor Co. Aguiniga, 9* S.W.3d 252, 264-65 (Tex. App. - - San Antonio 1999, no pet.); *Nissan Motor Co. v. Armstrong, 32* S.W.3d 701, 708 (Tex. App. - - Houston [14th Dist.] 2000, no pet.) ("The alleged defect about which he rendered an opinion relates to a relatively simple automotive component ... [It] did not require an explanation from a "rocket scientist" for the jury to understand. Indeed, almost any qualified mechanical expert could show the jury how the cable worked and how a loose dust boot might stick on the throttle cable...").

Ford attacks the reliability of Mr. Rosenbluth's opinions with blanket assertions and unsubstantiated claims. Their arguments are unavailing. First, Ford argues that Mr. Rosenbluth used improper characteristics for the surrogate he used in his testing. In his deposition he testified that

> Q:  First of all, what was the height and weight of Betty Payan?
> A:  5-foot 4, 130 pounds. And that information was obtained from the McAllen Medical Center records as well as her drivers license.

(Ex. 5; *Deposition of Gerald Rosenbluth* at 48:17 – 21). In fact, the surrogate was even more realistic because Mr. Rosenbluth used not only height and weight but an inseam measurement, to ensure the most accurate surrogate possible. (*See* Ex. 6; 11/29/04 Notes on Surrogate Testing by Rosenbluth; and *Deposition of Gerald*

*Rosenbluth* at 53:7 – 23). If the hospital records and Betty Payan's driver's license are not enough, Mrs. Ibarra testified that Betty Payan weighed approximately 130 pounds. (*See* Ex. 7; *Affidavit of Elsy S. Ibarra*). Nonetheless, the difference, if it even existed, would not make a substantial difference to the analysis. When asked what the difference would be if Betty Payan were two inches taller and weighed 35 pounds more, Mr. Rosenbluth opined that there may be head contact but no impact. (*Deposition of Gerald Rosenbluth* at 50:10 – 17).

Next, Ford argues that Mr. Rosenbluth used a dissimilar seat in his surrogate testing because the seat was electronic rather than manual, was a one-of-a-kind integrated seatbelt system, and was arbitrarily placed in the buck for testing. These arguments also miss the mark. First, Mr. Rosenbluth took great care to establish the exact seating position of the surrogate with respect to the original subject vehicle.

### EXEMPLAR VEHICLE TEST SET-UP:

SEAT ASSEMBLY POSITION #1

| SELECTED QUANTIFICATIONS | SUBJECT VEHICLE | EXEMPLAR VEHICLE |
|---|---|---|
| FLOORBOARD → BENCH HEIGHT VERTICAL | 12.50" | 12.50" |
| FIREWALL → BENCH SEAM LONGITUDINAL | 22.50" | 22.50" |
| BENCH → BACK HYPOTENUSE | 36.75" | 36.75" |
| PILLAR D-RING POSITION | | |
| | MAX HT ADJ DETENT | MAX HT ADJ DETENT |
| (H-POINT) SEAT BENCH → ROOF | 28.50" | 37.50" |
| TOP OF SEAT BACK → ROOF | 04.00" | 09.50" |

(11/29/04 Notes on Surrogate Testing by Rosenbluth). As the Court can see from the "Exemplar Vehicle Test Set-Up" found in Rosenbluth's notes, the measurements for the surrogate and exemplar vehicles were the same for the seat position: floorboard to bench height vertical; firewall to bench seam longitudinal; bench to back hypotenuse; and pillar d-ring position. The only deviations involve measurements to or from the roof which

was collapsed. There is nothing arbitrary about the placement of the seat in the surrogate; rather, it was carefully placed to simulate the seat position of the 2000 Ford Explorer in question.

Moreover, the integrated seatbelt design Mr. Rosenbluth used is nothing terribly unique. In fact, it is similar to the integrated seatbelt Ford uses in its Econoline vehicles. (*Compare* Ex. 8 and Ex. J to Defendant's Motion). Ford absolutely misses the mark by arguing that Mr. Rosenbluth should have used a Ford seat with integrated seatbelt. Mr. Rosenbluth crafted an exemplar seat with integrated seatbelt similar to what Ford uses in other Ford products. There is no requirement that he actually use a Ford seat for his testing. Finally, Ford argues that Mr. Rosenbluth cannot explain why he fabricated the seat the way he did; however, Ford chose not to ask him for his reasoning. The explanation is patently clear: he was fabricating a seat with an integrated seatbelt.

Ford also claims that there is too great an analytical gap between the testing and data Mr. Rosenbluth performed and obtained, on the one hand, and his opinions on the other. They complain about the "five static tests performed under artificial laboratory conditions." However, Ford's experts themselves rely on static testing. (*See* Ex. 9; Report of Piziali & Associates at p.3). Ford also cites to the deposition transcript of another of Plaintiffs' experts, to lead the Court to believe that Plaintiffs' own expert believes dynamic testing is necessary. Dean Jacobsen, Plaintiffs' structural expert, was commenting on drop testing in roof collapse issues (*See* Ex. 10; *Deposition of Dean Jacobsen* at 54:3 – 57:3).

Finally, Mr. Rosenbluth's testimony is both relevant and probative and, therefore, admissible in this case. Mr. Rosenbluth testified that that the seatbelt design in the 2000 Ford Explorer is defective in an accident foreseeable to Ford and that the incorporation of either an integrated seat belt or a pretensioner into the seat would make the seat reasonably safe. (*Deposition of Gerald Rosenbluth* at 72:9-14; 103:13-16). Moreover, Mr. Rosenbluth's testimony directly contradicts Ford's theory that Betty Reynoso Payan was injured when her head hit the roof before deformation. (*See* Report of Piziali & Associates at p.3). If Ford's theory is to be believed, then the seat and seatbelt design are defective and Rosenbluth's testimony is relevant and will assist the trier of fact in determining essential elements of the case.

### III.  Conclusion

WHEREFORE PREMISES CONSIDERED, Plaintiffs oppose Defendant Ford Motor Company's Motion To Exclude Testimony of Gerald Rosenbluth. Plaintiffs' request a hearing be set on this motion and that the Court enter an order denying Ford's motion.

Respectfully submitted,
**MARTINEZ, BARRERA Y MARTINEZ L.L.P.**
1201 E. Van Buren Street
Brownsville, Texas 78520
Ph. (956) 546-7159
Fax (956) 544-0602

_____
Tony Martinez
State Bar No. 1313900
Federal ID: 1943

**RANDOLPH KIMBLE WHITTINGTON**
Law Office of Randolph Kimble Whittington
2014 East Harrison Street
Harlingen, Texas 78550
Ph. (956) 423-7200
Fax (956) 423-7999

_____
R. K. Whittington
State Bar No. 21404500
Federal ID: 1091

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been forwarded to counsel of record on this the 24 day of June, 2005.

_____
R. K. Whittington

*PLAINTIFFS' OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S*
*MOTION TO EXCLUDE TESTIMONY OF GERALD ROSENBLUTH*

11