Page 1

```
 1                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                       BROWNSVILLE DIVISION


ISABEL ENNIS REYNOSO,     )(
SALLY PAYAN, AND ENRIQUE  )(
ROBERTO PAYAN             )(
       Plaintiffs         )(
                          )( CIVIL ACTION NO. B-03-120
VS.                       )(
                          )(
                          )(
FORD MOTOR COMPANY        )(
```

---

ORAL DEPOSITION OF
SUSANA REYNOSO
JUNE 10, 2005

---

     ORAL DEPOSITION OF SUSANA REYNOSO, produced as

a witness at the instance of the DEFENDANT, taken in

the above-styled and numbered cause on JUNE 10, 2005,

reported by PEGGY BRYANT, Certified Court Reporter

No. 1208, in and for the State of Texas, at the offices

of MARTINEZ, BARRERA Y MARTINEZ, L.L.P., 1201 East Van

Buren, Brownsville, Texas, pursuant to the Federal

Rules of Civil Procedure.

Martinez & Barrera

JUN 13 2005

RECEIVED

---

**BRYANT & STINGLEY, INC.**
McAllen (956)618-2366    Harlingen (956)428-0755    Brownsville (956)542-1020

**Page 2**

APPEARANCES

COUNSEL FOR PLAINTIFFS:

WILLIAM L. MENNUCCI
THOMPSON, COE, COUSINS & IRONS, L.L.P.
Suite 1500, Austin Centre
701 Brazos
Austin, Texas 78701

COUNSEL FOR DEFENDANT:
TONY MARTINEZ
MARTINEZ, BARRERA & MARTINEZ, L.L.P.
1201 East Van Buren
Brownsville, Texas 78520

ALSO PRESENT: Betsy Filizola

INDEX

PAGE

Appearances ..................................... 2

SUSANA REYNOSO
Examination by Mr. Mennucci ..................... 4

Errata Sheet/Signature Page ..................... 40

Reporter's Certificate .......................... 41

Attached to the end of the transcript: Stipulations

**Page 3**

EXHIBITS

PAGE

NUMBER  DESCRIPTION                    IDEN.

1  Invoice for 2000 Ford Explorer ............ 22

2  Document from State of Tamaulipas ......... 23

3  11-2-00 Service Record .................... 29

4  6-2-01 Service Record .................... 30

5  4-24-01 Service Record .................... 31

6  11-27-01 Service Record .................. 32

7  1-9-02 Service Record .................... 33

8  7-11-02 Service Record .................... 33

**Page 4**

1        SUSANA REYNOSO,
2  having been duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. MENNUCCI:
5      Q.  Please state your name, ma'am.
6      A.  Susana Laura Reynoso.
7      Q.  Ms. Reynoso, my name is Bill Mennucci, and I'm
8  an attorney representing Ford Motor Company in a
9  lawsuit that's been brought by, I guess, your niece and
10  your nephew, Sally and Enrique; do you understand that?
11     A.  Yes, I do.
12     Q.  Have you ever had your deposition taken before,
13  Ms. Reynoso?
14     A.  No.
15     Q.  Have you had a chance for Tony Martinez, the
16  attorney representing the plaintiffs, to explain to you
17  a little bit about what's going to happen here today?
18     A.  Yes.
19     Q.  It's pretty simple.  I'll be asking you some
20  questions, and you have just been sworn by the court
21  reporter to tell the truth, which I'm sure you will do,
22  and I would like you to consider the fact that it's
23  possible that portions of your testimony today may be
24  introduced into evidence at trial.  So please treat
25  your testimony today as if you were testifying in

**Page 5**

1  court, potentially before a judge and jury, okay?
2      A.  Okay.
3      Q.  If you don't understand anything that I ask
4  you, please ask me to rephrase it.  Sometimes I'll not
5  ask a clear question, and I would like for you to have
6  understood exactly what I'm asking before you answer so
7  that we can get a good record, okay?
8      A.  Okay.
9      Q.  You are doing a great job so far of answering
10  out loud with a yes or no or whatever is appropriate,
11  and I want you to continue to do that.  It's difficult
12  for the court reporter to take down things that we
13  might do in normal conversation, like a shrug or a nod
14  of the head or an uh-huh or an huh-uh, okay?
15     A.  I understand.
16     Q.  If you need to take a break at any time for any
17  reason, please let me know and I will be happy to
18  accommodate you, okay?
19     A.  I will.
20     Q.  How old are you, Ms. Reynoso?
21     A.  I'm 50 years old.
22     Q.  And describe for us your relationship to the
23  plaintiffs in this case, Sally Payan and Enrique Payan.
24     A.  They are my nieces -- they are the children of
25  my sister.

**Page 6**

1    Q. And your sister is the decedent, Betty Payan,
2 correct?
3    A. Correct.
4    Q. Your mother is Isabel Ennis Reynoso?
5    A. Yes, she is.
6    Q. I understand she recently passed away; is that
7 right?
8    A. Yes.
9    Q. When did that happen?
10    A. She died May 3rd.
11    Q. And what was the cause of her death as you
12 understand it?
13    A. Cancer.
14    Q. Are you employed, ma'am?
15    A. Yes, I am.
16    Q. Who do you work for?
17    A. I'm a partner with Long, Chilton, L.L.P. It's
18 a CPA firm.
19    Q. And where is that located, here in Brownsville?
20    A. 3125 Central Boulevard.
21    Q. Do you live in Brownsville?
22    A. I do not.
23    Q. Where do you live?
24    A. Matamoros.
25    Q. And how long have you lived in Matamoros?

