## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ISABEL ENNIS REYNOSO, SALLY PAYAN, )
and ENRIQUE ROBERTO PAYAN, )
)
Plaintiffs, )
)
-vs- ) Civil Action
) No. B-03-120
FORD MOTOR COMPANY, )
)
Defendant. )
_____)

Tempe, Arizona
May 9, 2005
10:00 a.m.

DEPOSITION OF GERALD ROSENBLUTH

REPORTED BY:
CATHY E. HOFF, RPR, CSR, CCR
Certified Court Reporter        (COPY)
CCR No. 50101
                HOLIDAY & ASSOCIATES
             Registered Professional Reporters
             2025 North Third Street, Suite B-173
                    Phoenix, Arizona 85004
                (602) 712-9700  Fax (602) 712-9701
PREPARED FOR:
ASCII/CONDENSED

## Page 2

INDEX

EXAMINATION                                       PAGE
Examination by Mr. Petersen ................... 4

EXHIBIT  DESCRIPTION                              PAGE

1  Defendant Ford Motor Company's Second ..... 5
   Amended Notice of Intention to Take
   Oral Deposition of Gerald Rosenbluth
   with Duces Tecum
2  Case file summary ......................... 6
3  Curriculum Vitae package .................. 6
4  Billing records ........................... 21
5  Correspondence ............................ 9
6  Automotive Consulting Services, Inc., ..... 9
   case file index dated 05/06/05
7  Case Intake Data Sheet .................... 13
8  Evidence retention records ................ 21
9  Technical Data Supplementation ............ 29
10 CD of exemplar models ..................... 29
11 October 26, 2004 subject vehicle and ...... 30
   seat belt examination photos
12 April 24, 2004 subject vehicle ............ 30
   examination photos
13 SAFE report ............................... 30
14 Surrogate analysis testing ................ 36
15 Pretensioner Seat Belt Case Recommended ... 10
   Activities

## Page 3

1    DEPOSITION OF GERALD ROSENBLUTH,
2  taken at 10:31 a.m. on May 9, 2005, at the offices of
3  Gerald Rosenbluth, 4747 South Lakeshore Drive, Suite
4  101, Tempe, Arizona, before CATHY E. HOFF, a Certified
5  Court Reporter in and for the County of Maricopa, State
6  of Arizona.
7
8
9  APPEARANCES:
10    For the Plaintiffs:
11       Martinez, Barbera & Martinez, L.L.P.
         by TONY MARTINEZ, ESQ.
12       1201 East Van Buren
         Brownsville, Texas 78520
13
14    For the Defendant Ford Motor Company:
15       Snell & Wilmer, L.L.P.
         by BRAD PETERSEN, ESQ.
16       One Arizona Center
         400 East Van Buren
17       Phoenix, Arizona 85004

## Page 4

1         (Exhibits 1 through 14 were marked for
2  identification.)
3
4             GERALD ROSENBLUTH,
5  a witness herein, having been first duly sworn by a
6  Certified Court Reporter, was examined and testified as
7  follows:
8
9              EXAMINATION
10 BY MR. PETERSEN:
11   Q.  Could you give your name and occupation,
12 please, sir.
13   A.  **Gerald Rosenbluth, president of Automotive**
14 **Consulting Services, Incorporated.**
15   Q.  You've agreed to be an expert for the
16 plaintiffs in this case?
17   A.  **Yes, sir.**
18   Q.  And the subject area in which you'll be
19 testifying is with regards to seat belts; is that fair?
20   A.  **Seat belt effectiveness and alternative**
21 **designs to increase seat belt effectiveness.**
22   Q.  You've rendered an opinion in this case that
23 you believe the seat belt design of the 2004 Explorer
24 is defective and unreasonably dangerous on the driver's
25 side position, fair?

**Page 9**

1 totaling up the time. You can either go off of the
2 original case time log or you can go off the billing
3 records.
4    Q. Exhibit No. 5, what's that?
5    A. Attorney correspondence.
6    Q. Does that include all of the correspondence
7 by and between you and plaintiffs' counsel's firm in
8 this case?
9    A. Yes, it does.
10   Q. Would it also include any correspondence
11 between you and other experts and --
12   A. Yes.
13   Q. -- testing facilities?
14      Does that also include e-mail correspondence?
15   A. Yes, it does.
16   Q. I assume that if there's been any sort of
17 written correspondence whatsoever, that you have it in
18 that section which we've marked as Exhibit 5?
19   A. Correct.
20   Q. Exhibit 6, can you identify that, please?
21   A. That would be the Automotive Consulting
22 Services, Inc., case file index dated 05/06 of '05
23   Q. That would include a listing of all the
24 documents that you reviewed for purposes of preparing
25 your opinions in this case?

**Page 10**

1    A. A, that is correct. B, that is also the
2 basis for the case file summary --
3    Q. So --
4    A. -- which is Exhibit 2.
5    Q. -- Exhibit 2, your case file summary, expands
6 on the documents in here, and, in fact, summarizes to a
7 greater or lesser extent those documents which you felt
8 were important and you relied upon for your opinions,
9 fair?
10   A. For the most part. I don't want to say that
11 there would be a document I wouldn't rely upon. It
12 depends on the question. But for the most part, yes.
13   Q. There's a document in here that's listed
14 Pretensioner Seat Belt Case Recommended Activities.
15 We're up to Exhibit 15. I'm going to mark that since
16 we're here.
17      (Exhibit 15 was marked for identification.)
18      MR. MARTINEZ: Did you jump from 6 to 15?
19      MR. PETERSEN: I did, because we marked them
20 in advance of the deposition. 15 just happens to be
21 the next one.
22   Q. BY MR. PETERSEN: This is a document that you
23 prepared?
24   A. Yes.
25   Q. Sometimes I've seen this in your report. You

**Page 11**

1 didn't put this in your report in this case, though; is
2 that right?
3    A. No, it's not part of the report.
4    Q. Have you provided this to plaintiffs' counsel
5 at some point during this case?
6    A. Yes.
7    Q. How far through this and what items have you
8 followed up on or has plaintiffs' counsel followed up
9 on for you and which items are still left open?
10   A. Most of the discovery is left open. Things
11 like, one, accident reconstruction analysis, that's
12 been done. Biomechanical engineering analysis is No.
13 2, that's been done. The occupant kinematic analysis,
14 No. 3, that's been done. No. 4,
15 metallurgical/materials structural analysis, that's
16 been done. That addresses the roof collapse issues.
17 The surrogate occupant analysis is No. 5, that's been
18 done.
19      So you kind of run down through it. The part
20 that probably hasn't been done to any significant
21 degree would be the discovery down here someplace.
22   Q. No. 12, discovery/interrogatories?
23   A. No. 12.
24   Q. In kind of looking through all the items that
25 you have here in your file in advance of the

**Page 12**

1 deposition, I didn't see any Ford documents.
2      You haven't reviewed any Ford documents for
3 purposes of your opinions in this case; is that fair?
4    A. Therein lies the issue.
5    Q. It is fair that you haven't reviewed any Ford
6 documents for purposes of your opinions in this case?
7    A. I haven't reviewed any Ford documents that
8 have been produced in this case for this case, because
9 they have not been produced. Ford is slacking.
10   Q. Is that something you asked for, or
11 plaintiffs' counsel?
12   A. I provided Exhibit 15 to plaintiffs' counsel
13 or his representatives at the time of the first vehicle
14 inspection, which would have been 4/24 of '04.
15   Q. Having not reviewed any Ford documents for
16 purposes of this case, are you able to give your final
17 opinions at deposition here today?
18   A. For the most part. I mean, I've seen
19 multiple documents in other cases, things of that
20 nature. For instance, a question: Did Ford have the
21 available technology in 2000 to put an integrated seat
22 belt in the subject vehicle, and the answer is
23 obviously yes, it was already designed. They had a
24 pretension seat belt. They also had an integrated seat
25 belt which was pretension, which would have gone right

