```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF TEXAS

 3                 BROWNSVILLE DIVISION

 4

 5   ----------------------------------
                                       :
 6   ISABEL ENNIS REYNOSO, SALLY PAYAN :
     and ENRIQUE ROBERTO PAYAN,        :
 7                                     :
          Plaintiffs,                  :
 8                                     :
       vs.                             :CIVIL ACTION NO.
 9                                     :   B-03-120
     FORD MOTOR COMPANY and AUTOMOTRIZ :
10   DEL NORESTE, S.A. DE C.V.,        :
                                       :
11        Defendants.                  :
                                       :
12   ----------------------------------

13

14

15

16        Deposition of:   RONALD L. HUSTON, Ph.D., P.E.

17        Taken:           By the Defendants
                           Pursuant to Notice
18
          Date:            March 15, 2005
19
          Time:            Commencing at 9:10 a.m.
20
          Place:           Marriott Cincinnati Airport
21                         2395 Progress Drive
                           Hebron, Kentucky  41048
22
          Before:          Kimberly L. Wilson, CSR
23                         Notary Public - State of Ohio

24

25
```

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620   Cincinnati, Ohio  45202



EXHIBIT A

1    Q.   Before we wander too far off afield, let
2  me just ask you:  Will you be offering any expert
3  opinions in the area of vehicle dynamics, stability
4  handling or resistance to rollover?
5    A.   I don't believe so.  I mean, obviously
6  I'll answer any questions that somebody would ask me
7  to the best that I can, but my understanding of what
8  I've been asked to do is primarily the biomechanics
9  and injury causation.
10    Q.   And you have not -- strike that.  Have you
11  ever been qualified to testify as an expert witness
12  at the time of trial on issues related to rollover,
13  stability, resistance to rollover, vehicle handling,
14  vehicle dynamics?
15    A.   Well, I've testified about that on a
16  number of occasions.  I'm trying to think what I've
17  done at trial.  I probably have done that at trial as
18  well.
19    Q.   Okay.  And those cases would be on your
20  trial testimony list?
21    A.   Yes.
22    Q.   But it is not -- just so we're clear
23  here -- your intention to testify at the time of
24  trial that there is a stability defect in the Ford
25  Explorer involved in this accident, is it?

Page 38

1  testimony about that?
2       A.   As far as I know I'm not, that's correct.
3       Q.   Warnings or marketing?
4       A.   Right, I'm not doing that.
5       Q.   How about human factors?
6       A.   No, I don't believe so.
7       Q.   Statistics?
8       A.   No.
9       Q.   Summarize, if you would, for me your
10 opinions as they relate to the biomechanics and
11 kinematics of Betty Payan in this accident.
12      A.   Well, my opinions are really very simple
13 and perhaps of all the experts my opinions will be
14 the simplest.  It's my opinion that during this
15 rollover incident that she was the driver of the
16 vehicle, that it -- the vehicle rolled over passenger
17 side leading, that the -- that at the time of the
18 accident she was wearing her seat belt, that during
19 the accident sequence the roof on her side was
20 collapsed, that the roof came into contact with her
21 head and caused a compression subluxation injury
22 that's reported in the medical records.
23           And that's -- well, that's -- yes, that's
24 all, but let me amend that just a little bit more.
25 It's my opinion based upon also the surrogate study

1  that I did after the preparation of the report that
2  if in this instance the roof had not come down that
3  she would not have experienced the injuries that she
4  did and that depending upon the nature of the
5  restraint system, she would have been kept out of
6  harm to varying degrees.
7     Q.  Are you going to be offering any opinions
8  on reasonable alternative designs for the seat belt
9  system in the Explorer?
10    A.  No, I'm not going to do that.
11    Q.  All right.  We know a surrogate study was
12 performed at Mr. Rosenbluth's facility; is that
13 correct?
14    A.  Yes.
15    Q.  And I'm sorry, tell me the date again of
16 the surrogate study.
17    A.  Well, I've forgot it.  I think it was
18 November the 29th.  Let me look to be sure.  Yes, it
19 was November the 29th of last year.
20    Q.  Did you do a spit test?
21    A.  No.  No, this was not a spit test.  Well,
22 it was a -- it was a spit, but it was not a dynamic
23 test.  That is to say we put a surrogate in the
24 vehicle, took some measurements and then rolled it
25 over so that it was at 180 degrees and to that extent