**Page 7**

1    A. All my life.
2    Q. Do you have any other siblings?
3    A. Yes, I do.
4    Q. Who?
5    A. Two brothers and one sister.
6    Q. What are their names?
7    A. Pedro Reynoso, Tomas Reynoso, Stella Filizola,
8 F-I-L-I-Z-O-L-A.
9    Q. And where do they live?
10    A. My brothers live in Mexico City and my sister
11 lives in Matamoros.
12    Q. And what was your sister's name again?
13    A. Stella Filizola.
14    Q. Can you describe for the jury your educational
15 background, please?
16    A. I have a Bachelors in Business Administration
17 with a major in accounting.
18    Q. From?
19    A. St. Mary's University in San Antonio.
20    Q. Ms. Reynoso, I understand from the depositions
21 of —
22    (Telephone ringing)
23    A. Excuse me.
24    Q. Sure. I understand from the depositions of
25 Sally and Enrique that you were involved to some extent

**Page 8**

1 in the purchase of the vehicle that was involved in the
2 accident, the 2000 Ford Explorer; is that correct?
3    A. Yes, it is.
4    Q. Could you please describe in a general nature
5 your involvement in the purchase of that vehicle.
6    A. I purchased that vehicle for my mother's use.
7    Q. And based on the records that have been
8 provided to us, it looks like that Explorer was
9 purchased new on June 23, 2000 in Matamoros from
10 Automotriz del Noreste; is that correct?
11    A. That is correct. I mean, the date, I don't
12 remember exactly, but everything else is correct.
13    Q. Summer of 2000?
14    A. Right.
15    Q. How did — how did it come to be that you
16 purchased an Explorer for your mother's use as opposed
17 to a different make or model of vehicle?
18    A. My brother-in-law was friends with Luis
19 Elizondo who was the manager of Ford, and when I
20 started looking for a car, he suggested that we go to
21 him just because it would speed up the process of
22 getting the car.
23    Q. Were there any other makes or models of
24 vehicles that you considered purchasing on behalf of
25 your mother?

**Page 9**

1    A. I looked at other cars, yes.
2    Q. Tell me the other cars you looked at.
3    A. I don't remember. I'm not good with car
4 models, but we went to the Chevrolet dealership.
5    Q. In Matamoros?
6    A. Yes.
7    Q. Okay.
8    A. We might have gone to others, I mean —
9    Q. You say "we might have gone." Tell me who else
10 was involved.
11    A. My sisters; at the time, both of my sisters.
12 My brother-in-law, my nieces, my nephews.
13    Q. Did your mother own a car or have use of a car
14 before this Explorer was purchased?
15    A. Yes.
16    Q. What type of vehicle was that?
17    A. She had a Grand Wagoneer.
18    Q. Is that kind of an SUV-type of vehicle, sport
19 utility vehicle?
20    A. Yes, it is.
21    Q. And how long did she have that vehicle before
22 the Explorer was purchased?
23    A. It might have been two or three years, or less.
24    Q. Did your mother drive herself?
25    A. She did not.

## Page 10

1  Q. Did she even have a license to drive?
2  A. She did not.
3  Q. How -- how was your mother able to utilize the
4  Grand Wagoneer and then the Explorer? Did she hire a
5  driver or something?
6  A. She did. She had a driver.
7  Q. In June of 2000 when this Explorer was
8  purchased, who was the driver that she had hired; do
9  you know?
10  A. I think it was Nacho -- his name was Ignacio.
11  I don't remember his last name. Or it might have been
12  Martin. I don't remember which driver it was at the
13  time.
14  Q. Were these employees of your mother?
15  A. Yes.
16  Q. And to the best of your knowledge, when was
17  Nacho employed by your mother? What were the dates?
18  A. I'm sorry, I would have no idea. 1999 to 2000,
19  1998 to 2000. We moved to the house in 1999, and he
20  was not the driver at the time. So somewhere -- I
21  guess Martin was the driver. And then Nacho was the
22  driver at the time of the accident. Sometime between
23  '99 and 2000 I think there was a change in drivers.
24  Q. Do you know Martin's last name?
25  A. I do not.