**Page 17**

1  this vehicle --
2  A. Correct.
3  Q. -- whether it should have had a rollover
4  sensor or whether it should have an electronic
5  stability control system?
6  A. The portion of the electronic stability
7  control that would prevent the rollover or reduce or
8  minimize or eliminate the propensity of a rollover
9  event would be part and parcel a function of accident
10 reconstruction.
11      The portion of the stability control system
12 that would address whether a vehicle is addressing an
13 impending rollover event would then signal the roll
14 sensor, A, there's a potential problem, such as the
15 Mercedes Pre-Safe system in where it senses an
16 impending rollover or accident event. In that sensing,
17 it pre-pretensions the seat belt, among other things.
18 It moves the seat back, it moves the steering wheel
19 forward, and, in addition, it moves the headrests up.
20 In addition, it moves the front bumper forward several
21 inches.
22 Q. In what model year was the Pre-Safe system
23 being used for the Mercedes?
24 A. Pre-Safe came in about -- I believe it's
25 around 2001, something like that. I'd say the early

**Page 18**

1  2000s.
2  Q. What I'm trying to draw the distinction is is
3  just figuring out where this electric stability control
4  system fits into your opinions and just make sure that
5  I understand.
6      Now, as far as the electronic stability
7  control system, the only part that you would look to
8  and perhaps testify about at trial is the extent to
9  which that system could be used to deploy a
10 pretensioner, for instance; is that fair?
11 A. Correct.
12 Q. As to whether an electronic stability control
13 system that was available in model year 2000 that would
14 have prevented the accident from ever happening, you
15 would defer to an accident reconstruction or handling
16 stability expert on that; is that fair?
17 A. Precisely.
18 Q. And you won't be testifying as a handling
19 stability expert in this case, fair?
20 A. Correct. That's a function of accident
21 reconstruction.
22 Q. Okay. I know I'm not going in numerical
23 order here, but I am going in order of your file. So
24 I'm going to hit Exhibit 16, which I believe is the
25 next number.

**Page 19**

1  Exhibit 16, is that your section of the file
2  that has all of your deposition summaries?
3  A. Yes.
4  Q. And those are summaries that your office
5  prepared of the depositions that you were provided in
6  this case; is that right?
7  A. That's correct.
8  Q. It looks like you have Steve Irwin, Dean
9  Jacobson and Enrique Payan, Sally Payan, Don Tandy and
10 Ed Paddock?
11 A. Correct.
12 Q. And Robert Piziali?
13 A. Correct.
14 Q. And Ron Huston?
15 A. Correct.
16 Q. Those are all the depositions that you were
17 provided in this case?
18 A. Correct.
19 Q. Have you spoken with any of these
20 individuals?
21 A. There should be eight depositions.
22 Q. As listed on page 13 of your case summary?
23 A. Yes, sir.
24 Q. Have you spoken with any of these individuals
25 personally about this case?

**Page 20**

1  A. Yes.
2  Q. Who have you spoken with?
3  A. Ron Huston.
4  Q. Anyone else?
5  A. Dean Jacobson.
6  Q. Anyone else?
7  A. No.
8  Q. In your conversations with Mr. Huston or
9  Dr. Jacobson, did you gain any additional information
10 that wasn't presented that you reviewed in their
11 depositions?
12 A. My conversations with Dr. Huston and
13 Dr. Jacobson, we shared basically facts of the case as
14 we understood them.
15 Q. You didn't learn anything more about their
16 opinions or what they thought about this case in your
17 discussions that wasn't presented in their depositions;
18 is that fair?
19 A. I probably did, but I don't remember
20 specifically from each person in one specific
21 conversation I may have had four or five months ago.
22 Q. How many times did you talk to Ron Huston
23 about this case?
24 A. Probably two or three.
25 Q. Have you spoken with him since his

**Page 25**

1  seat of the '71 Corvette, but mounted on the B-pillar.
2  So that the seat is not necessarily
3  experiencing load. The load on the seat belt is at the
4  pillar, and that was my differential point between the
5  Ford seat and the Corvette seat.
6  Q. Is there a seat and seat belt design that you
7  have fully evaluated that you can point to and say that
8  is a reasonably safe and non-defective seat and seat
9  belt design under all accident sequences and scenarios?
10  A. If we look at the best design, the most
11  efficient and effective design is a pretension
12  integrated seat belt design. And we can use as the,
13  quote-unquote, "go to," the Ford 2000 model year design
14  which was produced in September of '99, which is the X
15  cab pickup truck.
16  Q. You feel like you fully evaluated that 2000
17  design and feel it is reasonably safe and not defective
18  for all accident scenarios, true?
19  A. You put the word "all" in there, and I'm sure
20  there's going to be accident scenarios where the
21  occupant's still going to be injured.
22  Q. You can't prevent every injury in all
23  accidents, fair?
24  A. Yes.
25  Q. And what we're asking here is whether there's

**Page 26**

1  a reasonably safe design, not a foolproof design.
2  My question to you, Mr. Rosenbluth, is as a
3  technical specialist looking at seat belts and seats,
4  have you fully evaluated the Ford F-150 design with its
5  integration and pretensioners and decided and
6  determined, in your opinion, that is a reasonably safe
7  design under all the different accident scenarios,
8  rollovers, side impacts, angular impacts, frontals,
9  rears?
10  A. Now, that's a good question, and the answer
11  is yes.
12  Q. And what is your determination? It is
13  reasonably safe?
14  A. Yes.
15  Q. I'm flipping through your file here, and it
16  looks like there's a 2000 advertising pamphlet. Is
17  there anything that you'd be relying upon for your
18  opinions in this case in that section?
19  A. Other than the 2000 Ford Explorer, as
20  represented as a reasonably safe vehicle, I would take
21  issue with that because I don't believe it really meets
22  an ordinary consumer expectation. And one of the
23  reasons it doesn't meet an ordinary consumer
24  expectation is the consumer has a right, based on the
25  materials supplied by Ford, Ford testing, Ford

**Page 27**

1  representations in media representations, things of
2  that nature, that it is reasonably safe when it's not,
3  and it could be made reasonably safe.
4  Just do two things to make it safe:
5  Pretension the seat belt in a rollover accident, and
6  make the roof so it doesn't collapse. If Ford had done
7  those two things, you and I would not be sitting here
8  today.
9  Q. I just want to go back to my original
10  question. We've got 2004 Ford Explorer promotional
11  literature. And there's something in here that you
12  take issue with, and that is somehow Ford portrays this
13  vehicle as reasonably safe?
14  A. Generally, yes.
15  Q. The reason I ask is there's a couple of tags
16  in here. You put little blue tabs on your stuff?
17  A. They'll be highlighted. A lot of that is
18  promotional.
19  Q. And that's the distinction I want to try and
20  draw here, because I don't want to talk about all this
21  promotional literature if all you're doing is using it
22  to say, "Well, you know, it's got four seats and four
23  seat belts," and that sort of thing, or whether there's
24  something that you really are relying upon.
25  Is there something in here that you're

**Page 28**

1  relying upon for your opinions?
2  A. No. It's really foundational material. It
3  isn't like they offer a pretensioner seat belt that's
4  integrated as an option.
5  Q. One of the tabs and the highlights you have
6  here regards glass, and I think you've got a line in
7  your report that's within Exhibit No. 2 on glass as
8  well.
9  Are you going to offer any opinions in this
10  case about glass or glazing?
11  A. I'm not going to offer opinions about glass
12  or glazing in this matter.
13  Q. The next tab we have in here is the 2000
14  model year Explorer owner's guide. You have a number
15  of tabs in here, but my question is much simpler than
16  that.
17  Is there anything in there that you're
18  relying upon for your opinions in this case as opposed
19  to something that just provides you with some
20  background information?
21  A. It's background information.
22  Q. Thank you.
23  You've got the workshop -- at least the cover
24  and back page of the workshop owner's manual, and a
25  couple of different selections in here.