Page 83

1    A.   No.
2    Q.   Can you say whether there was any slack in
3  the belt before the accident occurred?
4    A.   No.
5    Q.   Can you say whether there was any slack
6  introduced into the restraint system during the
7  accident sequence?
8    A.   No.
9    Q.   Was there any evidence of spool out or
10 improper performance of the restraint system as it
11 relates to the retractor?
12   A.   Not that I know of.  There may be evidence
13 to that, but I don't know -- I don't know the answer
14 to that.
15   Q.   Let's talk about Mrs. Payan's kinematics,
16 okay?
17   A.   Uh-huh.
18   Q.   What injuries did Mrs. Payan suffer in
19 this accident?  And --
20   A.   Let me switch here to different notes.
21 Are you ready?
22   Q.   Yes.
23   A.   Okay.  It's my belief that the most
24 significant injury that she had was a paralysis from
25 a spinal cord injury.  That in turn was due to a

Page 84

1  subluxation of C6 on C7 with C6 going forward of C7
2  or anterior to C7.  That is what is significant.
3  That led then to a paralysis or quadriplegia.
4              She had, however, other injuries which
5  were less -- lesser importance.  She had contusions
6  on her head and chest.  She had a rather significant
7  contusion on her right shoulder, her right knee and
8  her right forehead.  There was a bruising of her
9  upper chest and her left arm, right leg and her left
10 hand.
11       Q.   Let's --
12       A.   Let me just look at one other thing
13 before -- she had a hematoma of her duodenum.
14       Q.   Where's that?
15       A.   Well, as the stomach empties, the first
16 part of the small intestine is the duodenum, so that
17 would be more on the right side near the base of the
18 thorax.
19       Q.   Your report says subdural hematoma.  Where
20 is that?
21       A.   Well, a subdural hematoma is a brain
22 injury.  The dura matter covers the brain so that
23 would be underneath the dura matter so it would be
24 within the brain itself.
25       Q.   Do you know where --

Page 85

```
1        A.    No, I don't know.
2        Q.    -- where the location of that was on her
3   head?
4        A.    No, I don't know.
5        Q.    Okay.
6        A.    No, I don't know.  I don't have that.  I
7   think that's all that I have that's significant.
8        Q.    All right.  Let's talk about her cervical
9   injury.  She had a C6-7 cervical subluxation; is that
10  right?
11       A.    Yes.
12       Q.    In your report you mentioned bilateral
13  jumped, j-u-m-p-e-d, facets of C6-7.  What does that
14  mean?
15       A.    Well, the -- let me tell you what I think
16  that means.  I got that out of the medical records,
17  but what I understand that to mean is that the
18  vertebrae, of course, sit one on top of another and
19  in the cervical spine they're numbered from top down
20  and there are seven of them, so that this would be
21  the bottom cervical vertebrae and the one on top of
22  it.  The sixth one then would have been moved forward
23  onto the seventh one so much that the facets which
24  come out of the back would have -- the facets of six
25  would have come forward on the facets of seven and
```

1    A.   No, that would just be the whole spine
2    itself and I don't know the distinction.
3        Q.   So you can't tell me the specific amount
4    of force necessary to cause the type of fracture that
5    Mrs. Payan sustained in this accident, right?
6        A.   Yes. As a matter of fact, I don't even
7    know if it was characterized as a fracture as much as
8    it was a displacement or subluxation.
9        Q.   So you can't tell me specifically how much
10   force was necessary to cause that injury; is that
11   true?
12       A.   Yes.
13       Q.   Have you seen the same type of injuries
14   sustained by Mrs. Payan in other accidents involving
15   belted occupants or is this the first time you've
16   seen this specific injury?
17       A.   No, I've seen this on other occasions. As
18   I look at my notes here, I may have misspoke earlier.
19   There was a compression fracture at C7, but in --
20   yes, I have seen this on other occasions.
21       Q.   Okay. And I know you said you didn't do
22   any testing specifically for this case to support
23   your theory of the mechanism of injury, but did you
24   do any testing in the other cases that -- case or
25   cases that you've seen this same type of injury occur