## Page 11

1  Q. Do you have any idea how to locate Nacho or
2  Martin?
3  A. I have no idea how to locate Nacho, and Martin,
4  I believe, is in town, but, I mean --
5  Q. Fair enough. Where did your mother live? Did
6  she have a house in Matamoros?
7  A. Lived with me.
8  Q. She lived with you? And how long did your
9  mother live with you?
10  A. All her life, all my life.
11  Q. Who is your father?
12  A. Pedro Reynoso.
13  Q. And is he deceased?
14  A. He died April 28th, 1972.
15  Q. What source of things did your mother use the
16  Grand Wagoneer and the Explorer for? What types of
17  uses did she make of the vehicle?
18  A. She did a lot of charity work in some of the
19  colonias in Matamoros, and she would go there twice a
20  week. She would go to her friend's house and then the
21  driver would go to the supermarket, run whatever
22  errands she needed to be run.
23  Q. Why was the decision made to replace the Grand
24  Wagoneer?
25  A. It was very old and was having a lot of

## Page 12

1  problems and was costing a lot of money to repair.
2  Q. You mentioned all the other people besides
3  yourself who were involved in looking at other vehicles
4  and selecting an Explorer for your mother, etc. Could
5  you please describe for me what involvement each of
6  those persons had in selecting the vehicle to the best
7  of your recollection?
8  A. Just that we went. They looked at the cars.
9  They said whether they liked it. I don't remember if
10  we drove any of them. I mean, it was just a matter of
11  them giving like an opinion, like when you go to a
12  dealership and you go with your family. Same type of
13  questions, same type of comments, I would say.
14  Q. In terms of the Explorer that was eventually
15  purchased, who besides yourself was involved in doing
16  the sorts of things and evaluating that vehicle?
17  A. Well, I'm sure everybody was involved. The
18  decision was mine, and ultimately I went with my
19  brother-in-law to the Ford dealership.
20  Q. What's your brother-in-law's name?
21  A. Ricardo Filizola.
22  Q. And he is married to your sister Stella?
23  A. He is deceased.
24  Q. When did he pass away?
25  A. July of 2004.

## Page 13

1  Q. In terms of evaluating which vehicle you are
2  going to purchase for your mother, did you look at any
3  sort of advertisements of any kind?
4  A. I did.
5  Q. Tell me about those.
6  A. Well, especially in selecting the Explorer, I
7  questioned both Luis Elizondo and my brother-in-law
8  because I had seen that they had stability problems,
9  apparently something with the center of gravity, and I
10  asked them about that. I specifically asked them about
11  getting an Expedition instead of the Explorer, and Luis
12  Elizondo's comment to me was that it was harder to get
13  the Expedition, much more expensive, and that his
14  daughter drove an Explorer and there was no reason to
15  be concerned, and that he could get the Explorer easier
16  than he could get the Expedition.
17  Q. Okay. Anything else that he told you about the
18  Explorer to alleviate your concerns?
19  A. Only that his daughter drove one and made a
20  comment concerning that if he was concerned about the
21  safety, he wouldn't let his daughter drive one.
22  Q. And you specifically questioned him about the
23  stability of the Explorer it sounds like.
24  A. I -- what I remember is being -- having asked
25  him about the stability. I had read or heard that if

**Page 14**

1 you turned the wheel, that there was some kind of --
2 not disability, but the center of gravity or something
3 with the center of gravity, that there was a problem
4 with the stability if you turned the wheel. That's
5 what I asked him about.
6 　Q. Okay. And in addition to telling you that his
7 daughter drove it, there were also availability
8 considerations, it sounds like, for the Expedition
9 versus the Explorer, correct?
10 　A. Well, he said he could get it faster.
11 　Q. And then the Expedition is more expensive as
12 well?
13 　A. He made a very strong point that it would be so
14 much more expensive.
15 　Q. Did he ever tell you anything specifically
16 about the stability concerns that you raised?
17 　A. Only that if he had a concern he wouldn't let
18 his daughter drive one.
19 　Q. Nothing more specific than that?
20 　A. Nothing more that I can remember. That's what
21 I remember.
22 　Q. You said you also questioned Ricardo about it
23 as well?
24 　A. I don't remember asking Ricardo. When we were
25 there and we were with Luis, I specifically -- I mean,

**Page 15**

1 I remember asking him because I had read it. I don't
2 remember that my brother-in-law made a comment one way
3 or another. I mean, I don't recall his having any
4 opinion on that at the time.
5 　Q. Fair enough. My original question, before we
6 start on this line, was about advertisements. I guess
7 were there any advertisements that you looked at in
8 terms of selecting the Explorer or evaluating the
9 Explorer?
10 　A. I can't tell you specifically. You know, I'm
11 on the Internet so much, that whether I saw it on the
12 Internet, whether I saw it on TV, whether I read it in
13 a newspaper or magazine, I can't tell you. I can tell
14 you that I went looking for specific properties of
15 cars. You know, I didn't do any research on the
16 Internet to print information or anything. It was just
17 whatever I picked up in either going to the Internet,
18 watching TV, talking to people, something like that.
19 　Q. The concerns that you had about stability, do
20 you recall how you -- how those concerns came to your
21 attention? Was it -- again, is it something that you
22 can't put your finger on right now, or can you point me
23 to a specific article or story or something that you
24 saw?
25 　A. I cannot. I can just tell you that I knew that