**Page 33**

1  sounds -- that opinion sounds an awful lot like a roof
2  or an injury causation opinion as opposed to what I
3  thought I heard you say earlier about the seat belt.
4      Do you understand my confusion?
5  A.  Yes. And, you know, there's a gray area,
6  there's an intertwining, and I think I said earlier you
7  have to do really two things to reduce, minimize or
8  eliminate a potential injury mechanism in a rollover
9  event.
10     And the two things are, keep the occupant as
11 far down in the seat as possible and keep the roof from
12 intruding into the occupant survival zone. Those two
13 things. And, obviously, keep the occupant from
14 experiencing a partial ejection.
15 Q.  Another question for you on that subject, in
16 your report, Exhibit 2, you discuss Ms. Payan being
17 partially ejected out of the driver's side door.
18     Do you recall that in your report?
19 A.  Yes.
20 Q.  Dr. Huston testified that it's his opinion
21 that Ms. Payan did not experience her injury outside
22 the vehicle, but rather inside the vehicle with her
23 head against the roof.
24     Do you understand that?
25 A.  Well, and I think I probably at that point

**Page 34**

1  agree with Dr. Piziali in that it's likely that the
2  injury on the right side happened during the partial
3  ejection event, but that was not the catastrophic
4  injury, because I don't know of anything inside where
5  she would have gotten that right side injury, although
6  I'm not saying in this case the partial ejection would
7  have been catastrophic as it has been in other
8  instances that we have investigated.
9  Q.  Let me make sure I understand that. The
10 point that you were making in your report is that there
11 was some evidence that Ms. Payan was partially ejected
12 out of her driver's side window?
13 A.  But that was not the cause of the
14 catastrophic injury, and then we agree.
15 Q.  You don't draw that distinction within your
16 report that's in Exhibit 2, though; is that fair?
17 A.  Well, you're seeing two injuries which
18 happened through different mechanisms. I mean, one
19 you're seeing a C6-7 subluxation, so you know you have
20 the chin down into the chest, and that clearly is a
21 roof crush injury as opposed to a diving injury. I'll
22 let that go.
23     And then you're seeing an injury to the right
24 side of the head, which is consistent with at least a
25 partial ejection, but not a partial ejection in the

**Page 35**

1  sense that you and I have talked about before.
2  Q.  Have you formed an opinion about when during
3  the accident these two separate injuries occurred?
4      First of all, have you formed an opinion
5  about when the paralysis causing subluxation injury
6  occurred during this accident?
7  A.  Probably during the second roll at the 135 to
8  180 degree region, because this sort of -- it rolls on
9  road, goes partially off and back on, and ends up
10 perpendicular or laterally in the roadway.
11 Q.  Now, Ms. Payan's second injury to the right
12 side of her head from being partially ejected, have you
13 formed an opinion about when during the rollover
14 accident that occurred?
15 A.  I didn't differentiate, nor did I analyze at
16 what degree of roll which injury mechanism took place,
17 but I think more likely than not it had to be during
18 the second roll. It wasn't during the first, it was
19 during the second. And if there was a third -- nobody
20 is really sure if there's two-and-a-half or
21 three-and-a-half rolls. So I can't really tell you,
22 although I can tell you it wouldn't be in the first
23 roll because there probably wasn't ground contact.
24 Q.  The window probably would have also prevented
25 her from getting out during the first roll?

**Page 36**

1  A.  Pardon?
2  Q.  The window probably would have also prevented
3  her from getting out during the first roll?
4  A.  During the first roll, yes.
5  Q.  So to the extent --
6  A.  Agreed.
7  Q.  So we've got at least two injuries to the
8  head, and you think that it's likely that both of those
9  occurred during the second roll, or if there was a
10 third roll, then partial ejection could have happened
11 during that roll; is that a fair summary?
12 A.  Correct. During the 180 point in the second.
13 Or if there was a third roll, more likely the third
14 roll.
15 Q.  All right. Exhibit 14, can you identify that
16 for me? It's a packet of materials that I got in
17 advance of your deposition.
18 A.  Yes.
19 Q.  What is Exhibit 14?
20 A.  What is it? It would be the surrogate
21 analysis testing performed by myself on 11/29 of '04,
22 and it would be copies of photographs, 219 photographs
23 taken 11/29 of '04 of the exemplar vehicle/surrogate
24 analysis. That completes what is incorporated in
25 Exhibit 14.

```
 1  produced in the Pollesche matter, and that's not what
 2  I'm seeing at all. And we've never really discussed
 3  all that, by the way. I was ready for that.
 4     Q. Mr. Rosenbluth, you, of course, know that my
 5  job here is to ask you questions and your job is to
 6  answer those questions to the extent that you can. If
 7  there's --
 8     A. For the most part.
 9     Q. If there's a question that I ask and you
10  don't understand it, please let me know, and I'll try
11  to rephrase it or ask it a different way to see if we
12  can come to a common understanding.
13     A. Correct.
14     Q. My question was exactly as I asked, and that
15  is, would it change your opinion if, in fact, there was
16  a test like that 208 integrated with a pretension
17  rollover sensor, all the good stuff, high HIC values,
18  in the serious injury-causing range, would that change
19  your opinion?
20     A. If the test was a valid test. But if we look
21  at the Volvo stress testing with the triple rollover,
22  you're going to find, A, there's no roof crush, B,
23  there's no glass fracture, and C, the dummies don't
24  even hit the roof.
25        If you want to go back in time -- and we're
                                              Page 41
```

```
 1  really talking more about roof crush than anything
 2  else. Now, if we look at a rollover -- no, this is all
 3  pertinent. If we look at a rollover, for instance, in
 4  the '34 Chrysler Airflow -- there is a rollover. Aside
 5  from the spit test, there's a rollover test. I think I
 6  showed that to you before.
 7        You'll find that back in 1934 they used live
 8  occupants in the test. I was trying to avoid the word
 9  "live dummies," but ...
10        And in the rollover test with a lap belt
11  only, there was no injury to the driver. As well, the
12  1961 Comet testing would come into play to address that
13  same question. And there was a rollover test done by
14  Ford Motor Company, as a matter of fact, that
15  demonstrates the -- with a well-cinched lap belt, the
16  dummies had minimum, if any, contact with the roof.
17        And that would be relying, then, on the
18  Chrysler testing, the '61 Comet testing, as well as the
19  Volvo testing. So we have 1934, 1961 and 2002 to
20  establish that if you have an adequate seat belt and a
21  non-collapsing roof, the occupant walks.
22        Now I can't remember the question.
23     Q. Let me ask a different one then.
24     A. Okay.
25     Q. We've talked about several areas that you
                                              Page 42
```

```
 1  won't be testifying about. Another one is going to be
 2  accident reconstruction.
 3        We're not going to hear about Jerry
 4  Rosenbluth's accident reconstruction?
 5     A. Correct.
 6     Q. Let me ask you this: The report you authored
 7  in December of 2004, did you have the benefit of an
 8  accident reconstruction for that?
 9     A. I was looking at the date of Steve Irwin's
10  report. My recollection is no, but let me verify that.
11  I don't think I have Steve Irwin's report. I have his
12  deposition. And, obviously, I didn't have that at the
13  time I wrote my report. And the other issue was I had
14  the Mexican police report, but I didn't have that in a
15  translated format.
16     Q. And you don't read Spanish?
17     A. My Spanish is extremely weak.
18     Q. So the discussion of the accident that's
19  within your December 23rd, 2004 report's solely based
20  on your findings after the vehicle inspection; is that
21  fair?
22     A. Yes, for the most part.
23     Q. We had a little discussion before the
24  deposition. Is there anything that you would add or
25  explain about your report that's within Exhibit No. 2,
                                              Page 43
```

```
 1  as you sit here today?
 2     A. Well, there could be some confusion.
 3     Q. How so?
 4     A. I say in my report that it's a passenger side
 5  leading rollover event.
 6     Q. Yes.
 7     A. And then I continue to say that it's a
 8  clockwise rotation. In fact, it would be a clockwise
 9  rotation if you're looking at it from the front of the
10  vehicle, if you're sitting in the driver's seat -- I'm
11  sorry, if you're in front of the vehicle, it would be a
12  counterclockwise rotation. If you're sitting in the
13  seat, it's a clockwise rotation.
14     Q. Normally when you're writing a report, you
15  would orient yourself either looking at the back of the
16  vehicle or sitting in the driver's seat, would you not?
17     A. Normally you would orient it as sitting in
18  the driver's seat, that's correct.
19     Q. So to the extent that it says
20  counterclockwise rollover, and you look at it from that
21  perspective sitting in the driver's seat, that would be
22  incorrect, it's the passenger side leading roll, not a
23  driver's side?
24     A. That's correct.
25     Q. Anything else that you would amend or
                                              Page 44
```