**Page 16**

1 like I know that Volvo advertises that they are the
2 safest car, and I can't tell you where I saw that,
3 where I read that. I can just tell you that I know
4 that as a general item of information.
5 　Q. Did anyone else, to your knowledge, conduct any
6 sort of Internet research or look at any articles or
7 anything like that in terms of selecting the Explorer,
8 any other family members who were involved?
9 　A. No.
10 　Q. Were you the person in your family primarily
11 responsible for evaluating the different choices in
12 selecting the car to be purchased?
13 　A. As I was going to pay for it, yes.
14 　Q. And did you, in fact, pay for this vehicle?
15 　A. I did.
16 　Q. So you and your brother-in-law Ricardo went to
17 the Ford dealership where the vehicle was purchased,
18 correct?
19 　A. Correct.
20 　Q. How many times did you actually visit that
21 dealership in the course of purchasing that vehicle?
22 　A. If I said somewhere between two and four, would
23 be my best recollection.
24 　Q. Tell me what you remember about the different
25 times that you visited in the course of purchasing that

**Page 17**

1 vehicle. What happened on each visit?
2 　A. You mean at the Ford dealership?
3 　Q. Yes, ma'am.
4 　A. I remember being in the back lot. I remember
5 looking at his daughter's car.
6 　Q. His daughter's Explorer?
7 　A. I believe that was the one in the back that he
8 showed me so that I could see the inside. He did not
9 have a new model for me to look at, so I was looking at
10 what he had in the back lot to get an idea of the
11 inside of the car. I remember being in his office. I
12 remember being in the service area. I remember being
13 in the back.
14 　Q. If I asked you to tell me on which of the
15 visits each of these things happened, would you be able
16 to do that?
17 　A. No.
18 　Q. So the vehicle that was ultimately purchased,
19 the 2000 Explorer, was not on the lot until the day
20 that you picked it up; is that fair?
21 　A. That is correct.
22 　Q. Were there any test drives that were taken of
23 an Explorer?
24 　A. None that I know of. None by me.
25 　Q. You said you wanted it to -- or you were able

Page 18

1  to look at another Explorer and kind of get a look at
2  the inside of the vehicle. What were the types of
3  needs that you had in terms of space availability or
4  features of the vehicle for your mother's use?
5      A. My mother wanted it to be a car that could hold
6  a lot of things. She carried clothes and milk to the
7  colonias that she worked with, so at Christmas they
8  would take toys and so it had to to be something that
9  could carry a lot of things, it had to have a good
10 cargo area, and she wanted it to have four doors.
11     Q. Was it also a requirement that the vehicle be
12 able to go off road? And by that I mean off paved
13 highway surface. I imagine some of the colonias don't
14 have paved roads. Was that a consideration at all?
15     A. She didn't want a car because when it rains,
16 you know, there can be mud that's hard. It is not
17 really off road. She was never going to go up and down
18 anything, but she might have gone somewhere where it
19 was wet, so having some kind of height in the car so
20 that it could go through the gravel roads or muddy
21 roads was a consideration.
22     Q. Any other features that were important to you
23 in selecting the vehicle for your mother's use besides
24 the height of the vehicle and the cargo space in the
25 vehicle?

Page 19

1      A. Not precisely. I did ask him about the
2  stability. I wanted it to be safe, but nothing else in
3  particular, no.
4      Q. All right. Did anyone else besides yourself
5  and Ricardo ever go to the Ford dealership in the
6  course of purchasing and selecting this vehicle?
7      A. Not that I remember.
8      Q. Did you and Ricardo and Mr. Elizondo ever have
9  any discussions about crashworthiness of the Explorer?
10 And by that I mean the functionality of the vehicle if
11 an accident were to happen and the vehicle were to
12 crash.
13     A. We did not.
14     Q. Same question as to the strength of the roof of
15 the Explorer.
16     A. Never discussed it.
17     Q. How about the strength of the windows or the
18 material that the windows were made of?
19     A. No.
20     Q. How about the seat belts or restraints in the
21 vehicle?
22     A. No.
23     Q. Air bags?
24     A. No.
25     Q. So it sounds like the only safety concern that

Page 20

1  was addressed by you, by Mr. Elizondo, by your
2  brother-in-law, to your knowledge, is the stability
3  issue that we have already talked about; is that
4  correct?
5      A. I don't know that my brother-in-law ever
6  considered it.
7      Q. Okay.
8      A. I asked Luis Elizondo about it when we were
9  talking about whether to get an Explorer or Expedition.
10     Q. Did that conversation with Luis Elizondo just
11 occur one time or is that something that you brought up
12 over the course of the several visits that you made to
13 the dealership?
14     A. Like I said, there weren't many visits, so I
15 cannot tell you if we discussed it on more than one
16 occasion.
17     Q. Tell me about any input that your mother had in
18 terms of selecting the Ford Explorer, deciding that was
19 the type vehicle that she wanted, etc. Any involvement
20 at all?
21     A. None.
22     Q. So essentially, she was aware that you were
23 going to purchase a new vehicle for her, and then one
24 day you brought it home, and that was her involvement;
25 is that right?