11 (Pages 41 to 44)

**Page 49**

1  Q. His testimony was a little different than
2  that, wasn't it?
3  A. Slightly.
4  Q. About 2 inches and 45 pounds, right?
5  A. I don't think it was 45 pounds. 30
6  something, I think.
7  Q. Did Dr. Huston say 5-foot 6 and 165 pounds?
8  Is that right?
9  A. That is correct.
10 Q. So the surrogate you used was actually 35
11 pounds lighter than Ms. Payan?
12 A. No. According to Dr. Huston's testimony. I
13 don't know what his basis is for that. I'm telling you
14 what the basis is for my surrogate analysis. And I'm
15 saying that Ms. Payan is 51 years old, 5-foot 4 inches,
16 130 pounds. And I obtained that information from the
17 McAllen Medical Center records and her driver's
18 license.
19     So if you had a follow-up question for
20 Dr. Huston, you would want to know where the 5-foot 6
21 comes from and 165 pounds.
22 Q. Would you agree that the 2 inches of
23 difference and 35 pounds would have some effect on your
24 surrogate analysis?
25 A. Yes.

**Page 50**

1  Q. Being 2 inches taller and 35 pounds heavier,
2  you would get greater --
3  A. Excursion.
4  Q. -- excursion? Thank you for the word. Fair?
5  A. Yeah. Your seated height would probably be
6  three-quarters of an inch to an inch higher, and then
7  if you have the extra weight, you would get somewhat of
8  a greater excursion because you would have greater soft
9  tissue compression.
10 Q. Do you have an opinion as to what the
11 difference would have been in your surrogate analysis
12 in terms of, say, vertical excursion at 180 degrees
13 with an original equipment manufacturer condition and
14 seat lock-up, assuming a 5-foot 6 inch surrogate and
15 165 pounds?
16 A. You may have had head contact, but not
17 impact.
18 Q. And that's in a dynamic surrogate test?
19 A. Yeah. We're looking at test A-1, which is a
20 roll-induced lock-up. And so at zero degrees,
21 obviously sitting upright, with the vehicle upright, we
22 have 5-1/2 inches of vertical clearance between the
23 head and the roof structure. At 180 degrees, we had 2
24 inches of clearance.
25     So if we take the three-quarters to one

**Page 51**

1  inch -- let's just call it one inch for conversation's
2  sake -- we now have -- because she's an inch higher in
3  the seat, we only have one inch of clearance. And if
4  we address, let's say, one inch for the additional soft
5  tissue compression, then we would have contact with the
6  roof with a non-collapsed roof and an OEM seat belt.
7      If we then take that further towards test
8  A-2, A-3, et cetera, that becomes different.
9  Q. Okay. Would you agree that body compression
10 is generally greater for older occupants than younger
11 occupants?
12 A. Soft tissue?
13 Q. Yes.
14 A. It depends on how much tissue you have.
15     Are you saying that I compress more than you
16 do?
17     MR. MARTINEZ: Touché.
18     MR. PETERSEN: Yes.
19     Let the record reflect everybody in the room
20 is laughing.
21 Q. BY MR. PETERSEN: Seriously, if two people,
22 same height, same weight, one's 60, the other is 20,
23 you're generally going to get more compression in the
24 60-year-old than the 20-year-old, all other things
25 being equal?

**Page 52**

1  A. That really depends on the amount of soft
2  tissue on the individual. And if we're talking about
3  compression, it's not really that different, because
4  your -- the lap belt is around the hip structure, and
5  so that would be underneath the greater portion of my
6  weight, if we were to compare you and I.
7  Q. Have you had an opportunity to review the SAE
8  article that was published by Dr. Carly Ward on spit
9  tests and using female surrogates?
10 A. No.
11 Q. Would it surprise you to find that or know
12 that Dr. Ward found some difference, great difference
13 in body compression between men and women of the same
14 size, and finding more soft tissue compression in
15 women?
16 A. You're saying she found differences -- I have
17 not reviewed it, but you're saying that she found
18 differences in a 25-year-old woman versus a 50-year-old
19 woman who had the same height, the same seated height
20 and the same weight?
21 Q. That is not at all what I just asked. My
22 question was, as between men and women, would it
23 surprise you that she found greater soft tissue
24 compression in women than men, speaking in very general
25 terms?

**Page 57**

1 believe is most likely caused by this accident?
2  A. Aside from the traveler bar that we've
3 discussed, or load bar it's sometimes called, was there
4 any evidence on the seat belt buckle of loading?
5  Q. I'm just trying to short-circuit this and
6 say, in those other 30 photos that you have there of
7 the buckle assembly and travel bar assembly, other than
8 what we've already described as the load transfer and
9 the dimpling, for a more simplistic term, is there any
10 other physical evidence that you believe indicates
11 loading or impact or anything like that that's more
12 likely caused by this accident?
13  A. No.
14  Q. Okay. Now let's talk about the seat belt
15 webbing. What witness marks did you find on the seat
16 belt webbing?
17  A. There were multiple markings on the seat belt
18 webbing which were honestly difficult to discern. The
19 seat belt webbing post-accident was probably wrapped
20 around the B-pillar, went through the door window.
21     So we had various types of material transfer,
22 as well as cutting and things of that nature from the
23 shards of glass. But discerning through those
24 materials at approximately the 39-inch range, between
25 39 and 40, and approximately the 74-inch range, would

**Page 58**

1 be the latch plate and D-ring witness marks,
2 respectively.
3  Q. If we went through your photos, there may be
4 some markings on the belt that preceded 39 inches or
5 came between 40 and 74 inches, but any of those marks
6 you believe more likely than not were caused by storage
7 or something after the accident; is that fair?
8  A. Correct.
9  Q. Okay. So let's pick out the 39- to 40-inch
10 mark. Do you have a photograph of that?
11  A. Yes, I do.
12  Q. What photograph do you have there?
13  A. 1051 through 10 -- approximately 1058.
14  Q. And what evidence and witness marks do we see
15 in that photograph?
16  A. We're seeing abrasion.
17  Q. And you think that abrasion was made during
18 this accident from Ms. Payan loading the belt?
19  A. You're seeing two things. You're seeing a
20 loading and you're seeing abrasion, and the abrasion
21 was not caused during this accident. The loading is
22 much more subtle than that. And the loading is --
23 proof of the loading, as a matter of fact, would be the
24 witness marks and the striation pattern on the latch
25 plate webbing guide, as well as the B-pillar D-ring

**Page 59**

1 guide.
2  Q. I want to be clear. We're looking at
3 photograph 1056 and 1058 right now. Okay?
4  A. Correct.
5  Q. The striations that we see in 1058 on the
6 latch plate, would you agree that the deepest marks
7 there are not necessarily uniform in their direction
8 and their depth?
9  A. We're looking at 1058 and the markings that
10 you're pointing to on 1058, which would be on the latch
11 plate, which is in the lower portion of the photograph,
12 are not webbing load. I think that's where you're
13 going, and that's correct. Cut through the chase.
14  Q. Fair enough. You think those heavier marks
15 that are not uniform in their direction were probably
16 abrasions made at the same time the abrasions were made
17 to the webbing; is that right?
18  A. Probably.
19  Q. The load mark that's on the webbing, can you
20 identify that in 1056 or -58 for me?
21  A. The loading that I found in the 39-inch range
22 is going to be -- it's 39 in the area mostly shown on
23 1054, and it's a very slight abrasion and coloration
24 pattern. Also very difficult to get in the
25 photographs.