Page 21

1      A. We told her we were going to get a car. We
2  discussed whether to get a smaller car, and she said it
3  had to be something that could hold cargo, something
4  that, you know, she could haul things in, okay, and she
5  wanted it to be a four-door, and that was also a
6  concern.
7      Q. You mentioned that your sister, Betty Payan,
8  had some involvement in evaluating different vehicles
9  and selecting vehicles to be purchased. Did she have
10 any involvement at all in the purchase of this
11 particular vehicle that was purchased, the Explorer?
12     A. She did not. As I mentioned, only Ricardo and
13 I, that I can ever remember, went to the dealership.
14     Q. Do you recall Sally Payan's input into this
15 vehicle selection process?
16     A. I mean, only in terms that you're in a family
17 group and you say, "We are thinking of buying a car,
18 you know. Do you like green better than white, blue
19 better than red." I mean, it was a very general
20 conversation that "We are buying a car for your
21 grandmother," things like that.
22     Q. Same question as to Enrique?
23     A. It would be the same. In fact, I don't think
24 Enrique was even in town. He was already out of town.
25     Q. After the vehicle was purchased in the summer

**Page 22**

1  of 2000, did you do any further Internet research, come
2  across any articles, anything like that, about the Ford
3  Explorer?
4      A. No.
5      Q. Did anybody else in the family, to your
6  knowledge, do that?
7      A. No.
8      Q. Did you ever have any conversations with Ford
9  Motor Company, as opposed to the dealership, regarding
10  the Explorer prior to purchase of that vehicle?
11      A. Did not.
12      Q. How about after the purchase of the vehicle,
13  have you ever had any conversations with an employee or
14  representative of Ford Motor Company?
15      A. Did not.
16      Q. Ms. Reynoso, I have marked as Exhibit 1 to your
17  deposition a document that's been provided by
18  plaintiff's counsel, and I'm going to ask you to look
19  at that document and identify it for me, if you can.
20      A. I can't say that I have a perfect memory of an
21  invoice, but it is apparently an invoice of the car
22  that I bought for my mother.
23      Q. All right. And this invoice shows that the
24  vehicle was -- your mother was the listed purchaser of
25  the vehicle; is that correct?

**Page 23**

1      A. That is correct.
2      Q. Are there any -- you're fluent in both English
3  and Spanish, correct?
4      A. Yes.
5      Q. You read and write both and speak both?
6      A. I do.
7      Q. Looking at Exhibit 1, one of the claims that's
8  been brought in this case is that Ford breached
9  something called an express warranty, which is a
10  written promise, essentially. That's not a legal
11  definition, but what I'm looking for from you, is there
12  anything on this invoice that in your mind looks like
13  an express warranty or express promise of some kind?
14      A. No, it just describes the model of the car and,
15  you know, the different things that come with it.
16      Q. All right. Ms. Reynoso, I have marked as
17  Exhibit 2 to your deposition another document provided
18  by Plaintiff's counsel. Can you please tell me what
19  that is?
20      A. This is a document from Gobierno del Estado de
21  Tamaulipas. It is from the State of Tamaulipas. It is
22  a document from the State of Tamaulipas. I really
23  don't know if this is what they kept in the car to be
24  able to circulate. I wasn't involved in any -- getting
25  any of these documents, but it appears to be something

**Page 24**

1  from the State of Tamaulipas, so I assume it's either
2  the permit or the license plates, or you have to have
3  something called -- it's like a circulation card that
4  had to be in the car. I don't know if the one on the
5  right is that.
6      Q. Besides Exhibit No. 1, turning back to that,
7  were there any other documents that were provided to
8  you in writing by the dealership involving the purchase
9  of the vehicle?
10      A. I think they gave -- that there was a document.
11  There was some kind of a tax you had to pay. I can't
12  remember. I think it started with an R, the name of
13  the tax that you had to pay, and they gave you that
14  document because you had to keep it in the car. And
15  the owner's manual. Apart from that, I don't recall
16  anything else.
17      Q. All right. Let's talk about the owner's manual
18  briefly. It did come with a written owner's manual,
19  correct?
20      A. Yes.
21      Q. Did you ever read that owner's manual?
22      A. No.
23      Q. Did your mother ever read that owner's manual,
24  to your knowledge?
25      A. No.

**Page 25**

1      Q. Do you have any knowledge of anyone ever
2  reading that owner's manual?
3      A. Only to the extent that we looked in the back
4  to see when the maintenance had to be done.
5      Q. Because you wanted to follow the service
6  schedule on the vehicle?
7      A. Correct.
8      Q. Who was primarily responsible for service on
9  the vehicle, making sure that got done?
10      A. That was something the driver was supposed to
11  keep up with.
12      Q. So either Nacho or Martin?
13      A. Correct.
14      Q. And the owner's manual, I assume, was written
15  in Spanish, correct?
16      A. I would assume so. I don't know if it came in
17  Spanish and English. I don't know.
18      Q. Was the -- was the service recommendation
19  material part of the owner's manual or was that a
20  separate service booklet?
21      A. I'm sorry, I don't remember.
22      Q. Okay. Besides Mr. Elizondo at the dealership,
23  was there anybody else there that you dealt with in the
24  course of selecting and purchasing this Explorer?
25      A. Not that I recall, no.