**Page 60**

1  Q. Did you find just one area, then, of loading
2 in that one inch between 39 and 40 inches for the latch
3 plate?
4  A. 39 -- yeah, pretty much between 39 and 40.
5 And I found that at the inspection of the belt. Then
6 when I did the surrogate analysis, I found that setting
7 our -- the seating -- incidentally, this is at the
8 latch plate. So that's what we're discussing.
9     I found 37-1/2 at zero degrees and 38.5 at
10 180, with the EOM belt, and that would be the test A-1,
11 which is the roll-induced ELR lock-up. And that's
12 pretty darn close. So I'm fairly happy with that.
13 Test A-1.
14     Test A-5 was actually setting the belt where
15 we had the lock-up at the D-ring and at the latch plate
16 on the subject belt.
17  Q. Okay. And I want to ask you about that, the
18 difference between -- that's test 1 and test 4 -- or
19 A-5. I'm sorry.
20  A. Right.
21  Q. Test A-5 was simply trying to model the latch
22 plate load mark, is that fair, that you actually found
23 on the subject belt?
24  A. Latch plate and D-ring load mark. The
25 purpose of A-5 was to match the marks we had on the

### Page 65

1  that you can't identify as being more likely than not
2  caused by Ms. Payan's imparting forces to the seat belt
3  in this accident?
4      A. True.
5      Q. Okay.
6      A. I photographed the non-load side, but that's
7  probably a moot point.
8      Q. Is it your assumption, Mr. Rosenbluth, that
9  this seat belt retractor locked and stayed locked
10 during the accident?
11     A. Was there a multiple lock-up? No, there was
12 a single lock-up.
13     Q. Thank you. In your inspections of the
14 vehicle, did you find any evidence of post-accident
15 modifications that were relevant to your opinions?
16     A. Let's say it made it difficult because the
17 seat belt was used to tie the door to the B-pillar on
18 the driver's side. And I won't say typically. You do
19 run across that periodically, and that's something the
20 recovery people do.
21         I'm not sure if you forgot to ask, but I'll
22 ask it anyway. There are also markings on the D-ring
23 webbing guide indicative of minor loading striation
24 patterns, aside from the ones you've identified which
25 were not loading.

### Page 66

1      Q. Let me stop you right there, Mr. Rosenbluth.
2  You're talking now about photographs 1163 through 1165,
3  correct?
4      A. Yes.
5      Q. And what you're indicating there is not the
6  D-ring, but actually the latch plate?
7      A. Correct.
8      Q. Okay. So when you said D-ring, you meant
9  latch plate?
10     A. Did I say D-ring?
11     Q. Yes.
12     A. That's correct, I meant latch plate.
13     Q. And the latch plate markings are the ones
14 that we discussed before the loading that you've
15 indicated that are not the heavy, inconsistent
16 striations, but the more consistent, same direction
17 striations on the load-bearing portion of the latch
18 plate; is that right?
19     A. That's correct.
20     Q. Okay.
21     A. There's a lot of different marks on the latch
22 plate, but certain of those marks, as indicated in 1165
23 and 1163 and 1164, specific markings are indications of
24 loading, which is then consistent with the traveler bar
25 or load bar, as well as consistent with the markings on

### Page 67

1  the D-ring.
2      Q. Let's take a look at the photographs of the
3  D-ring. You see load marks on the D-ring somewhere in
4  one of these photographs?
5      A. Yes. There are multiple striations going
6  right down the D-ring. The one that is not part and
7  parcel -- I'm looking at 1174 -- is the one which I've
8  got circled. They are not pronounced, but they're
9  definitely not wear marks. They're extremely light
10 load marks, and that is what I would expect to see. So
11 the point is that's consistent.
12         The next thing that we did, if you want to
13 ask me the question --
14     Q. Sure. What's the next thing that you did?
15     A. Okay.
16     Q. I don't even know why I show up sometimes.
17     A. Brad, I'm trying to get through it.
18         We tested the retractor for a lock-up doing a
19 tilt test, and the bottom line to that, without going
20 through all the degrees, that would be represented in
21 photographs 1185 through 1192, and that simply
22 indicates that we have a forward tilt or pitch, rear
23 tilt or pitch, right side tilt or pitch, left side tilt
24 or pitch, where the retractor is for the tilt test
25 locking up within OEM parameters. It's okay.

### Page 68

1      Q. No objections to the retractor and how it
2  performed as it was designed to perform?
3      A. Correct.
4      Q. I thought we covered that already. I'm happy
5  to see that you've got additional bases there to show
6  that it did just exactly what it was supposed to do.
7      A. We did our homework.
8      Q. All right. Fair enough.
9          Anything else you've done of inspections on
10 the subject vehicle's driver's side seat belt assembly
11 that we haven't discussed?
12     A. No.
13         MR. PETERSEN: Why don't we take a break.
14         (Recess taken at 12:26 p.m. to 1:30 p.m.)
15     Q. BY MR. PETERSEN: Before I forget it and
16 don't get back to it, you don't dispute that this 2000
17 Ford Explorer passed the applicable Federal Motor
18 Vehicle Safety Standards, correct?
19     A. It did.
20     Q. It did pass the Federal Motor Vehicle Safety
21 Standards?
22     A. Yes.
23     Q. It's your opinion that passing the Federal
24 Motor Vehicle Safety Standards is not enough to make it
25 reasonably safe and not defective; is that fair?

17 (Pages 65 to 68)

**Page 73**

1 Dr. Huston's answer to that question, was that he
2 thought it would make a significant difference, but he
3 couldn't quantify it.
4    Q. You don't have an opinion yourself as to
5 whether simply replacing the seat belt and seat system
6 in this Explorer with your reasonably safe alternative
7 design would have prevented the paralysis injury in
8 this case? You don't have an opinion on that today,
9 fair?
10    A. To a point I have an opinion, just short of a
11 biomechanical analysis, and that it would have at least
12 reduced or minimized the propensity for the
13 incapacitating C6-C7 injury mechanism.
14    Q. What's the basis for that opinion?
15    A. We have a roof collapse of approximately
16 9 inches, somewhat less, toward the B-pillar. And I
17 can do that and probably give you the exact numbers,
18 but let's just say approximately -- we have 5 inches at
19 the -- directly above the H point, and what we did do
20 was measure -- what we did was measure at that H point.
21    And you're getting somewhat less than
22 9 inches, but let's just go -- as we keep the occupant
23 just a little further back, as you get to the B-pillar,
24 you're probably at 5 inches, 6 inches, something like
25 that, in that order.