**Page 26**

1  Q. Besides the conversation that you had with
2  Mr. Elizondo about your concerns with the stability of
3  the vehicle, did Mr. Elizondo make any other comments
4  to you about safety issues regarding the Explorer or
5  any kind or safety features of the Explorer?
6  A. No.
7  Q. Besides your mother, were there any other users
8  of the vehicle?
9  A. Well, occasionally if somebody needed a car
10  and, you know, they would borrow the car.
11  Q. During the time period of June 23, 2000, when
12  this vehicle was purchased, up until the time of the
13  accident, what other vehicles were available for use in
14  your family? By "your family," I mean anyone living in
15  the house with you and your mother.
16  A. Only mother and I lived there, and I had my own
17  car and she had her car.
18  Q. Anybody else live with you guys?
19  A. No.
20  Q. And what kind of car or cars have you had
21  during that period?
22  A. Well, I believe that at the time my car was a
23  Lincoln Town Car.
24  Q. And do you still have that car?
25  A. I do not.

**Page 27**

1  Q. What do you drive now?
2  A. A Volvo XC 90.
3  Q. Who are the other people besides your mother
4  who would occasionally use the vehicle? As you
5  described it, whenever someone needed a vehicle and
6  they might use it, who were the other people who might
7  do that?
8  A. My nieces, my nephews borrowed it. The car was
9  of Mexican registry, so if they were going to go beyond
10  the 22nd kilometer, you know, it was easier to use that
11  car because you didn't have to get a permit for it.
12  Q. And when you say nieces and nephews, who all
13  are we talking about here? Many people?
14  A. Three people.
15  Q. Who?
16  A. Ricardo Filizola, Betsy Filizola, Sally Payan.
17  Q. How about Enrique?
18  A. He wasn't living in town.
19  Q. You described the use of these other folks of
20  the vehicle as occasional. What do you mean by
21  occasional exactly? How often would they be using the
22  vehicle say on a monthly basis?
23  A. I'm sure months went by when nobody used it. I
24  mean, it was very occasional.
25  Q. If I asked you to put a number on the number of

**Page 28**

1  times that Sally Payan borrowed that vehicle for use,
2  would you be able to do that?
3  A. I would not. It would be a wild guess whatever
4  I told you.
5  Q. All right. I don't want you to guess. How
6  about your sister, Betty Payan, would she ever use that
7  vehicle?
8  A. Very rarely. Everyone worked, everybody had
9  their own car.
10  Q. Including Betty?
11  A. Yes.
12  Q. And if I asked you the number of times that
13  Betty Payan borrowed that vehicle during -- between the
14  time you purchased it and the time of the accident,
15  would you be able to do that?
16  A. I could not.
17  Q. We know of at least one, and that's the time of
18  the accident, correct?
19  A. Yes.
20  Q. Do you know if there were others?
21  A. You know, I'm -- I would feel sure that she
22  used it at some point. I could never -- one day her
23  car was in the shop and she used it. It would have
24  been during the week. Like I said, everybody worked,
25  had their own car, and my mother used the car with her

**Page 29**

1  driver practically every day of the week. So I can't
2  be more precise than that. I would have no idea how
3  many times, but I'm sure that she probably had driven
4  it once or twice before, maybe more.
5  Q. Did your sister, Betty Payan, have any
6  experience in driving sport utility vehicles, trucks,
7  anything like that?
8  A. Well, she had a variety of cars herself. She
9  had a van. I had had an SUV for a long time, the Grand
10  Wagoneer. My other sister had a Suburban. I think her
11  husband at one time had a pickup, so I would assume --
12  how much she had driven particularly an SUV, I couldn't
13  say, but I'm sure she had driven one before.
14  Q. Ms. Reynoso, I have been provided by
15  Plaintiff's counsel the service records on the vehicle,
16  so I just want to introduce those as exhibits and go
17  through them briefly with you, and then you can tell me
18  how the vehicle was serviced from the time it was
19  purchased up until the accident, okay?
20  A. Yes.
21  Q. I have marked as Exhibit No. 3 a two-page
22  service record. Can you please take a look at that and
23  tell me the date of the service and generally what was
24  done to the vehicle based on your reading of it?
25  A. Well, I would assume that this is November 2nd

**Page 30**

1  of 2000 because it's a Mexican date. Although it shows
2  up as 2-11-00, it's November 2nd, and it says something
3  to do with the oil. I would assume that they changed
4  the filter and the oil.
5      Q. Okay. And take a look at the second page, too,
6  and see if page 2 is consistent with that.
7      A. They are from the same date, November 2nd, and
8  it says something about the floor and then change of
9  oil and I guess change of filter. And that's it.
10     Q. All right. And I -- in fairness, I want to
11 make Exhibit No. 3 three pages, and just take a look at
12 the third page. This "Caja General," what does that
13 mean?
14     A. I really don't know. I would -- if you had
15 shown me this without having to do with the Explorer, I
16 would say -- the back part of a pickup is called that,
17 so I really don't know what -- caja general, I don't
18 know what they did.
19     Q. Okay. Ms. Reynoso, I have marked as Exhibit
20 No. 4 another service record, and I've put these in,
21 hopefully, chronological order. But tell me the date
22 of service there and, also, generally what was done
23 based on your reading of that invoice.
24     A. February 6 of 2001, they rotated the tires,
25 they cleaned and adjusted the brakes and then service