**Page 74**

1    We know that if we pretension, as we have
2 done so, statically, integrated EOR with an ETR
3 lock-up, and we're roughly with an ETR, at 180 we have
4 4-1/2 inches. Therefore, we have an inch or two of
5 displacement, which probably could be absorbed by the
6 human body, but, again, now we're teetering on the
7 biomechanical. I can only give you the measurements
8 and the data. I can't interpret that data
9 biomechanically, or at least I shouldn't. And I should
10 rely on Dr. Huston.
11    But when Dr. Huston stated that if we reduce
12 the roof crush, and we don't have to reduce that roof
13 collapse 100 percent, the further back we keep the
14 occupant toward the B-pillar, the less roof crush we
15 have to deal with.
16    In this instance, test A-2 with the ETR, we
17 had 4-1/2 inches of clearance. So if you get an inch,
18 2 inches, even, you may have a headache, but you're
19 surely not going to have a C6-C7 subluxation. So the
20 answer to your question is probably yes, with that
21 explanation.
22    Q. Okay.
23    A. The truth is I forgot the question.
24    Q. Let's talk a little bit more about your
25 surrogate testing, because that forms a large part of

**Page 75**

1 the bases for your opinions in this case, right?
2    A. True.
3    Q. The surrogate testing you did, you did five
4 different tests, right?
5    A. Correct.
6    Q. And all of those were done in a -- and
7 they're quasi-static tests?
8    A. Correct.
9    Q. The movement, for instance, if we use the
10 first test -- which was in original equipment
11 manufactured condition, right?
12    A. Correct.
13    Q. And you allowed that to simply lock up
14 through rolling the vehicle through its plane, right?
15    A. A roll-induced ELR lock-up.
16    Q. So at 180 degrees, you end up with your
17 surrogate with a head that's about 2 inches from the
18 headliner, is that right, the roof liner?
19    A. Correct.
20    Q. Now, you would expect that to be different in
21 a dynamic accident, right?
22    A. Sure. There's some differences, and don't
23 forget when you have the roof crush and you have that
24 9 inches of crush that we talked about, probably the
25 restitution is 10 to 15 percent. So there's another

**Page 76**

1 inch, more or less, that you need to deal with
2 dynamically.
3    Q. So let's break this down. As far as the
4 difference between your static test and what you would
5 expect dynamically in an accident, you have the roof
6 deformation because you're assuming a perfectly stiff
7 roof in your static test, right?
8    A. Correct.
9    Q. So you've got the raw roof intrusion,
10 wherever that is at the end of the accident, the static
11 deformation, fair?
12    A. You said the raw roof intrusion?
13    Q. Static. Using the -- synonymous with static.
14    A. Okay.
15    Q. And then you've got what you would do for a
16 dynamic intrusion, which you would include another 10
17 to 15 percent deformation.
18    Do you think that's fair?
19    A. That's plastic deformation versus elastic
20 deformation. So static and dynamic intrusion, same
21 thing. We're agreeing.
22    Q. All right. I'll go back to my question then.
23 Static deformation, then you've got dynamic, which is
24 about the static plus 10 to 15 percent. That's what
25 you're saying, right?

**Page 81**

1 person?
2   A. Correct, 2-inch seated height taller person.
3   Q. Which is roughly 4 inches taller, if you
4 split it between --
5   A. Roughly, sure.
6   Q. So we're talking about going from five-four
7 to five-eight or five-six to five-ten. In your case,
8 with this spit test, you used a five-four woman, so
9 that would just be up to five-eight. So a 95th
10 percentile male, now you're looking at adding 10
11 inches?
12   A. How tall is a 95th percentile male?
13   Q. Between six and six-two, is it not?
14   A. I'm not sure. I could look it up.
15   Q. As you sit here, you don't know?
16   A. I'm not going to guess at it.
17   Q. What if you got into that surrogate spit and
18 flipped yourself upside down at 180 degrees using your
19 ETR and SIR restraint system, is your head in contact
20 with the roof liner?
21   A. That would depend on my seated height or
22 upper trunk versus lower also.
23   Q. Have you done it yourself?
24   A. No.
25   Q. How come?

**Page 82**

1   A. I'm not brave.
2   Q. So you're willing to put a
3 20-something-year-old woman through this, but you're
4 not brave enough to do it yourself?
5   A. Well, we have done surrogate analyses here
6 with various employees, including Mr. Pollack, Sr., Tom
7 Pollack, Craig Pollack. So if I fit the bill for the
8 surrogate, we probably would use me.
9   Q. Okay.
10   A. Absolutely.
11   Q. So it's nothing about bravery. You don't
12 have hesitation of going and doing that?
13   A. No.
14   Q. You just haven't done it yourself?
15   A. There hasn't been a need to.
16   Q. All right.
17   A. I could prove to you the efficiency of the
18 system if you're willing to get in the buck right now.
19   Q. Once again, I'm asking the questions,
20 Mr. Rosenbluth.
21       MR. MARTINEZ: He's just trying to be
22 friendly.
23   Q. BY MR. PETERSEN: Mr. Rosenbluth, have you
24 seen or are you aware of any other expert or engineer
25 who has modeled seat-integrated restraints the same way

**Page 83**

1 you have, by cutting a hole in the seat?
2   A. Yes.
3   Q. Who?
4   A. Bill Muzzy.
5   Q. Anyone else?
6   A. I don't know one way or the other. I know
7 Mr. Muzzy did it because it was on a Bronco II and we
8 did the test for him, and he requested that we do that.
9   Q. Was it his idea to start doing that, where
10 you cut the hole in the back of the seat and loop it
11 through?
12   A. Who, Mr. Muzzy?
13   Q. Yes.
14   A. No.
15   Q. It was something that you came up with?
16   A. Yes.
17   Q. Now, when you did your seat-integrated
18 restraint test, which is A-2, it's in Exhibit 14, you
19 took out 3 inches of belt webbing; is that right?
20   A. The ETR, yes.
21   Q. ETR is?
22   A. Emergency tensioning retractor.
23   Q. The pretensioner?
24   A. Yes.
25   Q. Where did you get the 3 inches from?

**Page 84**

1       Where did the 3 inches come from,
2 Mr. Rosenbluth?
3   A. The seat belt webbing.
4   Q. I understand. As opposed to one inch, a
5 half-inch, 5 inches, where did the 3 inches come from?
6   A. Well, the maximum authority would be
7 6 inches, so I chose 50 percent of the maximum
8 authority.
9   Q. What is the maximum authority?
10   A. 6 inches.
11   Q. Where does the maximum authority come from?
12   A. Data that I've seen relative to pretensioner
13 seat belts.
14   Q. Have you done any dynamic testing of
15 pretensioners yourself?
16   A. No.
17   Q. You've reviewed Bob McCoy's pretensioner
18 presentation and testing, have you not?
19   A. Bob McCorey?
20   Q. McCoy, M-c-C-o-y. It was produced in this
21 case and has been in others. It's a presentation that
22 he gave to the Rollover Committee in 2004.
23   A. Produced in this case?
24   Q. Yes.
25   A. Is that the Chevy?

**Page 89**

1  record, the paper number is SAE 2002-01-0941.
2       Have you reviewed the SAE presentation -- I'm
3  sorry, SAE paper 2001-22-0009? It's the comparison of
4  thoracic injury risk in frontal crashes for occupants
5  restrained without load limiters and those restrained
6  with 6 kilonewton and 4 kilonewton belt load limiters.
7       Do you recall that paper?
8   A.  It doesn't come to the forefront of my hard
9  drive at this time.
10  Q.  You've never been against using load
11 limiters, right?
12  A.  No.
13  Q.  And the load --
14  A.  I mean, correct. I agree.
15  Q.  Right. And I think the limit that you said
16 before is somewhere in the 900 to 1,000 pound range?
17  A.  Correct.
18  Q.  And that's appropriate because it's kind of
19 the doctor-do-no-harm type philosophy, as much as you
20 can mitigate ride-down, particularly in frontal
21 accidents and things like that, that helps?
22  A.  At some point you have to give up the
23 restraint and give into the ride-down theory so that
24 you don't induce injuries.
25  Q.  For a 130-pound woman in a 3- to 5-G