**Page 31**

1  to change the oil. And then I guess the other things
2  are just the supplies, the filter, a bottle of oil, a
3  "garraf" of oil. That's what it looks like.
4      Q. And all these service records that I am showing
5  you, it sounds like these would have, I guess, been
6  collected by Martin or by Nacho, correct, not by you?
7      A. They would have taken it to be serviced, and
8  then they would have left them with my mother, and, you
9  know, we had a file just to keep the service records
10 there to make sure that we didn't lose the warranty on
11 the car. That was the purpose of keeping up the
12 service.
13     Q. But you weren't actually going to the
14 Automotriz del Noreste to have the vehicle serviced.
15 These were the drivers?
16     A. Absolutely.
17     Q. All right. Ms. Reynoso, I have marked as
18 Exhibit No. 5 chronologically the next service on the
19 vehicle. It looks like April 24th, 2001.
20     A. That is correct.
21     Q. What was done to the vehicle based on your
22 reading of that?
23     A. Well, I don't understand what "Seguro de Piso"
24 means. I have no idea what that is. It says clean and
25 adjust in Spanish, but that's that it says, clean and

**Page 32**

1  adjust.
2      Q. Can you tell from that what they cleaned and
3  adjusted?
4      A. I cannot.
5      Q. Ms. Reynoso, I have marked as Exhibit No. 6
6  another service record. It looks like it was dated
7  November 27, 2001; is that right?
8      A. Yes, that's correct.
9      Q. What was done with the vehicle on that service
10 as best you can tell?
11     A. Clean and adjust the breaks, service to change
12 the oil, and rotated the tires.
13     Q. In going through these records, we have now
14 come across two times when the breaks were cleaned and
15 adjusted. Was the vehicle having any kind of brake
16 problems, to your knowledge, or was this sort of
17 standard maintenance on the vehicle?
18     A. I would assume it was standard maintenance
19 because he would take it in when it was time to get the
20 oil changed, and the driver would not have had the
21 knowledge to say check anything. So whatever they were
22 doing at Ford is what got done.
23     Q. All right. But was the vehicle having any sort
24 of brake problems, to your knowledge, at any time?
25     A. I don't recall any problems.

**Page 33**

1      Q. Any problems of any kind?
2      A. I don't remember any problems of any kind.
3      Q. Exhibit No. 7 is dated the 9th of January,
4  2002. Can you tell from that what was done to the
5  vehicle at that time?
6      A. They, I think, replaced I guess inside of
7  the -- the locks, the automatic locks, something to do
8  with the locks, adjust the door -- I think the right
9  door. Adjusted -- I don't know if this is the seat
10 belt or -- no, adjust the door lock, "Seguro puerta
11 delanter." So that's the -- the little box, whatever
12 makes the automatic lock go up and down.
13     Q. Okay.
14     A. And then "remaches," I don't know what those
15 are. I don't know what those are.
16     Q. Okay. Is there anything about seat belts on
17 that invoice?
18     A. No.
19     Q. All right. And I -- I accidently did not clip
20 the back page to this. Take a look at page 2 to
21 Exhibit 7. I think it is just the same thing.
22     A. Yes, they seem to give two invoices every time.
23     Q. All right. Ms. Reynoso, Exhibit No. 8 is from
24 the 11th of July, 2002. Can you tell me, based on your
25 reading of that, what was done to the vehicle?

Page 34

1    A. They put a grille, whatever you call that, that
2  black grille that goes in the front.
3    Q. Right. Is that "Tumba burros" --
4    A. Yes, it's that big black grille that was in the
5  front.
6    Q. Do you know why that was put on?
7    A. For looks.
8    Q. Besides the service records that we have just
9  looked at and introduced as exhibits to your
10  deposition, are you aware of any other service that was
11  ever done to that vehicle at any time?
12    A. No, I'm not.
13    Q. To your knowledge, were the seat belts in the
14  vehicle ever repaired, changed, modified in any way
15  during the time that the vehicle was owned?
16    A. Not to my knowledge.
17    Q. It looks like from these service records all of
18  the service of the vehicle was performed at the
19  dealership where it was purchased. Was there any other
20  place that serviced this vehicle during the time that
21  your mother owned it, to your knowledge?
22    A. Not to my knowledge. Like I said, the purpose
23  of the service was to keep up the warranty.
24    Q. Did Nacho or Martin ever perform any service on
25  the vehicle themselves?

Page 35

1    A. No.
2    Q. Before the accident that's the subject of the
3  lawsuit, was this Explorer ever involved in any other
4  accidents?
5    A. Yes.
6    Q. Tell me about that.
7    A. The driver -- and that was Nacho, so I guess he
8  did drive the car -- I guess it was -- he was parked
9  and it was side-swiped. They hit the door.
10    Q. So minor body damage?
11    A. Right.
12    Q. Any other accidents?
13    A. No.
14    Q. Did Nacho or Martin ever communicate to your
15  mother or to you or to anybody, to your knowledge, any
16  problems they were having with the vehicle, any
17  concerns they had with the vehicle, anything like that?
18    A. They did not tell my mother and I, and they
19  would have never told anyone else.
20    Q. The other people who occasionally used the
21  vehicle, did any of those people ever tell you or tell
22  your mother, to your knowledge, any concerns, problems,
23  difficulties they were having with the vehicle of any
24  kind?
25    A. I don't remember anybody mentioning anything.