**Page 90**

1  rollover, how much would you need to pretension a belt
2  in order to bring -- pull out 3 inches of belt webbing?
3  How much force would you need?
4   A.  Probably 30, 40 pounds. Not that much. I
5  mean, we do it here.
6   Q.  In a dynamic accident --
7   A.  And you're agreeing that we have a 130-pound
8  woman?
9   Q.  I'm not. I gave you an example.
10  A.  Okay.
11  Q.  Hypothetical.
12  A.  Just checking.
13  Q.  If the evidence bears out, Mr. Rosenbluth,
14 that Ms. Payan was actually 165 pounds instead of 130
15 pounds, you've already agreed that that's going to
16 affect your findings in the surrogate analysis, right?
17  A.  If that were to come to pass.
18  Q.  Yes.
19  A.  I think we can still rely on the surrogate
20 analysis done, but just to be on the safe side, I would
21 recommend to Mr. Martinez that we do another surrogate
22 analysis, and let's see what -- how the numbers differ,
23 if they do at all, if significantly.
24  Q.  So if you were using a buckle-based
25 pyrotechnic pretensioner in a high-speed rollover

**Page 91**

1  accident, like we have in this case, it's your
2  testimony, Mr. Rosenbluth, that the only force you
3  would need to generate with that pretensioner is merely
4  30 to 40 pounds to take out 3 inches of belt webbing to
5  keep Ms. Payan, assuming 130 pounds?
6   A.  Yes.
7   Q.  Why do you say that?
8   A.  Because she's not necessarily or
9  significantly out of position at the time the belt
10 pretensions.
11  Q.  Because it's a dynamic accident, she will be
12 loading the belt in advance of the pretensioner firing,
13 will she not?
14  A.  Not significantly. You've already locked it
15 up. You've already locked it up way before the trip
16 mechanism.
17  Q.  When you say locked it up, you mean the
18 retractor is locked before that point?
19  A.  You have web sensitivity and vehicle
20 sensitivity, so you have a retractor lock. As soon as
21 you have any type of acceleration to that system,
22 anything in the .3 to .7 G range, which is simply
23 moderate braking, so very early you have a lock-up,
24 then you have a pretension.
25  Q.  When during a rollover accident should a

**Page 92**

1  pretensioner fire, in your opinion?
2   A.  I'm sorry?
3   Q.  When during a rollover accident should a
4  pretensioner fire, in your opinion?
5   A.  At a point where the vehicle tip value --
6  well, the tip value is equal to at least one wheel
7  if -- definitely with both wheels off the ground. So
8  you're talking in a 10- to 15-degree range of lateral
9  tip --
10  Q.  Now --
11  A.  -- minus the suspension.
12  Q.  Sure. So if you're looking at a 10- to
13 15-degree of tip, in that area, that's when you want to
14 fire the pretensioner; is that right?
15  A.  10 to 15 degree after suspension elongation.
16 So you're probably going to be more like closer to 18
17 to 20 --
18  Q.  Okay.
19  A.  -- net, because a certain amount of that is
20 going to be taken up by the suspension.
21  Q.  So you're looking at 18 to 20 degrees?
22  A.  Net.
23  Q.  Now, there's going to be some time that needs
24 to elapse between when you decide to fire the
25 pretensioner and when the webbing actually comes out,

Page 97

1  the rollover actually confirms and is an event, then
2  the pyrotechnic device deploys the full pretensioner.
3  So there's two levels of pretension. That's the whole
4  purpose of the system.
5       To more directly answer your question, if the
6  rollover event doesn't happen and we electronically
7  have pretensioned the seat belt, the vehicle senses the
8  event will not happen and it releases the seat belt.
9       Q. When was the first case in which you adopted
10 this safe design approach as your reasonably safe
11 alternative design?
12      A. I'm sorry. Reasonably safe, alternative
13 design?
14      Q. Yeah. When did you adopt these Mercedes
15 safe-type approach as your alternative design to the
16 standard?
17      A. Probably sometime around 2000, is when I
18 learned about it. And all that testing and even
19 greater degree -- these aren't the only alternative
20 designs. We have the inflatable seat belt. We have
21 all kinds of things that could reduce the severity in a
22 rollover accident. We have the side air curtains,
23 which are the Bart-type air curtains like BMW uses.
24      There are many different designs, and I guess
25 my point is, when you have a vehicle -- and I know I'm

Page 98

1  treading on thin ice. When you have a vehicle that has
2  a high center of gravity, a short-wheel base, a narrow
3  track, and has a propensity to roll over, then you have
4  an even greater obligation to ensure -- if you have
5  that propensity, to ensure the safety of the occupants.
6       So there are many alternative designs that
7  could reduce, minimize, and potentially eliminate a
8  catastrophic injury mechanism to an occupant. That's
9  my only point.
10      Well made, but unresponsive.
11      Q. Object as non-responsive.
12      A. I made the objection for you.
13      Q. Is your ultimate end-of-the-day conclusion
14 from this surrogate testing actually that the most
15 effective seat belt system that you tested, at least
16 for the static test, was simply the pretensioner by
17 itself?
18      A. That's what it turned out to be.
19      Q. Is that consistent with the other tests that
20 you've run?
21      A. No. That's the way the data came out.
22      Q. And in previous tests, it's been, as I
23 remember it, the combination of both using the
24 seat-integrated restraint and the pretensioner that
25 minimized vertical excursion.

Page 99

1       A. Theoretically that's correct.
2       Q. Why in this case was it not by the order of
3  about an inch?
4       A. Oh, she may have been slightly out of
5  position or something like that. The way the data
6  comes out, it comes out. If you try to keep apples to
7  apples throughout your series of tests, it doesn't
8  always work out that way.
9       Q. You didn't do any video of your testing; is
10 that right?
11      A. No. The data is the data.
12      Q. Did you do any other spit tests for this
13 case, other than the A-1 through 3 -- or A-1 through 5,
14 excuse me?
15      A. No.
16      Q. Didn't do any pretest testing?
17      A. I'm not failure analysis. The answer is no.
18      Objection, non-responsive.
19      Q. Just to the comment about failure analysis.
20      A. A-1 through A-5. There's no test A-0.
21      MR. MARTINEZ: It may be minus one or minus
22 two.
23      A. A potential answer is by the time we got to
24 test A-3, A-4, she may have been stretching out a
25 little bit.

Page 100

1       Q. BY MR. PETERSEN: And that's a decent
2  question, or at least you spurred one in my mind. In
3  between each of these tests, did you have the model get
4  out of the vehicle?
5       A. No, but we let her rest for a minute or two.
6       Q. Unbuckled the belt and have her rest?
7       A. Yes.
8       Q. Get up out of the seat and move around a
9  little bit?
10      A. If she wanted to get out, that was fine.
11 Usually after two or three tests, then you should let
12 them out and walk around a little bit. It's really
13 difficult being upside down for that period of time.
14      Q. I was looking at the difference between test
15 A-1 and A-5 where you've added an additional couple of
16 inches at the D-ring. It looks like 3 inches at the
17 D-ring, from 71 to 74. Okay?
18      A. Correct.
19      Q. As to orient yourself.
20      A. Well, I added -- correct.
21      Q. The --
22      A. At the latch plate and the D-ring.
23      Q. Interestingly, though, the difference between
24 the buttock and the seat is still 2 inches?
25      A. That's what it was.