Page 36

1    Q. During the times that you occasionally drove
2  the vehicle, did you ever have any problems with it,
3  the way it was handling, the way it was riding?
4    A. I drove it very little, maybe twice, to go to
5  my sister's house, so it would have been a five-minute
6  drive, ten-minute drive at the most.
7    Q. Ms. Reynoso, I want to talk just a little bit
8  about the accident and subsequent events, and then I'll
9  get you out of here. The accident happened on January
10  11, 2003. How did you learn about it?
11    A. My sister Stella called me and told me that
12  Betty had had an accident.
13    Q. And this was on the same day as the accident?
14    A. It was same day as the accident.
15    Q. And what did you do?
16    A. I went over to her house, and she and my
17  brother-in-law and myself left to go drive towards the
18  accident site.
19    Q. And did you arrive -- did you go to the
20  accident site?
21    A. We did not. We spoke with Sally -- or Sally
22  had spoken to someone. I really don't remember, but we
23  ended up going straight to McAllen to wait for the
24  ambulance that was bringing her there.
25    Q. And what time did the ambulance arrive with

Page 37

1  your sister?
2    A. At night. I couldn't tell you what time it
3  was.
4    Q. Was Sally also with your sister?
5    A. Yes, she was.
6    Q. Was Sally injured in the accident?
7    A. They examined her. She didn't have -- I don't
8  know if she even had a bruise. I don't think she even
9  had a bruise.
10    Q. I have had a chance to look at all the medical
11  records, post-accident, leading up to your sister's
12  death. How much -- how much time or how many days did
13  you spend with her in the course of her treatment
14  leading up to her death?
15    A. Well, I was always in Harlingen. I never left
16  the hospital the days that she was in the hospital.
17  When she got air ambulanced to Houston, my sister went
18  with her, and I think I didn't go until the next day
19  when Stella called me that she had gotten bad. During
20  the time that she was at Hermann Memorial, I probably
21  came back home two or three times for a couple of days
22  because, supposedly, she had been stabilized and then
23  something would go wrong, so I would go back up.
24    Q. Otherwise, except for those trips back home for
25  a few days, you were there at Hermann Memorial?

**Page 38**

1  A. Yes, I was.
2  Q. Since the death of their mother, have you
3  noticed any sort of personality, mood, emotional
4  changes in Betty or Enrique -- I'm sorry -- in Sally or
5  Enrique?
6  A. I mean, that's obviously a very troubled
7  question. Not that they've had a personality change.
8  Are we all saddened beyond belief, yes.
9  Q. Right. And that was a general question, hoping
10  to draw out some specifics that we could talk about.
11  But, obviously, when something like this happens,
12  it's -- there's a great deal of sadness involved. I'm
13  looking for anything more specific than that. Is there
14  any sort of specific changes that you can tell me about
15  in terms of personality changes, anything like that?
16  A. No.
17  Q. Did your sister have a good relationship with
18  her children?
19  A. The best.
20  Q. Tell me a little bit about that. What do you
21  mean by the best?
22  A. She was the best mother. They had a wonderful
23  relationship. They talked every day. She knew
24  everything about them. She knew every aspect of their
25  lives. She helped them in every aspect of their life.

**Page 39**

1         MR. MENNUCCI: All right. I don't think
2  of any more questions for you. I appreciate your time
3  today. Thank you.
4         (Deposition concluded)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 40**

ERRATA SHEET/SIGNATURE PAGE

PAGE LINE CHANGE          REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I, SUSANA REYNOSO, have read the foregoing
transcript and hereby affix my signature that same is
true and correct, except as noted above.

_____
SUSANA REYNOSO

THE STATE OF TEXAS
COUNTY OF CAMERON
     SUBSCRIBED AND SWORN TO BEFORE ME, the
undersigned authority on this the _____ day of
_____, 2005.

_____
Notary Public in and for
The State of Texas

**Page 41**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ISABEL ENNIS REYNOSO,  )(
SALLY PAYAN, AND ENRIQUE )(
ROBERTO PAYAN          )(
     Plaintiffs       )(
                      )( CIVIL ACTION NO. B-03-120
VS.                   )(
                      )(
                      )(
FORD MOTOR COMPANY     )(

REPORTER'S CERTIFICATE TO THE
ORAL DEPOSITION OF
SUSANA REYNOSO
JUNE 10, 2005

     I, PEGGY BRYANT, Certified Court Reporter,
certify that the witness, SUSANA REYNOSO, was duly
sworn by me, and that the deposition is a true and
correct record of the testimony given on June 10,
2005; that the deposition was reported by me in
stenograph and was subsequently transcribed under
my supervision.
     I FURTHER CERTIFY that I am not a
relative, employee, attorney or counsel of any of the
parties, nor a relative or employee of such attorney or
counsel, nor am I financially interested in the action.
     WITNESS MY HAND on this the _____
day of _____, 2005.

_____
PEGGY BRYANT, CSR NO. 1208
Expiration Date: 12/31/06
Bryant & Stingley, Inc.
Firm Registration No. 41
2010 East Harrison
Harlingen, Texas 78550
1-956-428-0755

**BRYANT & STINGLEY, INC.**
McAllen (956)618-2366    Harlingen (956)428-0755    Brownsville (956)542-1020

Page 42