25 (Pages 97 to 100)

Gerald Rosenbluth Vol. 1

**Page 105**

 1  past to say that the seat-integrated restraint does not
 2  minimize occupant excursion. You just flat-out think
 3  that's wrong?
 4     A.  Totally wrong.
 5     Q.  So in the model year 2000, if Ford had used a
 6  seat-integrated restraint without a pretensioner, you
 7  think that would have been a reasonably safe design
 8  from a seat and seat belt system perspective?
 9     A.  It would have been a safer design. And your
10  question is -- you're trying to get this fine line of
11  saying what is defective, what is not defective, but
12  not the maximum protection. And those two things would
13  be the pretensioner and the integrated seat belt. And
14  I probably would go with the integrated seat belt, then
15  the pretensioner, then the pretension integrated.
16     Q.  And those three, the pretension integrated,
17  the pretension and the integrated, those three you
18  think are all reasonably safe and non-defective designs
19  from the seat and seat belt system perspective?
20     A.  Correct. But they go up in effectiveness.
21     Q.  All right. And I guess that's a valid point
22  that you bring out. I want to make sure that we're
23  both on the same page here.
24          It's not Jerry Rosenbluth's position that you
25  have to use the absolute maximum in safety on every

**Page 106**

 1  vehicle to be reasonably safe, but there's a certain
 2  level that you need to attain?
 3     A.  There's a level at which it becomes
 4  reasonably safe, and then there's a level that you
 5  would want as a vehicle to put your son or daughter in.
 6          And I make the point, and you know I truly
 7  respect and care for your compadre, Mr. Seitz, but you
 8  understand Mr. Seitz does drive a 2000 model year Ford
 9  truck with an integrated pretension seat belt in it.
10     Q.  The pretension seat that he was driving, at
11  least, didn't have a rollover sensor on it.
12     A.  Did he buy one with a rollover sensor now?
13     Q.  But while we're talking about family members
14  and cars that they drive, is your daughter still
15  driving the Ford van?
16     A.  Why do you pick on that daughter? She is an
17  aspiring up-and-coming person who is raising a family,
18  and she is just entering the real estate market. And
19  it's true, she drives a 2000 Ford Windstar.
20          My other daughter -- you don't have to ask
21  the question, I'll volunteer it. My other daughter
22  drives a 2005 XC 90 Volvo. And whenever I take the
23  grandchildren out, I drive my 2003 Mercedes ML 500,
24  which has pretension seat belts at all seating
25  positions, as does the Volvo, and side air bags, front

**Page 107**

 1  air bags, curtain air bags, and header air bags.
 2     Q.  Done?
 3     A.  When my granddaughter wants to ride in my
 4  defective pickup truck, I say no.
 5     Q.  Object to the non-responsive portion.
 6     A.  I think you suggested last time that I give
 7  my other daughter the Mercedes, didn't you? It was you
 8  or somebody else that said that.
 9          Take a short break?
10          MR. PETERSEN:  Yes, you bet.
11          (Recess taken at 2:40 p.m. to 2:51 p.m.)
12     Q.  BY MR. PETERSEN:  Talk a little bit about the
13  pretensioner that you would use if it were your
14  vehicle. Okay?
15     A.  Fair.
16     Q.  Would your pretensioner be stroke dependent
17  or load dependent?
18     A.  You said load dependent or --
19     Q.  Or force dependent. Stroke or force.
20     A.  Sure. It has to be, to some degree.
21     Q.  What would you use?
22     A.  I wouldn't use anything in excess of 200
23  pounds. So you basically have 200 pounds or 6 inches,
24  whichever comes first.
25     Q.  Would you use a 6-inch pretensioner? I know

**Page 108**

 1  that you said -- you referred to that before. Is that
 2  what you would use? Because I know there's a range
 3  from like 3 to 6.
 4     A.  I think that's really the maximum that you
 5  could possibly use, and I think that -- I don't believe
 6  you'll ever really get to 6 inches. You're not going
 7  to get much beyond 3 or 4 inches.
 8     Q.  And now the pretensioner that you've looked
 9  at with 6 inches, that's a buckle pretensioner, right?
10     A.  Well, buckle pretensioner's capable of
11  6 inches as well as retractor pretensioner's capable of
12  6 inches, sure.
13     Q.  The pretensioner with the 6-inch you're
14  referring to, though, is a buckle pretensioner?
15     A.  In this case?
16     Q.  Yes.
17     A.  Yes.
18     Q.  Would you use a buckle pretensioner or a
19  retractor pretensioner, or both, or does it matter?
20     A.  I think you can use either one and achieve
21  the same end. A buckle pretensioner would be slightly
22  faster relative to response time.
23     Q.  It used to be many moons ago that one theory
24  that plaintiff experts posited was the sliding latch
25  plate versus locking latch plate?

Gerald Rosenbluth Vol. 1

1 survive.
2   Q. That covers those two tests?
3   A. Yes.
4      MR. MARTINEZ: I think this may be an
5 appropriate time, Brad, that I do have an agreement
6 with Ford with regard to discovery, and it has been
7 informal discovery to this date, because I have signed
8 an agreement not to disclose any protected documents,
9 but there may be some documents which I will request
10 which I may give to the witnesses prior to trial.
11      MR. PETERSEN: Okay. I'm assuming that if
12 Mr. Rosenbluth, or whoever the experts are, that part
13 of that agreement is that you'll update counsel on
14 changes in those opinions or whatever.
15      MR. MARTINEZ: Of course.
16   Q. BY MR. PETERSEN: I'm assuming that you'll
17 read anything that Mr. Martinez sends to you by way of
18 additional documents or papers or anything like that?
19   A. Yes.
20      MR. PETERSEN: Go off the record for a
21 second.
22      (Discussion off the record.)
23   Q. BY MR. PETERSEN: Mr. Rosenbluth, you're not
24 a mechanical engineer?
25   A. Correct.

Page 113

1   Q. You've never taken an engineering course?
2   A. I've taken courses concurrent between
3 industrial design and technology and engineering.
4   Q. The courses that you took were with regard to
5 industrial design?
6   A. Arizona State University School of Education,
7 Division of Industrial Design and Technology, with the
8 specialization in automotive technology, and a minor in
9 physical sciences.
10      And I have a hunch you know the answers to
11 every one of these questions.
12   Q. You've never worked for an automobile
13 manufacturer as a full-time employee?
14   A. That's correct. I have worked for numerous
15 manufacturers in a litigation posture.
16   Q. Object to the non-responsive portion.
17      You've never worked as a full-time employee
18 for an automotive design component manufacturer?
19   A. Correct.
20   Q. Never worked as a full-time employee for
21 NHSTA?
22   A. Correct.
23   Q. The degrees you got from the Arizona State
24 University were from the School of Education?
25   A. Asked and answered. Yes.

Page 114

1   Q. You've not personally designed an automobile
2 or an automobile component?
3   A. False.
4   Q. What have you designed?
5   A. That's an interesting question, because
6 that's not the question you meant to ask, but that's a
7 good question. I have designed vehicles that have been
8 used in off-road racing, both track racing as well as
9 off-road racing. And I have designed those vehicles
10 and fabricated them from the ground up, and that
11 includes the frame, structures, suspension, seats, seat
12 belt, drive train, power train, the complete vehicle
13 designed and fabricated that have run the Las Vegas
14 500, the Baja 1000, that have been subjected to 10, 12,
15 15 rolls and never had an injury, not once.
16      Now that I've answered your question, the
17 question you meant to ask was, have I ever designed a
18 vehicle, a production vehicle, for a manufacturer. And
19 the answer is no.
20   Q. You've not designed a production vehicle that
21 reached the highways and byways of these United States?
22   A. Well, I've not designed a production vehicle
23 for sale to the general public.
24   Q. Not designed a seat belt or safety restraint
25 system that has made its way into a production vehicle

Page 115

1 to the consuming public?
2   A. Correct.
3   Q. You don't hold any patents?
4   A. Correct. That's my brother you're thinking
5 of.
6   Q. I was not. But you don't hold any patents
7 yourself?
8   A. Correct.
9   Q. You've not taught any design courses in the
10 area of seat belts or safety restraints, fair?
11   A. They've been part and parcel of a number of
12 courses I've taught on the junior college, technical
13 college and university level.
14      I think your question is that -- or the
15 question you want to ask is have I taught occupant
16 restraint design to engineers. And that answer is no.
17      I'm just trying to get to the point here.
18   Q. That sounds an awful lot like the question I
19 asked, so I'm not going to go back and ask it again.
20   A. There was a slight difference. The answer to
21 your question is yes. The answer to my question is no.
22 And the answer to our question is possibly.
23   Q. You've reviewed the reports, and in some
24 cases the depositions of experts retained by defense
25 counsel?

Page 116

29 (Pages 113 to 116)